### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORTHWEST IMMIGRANT<br>RIGHTS PROJECT,<br>    615 2nd Avenue, Suite 400<br>    Seattle, WA 98104, | )<br>)<br>)<br>)<br>) | |
| AYUDA, INC.,<br>    6925 B Willow Street NW<br>    Washington DC 20012, | )<br>)<br>)<br>) | |
| AND | )<br>) | |
| CASA DE MARYLAND, INC.,<br>    8151 15th Avenue<br>    Langley Park, MD 20783, | )<br>)<br>)<br>) | Case No. 19-cv-03283-RDM |
| Plaintiffs, | )<br>)<br>) | |
| v. | )<br>) | |
| UNITED STATES CITIZENSHIP<br>AND IMMIGRATION SERVICES,<br>    c/o USCIS<br>    Office of the Chief Counsel<br>    20 Massachusetts Avenue, NW<br>    Room 4210<br>    Washington, DC 20529, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| DEPARTMENT OF HOMELAND<br>SECURITY,<br>    c/o Office of the General Counsel<br>    U.S. Department of Homeland Security<br>    2707 Martin Luther King Jr. Ave, SE<br>    Washington, DC 20528-0485, | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| CHAD F. WOLF, in his official capacity<br>as Acting Secretary of Homeland Security,<br>    c/o Office of the General Counsel<br>    U.S. Department of Homeland Security<br>    2707 Martin Luther King Jr. Ave, SE<br>    Washington, DC 20528-0485, | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| AND | )<br>)<br>) | |

| | |
|---|---|
| KENNETH T. CUCCINELLI, in his | ) |
| official capacity as Senior Official | ) |
| Performing the Duties of the USCIS | ) |
| Director and Senior Official Performing the | ) |
| Duties of the Deputy Secretary of | ) |
| Homeland Security, | ) |
|     c/o USCIS | ) |
|     Office of the Chief Counsel | ) |
|     20 Massachusetts Avenue, NW | ) |
|     Room 4210 | ) |
|     Washington, DC 20529, | ) |
| | ) |
|           Defendants. | ) |

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.  This suit challenges a series of actions by the Department of Homeland Security (DHS) that make it significantly more difficult and expensive for immigrants to apply for vital immigration benefits: naturalization, employment authorization, asylum, and others. In October 2019, DHS component United States Citizenship and Immigration Services (USCIS) purported to narrow the ways in which individuals can qualify for waivers of USCIS's substantial application fees. Then, in August 2020, DHS issued a new rule that would codify many of the changes that USCIS had sought to make without rulemaking. DHS's rule also took USCIS's approach further. It eliminated fee waivers for all but a few narrow categories of immigrants. To make more individuals pay immigration fees, DHS created new charges, including a fee to apply for asylum. DHS also raised existing fees, in some cases, by more than 500 percent. Under DHS's new rule, immigrants seeking humanitarian protections, legal authorization to work and live in the United States, or citizenship will face fees that can be more than $1,000 greater than what they would have to pay under current law.

2

2.      DHS expects that its new rule will force immigrants to pay a combined total of about $1 billion in extra fees to USCIS per year, to fund operations that DHS does not explain and to raise money against an outdated estimated budget.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

4.      Venue is proper under 28 U.S.C. § 1391(e).

## PARTIES

5.      Plaintiff Northwest Immigrant Rights Project (NWIRP) is a nonprofit legal services organization founded in 1984 to defend and advance the rights of immigrants. To further its mission, NWIRP provides direct legal representation and consultations in immigration matters to thousands of low-income individuals each year. NWIRP also provides immigration-related advice and information through community-based know-your-rights presentations and trainings offered to service providers and attorneys.

6.      Through its direct legal services, NWIRP helps low-income individuals seeking to apply for a range of immigration benefits, including visas, asylum, employment authorization, lawful permanent residence, and naturalization. It prioritizes serving individuals who are in vulnerable circumstances or who face complex legal issues, including those who have been impacted by the criminal legal system.

7.      NWIRP's work includes helping survivors of domestic and sexual violence gain access to humanitarian protections. Principally, NWIRP represents these individuals in filing applications and petitions for benefits under the Violence Against Women Act (VAWA), a statutory framework that allows survivors of domestic abuse to apply for lawful permanent residence without having to rely on their abusers; T or U visas, immigration benefits that Congress

created to help survivors of human trafficking or crimes; and employment authorization or lawful permanent residence.

8.     NWIRP also assists individuals who are seeking naturalization, many of whom have a disability or face other circumstances that may make the naturalization process complicated.

9.     Additionally, NWIRP represents individuals who are in immigration detention. Among other things, NWIRP helps these clients apply for immigration benefits and, in removal proceedings, seek asylum, withholding of removal, and protection under the Convention Against Torture.

10.     Further, NWIRP helps other individuals seeking asylum; children and youth seeking Special Immigrant Juvenile Status, an immigration benefit available to those who were abandoned, abused, or neglected by their parents; and others.

11.     NWIRP serves the community from four offices spread across Washington State. Because of the high demand for its services, NWIRP maintains waiting lists of individuals seeking its services.

12.     Plaintiff Ayuda, Inc. is a nonprofit with offices in Washington, D.C., Virginia, and Maryland, whose mission is to advocate for low-income immigrants through direct legal, social, and language services, training, and outreach. Ayuda envisions a community where all immigrants succeed and thrive in the United States. Ayuda's direct legal services include helping individuals seek a wide range of immigration benefits, including T visas, U visas, VAWA-related benefits, asylum, adjustment of status to lawful permanent residence, naturalization, employment authorizations, and replacements of permanent resident cards. Ayuda also provides clients with representation in immigration court removal proceedings.

13.     Plaintiff CASA de Maryland, Inc. (CASA) is a nonprofit, membership-based immigrant rights organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, and Pennsylvania. Its mission is to create a more just society by building power and improving the quality of life in low-income immigrant communities. To further this mission, CASA offers a wide variety of services to immigrant communities. These services include helping members apply for citizenship through an integrated program that includes naturalization application assistance, financial education, civics courses, legal support, and English instruction. Across its programs, a core focus of CASA's work is helping immigrants gain the right to vote.

14.     Defendant DHS is an agency of the federal government, whose components include USCIS, U.S. Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE). DHS has authority to promulgate regulations regarding immigration law and promulgated the August 3, 2020 rule at issue in this case.

15.     Defendant USCIS adjudicates applications for lawful permanent residence, naturalization, employment authorization, and other immigration benefits, including asylum, SIJS, VAWA self-petitions, and T and U visas. Under regulation, USCIS charges filing fees for a number of immigration-benefit applications but allows waivers of certain such fees.

16.     Defendant Chad F. Wolf holds the title of acting DHS secretary.

17.     Defendant Kenneth T. Cuccinelli holds the titles within DHS of senior official performing the duties of the deputy secretary and senior official performing the duties of the director of USCIS.

## BACKGROUND

18.     Each year, immigrants submit millions of applications to USCIS for immigration benefits that can transform their lives. These benefits include humanitarian benefits, such as T and U visas, VAWA self-petitions, asylum, and SIJS; employment authorization and lawful permanent

residence, which establish individuals' right to live and work in the United States; and naturalization, which enables individuals to become citizens and fully participate in American life, including by voting.

19.     USCIS charges significant application fees for some benefits. For example, under the agency's 2016 fee schedule, it charges $1,140 to apply to become a lawful permanent resident; $410 to request employment authorization; up to $455, plus an $85 biometrics fee, to replace a permanent resident card; and up to $640, plus an $85 biometrics fee, to apply for naturalization. Under that schedule, the agency also charges $700 for an appeal in a naturalization matter, $675 for an appeal on a VAWA self-petition or T or U visa, and $930 for an application for a waiver of inadmissibility, which often accompanies a T or U visa application.

20.     For low-income individuals, USCIS application fees can be an insurmountable obstacle to applying for benefits.

21.     Forgoing an immigration-benefit application because the fee is too expensive can lead to devastating consequences for individuals. For example, a delay in seeking humanitarian benefits can mean that a survivor of domestic violence or trafficking will suffer longer at the hands of an abuser, without access to legal rights and protections. A delay in seeking to naturalize can mean missing the right to vote in upcoming elections or losing access to public benefits that depend on recipients naturalizing by a certain date. And in multiple circumstances, missing a filing deadline can mean that an individual loses the chance to receive the immigration benefit altogether.

22.     As a result, no-fee filings, affordable fees, or fee waivers are often essential to allow low-income immigrants reasonable access to vital immigration benefits.

## I. IMMIGRATION FEES AND FEE WAIVERS

### A. USCIS funding sources

23.     DHS sets USCIS application fees under the Immigration and Nationality Act (INA), 8 U.S.C. § 1356(m). That provision creates an Immigration Examination Fee Account (IEFA), directs that "adjudication fees as are designated by the Attorney General in regulation" be deposited into the IEFA, and allows that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services" and "any additional costs associated with the administration of the fees collected." Section 1356(n) similarly states that IEFA funds are available "to reimburse any appropriation … for expenses in providing immigration adjudication and naturalization services and the collection, safeguarding and accounting for fees deposited in and funds reimbursed from" the account.

24.     In addition to receiving standard USCIS application fees, the IEFA receives premium processing fees paid by employers, *id.* § 1356(u), fees paid by immigrants to the Department of Justice (DOJ) Executive Office of Immigration Review (EOIR), and fees paid by individuals seeking genealogy information, *id.* at § 1356(t)(1).

25.     USCIS also receives funding from sources other than IEFA, including funds appropriated by Congress and employer-paid fees that are designated for fraud prevention and detection and other purposes. *See id.* § 1356(s), (v).

### B. Fee-Waiver Statutes and Regulation

26.     DHS is not required to charge the full range of fees that it has set for USCIS. Though the INA may permit DHS to charge enough USCIS fees to recover the full cost of immigration adjudication and naturalization services, the INA does not require DHS to set fees at this level. The INA also recognizes that immigration services can be "provided without charge to

asylum applicants or other immigrants," *id.* § 1356(m), specifies certain fee exemptions or fee caps, *e.g.*, *id.* § 1439(b)(4), and requires that DHS "shall permit" individuals seeking or holding certain forms of humanitarian benefits "to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status," *id.* § 1255(*l*)(7).

27.    In 2010, as part of a fee-schedule revision, DHS revised its rule on fee waivers. Under the principal fee-waiver provision, 8 C.F.R. § 103.7(c), USCIS can waive listed fees if the requester is "unable to pay" and a waiver "is consistent with the status or benefit sought." *Id.* § 103.7(c)(1). To apply, an individual must "submit a written request" that "state[s] the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated." *Id.* § 103.7(c)(2). The regulation permits a wide range of applicants to seek fee waivers for a wide range of applications.

28.    In 2016, DHS adopted another comprehensive revision to its fee schedule through a rule that took effect on December 23, 2016. *See* 81 Fed. Reg. 73,292 (Oct. 24, 2016). That rule created a new, reduced fee for low-income naturalization applicants, and did not change the principal fee-waiver regulation that had been adopted in 2010.

29.    Through fiscal year 2020, DHS's December 23, 2016 fee schedule remained in place, except for inflation adjustments to premium processing fees and fees added by new rules.

**C. USCIS's Fee-Waiver Practice, 2011-2019**

30.    Following DHS's 2010 revision of the fee-waiver regulation, USCIS released a memorandum (2011 Memorandum) amending its Adjudicator's Field Manual and titled "Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to *Adjudicator's Field Manual* (*AFM*) Chapter 10.9, *AFM* Update AD11-26," https://www.uscis.gov/

sites/default/files/USCIS/Laws/Memoranda/2011/March/FeeWaiverGuidelines_Established_

by_the_Final%20Rule_USCISFeeSchedule.pdf.

31.     The 2011 Memorandum was binding on USCIS employees.

32.     The 2011 Memorandum stated that "[a] fee-waiver request may be granted when

USCIS has determined that the individual is unable to pay the fee," *id.* at 5, and explained that

USCIS would generally review fee waiver requests under 8 C.F.R. § 103.7(c) "by considering, in

a step-wise fashion," whether the individual fell into one of three categories. 2011 Memorandum

at 2. First, USCIS would consider whether the individual was receiving a means-tested benefit: a

benefit such as Medicaid or Supplemental Security Income for which eligibility, the amount, or

both "are determined on the basis of the person's income and resources." *Id.* at 5. If so, "the fee

waiver [would] normally be approved." *Id.* Second, USCIS would consider whether household

income was at or below 150 percent of the federal poverty guidelines. *Id.* at 6. If so, "the fee waiver

[would] normally be approved." *Id.* at 7. Third, USCIS would consider whether the individual was

suffering financial hardship "that renders the individual unable to pay the fee." *Id.* at 7.

33.     The 2011 Memorandum included other material, including material regarding

humanitarian fee waivers under 8 U.S.C. § 1255(*l*)(7), and material regarding the processing of

fee waiver requests.

34.     The three-part framework set forth in the 2011 Memorandum was reflected in form

I-912, which individuals could use to request fee waivers under 8 C.F.R. § 103.7(c). But the 2011

Memorandum stated that "the use of a USCIS-published fee-waiver request form is not mandated

by regulation," 2011 Memorandum at 2, and USCIS did not require fee-waiver applicants to use

the I-912 form for fee-waiver requests.

35.     USCIS also did not require applicants seeking fee waivers based on their income or hardship to obtain and submit documents from the IRS or provide any other specific form of documentation. Additionally, USCIS permitted family members to submit one joint fee-waiver application for immigration applications that included derivative family members.

36.     Under the 2011 Memorandum's framework, the first category—receipt of means-tested benefits—was the most common way for individuals to establish their eligibility for USCIS fee waivers. The second category—the income standard—was also used, but far less frequently. Individuals rarely received fee waivers with eligibility based on the third category—financial hardship.

37.     For instance, a 2017 USCIS study showed that, among granted fee-waiver requests, 71.9 percent relied on means-tested benefits to establish eligibility and 26.9 percent were based on income, leaving less than two percent that established eligibility based on financial hardship.

38.     Submitting a fee-waiver application based on receipt of a means-tested benefit was the easiest and most reliable way to seek a fee waiver under the 2011 Memorandum. Both completion of the application and USCIS's adjudication of the request tended to be quick. Further, USCIS reliably granted fee-waiver applications accompanied by proof of means-tested benefits.

39.     By contrast, fee-waiver applications based on individuals' income or financial hardship often took longer to prepare, required more time for USCIS to adjudicate, or involved a higher risk of denial, including because the hardship standard is vague and applicants were often left in the position of proving a negative—the absence of financial resources to afford the fees.

40.     The amount of time it takes for an individual to prepare, and for USCIS to adjudicate, a fee-waiver application can be critical for individuals seeking access to immigration benefits because when USCIS denies a fee-waiver request, it returns the applicant's underlying

petition or application. Although the individual may resubmit the petition or application, USCIS considers the filing date to be the date of the resubmission, not the date of the original submission. Thus, if USCIS rejects an individual's fee-waiver request, that action can make the applicant miss any filing deadline that arose while the fee-waiver request—with the underlying benefits application—was pending. Even if the applicant re-submits the benefit request with payment, it could be considered untimely.

41.     Under the 2010 fee-waiver regulation and 2011 Memorandum framework, USCIS waived between 400,000 and 600,000 fees during each of the last several years. From 2017 to 2019, the volume of fee waivers that USCIS granted decreased by about 30 percent.

## II. 2019 ACTIONS TO NARROW FEE-WAIVER ELIGIBILITY

### A. USCIS's Process for Changing the Fee Waiver Standard

42.     In October 2019, USCIS changed the I-912 form and the form's instructions, set the 2011 Memorandum to expire, and added new sections to its Policy Manual.

43.     These actions (collectively, October 2019 fee-waiver actions) significantly narrowed USCIS's principal fee-waiver eligibility standard. They restricted eligibility to (1) individuals with documented household income at or below 150 percent of the federal poverty guidelines or (2) individuals suffering demonstrated financial hardship. Further, they limited eligibility to those who show their income or hardship with specified types of documents. Under the new system, receipt of a means-tested benefit cannot establish an individual's eligibility for a fee waiver; an individual receiving such benefits and earning just over 150 percent of the federal poverty guidelines may receive a fee-waiver only after establishing financial hardship in accordance with the form I-912 instructions.

11

44.     Rather than promulgating a rule change using notice-and-comment rulemaking, USCIS purported to adopt the new I-912 form and instructions under the Paperwork Reduction Act (PRA), a statutory scheme that provides for Office of Management and Budget (OMB) approval of agency-required collections of information.

**(1) First Paperwork Reduction Act Notice**

45.     On September 28, 2018, USCIS published in the Federal Register its first PRA information-collection notice indicating that it proposed to change the I-912 form and rescind the 2011 Memorandum. *See* 83 Fed. Reg. 49,120 (Sept. 28, 2018).

46.     The September 2018 notice stated that "[t]he proposed revision would reduce the evidence required for Form I-912," by "no longer requir[ing] proof of whether or not an individual receives a means-tested benefit." *Id.* at 49,121.

47.     The September 2018 notice additionally stated that "USCIS has found that the various income levels used in states to grant a means-tested benefit result in inconsistent income levels being used to determine eligibility for a fee waiver," and that "[t]herefore, the revised form will not permit a fee waiver based on receipt of a means-tested benefit, but will retain the poverty-guideline threshold and financial hardship criteria." *Id.*

48.     The September 2018 notice did not provide any other information to support or explain its assertion about states' benefits practices, did not discuss any other proposed changes to the I-912 form or its instructions, and did not discuss alternative ways to address the purported concern it raised.

49.     After publishing the September 2018 notice, USCIS posted materials online that showed specific proposed changes to the I-912 form and its instructions. Those materials made clear that USCIS was not proposing to reduce the evidence required to apply for a fee waiver.

Instead, USCIS sought to make the standard for qualifying for a fee waiver stricter and more demanding. Principally, the proposed changes would:

    a. Eliminate individuals' ability to qualify for fee waivers based on their receipt of means-tested benefits.

    b. Require that individuals seeking to qualify for fee-waivers based on their income or financial hardship submit certain specified documentation, including, in many cases, tax transcripts or other documentation that individuals would have to obtain from the IRS.

    c. Require individuals to submit fee waiver requests on the I-912 form and to do so individually, rather than combining family members' submissions into one.

50.     USCIS received 1,198 comments in response to its September 2018 notice.

**(2) Second Paperwork Reduction Act Notice**

51.     On April 5, 2019, USCIS published in the Federal Register a second PRA information-collection notice regarding its proposal to change the I-912 form and rescind the 2011 Memorandum. *See* 84 Fed. Reg. 13,687 (Apr. 5, 2019).

52.     Similarly to the September 2018 notice, the April 2019 notice described the proposed changes as ones that "would reduce the evidence required for a fee waiver" and stated that the agency "found that the various income levels used in states to grant a means-tested benefit result in inconsistent income levels being used to determine eligibility for a fee waiver." *Id*.

53.     The April 2019 notice did not provide any information to support or explain its assertion about states' benefits practices, did not discuss any other proposed changes to the I-912 form or its instructions, and did not discuss alternative ways to address the purported concern it raised.

54.     With the April 2019 notice, USCIS again posted materials online showing the details of its proposed revisions. The agency's April 2019 proposal was similar to its September 2018 proposal, but some aspects were changed.

55.     USCIS also posted a document styled as a summary of and response to comments regarding the September 2018 notice.

56.     OMB and USCIS received 1,240 comments in response to the April 2019 notice.

**(3) Third Paperwork Reduction Act Notice**

57.     On June 5, 2019, USCIS published in the Federal Register a third PRA information-collection notice indicating that it proposed to change the I-912 form, rescind the 2011 Memorandum, and issue new guidance. *See* 84 Fed. Reg. 26,137 (June 5, 2019).

58.     Unlike the prior notices, the June 2019 notice described the proposed I-912 changes as "removing the means-tested benefit as a criterion in [the agency's] fee waiver request determinations, requiring the submission of Form I-912 to request a fee waiver, and clarifying what the evidentiary [sic] that will be considered for a fee waiver." *Id.* at 26,138.

59.     The June 2019 notice also provided a new reason for the proposed I-912 changes: limiting the number of fees waived. The notice stated: "USCIS has determined that without changes to fee waiver policy it will continue to forgo increasing amounts of revenue as more fees are waived. As a result, USCIS expects that DHS will be required to increase the fees that it charges for benefit requests for which fees are not waived." *Id.* It went on to state that: "In addition to curtailing the rising costs of fee waivers, this proposed policy change is intended to introduce more consistent criteria for approving all fee waivers. USCIS has found that the various income levels used in states to grant a means-tested benefit result in inconsistent income levels being used to determine eligibility for a fee waiver." *Id.* at 26,139.

60.     The June 2019 notice did not include any data or analysis to support or explain its assertion about USCIS fees and revenues, did not describe any proposed changes to the I-912 form other than the elimination of the means-tested benefit application-category, and did not discuss alternative ways to address the purported concerns it raised.

61.     The agency again posted materials online showing its proposed revisions. Those materials did not reflect substantive changes from those posted in April 2019.

62.     OMB and USCIS received 617 comments in response to the April 2019 notice.

**(4) Submission to OMB and OMB Approval**

63.     On October 16, 2019, USCIS submitted to OMB the proposed changes to USCIS's I-912 form and the form's instructions, for approval under the PRA as revisions to the agency's fee-waiver information-collection.

64.     USCIS's submission to OMB included documents styled as responses to the public comments received in response to the Federal Register notices and a "Supporting Statement" that included estimates of the information-collection burden and other OMB-required information.

65.     USCIS's submission to OMB also included a certification that the revised information collection satisfied certain PRA requirements.

66.     On October 24, 2019, OMB approved the proposed changes, despite concluding that USCIS had failed to comply with the Government Paperwork Elimination Act, Pub. Law No. 105-277, div. C, tit. XVII, 112 Stat. 2681, 2681-749 (1998).

67.     On October 24, 2019, USCIS adopted the new I-912 form and instructions, which are very similar to those that USCIS published in connection with the June 2019 Federal Register notice.

68.     On or about October 25, 2019, USCIS:

a. Published the new I-912 form and instructions online.

b. Released new sections in volume 1, part B of its online Policy Manual, which had not been submitted to OMB: chapter 3, regarding fees, and chapter 4, regarding fee waivers, to supersede sections 10.9 and 10.10 in the Adjudicator's Field Manual and related material.

c. Announced that on December 2, 2019, the new Policy Manual chapters would be effective and the October 2019 I-912 form would be required; similarly, USCIS would cease applying the 2011 Memorandum to fee-waiver applications postmarked on or after that date.

**B. The 2019 Fee-Waiver Standard**

69.    As revised in October 2019, the I-912 form and instructions establish a new, stricter standard for individuals to be eligible for fee waivers.

70.    USCIS intended the new standard to conclusively determine eligibility for fee waivers under 8 C.F.R. § 103.7(c).

71.    First, to establish eligibility, each applicant must show household earnings at or below 150 percent of the federal poverty guidelines or financial hardship. Receipt of a means-tested benefit cannot establish eligibility, even if such benefit was based on an income standard that is consistent with the fee-waiver standard and even though receiving such a benefit demonstrates that a government agency has already determined that the individual has limited financial means.

72.    Second, to establish eligibility based on income or hardship, individuals must obtain and submit certain types of required documentation. For example:

16

a.  In most circumstances, individuals applying based on their household income must obtain from the IRS and submit tax transcripts or other IRS documentation regarding themselves and their household members. If individuals do not have income or are unable to provide proof of income, they must submit "documentation from the IRS that indicates no tax transcripts and no W-2s were found," as well as a description "in detail" of their situations. If household members paid taxes to foreign countries or U.S. territories, individuals may be required to obtain and submit tax transcripts from the relevant foreign countries or U.S. territories. USCIS, *Request for a Fee Waiver*, *Form I-912 Instructions*, at 6 (Oct. 24, 2019).

b.  Individuals that have or are applying for VAWA benefits or T or U visas can submit the revised I-912 form without certain required documentation, but only if they lack income or proof of income "due to [their] victimization," substantiate both their inability to pay and their inability to obtain documents, and "provide any available documentation of … income, such as pay stubs or affidavits from religious institutions, non-profits, or other community-based organizations verifying that [the applicant is] currently receiving some benefit or support from that entity and attesting to [the applicant's] financial situation." *Id.* at 8, 9.

c.  In general, applicants cannot satisfy the revised standards by submitting state or federal agencies' benefit determinations or copies of filed tax forms.

73.  Third, under the revised standard, each applicant must complete the I-912 form, individually, to apply for a fee waiver.

17

74.     Fourth, the new standard requires other new information from applicants, including answers to questions about whether they and their family members filed tax returns and if not, why not.

75.     Some otherwise-eligible individuals will not be able to apply under the new standard established by the October 2019 form because the required documentation is unavailable. For example, in some circumstances, the IRS does not provide required documents, including "documentation … that indicates no tax transcripts or W-2s were found," as quickly as necessary to meet short USCIS filing deadlines.

76.     The October 2019 Policy Manual revisions include material in addition to the requirements of the revised fee-waiver form and instructions. For example, they address scenarios, such as applications from children in foster care, that the revised I-912 form and instructions do not describe.

77.     Chapter 4 of the new Policy Manual states an interpretation of 8 U.S.C. § 1255(*l*)(7), which requires DHS to permit fee-waiver applications for "any fees associated with filing an application for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under" certain enumerated statutory provisions. Without any explanation, reference to the existing fee-waiver regulation, or discussion of the agency's earlier interpretation of the statute, the chapter states that USCIS interprets this mandate "to mean that, in addition to the primary benefit request, an applicant who files any form that may be filed with the primary benefit request or the adjustment of status application must be provided the opportunity to file a fee waiver." USCIS, *Policy Manual, Chapter 4-Fee Waivers* (2019).

78.     USCIS's Policy Manual is binding on USCIS officers.

**C. USCIS's Attempts to Justify Its Narrowed Fee-Waiver Standard**

79.     In its Federal Register notices, USCIS asserted shifting and incomplete justifications for changing the I-912 form and its instructions and rescinding the 2011 Policy Memorandum.

80.     In material submitted to OMB, USCIS asserted other reasons for the changes. For example, USCIS suggested that it should not allow applications based on means-tested benefits because:

> a.  Commenters' strong opposition to the proposed changes, growth in the economy and incomes, growth in fee waivers, and a decrease in unemployment together indicate that "means tested benefits are too easy to obtain for them to be good indicators of true inability to pay a USCIS fee." USCIS, *All Comments & Responses, 84FR13687* (at row 71), available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201910-1615-006.

> b.  The dollar-value of fee waivers granted has increased during an economic growth cycle; and in a different rulemaking, another federal agency is attempting to cut back on states' flexibility to raise the income or asset limits for applying for food assistance.

> c.  Applicants should not have to pay higher fees in order to help others "with incomes considerably above the poverty level" and without "financial hardship" apply for immigration benefits without paying filing fees. *Id.* at row 13.

> d.  Fee waivers have grown more quickly than the number of individuals receiving benefits.

81.     USCIS did not provide data or analysis to support its justifications for the October 2019 changes to the I-912 form and instructions.

82.     USCIS did not consider individuals' ability to pay USCIS application fees.

83.     USCIS did not consider the relationship between its October 2019 fee-waiver actions and other regulatory initiatives, including rulemakings regarding USCIS fees and the public charge determination in immigration law, as well as U.S. Department of Agriculture rulemakings on the standards for a means-tested benefit program.

84.     Some or all of USCIS's asserted justifications and explanations are illogical, unsupported, conclusory, or inconsistent with the changes that USCIS made to the fee-waiver standard.

85.     USCIS failed to address or respond meaningfully to relevant and significant issues raised in comment letters, such as the burden that the new standard will impose on applicants, USCIS, and the IRS; the potentially severe consequences of delaying or forgoing applications for immigration benefits due to filing fees or the challenges of obtaining fee-waiver documentation on a timely basis; the importance of an easily-applied standard, such as receipt of means-tested benefits; and the impact of the proposed changes on individuals' ability to seek and receive low-cost legal assistance from organizations that had relied on the 2011 Memorandum in developing models to serve clients effectively.

86.     USCIS ignored, rejected, or addressed only in conclusory fashion, without any supporting data or analysis, commenters' explanations of the extensive burdens and harms the revised I-912 form and its instructions would impose on certain applicants.

87.     USCIS responded to some comments with explanations that ignored or contradicted data; contradicted existing law; were internally inconsistent; lacked supporting data; depended on

assumptions about areas outside of USCIS's expertise; or relied on misrepresentations of the revised I-912 form, its instructions, or the 2011 Memorandum. For instance:

    a.   USCIS stated that it "disagrees" with a commenter's assertion that the new standard "severely limits fee waiver eligibility," *All Comments & Responses, 84FR13687* (at row 8), but elsewhere estimated that the standard will drastically reduce the number of fee waiver applications and asserted that changes are necessary precisely to reduce the number of waivers granted.

    b.   USCIS suggested that the required documentation of income is the same as what individuals would submit to receive means-tested benefits, but ignored evidence to the contrary and elsewhere stated that USCIS and other agencies' determinations are "distinct." *Id.* at row 12.

    c.   USCIS stated that T- and U-visa applicants and VAWA self-petitioners do not have to provide otherwise-required documentation if requesting it "would trigger further abuse or endanger" the applicant—an allowance that the October 2019 I-912 form and instructions do not state. *Id.* at row 97.

88.    In its submission to OMB, USCIS responded to some of the points identified without addressing the stated concerns, without explaining whether circumstances or USCIS's position had changed, or by rejecting, in conclusory ways, more measured alternatives.

89.    In its Supporting Statement, USCIS responded to OMB questions in conclusory or incomplete fashion and provided burden estimates that lacked supporting analysis and contradicted the record. For example, the Supporting Statement:

    a.   Asserted burden-related estimates without supporting data or analysis.

21

b.   Ignored record evidence about the burdens associated with applying for a fee-waiver, including the agency's own recognition that applicants could incur costs to obtain required documentation from the IRS or translate forms into languages they can understand.

c.   Included only a conclusory statement to show that USCIS had satisfied a PRA requirement that certain characteristics of the collection, if present, meet a "substantial need" or statutory requirement, 5 C.F.R. § 1320.5(d)(2).

90.   USCIS's certification that the revised I-912 form and instructions comply with PRA requirements was not supported by the record.

91.   The certification represented that the fee-waiver information-collection, as revised, "[i]s necessary for the proper performance of the functions of the agency, including [because] the information … collected will have practical utility"; "[r]educes to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency"; "[i]s written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond"; "[i]s to be implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond"; and satisfies other requirements. 5 C.F.R. § 1320.9; *see also* 44 U.S.C. § 3506(c)(3); 5 C.F.R. § 1320.5(a)(1)(iii)(A).

92.   The revised I-912 form and instructions do not match the certification. For instance:

a.   The new form requires information and documentation that USCIS did not show is necessary, such as an explanation of why any applicant or any member of an applicant's household did not file taxes the prior year.

b.  The revisions serve only to increase burden on fee-waiver applicants, and the agency failed to consider obvious, less burdensome alternatives.

c.  The record suggests that the revised form and its instructions could increase the agency's burden for processing individual fee-waiver requests, and USCIS's conclusory statements to the contrary were not backed by data.

d.  The revised form and its instructions use complex and ambiguous terms and phrases, such as "hardship" and "due to [their] victimization," to describe requirements.

e.  The revisions generally eliminate individuals' ability to apply for fee waivers based on means-tested benefits documentation or tax documentation they already have, and instead require documentation that is not compatible with the types of records that applicants may already have or be required to provide.

93.  In other ways as well, USCIS's submission to OMB made clear that USCIS lacked data to support its reasoning or to suggest that the changes would have their desired effect. For instance:

a.  The submission showed that USCIS finalized the revised I-912 form and instructions without evaluating their fiscal impact on USCIS, despite asserting that the agency needed to change the fee-waiver standard in order to avoid fee increases, and stating that budgetary considerations overrode concerns about the burden imposed by the revised form.

b.  USCIS stated that it is "confident" the IRS can handle the increased workload that the new I-912 form and its instructions will generate, without any apparent data regarding the IRS's capabilities. USCIS, *All Comments & Responses, 84FR13687*,

(at row 59), available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201910-1615-006. Further, USCIS's external consultations regarding the revisions to its fee-waiver information-collection did not involve consultation with the IRS.

c.   USCIS dismissed concerns that the new standard will increase its own workload and backlog, but provided no supporting data and did not suggest that the agency had planned for how it will handle applications under the revised standard.

## III. 2020 FEE-WAIVER CUTS AND FEE INCREASES

### A. Proposal to Restrict Fee Waivers and Raise Fees

94.   Shortly before USCIS submitted its October 2019 revisions to the fee-waiver form and instructions for OMB review, DHS submitted a rulemaking proposal to OMB that also aimed to reduce fee-waiver eligibility. On November 14, 2019, DHS published that proposed rule in the Federal Register, allowing commenters until December 16 to comment on the proposal generally, but 60 days to comment on proposed forms. 84 Fed. Reg. 62,280, 62,280, 62,349-56 (Nov. 14, 2019) (Fee Proposal).

95.   The Fee Proposal included key aspects of the October 2019 fee-waiver actions, in some cases offering no explanation other than that it "would update the language in the regulation to codify" what was "provided in the previous I-912 notice." 84 Fed. Reg. at 62,299. For instance, it narrowed the fee-waiver eligibility standard, including by eliminating means-tested benefits-based applications; and mandated that applicants use USCIS's form and submit specified documentation of income, generally including a tax transcript. *See id.* at 62,363 (proposed 8 C.F.R. § 106.3). The Fee Proposal also addressed other topics covered in the October 2019 updates to the USCIS Policy Manual.

96.     The Fee Proposal additionally extended the approach of the October 2019 fee-waiver actions, by eliminating hardship-based fee-waiver applications, as well as benefits-based ones, and setting a single, lower income standard for fee-waiver applications: 125 percent of the federal poverty guidelines. Further, DHS proposed to restrict fee-waiver applications to the narrow categories of immigrants covered by 8 U.S.C. § 1255(*l*)(7), and to impose other new eligibility restrictions. Its documentation requirements were stricter than the October 2019 fee-waiver form's, in ways that the Fee Proposal did not acknowledge in its preamble or explain. *See* 84 Fed. Reg. at 62,363 (proposed 8 C.F.R. § 106.3).

97.     Like the October 2019 fee-waiver actions, the Fee Proposal linked fee waivers to fees. The Fee Proposal sought to increase many USCIS and CBP fees, often significantly, stating that without the fee-waiver changes, fees would go up even more. The Fee Proposal also introduced new fees, seeking to shift more costs to certain types of applications or groups of applicants that, under existing law, had no fees, exemptions from otherwise applicable fees, or fees whose increases has been capped in prior rulemakings. The Fee Proposal additionally limited the payment devices that USCIS would accept.

98.     The Fee Proposal was tied to stated budget amounts for fiscal years 2019 and 2020 and a related review of IEFA fees. The stated budgets excluded the fees for and costs of premium processing, and included $207.6 million that DHS planned to raise from immigrants seeking USCIS benefits and then transfer to ICE, DHS's immigration enforcement component. The IEFA fee review was conducted pursuant to a statutory requirement for biennial reviews of an agency's user fees, *see* 31 U.S.C. § 902(a)(8), and was based on the stated budget figures and multiple assumptions, including assumptions about the number of applications that immigrants would submit, the percent of applications that would be fee-paying, and the costs associated with different

types of USCIS activities. DHS stated that if fee and fee-waiver law did not change, DHS's forecasted non-premium revenue would be less than the stated budgets. DHS thus used the IEFA fee review to calculate new, proposed fees at amounts that it estimated would cover the stated budget amounts.

99.    DHS failed to provide notice of key assumptions, calculations, estimates, models, or rationales on which the Fee Proposal and the IEFA fee review rested.

100.    Although DHS stated that the proposed changes were needed for budget reasons, the Fee Proposal did not discuss USCIS budget needs for fiscal year 2021 or beyond, when any new fee rule would be in effect.

101.    DHS did not otherwise explain its asserted 2019 and 2020 budgets. For instance:

   a.   DHS did not identify all the operations, policies, and practices that it sought to fund or explain how they all fell within the scope of DHS's fee-funding authority under 8 U.S.C. § 1356(m).

   b.   DHS used unclear, incomplete, and vague terms to describe the composition of the stated budgets and new costs.

   c.   The Fee Proposal stated that DHS sought to "maintain an adequate level of operations," 84 Fed. Reg. at 62,286, but did not explain what such a level entails or why the stated budget amounts were necessary to maintain it.

   d.   DHS did not provide other key budgeting assumptions. It referenced its "staffing allocation model," *id.*, but did not provide that model or any other model used to create the budget or relevant inputs.

   e.   DHS's description of its estimates and methodologies were unclear and incomplete.

    f.   DHS did not describe the relationship between the figures on which the proposal relied and recent DHS forecasts, results, and data.

    g.   DHS did not explain the extent to which the stated budgets took into account recent or upcoming changes in law, policy, or operations. Though DHS acknowledged that the budgets failed to take into account certain cost savings, DHS did not explain or estimate the impact of that omission.

    h.   DHS did not explain the relationship between its stated budget figures (and the operations those budgets would fund) and other sources of money available to fund USCIS or CBP (and the operations those sources would fund).

102.    DHS did not explain or justify the composition of its revenue estimates. DHS did not provide all of the data, assumptions, or models from which it derived its revenue forecasts, including assumptions about the use of other available funds or the assumptions underlying its workload forecasts. *See* 84 Fed. Reg. at 62,288-89. DHS identified certain periods it had used for data collection, but did not explain why those periods were chosen. DHS did not explain the extent to which it had taken into account pertinent trends or upcoming changes in law, policy, or operations.

103.    DHS did not identify or explain all of the key data, assumptions, or models that it used to calculate proposed fees, by dividing the assumed budget figures across fee-paying applications. For example, DHS broke the relevant budget figures into buckets of costs, *e.g.*, "management and oversight" and "fraud detection and prevention," and spread those costs across different types of immigration applications. Its vague discussion of how the costs were divided across application types did not explain the tables of figures provided. Further, DHS provided little detail about what fell into these buckets of costs and did not provide the models and staffing

27

projections it used to generate the total amounts for each bucket (or such totals themselves). DHS changed its model to reflect costs that had not been incorporated into past models and did not explain why.

104.    The Fee Proposal and IEFA fee review reflected different estimates of key figures. DHS did not explain the difference.

105.    The Fee Proposal inaccurately summarized some of the changes it proposed, and referenced, but failed to include, figures that DHS stated would support its assertions about fee-waiver trends. DHS also failed to provide relevant context for its figures. For instance, it compared its current estimates to 2016 estimates, rather than actual and current figures.

106.    After publishing the Fee Proposal, DHS changed the docket, the comment period, and the substance of its proposal. Through November 22, 2019, DHS posted dozens of documents in the online docket for the Fee Proposal at regulations.gov, including proposed changes to forms; a "small entity analysis"; analysis regarding the IEFA account; and an economic analysis. Then, on December 9, 2019, after earlier rejecting calls for a longer comment period with the unsupported representation that its financial situation was dire, DHS changed the content of its proposal and the deadlines to comment. 84 Fed Reg. 67,243 (Dec. 9, 2019) (Supplemental Proposal). The Supplemental Proposal revised DHS's calculation of the money that it would transfer to ICE, included new descriptions of the ICE costs DHS intended to fund, and stated that the change would affect calculated USCIS fees, but did not provide a new set of proposed fees. The Supplemental Proposal set a new deadline of December 30, 2019 to comment on the Fee Proposal, the Supplemental Proposal, and the proposed forms, shortening the period to comment on the proposed forms. Then, on January 24, 2020, DHS reopened the comment period until February 10, 2020. *See* 85 Fed. Reg. 4243 (Jan. 24, 2020). On February 3, 2020, but not before,

DHS hosted a meeting with some members of the public to discuss its fee-modeling software and methodology.

107.    Multiple commenters informed DHS that the Fee Proposal and Supplemental Proposal failed to provide enough information to enable thorough responses. Commenters also informed DHS that the periods to comment on the Fee Proposal, Supplemental Proposal, and supporting materials were insufficient.

**B. The 2020 Fee Rule**

108.    On August 3, 2020, DHS published its final rule in the Federal Register and set an effective date of October 2, 2020. 85 Fed. Reg. 46,788 (2020 Fee Rule). The rule adopted nearly all of the changes that DHS had proposed and stated that it "relies on all the justifications articulated in the [Fee Proposal] except as articulated" in the Federal Register notice. *Id.* at 46,790.

109.    The 2020 Fee Rule eliminates fee waivers for nearly all immigrants and USCIS filings. It makes fee waivers generally available only to requesters seeking or holding specialized types of humanitarian protections: (1) those covered by 8 U.S.C. § 1255(*l*)(7), (2) some children seeking or holding Special Immigration Juvenile Status (SIJS) and (3) certain Afghan or Iraqi "Special Immigrants." Further, for these groups of immigrants, the 2020 Fee Rule replaces the "unable to pay" standard in current law, 8 C.F.R. § 103.7(c)(1)(i), with a single income standard: eligible immigrants can only request fee waivers if their household income is at or below 125 percent of the federal poverty guidelines. 85 Fed. Reg. at 46,920 (to be codified at 8 C.F.R. § 106.3(c)). Thus, for example, a single person earns too much to qualify if his or her income is over $15,950 per year. Additionally, the 2020 Fee Rule only permits fee-waiver applications using USCIS's prescribed form and supported by certain specified documents. In

many circumstances, the rule requires applicants to obtain and submit a tax transcript or other IRS document. *See* 85 Fed. Reg. at 46,920 (to be codified at 8 C.F.R. § 106.3(d), (f)).

110.    With these new restrictions, eligible requestors can seek waivers of any fees for immigration benefits and "any associated filing," "up to and including adjustment of status," as well as certain citizenship-related forms. 85 Fed. Reg. at 46,920 (to be codified at 8 C.F.R. § 106.3(a)(1)-(3)).

111.    The 2020 Fee Rule eliminates fee waiver applications for all other immigrants.

112.    The 2020 Fee Rule permits, but narrows, the USCIS director's discretion to make exceptions to the revised fee-waiver rule. While the current regulation enables the director to waive any fee when "in the public interest and the action is consistent with other applicable law," 8 C.F.R. § 103.7(d), under the 2020 Fee Rule, the director may only consider exemptions for certain populations or in certain listed circumstances, 85 Fed. Reg. at 46,920 (to be codified at 8 C.F.R. § 106.3(b), (e)).

113.    DHS characterized the near elimination of fee waivers as necessary to limit fee increases, increase the number of immigrants paying for USCIS applications, and reduce the dollar amount of fees waived. The fee-waiver restrictions are part of a package of changes that DHS asserted were necessary for such purposes. Like the Fee Proposal, the 2020 Fee Rule creates new USCIS fees, eliminates prior fee exemptions and caps on fee waivers, and raises a number of fees.

114.    For instance, the rule eliminates a reduced fee for low-income individuals seeking naturalization, and without allowing any fee waivers, imposes new fees on individuals seeking asylum, before they have even had the chance to gain authorization to work. Under the 2020 Fee Rule, applying for asylum will cost $50; a first employment authorization application will cost

$550, plus $30 for biometrics. Naturalization fees will nearly double, to $1,170, and other fees will increase as much as 546 percent.

115.    The 2020 Fee Rule also raises fees charged by other agencies. It increases the cost of certain applications made to CBP, another DHS component. Further, the $50 asylum fee means that individuals who are placed in removal proceedings before the Department of Justice's EOIR prior to filing for asylum will also face a new $50 fee when they seek asylum, withholding of removal, and protection under the Convention Against Torture as a defense. Other USCIS fees also apply in removal proceedings. DHS dismissed concerns about such fees by stating it "did not collaborate with DOJ" in its fee modeling and that the matter was within the other agency's jurisdiction. *See* 85 Fed. Reg. at 46,793.

116.    Other measures in the 2020 Fee Rule include restrictions on DHS's acceptance of checks, an allowance for USCIS to impose other restrictions on the methods that immigrants can use to pay USCIS fees, and restrictions on how immigrants can receive documents from USCIS. *See* Fed. Reg. at 46,914, 46,916 (to be codified at 8 C.F.R. §§ 103.2(a)(7)(ii)(D), (b)(19)(iii), 106.1(b))). DHS additionally submitted changes to dozens of forms to OMB for approval.

117.    The 2020 Fee Rule includes provisions, rationales, and data that were not discussed in the Fee Proposal and that commenters could not have anticipated. These include:

a.    A distinction among categories of SIJS: abused, abandoned, and neglected juveniles who are eligible for benefits under immigration law. The 2020 Fee Rule allows some SIJS to continue to seek fee waivers, but not others. 85 Fed. Reg. at 46,920 (to be codified at 8 C.F.R. § 106.3(a)(2)(i)),

b.    A distinction among naturalization-related forms. The 2020 Fee Rule allows that fee-waiver eligible immigrants can seek waivers of some citizenship-related fees,

but not the fee for appealing an adverse naturalization decision. *See id.* (to be codified at 8 C.F.R. § 106.3(a)(3)).

    c.   A surcharge for applicants who file paper, rather than online, applications. *See* 85 Fed. Reg. at 46,919 (to be codified at 8 C.F.R. § 106.2(d)).

    d.   A $30 biometrics fee for asylum seekers and certain residents of the Northern Mariana Islands. *See* 85 Fed. Reg. at 46,918 (to be codified at 8 C.F.R. § 106.2(a)(32)(i)).

    e.   Data and rationales not in the 2020 Fee Proposal, including data regarding fee waivers, justifications for fee-waiver restrictions, and information about the composition of the asserted budgets.

**(1) Violations of INA**

118.    Under the INA, DHS can only set fees to recover "costs of providing" "adjudication and naturalization services" or "additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m).

119.    When DHS set new fees, it sought to cover costs that do not fall within the scope of section § 1356(m). Those include costs of national security and intelligence work, salaries of USCIS staff assigned to work for other components of DHS, and the cost of a program to provide information to other government entities.

120.    DHS did not explain how it sought to comply with section 1356(m). In the Fee Proposal, DHS stated a vague and confusing description of how it was applying the statutory limits on IEFA spending. In the final rule, DHS referenced its authority under 8 U.S.C. § 1356(m) only in conclusory terms, did not identify all of the USCIS operations it sought to fund, used unexplained and vague terms to describe those it did identify, and did not explain how all such

operations fall within the limits of 8 U.S.C. § 1356(m). DHS also raised CBP fees without stating a budget or funding need to justify the increase, and without providing any explanation of how the new CBP funds will be used in accordance with statute. Further, DHS's rule increased fees charged by DOJ, without any discussion of that agency's funding needs or uses.

121.    The INA requires that the DHS secretary "shall permit" certain groups of immigrants to apply for fee waivers. 8 U.S.C. § 1255(*l*)(7).

122.    Under the 2020 Fee Rule, some immigrants whose applications are covered by 8 U.S.C. § 1255(*l*)(7) will not be able to seek fee waivers because the required documentation is unavailable. For instance, in some circumstances, the IRS does not provide required documents as quickly as needed to meet short USCIS filing deadlines. Further, while the rule lists certain types of documentation an income-earning applicant without a tax return can submit, some immigrants will earn income that does not generate any of the listed documentation (*e.g.*, W-2 or certain statements of government payments). Such documents are not legally required for all types of work individuals perform. The 2020 Fee Rule provides an exception to documentation requirements for some, but not all, individuals covered by 8 U.S.C. § 1255(*l*)(7).

123.    DHS did not acknowledge or explain the effect of the 2020 Fee Rule in preventing applicants from applying based on what type of work they perform, whether they filed taxes, or the restrictions of IRS's system. DHS also did not discuss the availability of W-2 forms and the limitations on the availability of tax transcript or other documents from the IRS, explain why it chose to require W-2 forms from individuals without tax returns, or explain why it had changed position since the October 2019 fee-waiver form change. DHS failed to respond to comments describing the challenges immigrants will face in obtaining required documentation.

124.    The INA requires that individuals receive certain immigration benefits if they satisfy listed criteria, which do not include any measure of an applicant's financial circumstances. *See*, *e.g.*, *id.* §§ 1186a(c)(3) (removal on conditions for residence), 1452(a) (certificate of citizenship). For such benefits, the 2020 Fee Rule means that applicants who cannot receive fee waivers also cannot apply for the benefit if they are unable to pay the requisite fee.

**(2) DHS's Use of Unreasonable and Unexplained Financial Estimates**

125.    In support of the 2020 Fee Rule, DHS produced a revised IEFA analysis, dated May 2020. The 2020 Fee Rule and the revised IEFA analysis use the 2019 and 2020 budgets stated in the Fee Proposal, adjusted to eliminate two sets of expenses that had been included at the proposal stage: funds intended for transfer to ICE and expenses associated with Deferred Action for Childhood Arrivals (DACA) program. As in the proposal, DHS estimated revenue that it would earn under the current fee schedule, and then set fees to recover the entirety of the stated budget amounts. Though DHS made adjustments to reflect changes to the final rule's determinations about who should pay fees, key inputs to the IEFA analysis, such as estimates of staffing needs and filing volume, remained the same.

126.    DHS failed to support its conclusion that it could not continue to use the 2016 fee schedule. With reasoning relied on in the final rule, the Fee Proposal stated that maintaining the current fee schedule "would risk degrading USCIS operations." 84 Fed. Reg. at 62,288. The 2020 Fee Rule also states that "new fees will help reduce backlogs," 85 Fed. Reg. at 46,861, and that maintaining the current fee schedule "*could* result" in other reductions in service, *id.* at 46,904 (emphasis added). But DHS did not explain the extent to which any particular operations were at risk under the 2016 fee schedule or the extent of new operations it intended to fund, explain how

its budget enables the reduction of backlogs or the accomplishment of any other operational goal, or otherwise support its assertions.

127.   In setting fees to match the stated budgets for 2019 and 2020, DHS relied on estimates that were not reasonable or supported.

> a.  Most of the analysis underlying the 2020 Fee Rule was conducted in 2017, and DHS's budget predictions were for fiscal years 2019 and 2020. The 2020 Fee Rule takes effect after the start of fiscal year 2021.
>
> b.  DHS did not suggest that its stated figures represent predictions about fiscal year 2021 or beyond.
>
> c.  DHS's operations have not matched its 2017 predictions. As DHS recognized, "filing trends have changed" since its IEFA fee review, and DHS's projections regarding the numbers of applications that immigrants would file "did not materialize" even in fiscal year 2019. *See id.* at 46,870.
>
> d.  Since 2017, and even since the publication of the Fee Proposal, DHS has made, proposed, or attempted to make multiple changes in immigration policy that could significantly affect USCIS budget and revenue. Other aspects of the immigration application, policy, and funding environments have also changed, and were in flux when DHS adopted the 2020 Fee Rule. DHS's figures did not account for any of these changes.
>
> e.  Some of DHS's estimates relied on data from 2016 and 2017. Data from that period was likely to be anomalous, for reasons including the December 2016 fee-schedule change, the November 2016 election, and a spike in naturalization applications during 2016 and 2017.

35

f.  The 2019 and 2020 budget figures did not reflect the impact of cost savings that had already materialized.

g.  The 2019 and 2020 budget figures reflected costs that, in adopting the 2020 Fee Rule, DHS identified as unnecessary for their original purpose but retained in the budget. *See* 85 Fed. Reg. at 46,790.

h.  When DHS adopted the rule, it was projecting ending the current fiscal year with a surplus, not a deficit.

128.  When DHS adopted the 2020 Fee Rule, it had, but did not use, more recent data and budget estimates, including budget figures submitted to Congress, actual fiscal year 2019 results, and an operating plan USCIS completed in April 2020. DHS did not provide any explanation of how its figures relate to the agency's more recent results and predictions. Further, DHS rejected the option of using more accurate or recent estimates without a reasoned explanation. The agency stated it was concerned that using new figures would constitute a failure to provide proper notice. *See* 85 Fed. Reg. at 46,874. But DHS did not explain why that adjustment of figures (as opposed to others it did make) would constitute a lack of notice under law, or why it could not use more recent figures to reconsider the proposal altogether. Additionally, DHS cited the "constantly evolving immigration policy environment," *id.*, without considering that DHS itself could slow down the pace of policy change. Although DHS cited its obligations under certain statutes, *see id.*, no law required DHS to change USCIS fees in 2020.

129.  The 2020 Fee Rule's calculations reflect other errors. For instance, they are based on the assumption that immigrants will apply for benefits at the same rate and pace, under the 2020 Fee Rule, as they would without it. But data before the agency shows that increased fees can deter

applicants, and in parts of the 2020 Fee Rule, DHS acknowledged such effects. DHS failed to explain why it could not incorporate an estimate of such effects in its modeling.

130.    DHS also overestimated the number of fee waivers that USCIS will continue to issue under the 2020 Fee Rule. In calculating the extra fees that will be paid by immigrants no longer able to seek fee waivers, DHS assumed that all immigration benefits requests that are eligible for waivers under current law will remain eligible. It failed to factor in the rule's restrictions on eligible immigrants and forms.

131.    DHS failed to explain many other aspects of its calculations. The 2020 Fee Rule generally adopted the Fee Proposal's calculations, which themselves lacked explanation, with little additional explanation. DHS did not provide key data, models, or assumptions needed to understand its budget, revenue, and other figures. DHS also did not explain the extent to which its budget took into account savings DHS suggested the 2020 Fee Rule will generate. DHS calculated some fees without using the IEFA fee review model and without explaining the need for or use of the fee revenue.

132.    Other aspects of the calculations in the 2020 Fee Rule are unsupported by data or reasoning or conflict with data before the agency.

**(3) DHS's Unexplained and Improper Policy Goals**

133.    In adopting the 2020 Fee Rule, DHS sought to pursue objectives in addition to raising revenue. These other objectives were unexplained, unsupported, and/or improper.

134.    For instance, DHS sought to deter or exclude individuals who are not "self-sufficient" from seeking immigration benefits. In its original Fee Proposal materials, DHS stated it was "concerned" that maintaining a reduced naturalization fee "may result in the naturalization of more individuals who will be reliant upon public benefits rather than embodying the principle

of self-sufficiency that is central to U.S. immigration laws." *Regulatory Impact Analysis, USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements* 119 (Sept. 2019) (posted by DHS and later withdrawn from docket). In the same document, DHS stated that fee waivers "suggest[] an inability to be self-sufficient," and concluded that elimination of many fee waivers would be consistent "with congressional intent in noncitizens maintaining self-sufficiency." *Id.* at 27. Similarly, the 2020 Fee Rule states that maintaining fee-waivers and reduced-fee naturalization applications would not be "in accordance with the principle of self-sufficiency that Congress has frequently emphasized," 85 Fed. Reg. at 46,858, and concludes that certain fee-waiver authority should be restricted due to a concern about individuals becoming "public charges," *id.* at 46,828.

135.    DHS did not explain or support its assumptions about self-sufficiency, the receipt of public benefits, or immigrants being "public charges." DHS also did not reconcile its concerns about which types of individuals will naturalize or seek other immigration benefits with its repeated suggestion that new fees will not reduce the number of people seeking immigration benefits. *See*, *e.g.*, 85 Fed. Reg. at 46,797, 46,858. Additionally, no law establishes encouraging "self-sufficiency" or deterring naturalization of immigrants receiving public benefits as a general goal of immigration law or a factor that DHS should consider in setting fees. To the contrary, Congress, through the INA, has made immigrants' likelihood of becoming a "public charge" or their ability to satisfy minimum financial requirements a consideration in only limited and specified circumstances, which do not include naturalization and fee waivers.

136.    DHS also sought to deter certain immigrants from seeking asylum. Asylum law reflects an intent to enable individuals to apply for and receive protections from the threat of danger abroad, not to deter individuals through fees. But the Fee Proposal stated that a fee for asylum

applications would "discourage frivolous filings." 84 Fed. Reg. at 62,320. The final rule adopted this reasoning, and also asserted that DHS did "not intend to deter legitimate asylum seekers," 85 Fed. Reg. at 46,850, or "meritorious asylum claims," *id.* at 46,844. DHS did not explain or support its suggestion that it faces a problem of frivolous filings, or its assumption that an asylum application fee will deter frivolous filers and not legitimate ones. DHS also did not recognize or explain the agency's change in approach, compared to past fee rules, in which DHS stated that fees were "not designed to function as tariffs, to generate general revenue to support broader policy decisions, or to deter certain behavior." 81 Fed. Reg. at 73,312 n.69; *see also* 75 Fed. Reg. 58,962, 58,970 (Sept. 24, 2010) (similar, 2010 fee rule).

137.   DHS repeatedly stated that it sought to restrict fee waivers and raise fees in order to pursue a "beneficiary pays" system. DHS stated in its proposal that a "beneficiary pays" principle means that "beneficiaries of a service pay for the cost of providing that service." 84 Fed. Reg. at 62,298. The final rule adopted this reasoning and equated the principle with removing fee waivers, exemptions, and caps, such that immigrants pay all the costs in DHS's asserted budget.

138.   DHS did not reconcile its discussion and application of the beneficiary pays principle with the Government Accountability Office (GAO) document that the 2020 Fee Rule cites. That document recognizes that a "beneficiary pays" system can incorporate reduced or waived fees. It also recognizes that other systems may be more equitable or efficient. Further, in contrast to DHS's rule, it suggests that under a "beneficiary pays" system, costs for public benefits should be borne by the public, not by individual users. *See* GAO, *Federal User Fees: A Design Guide* 7-11 (May 2008) (GAO-08-386SP).

139.   DHS's use of the "beneficiary pays" principle is internally inconsistent. The 2020 Fee Rule exempts some immigrants from otherwise applicable fees, caps some fees increases, and

39

allows some fee waivers. Thus, although DHS repeatedly referred to the beneficiary pays principle as a reason to increase or create some fees and restrict fee waivers, its references to this principle do not explain why DHS decided to make such changes in some instances but not others.

140.    In adopting the 2020 Fee Rule, DHS asserted that "different immigration services provide varying levels of societal net benefits" and suggested that holding fees below their costs has been a way to "account" for these differences. 85 Fed. Reg. at 46,890. DHS did not explain this statement or whether it applied this principle in the 2020 Fee Rule in deciding which fee limits to preserve and which not.

141.    DHS is pursuing other measures aimed at addressing its non-revenue policy goals. DHS did not explain why the 2020 Fee Rule was necessary, in addition to other measures, to achieve its policy goals.

**(4) DHS's Other Attempts to Justify Making More Immigrants Pay More**

142.    In multiple other ways, DHS failed to support aspects of the 2020 Fee Rule. For instance, the 2020 Fee Rule's elimination of hardship-based fee waivers relies on a misinterpretation of DHS data and fails to take into account the importance of such fee waivers. DHS's assertion that the 2020 Fee Rule does not "make immigrant benefits inaccessible to low income applicants who have financial hardships" contradicts other statements in the 2020 Fee Rule and is unsupported. 85 Fed. Reg. at 46,822. The rule eliminates benefits-based fee-waiver applications for reasons of equity but cites no data regarding means-tested benefits standards, fails to consider alternatives, and fails to consider the equitable principles reflected in USCIS's current practice, under the 2011 Memorandum.

143.    DHS established an income ceiling for fee waivers based on a figure that is used elsewhere in immigration law. But DHS did not explain why such consistency was relevant or take

into account the differences between fee waivers and the contexts in which the 125-percent standard is used elsewhere. Its decision is also inconsistent with other aspects of DHS's reasoning and the October 2019 fee-waiver actions, in which USCIS asserted that two other criteria—hardship and earning below 150 percent of the federal poverty guidelines—were appropriate to measure an individual's ability to pay an immigration fee.

144.    The 2020 Fee Rule restricts fee waivers to only certain populations of immigrants. DHS failed to support its distinctions between the populations who will be able to seek fee waivers under the 2020 Fee Rule and the other groups of immigrants who will not.

145.    The 2020 Fee Rule offers no explanation for aspects of its fee-waiver form and documentation requirements. For other aspects, DHS provided justifications that are not supported by data, fail to take into account the impact of the new rule on individual applicants, fail to match solutions to actual problems, and fail to consider the range of types of documentation DHS could accept. For instance, although DHS expressed a concern about receiving unsigned tax forms, it did not support its assertion that the rule will decrease administrative burden, show that USCIS currently experiences a problem with receiving incomplete tax forms, or consider the alternatives of clarifying existing form instructions or requiring documentation that is more accessible than a tax transcript or other required documentation. While the 2020 Fee Rule permits some applicants to submit alternative documentation, DHS did not explain why others applicants should not receive a similar allowance or justify its choice of allowable alternative documentation. DHS did not consider the full range of challenges that fee-waiver eligible immigrants would face in obtaining the required documentation. DHS did not consider the effect of its rule on individuals unable to obtain required documents.

146.     DHS made unsupported distinctions between the people or types of forms eligible for fee waivers and those not. For instance, DHS decided to allow fee waivers for some SIJS because it concluded they are "particularly vulnerable, *id.* at 46,815, but did not explain how it concluded that other SIJS are not also vulnerable enough to benefit from fee waivers. The final rule allows fee waivers for some citizenship-related forms, but not others, and failed to explain the distinction. In the preamble of the rule, DHS published a list of forms eligible for fee waivers that was in conflict with its own new rule, as it omitted at least one eligible form, a 290B form.

147.     DHS stated that it restricted the USCIS director's discretion to issue additional fee waivers or fee exemptions due to a concern that the director might otherwise expand waivers or exemptions "beyond what may be fiscally sound" and "shift[] the burden to just a few payers." 85 Fed. Reg. at 46,828. These and other assertions about the effect of the current exemption authority are unsupported and illogical. DHS did not explain all of the distinctions it drew between populations potentially eligible for director-issued exemptions and those not.

148.     In other ways as well, DHS failed to provide reasoned analysis to support the 2020 Fee Rule's fee-waiver provisions. For instance, DHS relied on assertions about fee-waiver trends and the impact of fee waivers that are unexplained and do not match the data before the agency or reflect the relevant context.

149.     DHS failed to provide a reasoned justification for adopting multiple new fees for asylum-seekers: a $50 fee for applying for asylum, a new $550 fee for a first employment authorization, and a new $30 biometrics fee for seeking or renewing employment authorization. Though DHS suggested that it was mitigating the harm to asylum seekers by allowing that some individuals, in effect, receive a refund of the $50 fee, DHS's solution does not match the problem, as the $50 discount only applies once an individual is granted asylum and later applies for lawful

permanent resident status. Additionally, especially in light of this effective refund, DHS failed to explain how the $50 application fee will support asserted goals, including raising revenue or mitigating the increases of other fees. DHS's assertions about the need for fee revenue also conflict with other aspects of the 2020 Fee Rule and its reasoning, including DHS's goal of deterring some applicants and its acknowledgment that some will not be able to afford the fee.

150.    DHS failed to consider the effect of its rule on individuals in removal proceedings. In that context, the new $50 fee will operate to bar indigent individuals from seeking mandatory forms of relief from removal; many of these individuals are initially detained by the government and have no meaningful form of income. Although removal proceedings are governed by DOJ and its own fee regulation, that regulation incorporates this USCIS fee. DHS failed to consider alternatives within its authority to avoid hurting individuals in removal proceedings. In contrast, DHS elsewhere distinguished between fees charged in USCIS proceedings and those charged in DOJ proceedings, and kept DOJ fees the same, even while changing the USCIS fee.

151.    With reasoning adopted in the final rule, DHS exempted certain unaccompanied minors in removal proceedings from the $50 asylum fee due to concerns about "undue delay." 84 Fed. Reg. at 62,319. DHS failed to explain why this same concern does not apply to other asylum seekers. For instance, DHS's decision not to exempt other unaccompanied minors was inconsistent with the purpose of the statute it cited, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457. Further, DHS failed to take into account the variety of circumstances in which other asylum-seekers will have an urgent need to apply, including because they face a one-year bar to apply. It ignored or offered only conclusory and unsupported responses to comments explaining such needs.

152.    DHS recognized that its predecessor agency earlier declined to adopt a fee for seeking asylum. DHS did not describe the reasoning of earlier decisions not to adopt an asylum fee or explain the extent to which (or why) DHS's position has changed.

153.    DHS failed to reconcile the new asylum-seeker fees, which it acknowledged would deter applicants, with the goals and purposes of asylum law, to enable individuals to seek and receive protections from the threat of danger abroad.

154.    DHS ignored data in the record about the impact of the new fees on asylum seekers, failed to consider the impact of new fees on asylum seekers' families and their communities, and failed to provide a reasoned justification for rejecting alternatives, such as installment payments, that would have lessened the harm of new fees. Though in some parts of the 2020 Fee Rule DHS acknowledged that the $50 asylum application fee would cause some immigrants to not apply, elsewhere it assumed that all asylum seekers (or all non-frivolous ones) can afford to pay a $50 fee before the end of the statutory one-year period to apply. That assumption is unsupported and unreasoned.

155.    DHS stated that it would not allow fee waivers for asylum seekers because the cost of processing fee waiver requests would be enough to eliminate the revenue earned. DHS did not reconcile this statement with its assertion that the fee was affordable to asylum seekers.

156.    DHS asserted in its proposal that without a new employment authorization fee for asylum seekers, others would have to pay $10 more. In the final rule, DHS cited the beneficiary pays principle, but failed to explain why new fees for asylum seekers were necessary to save a small amount of money for other applicants, when DHS continued to allow other fee waivers or caps.

157.    DHS failed to consider the combined effects of all the new asylum-related fees on asylum seekers, the interaction between the new fees and its other efforts to change asylum regulations, and asylum seekers' financial circumstances. In imposing new fees on asylum seekers, DHS also rested on unsupported assertions about filing trends and assumptions about asylum seekers' budgets, as well as unreasonable interpretations of or comparisons to international law and other countries' practices. DHS also failed to consider the option of providing biometrics to asylum seekers without an additional fee, and did not reconcile its addition of this new fee, without prior notice or inclusion in its modeling, with its conclusion that it could not update other aspects of its fee modeling to reflect recent changes.

158.    Other provisions of the 2020 Fee Rule eliminate prior measures that limited fee increases: a reduced naturalization fee for low-income immigrants, certain fee exemptions, and previously-imposed caps on the increases of naturalization and other fees. At the same time, the 2020 Fee Rule imposes a cap on the fee increase applicable to certain adoption-related fees. DHS stated, with reasoning adopted in the final rule, that the adoption-related fee cap was due to "public and humanitarian interests." 84 Fed. Reg. at 62,3113. DHS did not explain why the forms for which it lifted fee exemptions, fee caps, or a reduced fee, or imposed new fees, do not involve "public and humanitarian interests" that would support maintaining the agency's prior practices. DHS did not recognize why it adopted certain fee exemptions or limits in the first place, or explain whether or why it changed its view on the relevant factors in some cases but not others.

159.    In other ways, DHS failed to provide reasoned justifications for eliminating exemptions or fee caps. For example, DHS failed to meaningfully address comments about applicants' needs for affordable applications and made assertions about fee dynamics and immigrants' circumstances that were unsupported and conflicted with other statements in the rule.

160.    DHS attempted to justify its measures to increase naturalization fees with unsupported assertions. It referenced an increase in naturalization filings, though applications have dropped for the last two years. It mischaracterized congressional intent. It cited data on reduced-fee filings without putting that data in the relevant context and failed to support its suggestion that the new naturalization fee would not hinder applications. It cited high-level figures about naturalization that do not show the factors that affect whether people naturalize.

161.    DHS stated that it agrees with international law dictating that no one shall be "denied the right to change nationality," but did not explain how its change in approach to naturalization fees can be reconciled with this concern or a recommendation, cited by a commenter, that high-demand benefits be affordable. *See* 85 Fed. Reg. at 46,856.

162.    Without a reasoned justification, the 2020 Fee Rule changes DHS's approach to interim benefits: employment authorizations or other benefits that immigrants seek with their applications for lawful permanent residence or while such applications are pending. In 2007, DHS decided to make these interim benefits free, to ensure immigrants would not have to pay for renewals they needed only because of a processing delay and to avoid a perception that DHS would profit from delaying processing adjustment-of-status applications (which would lead to immigrants needing to seek more interim benefit renewals). *See* 72 Fed. Reg. 4888, 4894 (Feb. 1, 2007). With the 2020 Fee Rule, DHS reversed this position. It created significant new fees for individuals who apply for lawful permanent residence and are waiting for DHS to finish processing their applications. DHS mischaracterized its 2007 decision and failed to explain whether or why the concerns that motivated DHS in 2007 are no longer true. DHS relied on assertions about the benefit of the change that are unsupported and do not take into account the impact of the new fees

on the individuals who must pay them. DHS also failed to explain the calculations behind its assertions or consider alternatives that would lessen the financial burden on applicants.

163.    The 2020 Fee Rule reverses the agency's prior position of charging less to children seeking adjustment of their status to lawful permanent residence than it charges to adults. DHS's attempt to justify this change is unsupported.

164.    The 2020 Fee Rule increases the fee that immigrants will pay to be able to return to the United States, after travel abroad, following the loss of a green card or other documentation. DHS calculated the fee increase without accounting for the impact of DHS's closure of international offices and using a figure for expenses paid to the Department of State that is higher than what DHS was actually paying at the time the proposal was published.

165.    DHS failed to justify the 2020 Fee Rule's surcharge for paper-filed applications. Although DHS connected the surcharge to commenters' concerns about inefficiencies in DHS processes, DHS did not explain how the surcharge would solve those or other problems. DHS did not consider the variety of circumstances that might cause someone to use a paper application, rather than an online one. The surcharge is also inconsistent with DHS's calculations, which assume that there will be no cost savings and that individuals are not price sensitive.

166.    DHS raised the USCIS and CBP fees for certain forms that both agencies use. The new fees are based on a change in approach: considering some aspect of CBP expenses along with USCIS's stated budget figures. DHS stated that for, at least one form, most of the costs come from CBP, not USCIS. *See* 85 Fed. Reg. at 46,840. DHS failed to support this change in approach and the resulting fee increases. For instance, DHS did not support the proposal's suggestion, adopted through the final rule, that the prior approach was causing confusion; make clear how it calculated or used CBP figures; explain how it would use the new CBP revenue; or explain why it could not

set CBP fees to equal USCIS fees without changing its fee-calculation method. DHS also did not address the impact on, and potential savings for, immigrants of continuing to calculate USCIS fees using only USCIS costs.

167.    DHS increased a fee for individuals seeking protection from being removed from the country under the Nicaraguan Adjustment and Central American Relief Act (NACARA), Pub. L. No. 105-100, tit. II, § 203, 111 Stat. 2160, 2916 (1997). Previously, the USCIS fee was $285 per individual and up to $580 for families. The 2020 Fee Rule sets the USCIS fee at $1,810 per individual, more than six times the current fee. DHS failed to provide a reasoned explanation for this increase. DHS recognized that, in prior years, DHS treated the program similarly to other temporary programs, for which it excluded cost and revenue figures from IEFA calculations. DHS failed to explain why it did not continue treating the program in a like manner, and relied on internally contradictory reasoning. DHS also failed to consider the hardship the new fee will cause for affected individuals, compared to the small amount of revenue it will raise.

168.    The 2020 Fee Rule requires that, if USCIS sends certain documents to applicants' attorneys or other agents, the agency will require signature confirmation. *See* 85 Fed. Reg. at 46,914 (to be codified at 8 C.F.R. § 103.2(b)(19)(iii)(A)). DHS stated that USCIS would use the U.S. Postal Service Signature Confirmation Restricted Delivery service. *See id.* at 46,868. DHS failed to consider or respond meaningfully to concerns that the system would be unworkable. DHS also failed to explain why it rejected the alternative of sending documents to be held for pickup at a post office.

### (5) DHS's Failure to Consider the Harm Caused by the 2020 Fee Rule

169.    As commenters explained, DHS's fee-waiver restrictions and new and increased fees will cause a variety of harms to immigrants, their families, and their communities, by forcing

some immigrants to delay or forgo applications for critical benefits or to pay fees they cannot afford.

170.    DHS ignored or responded to concerns about such harm with conclusory, internally contradictory, or unreasoned responses.

171.    For example, in some parts of the 2020 Fee Rule and its supporting material, DHS recognized that the rule will mean some immigrants cannot apply, will cause financial hardship, or will mean that immigrants must put off other expenses. Elsewhere, DHS stated it does not know how sensitive immigrants seeking benefits are to the fees USCIS charge. Still elsewhere, DHS made unsupported assertions that the rule will not affect individuals' ability to apply or cause other harm.

172.    DHS did not consider the circumstances that limit immigrants' ability to pay fees. For instance, DHS made unsupported and illogical assertions about immigrants' budgets, their ability to increase their savings, their ability to access or afford credit, and the relative significance to immigrants of a particular cost. DHS failed to consider the particular challenges faced by immigrants applying for employment authorization without yet having permission to earn money in the United States. It also failed to assess the range of financial circumstances faced by immigrants, to consider how short filing deadlines affect individuals' ability to pay fees, to address the cumulative effects of this rule with other rulemakings and initiatives, or to consider the combined effect of multiple fees on the same immigrant or multiple members of the same family.

173.    In responding to comments, DHS made unsupported statements about its beliefs or disagreements with commenters' evidence and dismissed studies on unreasonable grounds.

174.    Instead of engaging with commenters' concerns, DHS repeatedly relied on conclusory references to its budget needs, the beneficiary pays principle, the existence of fee

waivers for some applicants, and its lack of intent to harm or prohibit applications. For instance, DHS responded to commenters' concerns about the harm caused by the I-929 fee, set to increase by more than 500 percent, with only conclusory references to the availability of fee waivers and no consideration of the fee's impact on individuals ineligible for such waivers. DHS stated that it expected that many applicants would seek fee waivers, and failed to explain why it should not thus waive the fee entirely, as DHS has done with other fees for which many applicants seek fee waivers. *See* 85 Fed. Reg. 46,855; *see also* 84 Fed. Reg. at 62,302.

175.    DHS unreasonably downplayed the importance of immigration benefits, such as employment authorization, a certificate of citizenship, and a provisional unlawful presence waiver, to immigrants and their families.

176.    DHS evaluated the 2020 Fee Rule pursuant to a statutory requirement that agencies assess rules that may affect family well-being. *See* 5 U.S.C. § 601 note (regarding "Assessment of Federal Regulations and Policies on Families"). DHS's assessment and its conclusion that "the benefits of the new fees justify the financial impact on the family," 85 Fed. Reg. at 46,906, are conclusory and unsupported; fail to account for the relevant factors; and ignore comments explaining the multiple ways in which the 2020 Fee Rule will harm families, by making it difficult for immigrants to afford the benefits that enable immediate family members to stay together.

177.    DHS's evaluation of the impacts of the 2020 Fee Rule under various executive orders is misleading, inaccurate, and incomplete. For instance, with only a few exceptions, the analysis does not address the costs that the rule will impose on individual applicants or society at large, other than the payment of funds. And DHS's analysis does not recognize the significant cost or other effects of fee increases alone.

178.    DHS failed to consider or offer a reasoned explanation for rejecting alternatives that would have lessened the harm caused by the 2020 Fee Rule. For instance, DHS failed to consider, or offer a reasoned explanation for rejecting, other mechanisms for reducing any projected budget shortfall. Such alternatives include reducing costs, increasing revenue by making fee-generating applications more accessible to potential filers, and funding USCIS's budget through other sources (such as by raising more premium processing revenue, using existing premium processing revenue in additional ways, seeking additional appropriations, or spending more carryover funds). Among other things, DHS did not provide a reasoned justification for its failure to use this rule to expand its premium-processing revenue stream.

## IV. DHS DECISIONMAKING

179.    The Federal Vacancies Reform Act (FVRA), 5 U.S.C. §§ 3345-3349, and the Homeland Security Act (HSA), 6 U.S.C. § 113, limit which individuals may serve as acting officials within DHS and USCIS and the amount of time for which they may do so.

180.    The FVRA specifies that when a position requiring presidential appointment and Senate confirmation is vacant, only certain individuals can serve as acting officials. *See* 5 U.S.C. § 3345. With exceptions inapplicable here, such acting officials can serve for no longer than 210 days after the relevant position became vacant. *See id.* at § 3346.

181.    The FVRA is the "exclusive means" for appointing acting officials, unless an alternative statutory provision "expressly" authorizes certain other mechanisms to fill positions in an acting capacity or the President makes an appointment during a Senate recess. *See id.* at § 3347(a).

182.    The FVRA directs that an action taken by a person "in the performance of any function or duty of a vacant office" covered by FVRA provisions "shall have no force or effect" if

51

the action is taken by a person who is "not acting under" FVRA provisions, including section 3347, permitting appointment pursuant to other express statutory provisions. *Id.* § 3348(d)(1).

183.    The HSA addresses the order of succession to serve as acting DHS secretary. 6 U.S.C. § 113(g)(1), (2).

184.    Then-acting USCIS director Kenneth T. Cuccinelli adopted the October 2019 fee-waiver actions. The Fee Proposal was signed on November 8, 2019 by Kevin K. McAleenan, as acting DHS secretary. The Supplemental Proposal, as well as the January 2020 notice reopening the comment period, were signed by Chad F. Wolf, as acting DHS secretary. In July 2020, the 2020 Fee Rule was approved by Chad F. Wolf, as acting DHS secretary. The 2020 Fee Rule states, in one part, that Wolf signed the document and, in another part, that Wolf delegated authority to electronically sign the document to Chad R. Mizelle, described as "Senior Official Performing the Duties of the General Counsel for DHS." *See* 85 Fed. Reg. at 46,804, 46,913.

185.    The offices of USCIS director, DHS secretary, and DHS general counsel are ones that must be filled by presidential appointment, with the advice and consent of the Senate. *See* 6 U.S.C. §§ 112(a)(1), 113(a)(1)(E), (J).

186.    In their acting positions, Cuccinnelli, McAleenan, and Wolf performed functions or duties of such positions, as defined in 5 U.S.C. § 3348. The USCIS director's "[f]unctions" include establishing policies and overseeing the administration of such policies. 6 U.S.C. § 271(a)(3)(A), (B), (D). The DHS secretary's functions or duties include issuing regulations and delegating the secretary's functions to others. *See* 6 U.S.C. § 112(b)(1), (e); 8 U.S.C. § 1103(a)(3).

187.    When he adopted the October 2019 fee-waiver actions, Cuccinelli was performing the role of acting USCIS director in violation of the FVRA. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 29 (D.D.C. 2020).

188.    When he signed the 2020 Fee Proposal, McAleenan was performing the role of
acting DHS secretary in violation of the HSA and the FVRA. At the time, the order of succession
applicable under the HSA was reflected in Executive Order No. 13,753, 81 Fed. Reg. 90,677 (Dec.
9, 2016), and McAleenan, the CBP commissioner, was not the next in line under that order. *See*
GAO, *Homeland Security*, File B-331650, at 4-9 (Aug. 14, 2020),
https://www.gao.gov/assets/710/708830.pdf. Also, by the time McAleenan signed the 2020 Fee
Proposal, the vacancy had been open for more than 210 days. The DHS secretary position had
become vacant by April 10, 2019.

189.    When he signed the Supplemental Proposal and the January 2020 comment-period
extension, approved the 2020 Fee Rule, and made any delegation of signature authority to Mizelle,
Wolf was performing the role of acting DHS secretary in violation of the HSA and the FVRA. On
November 8, 2019, McAleenan issued a document that purported to change the DHS secretary
order of succession in a way that could have made Wolf the next in line to be the acting secretary.
But that change was invalid because McAleenan was not validly serving as acting secretary. *See
id.* at 9-11. Also, when Wolf assumed the title of acting secretary, the vacancy had been open for
more than 210 days.

190.    When he signed the 2020 Fee Rule, Mizelle did not have authority to serve as acting
general counsel under the FVRA. The position had been vacant for more than 210 days.

**V. IMPACT OF 2019 FEE-WAIVER ACTIONS AND 2020 FEE RULE ON PLAINTIFFS**

**A. Harm to NWIRP**

### (1) Harm Caused by October 2019 Fee-Waiver Actions

191.    When NWIRP helps its direct-representation clients apply for USCIS benefits, it also assists those clients with associated fee-waiver applications. In recent years, many NWIRP direct-representation clients have sought waivers of USCIS filing fees.

192.    Before USCIS's October 2019 fee-waiver actions, NWIRP routinely prepared fee-waiver applications based on clients' receipt of means-tested benefits. In these cases, NWIRP would advise a client receiving such benefits to bring documentation to his or her appointment. NWIRP staff could use this documentation to prepare a fee-waiver application in a matter of minutes.

193.    NWIRP also routinely prepared successful fee-waiver applications without the documentation required by the October 2019 I-912 form, even for clients who were not receiving means-tested benefits.

194.    Further, before USCIS adopted the October 2019 revisions to the I-912 form and instructions, set a date for the 2011 Memorandum to expire, and revised its Policy Manual, NWIRP submitted some fee-waiver applications without the I-912 form. Also, in some cases, NWIRP combined the fee-waiver applications for multiple members of the same family into one.

195.    By creating new documentation requirements, eliminating the most straightforward of the 2011 Memorandum's application criteria, and creating additional uncertainty about how an applicant can successfully establish eligibility for a fee waiver, the October 2019 fee-waiver actions would make applying for fee waivers a more burdensome, time-consuming, and lengthy process, with a higher risk of denial, for individual applicants and for NWIRP, in serving its clients.

196.    The October 2019 I-912 form and its instructions, the expiration of the 2011 Memorandum, and the new Policy Manual sections thus impair NWIRP's ability to assist clients with immigration legal matters and implement other programs, and conflict with NWIRP's mission. In multiple ways, NWIRP will devote scarce resources to counteracting the harmful effects of these agency actions.

197.    For instance, the October 2019 I-912 form and its instructions, the expiration of the 2011 Memorandum, and the new Policy Manual sections will cause NWIRP to spend more time, per individual, assisting clients with fee waivers, if they go into effect.

    a.    NWIRP will have to spend substantially more time working with many of its fee-waiver clients to gather, compile, or review additional documentation, and to re-submit applications if USCIS deems clients' initial fee-waiver applications to be insufficient. For example, NWIRP expects that, for the first time, it will routinely have to assist clients in seeking and obtaining tax transcripts from the IRS. NWIRP expects that helping clients obtain documents from the IRS could be particularly time-consuming with its disabled or elderly clients or others who are likely to lack access to the Internet, accounts in their name, or other requirements for obtaining documents from the IRS online.

    b.    NWIRP will spend more time assessing fee-waiver clients' tax situations due to the I-912 form's new questions about tax filing.

    c.    NWIRP will also spend extra time counseling clients about fee waivers because of the additional uncertainty about how to establish eligibility for a fee waiver, whether individuals will need to resubmit fee-waiver applications with additional documents, and the timeline needed for achieving a favorable result.

198.    Increasing the time required to assist clients with fee-waiver applications and counsel clients on fee-waiver issues will mean that NWIRP must divert resources from serving other clients. As a result, NWIRP will not able to serve as many clients as it could previously.

199.    If the October 2019 fee-waiver actions go into effect, NWIRP will also divert resources to address the October 2019 revisions to the I-912 form and its instructions, the expiration of the 2011 Memorandum, and the new Policy Manual sections by advancing the application fees of certain clients who are facing urgent immigration deadlines, who are unable to proceed with their USCIS applications if they must pay application fees, and for whom NWIRP is now less certain whether USCIS will grant a fee waiver in time, due to the extra time required to compile an application under the revised fee-waiver standard, the uncertainty regarding USCIS's timeline for processing applications under the new standard, and the lack of clarity about what applicants must do to satisfy the new standard.

200.    NWIRP will additionally address the harm caused by the October 2019 fee-waiver actions by devoting time to modifying its community-education and training materials. Though NWIRP's training and outreach efforts are currently limited by the coronavirus pandemic, as NWIRP prepares for more limited trainings during the pandemic and further training and outreach as the pandemic subsides, NWIRP will need to adjust its materials not only to describe the new agency actions and their importance, but also, in the future, to address complications that arise in the agency's application of them.

**(2) Harm Caused by 2020 Fee Rule**

201.    The 2020 Fee Rule will make it more difficult to NWIRP to serve its clients, and thus advance its mission, in several ways.

202.    The 2020 Fee Rule will make understanding and assisting clients in applying for fee waivers a more burdensome, time-consuming, and lengthy process for NWIRP. To help clients apply for fee waivers under the new rule, NWIRP will have to spend more time working with many of those clients to gather, compile, or review the required documentation and forms. For instance, helping clients obtain and review a tax transcript, or similar IRS documents, can alone take more time than submitting an application under the 2011 Memorandum and related USCIS practice. Many NWIRP clients will only be able to obtain and interpret these documents with NWIRP's help. NWIRP will have to spend more time completing individual forms for every applicant, instead of combining family members' related forms into one. Additionally, when clients seek to use the 2020 Fee Rule's alternative documentation requirements, NWIRP will have to spend more time documenting clients' circumstances and helping clients obtain any alternative documentation. Because of the risk that USCIS might apply the alternative documentation requirements in unexpected ways, these requirements may also mean that NWIRP has to spend time re-submitting applications after initial denials.

203.    The 2020 Fee Rule will make it harder for NWIRP to serve clients who are not eligible for fee waivers. Because of new restrictions on fee waiver availability and increased fees, NWIRP expects that more of its potential clients will face fees that they cannot afford to pay at the time they seek assistance. The 2020 Fee Rule will thus make it more difficult for NWIRP to identify clients that NWIRP is able serve and then help such clients apply for immigration benefits. For instance:

   a.  In order to proceed with their applications, more clients than before will need NWIRP's help in identifying options for gathering the funds to pay the necessary fees. NWIRP will spend more time providing such assistance.

b. More clients will need more time to obtain the necessary funds. When a client needs more time to come up with the necessary funds, NWIRP puts the client's case file on hold until the client has the funds to apply. This process, of putting a case on hold and restarting, can increase the amount of work required for NWIRP to serve a client.

c. Among the potential clients who seek NWIRP's assistance, a greater portion will have no foreseeable way to pay the required fee. NWIRP will have to devote more time to assessing the circumstances of potential clients whom NWIRP ultimately is unable to help, and then identifying other individuals whom NWIRP can help instead.

d. Because the 2020 Fee Rule imposes a surcharge for filing paper-based applications, when online options are available, NWIRP will spend additional effort to help clients file applications online when they might otherwise have used paper forms. For clients who do not have access to technology or are facing other life challenges that limit their ability to use online forms, NWIRP will have to spend more time helping clients create email accounts or keep track of such accounts.

e. NWIRP will use available resources to advance certain clients' application fees. The 2020 Fee Rule's fee increases mean that when NWIRP assists clients in this way, NWIRP will often have to pay more, per client. Thus, available NWIRP funds will help fewer individuals.

204. The 2020 Fee Rule will require NWIRP to spend additional time with clients and potential clients and spend more money for individual fees that it advances.

205.    NWIRP will additionally address the harm caused by the 2020 Fee Rule by devoting time to modifying its community-education and training materials. Though NWIRP's training and outreach efforts are currently limited by the coronavirus pandemic, as NWIRP prepares for more limited trainings during the pandemic and further training and outreach as the pandemic subsides, NWIRP will need to adjust its materials not only to describe the new rule and its importance, but also, in the future, to address complications that arise in the agency's application of it.

206.    The uses of NWIRP resources described above mean that NWIRP will divert time and money from helping other clients. NWIRP will not be able to advance the fees of as many clients as it could previously and will not be able to serve as many clients as it could previously.

**B. Harm to Ayuda**

207.    Many Ayuda clients cannot afford to pay immigration filing fees. Ayuda often helps eligible clients apply for USCIS fee waivers. Also, since 2019, Ayuda has sought and received grant funds that it uses to pay the USCIS fees of certain clients who would face legal prejudice or other harm if they sought a fee waiver and were denied.

208.    The October 2019 fee-waiver actions will hamper Ayuda's ability to serve its clients, and thus advance its mission, in multiple ways. First, these actions will make it more time-consuming for Ayuda to help clients seeking fee waivers. Under current law and USCIS practice, Ayuda generally helps clients apply for fee waivers based on a single document: proof of receipt means-tested benefits, a copy of a tax return, or a declaration. In many cases, clients are able to locate the required documents easily and bring them to Ayuda during a meeting that is early in the preparation of the case. If the October 2019 fee-waiver actions go into effect, many fee-waiver clients will need more help from Ayuda in identifying, obtaining, and reviewing required

documents. The documents required by the new standard are not generally familiar to Ayuda clients and can vary based on the circumstances of the client and the client's household members. Ayuda will need to spend more time assessing which documents are required and helping clients gather the required IRS and other documents. Additionally, because the October 2019 fee-waiver actions will make the fee-waiver application process lengthier and increase the risk of unexpected denials, a greater portion of Ayuda's fee waiver clients will need help from Ayuda in assessing their options, and re-applying, if their fee-waiver applications are denied, or receiving grant funds to pay their USCIS fees.

209.    The October 2019 fee-waiver actions will require Ayuda to spend more time and money helping individual fee-waiver clients. Ayuda's time will be diverted from helping other clients, and its grant funds will be diverted from other uses, including other clients' litigation expenses.

210.    The 2020 Fee Rule will also hamper Ayuda's ability to serve its clients and thus advance its mission.

211.    For Ayuda clients eligible for fee waivers under the 2020 Fee Rule, the rule's documentation requirements will make Ayuda's work more difficult and resource-consuming in ways similar to the October 2019 fee-waiver actions.

212.    The 2020 Fee Rule will also make it harder for Ayuda to serve clients who are ineligible for fee waivers. Ayuda will continue paying some clients' fees, but that assistance will often cost more, due to the fee increases in the 2020 Fee Rule. As a result, Ayuda's existing grant funds will not help as many clients as they could before. Additionally, when Ayuda cannot provide grant funds to help clients, Ayuda will more frequently need to wait to proceed with filing clients' applications until they have the funds to pay the applicable fees. Waiting for clients to find the

funds to pay immigration fees can require more work from Ayuda. For instance, Ayuda staff may have to help clients re-do documentation when the client is ready to file. Additionally, among the potential clients who seek Ayuda's assistance, a greater portion will have no foreseeable way to pay the required immigration fee. Because Ayuda will not be able to provide grant funds to all such clients, Ayuda will have to devote more time to assessing the circumstances of potential clients whom Ayuda ultimately is unable to help, and then identifying other individuals whom Ayuda can help instead.

213.    The 2020 Fee Rule's surcharge for filing paper-based applications will also make it harder for Ayuda to serve its clients. In order to enable clients to avoid the surcharge, Ayuda will spend additional effort helping clients file applications online when they might otherwise have used paper forms. Because not all Ayuda clients have access to or are comfortable with technology, Ayuda will have to spend more time helping clients create email accounts or keep track of those accounts.

214.    As a result of the 2020 Fee Rule, Ayuda will have to spend additional time and money helping individual clients and, therefore, divert its time and resources from other clients. Ayuda will be prevented from helping as many new clients as it would otherwise be able to help.

215.    Because of the harm caused by the 2020 Fee Rule, Ayuda will also devote additional time to seeking—and monitoring the use of—grant funds that it can use to pay Ayuda clients' immigration fees. This work will divert Ayuda resources from other efforts.

216.    The 2020 Fee Rule will additionally cause Ayuda to lose revenue, while increasing the costs of serving individual clients. Ayuda charges below-cost fees to some clients, but does not turn away clients unable to pay Ayuda's fee. Because of the 2020 Fee Rule's fee increases and fee-waiver restrictions, fewer clients will be able to pay any Ayuda fee. At the same time, the costs

of representing clients under Ayuda's low bono fee model will increase, due to the increased work that the 2020 Fee Rule will cause.

## C. Harm to CASA

217.    CASA's members will face increased fees due to the 2020 Fee Rule.

218.    The October 2019 fee-waiver actions and 2020 Fee Rule will also make it more difficult for CASA to help members through its naturalization program.

219.    Through its naturalization program, CASA mostly serves low-wage workers who struggle to pay for basic necessities and have limited English proficiency. Under current law, many are eligible for a fee waiver or a reduced naturalization fee. CASA helps eligible individuals understand the requirements for seeking a fee waiver or reduced fee. Most frequently, eligible CASA members are able to support their fee waiver or reduced-fee applications with proof that they receive means-tested benefits or copies of their tax returns, not tax transcripts.

220.    The October 2019 fee-waiver actions will require more CASA members to support their fee-waiver applications with tax transcripts or other documents from the IRS, for themselves and their household members. These documents are not ones that CASA members tend to have at their homes; in seeking CASA's assistance, members will expect and need CASA's help obtaining them. Helping clients identify and gather the required documentation will require more effort from CASA. For instance, CASA staff will spend additional time guiding individuals through the IRS's online system for seeking tax transcripts or helping them seek such forms at an IRS office. The time required to help individuals in this way will take away from CASA's ability to serve other clients and mean that, with existing staff, it cannot serve as many individuals as it would otherwise.

221.    The 2020 Fee Rule will also make it more difficult for CASA to serve members and accomplish its mission. To the extent that individuals in CASA's naturalization program are

still eligible for fee-waivers under the new rule, the 2020 Fee Rule will require CASA to spend more time helping members obtain required documents, such as tax transcripts or other required documents from the IRS.

222.    The 2020 Fee Rule will also require CASA to spend more time helping individuals who are not eligible for fee waivers.

223.    Currently, when members are ineligible for fee waivers and reduced fees, CASA helps those individuals identify other strategies for funding their naturalization applications. Members who live in a certain county may be eligible for scholarship funds. If members are ineligible for those funds, CASA informs them about an available credit union loan, counsels them on the consequences of taking out a loan, and, if they are interested, helps them apply and provides continuing support. When individuals are unable to afford USCIS naturalization fees and are ineligible for, or not interested in, the scholarship or the loan, CASA provides additional one-on-one financial counseling to help the members identify ways to afford the USCIS fees.

224.    The 2020 Fee Rule means that a smaller fraction of members in CASA's naturalization program will be eligible for fee waivers. As a result, more members will require CASA's help obtaining and using a credit union loan or identifying other options through financial counseling. This type of assistance generally requires more of CASA's time than helping people apply for fee waivers. Because the 2020 Fee Rule means that CASA will spend more time on this type of assistance, CASA will divert resources from serving other members or from other activities. Absent more resources, CASA will not be able to help as many people naturalize (and therefore be eligible to vote), as it could before.

225.    The 2020 Fee Rule will also cause CASA to lose revenue. CASA charges a small fee for its naturalization program, which it waives for individuals who demonstrate significant

financial hardship. Due to the 2020 Fee Rule, CASA will not be able to serve as many members through its naturalization program as it could before. Additionally, because the 2020 Fee Rule imposes substantial new financial burdens on already low-income members, CASA anticipates that a greater portion of the members in its naturalization program will need the CASA fee waived. As a result of these circumstances, CASA will lose revenue.

## FIRST CAUSE OF ACTION
**(Failure to observe required procedure—Revisions to I-912 form and instructions)**

226.    The APA empowers this Court to "hold unlawful and set aside" agency actions taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

227.    The October 2019 changes to the I-912 form and its instructions constitute a substantive and legislative rule that was subject to the notice-and-comment requirements of the APA, *id.* § 553.

228.    USCIS did not conduct notice-and-comment rulemaking before changing the I-912 form and its instructions.

229.    By failing to engage in notice-and-comment rulemaking before adopting the October 2019 revisions to the I-912 form and its instructions, USCIS failed to observe procedures required by law, in contravention of the APA.

## SECOND CAUSE OF ACTION
**(Agency action that is arbitrary, capricious, an abuse of discretion, or not in accordance with law—Revisions to I-912 form and instructions)**

230.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

231.    USCIS failed to provide a reasoned explanation for the October 2019 revisions to the I-912 form and instructions. It has provided shifting, incomplete, and illogical explanations of

the changes; asserted justifications that are unsupported by data, internally inconsistent, conclusory, or in contradiction of the record or the law; made assertions about matters outside its expertise; provided a certification to OMB that is not supported by the record; and failed to rationally connect the choices made to facts found.

232.    In issuing the October 2019 revisions to the I-912 form and instructions, USCIS relied on inappropriate and irrelevant factors, including factors unrelated to individuals' ability to pay required fees.

233.    In issuing the October 2019 revisions to the I-912 form and instructions, USCIS failed to engage with the information and arguments in the record and failed to consider important aspects of the problem.

234.    USCIS did not identify the facts and circumstances underlying the 2011 Memorandum or explain whether or why it disregarded them.

235.    USCIS's October 2019 I-912 form and its instructions omit directions that USCIS identified separately, in its Policy Manual, and did not explain.

236.    USCIS failed to consider significant and obvious alternatives to the October 2019 revisions to the I-912 form and instructions.

237.    The October 2019 revisions to the I-912 form and its instructions are arbitrary, capricious, or an abuse of discretion, in contravention of the APA.

**THIRD CAUSE OF ACTION**
**(Agency action that is arbitrary, capricious, an abuse of discretion,**
**or not in accordance with law—Expiration of 2011 Memorandum)**

238.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

239.    USCIS provided no reasons for setting the 2011 Memorandum to expire, other than those offered to justify the October 2019 revisions to the I-912 form and its instructions. Those reasons are incomplete, unsupported, and otherwise inadequate, as described above.

240.    USCIS's establishment of an expiration date for the 2011 Memorandum is arbitrary, capricious, or an abuse of discretion, in contravention of the APA.

**FOURTH CAUSE OF ACTION**
**(Agency action that is arbitrary, capricious, an abuse of discretion,**
**or not in accordance with law—Policy Manual revisions)**

241.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

242.    USCIS provided no reasons for issuing new sections of its Policy Manual, to supersede sections in the Adjudicator's Field Manual and related material, other than those offered to justify the October 2019 revisions to the I-912 form and its instructions. Those reasons are incomplete, unsupported, and otherwise inadequate, as described above.

243.    The Policy Manual's new chapter 4 incorrectly and unreasonably interprets 8 U.S.C. § 1255(*l*)(7), to the extent that such interpretation attempts to narrow individuals' ability to seek fee waivers for certain filings.

244.    USCIS's new Policy Manual sections, regarding fees and fee waivers, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in contravention of the APA.

## FIFTH CAUSE OF ACTION
**(Agency action that is arbitrary, capricious, an abuse of discretion,
not in accordance with the law, or taken without
observance of required procedure—Information collection revisions)**

245.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or taken "without observance of procedure required by law," *id.* § 706(2)(D).

246.    USCIS did not comply with the PRA requirement that, before revising its fee-waiver information-collection, it first complete a multi-factor review that included an "objectively supported estimate of burden," 5 C.F.R. § 1320.8(a)(4); "[a] plan for the efficient and effective management and use of the information to be collected, including necessary resources," *id.* § 1320.8(a)(7); and other elements, *id.* § 1320.8(a). *See generally id.* § 1320.5(a)(1)(i).

247.    Because they were inaccurate and incomplete, the agency's Federal Register notices did not satisfy the PRA requirement for USCIS to publish two Federal Register notices before revising its fee-waiver information-collection. *See* 44 U.S.C. §§ 3506(c)(2)(A), 3507(a)(1)(D); 5 C.F.R. §§ 1320.5(a)(1)(iv), 1320.8(d)(1), 1320.10(a).

248.    USCIS did not comply with the PRA requirement that, to obtain OMB approval for the October 2019 revisions to its fee-waiver information-collection, it "demonstrate that it has taken every reasonable step to ensure that the proposed collection of information" "[i]s the least burdensome necessary," "[h]as practical utility," has not "shift[ed] disproportionate costs or burdens onto the public" in "seek[ing] to minimize the cost to [USCIS]," and meets other standards, 5 C.F.R. § 1320.5(d)(1), as well as demonstrate in its OMB submission that certain characteristics of the collection, if present, satisfy a "substantial need" or a statutory requirement, *id.* § 1320.5(d)(2).

249.    USCIS failed to satisfy the PRA requirement that it provide a certification, supported by the record, that its fee-waiver information-collection, as revised, satisfies certain requirements. *See id.* § 1320.9; *see also* 44 U.S.C. § 3506(c)(3); 5 C.F.R. § 1320.5(a)(1)(iii)(A).

250.    In adopting the October 2019 revisions to its fee-waiver information-collection, USCIS failed to observe procedures required by law, or took agency action that is arbitrary, capricious, an abuse of discretion, or not in accordance with the PRA, in contravention of the APA.

### SIXTH CAUSE OF ACTION
### (Agency action that is not in accordance with the INA and regulation — Revisions to I-912 form and instructions)

251.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

252.    The INA, 8 U.S.C. § 1255(*l*)(7), requires DHS to "permit" immigrants "to apply" for the waiver of "any fees" associated with certain applications related to humanitarian forms of protection.

253.    Under DHS regulation, an individual "unable to pay" a USCIS fee is eligible for a waiver if the waiver is consistent with the benefit sought and the applicant submits a written request "stat[ing] the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated." 8 C.F.R. § 103.7(c)(1), (2).

254.    The October 2019 revisions to the fee-waiver form and instructions require applicants, including those applying under 8 U.S.C. § 1255(*l*)(7), to submit specified types of documentation that are not available to some otherwise-eligible immigrants.

255.    The October 2019 revisions to the I-912 form and its instructions violate the INA, 8 U.S.C. § 1255(*l*)(7), and DHS regulation, 8 C.F.R. § 103.7(c), in contravention of the APA.

## SEVENTH CAUSE OF ACTION
### (Failure to observe required procedure—2020 Fee Rule)

256.   The APA empowers this Court to "hold unlawful and set aside" agency actions taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

257.   Under the APA's requirements for notice-and-comment rulemaking, an agency must provide notice of the proposed rule, including the "legal authority under which the rule is proposed" and "the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(2), (3). The agency also must "give interested persons an opportunity to participate through submission of written data, views, or arguments." *Id.* § 553(c).

258.   DHS did not explain or make available many aspects of the reasoning, data, assumptions, models, studies, or other material on which the Fee Proposal relied. The preamble to the Fee Proposal did not accurately describe all of the proposed regulatory text.

259.   Interested parties could not comment meaningfully on the Fee Proposal, Supplemental Proposal, and supporting material.

260.   The 2020 Fee Rule included new provisions, data, and rationales that were not discussed in the Fee Proposal and that interested parties could not have anticipated.

261.   By failing to comply with the APA's notice-and-comment rulemaking requirements in adopting the 2020 Fee Rule, DHS failed to observe procedures required by law, in contravention of the APA.

## EIGHTH CAUSE OF ACTION
### (Agency action that is not in accordance with the INA—2020 Fee Rule)

262.   The APA empowers this Court to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

69

263.    Under the INA, "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," as well as "any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m).

264.    The 2020 Fee Rule is not in accordance with the INA, 8 U.S.C. § 1356(m), because it sets fees at a level intended to recover costs other than those of "providing adjudication and naturalization services" or "the administration of the fees collected."

265.    The INA, 8 U.S.C. § 1255(*l*)(7), requires DHS to "permit" immigrants "to apply for a waiver of any fees associated with" certain applications related to humanitarian forms of protection.

266.    The 2020 Fee Rule requires that immigrants applying for waivers of the fees covered by section 1255(*l*)(7) submit specified types of documentation that are not available to some otherwise-eligible immigrants. By thus prohibiting certain applicants from applying, the 2020 Fee Rule violates 8 U.S.C. § 1255(*l*)(7).

267.    The INA states that individuals must receive certain immigration benefits if they satisfy certain listed criteria, which do not include any measure of an applicant's financial circumstances. These provisions include: 8 U.S.C. §§ 1186a(c)(3) (removal on conditions for residence) and 1452(a) (certificate of citizenship).

268.    The 2020 Fee Rule violates the INA by barring applicants who are unable to pay required fees from applying for mandatory benefits whose criteria do not include any measure of applicants' financial circumstances.

269.    The 2020 Fee Rule is not in accordance with the INA, in contravention of the APA.

70

## NINTH CAUSE OF ACTION
### (Agency action that is arbitrary and capricious—2020 Fee Rule)

270.     The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

271.     DHS failed to provide a reasoned explanation for the 2020 Fee Rule. For instance, DHS based the rule on unreasonable, inaccurate, and unexplained estimates of its budget needs, filing volumes, USCIS revenue, and other key figures. It did not describe all the operations whose costs it sought to cover or why they fell within the scope of DHS's authority to charge fees. DHS considered inappropriate factors; failed to engage with information and arguments in the record; relied on internally inconsistent, illogical, unsupported, or conclusory justifications; made assertions that were contradicted by data in the record; and failed to explain changes in position. It also failed to consider the harm its rule will cause and other important aspects of the problem; and failed to consider alternatives or explain its rejection of them.

272.     To the extent DHS's preamble sought to interpret the scope of the new fee-waiver regulation by listing all forms that could be eligible for such waivers, that interpretation excluded at least one eligible form and is contrary to the regulation.

273.     The 2020 Fee Rule is arbitrary and capricious, in contravention of the APA.

## TENTH CAUSE OF ACTION
### (Agency action that is in excess of authority under
### the FVRA and HSA, or without observance of procedure required by law
### —2020 Fee Rule and October 2019 fee-waiver actions)

274.     The APA empowers this Court to "hold unlawful and set aside" agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory … authority," *id.* 706(2)(C), or "without observance of procedure required by law," *id.* 706(2)(D).

275.     The FVRA, 5 U.S.C. §§ 3345-3349, and the HSA, 6 U.S.C. § 113(g), limit which individuals may serve as acting officials within DHS and USCIS and the amount of time for which they may do so.

276.     The FVRA directs that an action taken by a person "in the performance of any function or duty of a vacant office" covered by FVRA provisions "shall have no force or effect" if the action is taken by a person who is "not acting under" FVRA provisions. *Id.* § 3348(d)(1).

277.     The October 2019 fee-waiver actions were adopted by Cuccinelli while he was purporting to serve as acting USCIS director, in violation of the FVRA. These actions constitute "function[s] or dut[ies]" of the applicable "vacant office," under the FVRA, 5 U.S.C. § 3348(d)(1).

278.     The 2020 Fee Rule was adopted through a series of actions, including issuance of the Fee Proposal and approval of the final rule, that were taken by individuals while they were purporting to serve as acting DHS officials, in violation of the FVRA and the HSA. These actions constitute "function[s] or dut[ies]" of the applicable "vacant office," under the FVRA. 5 U.S.C. § 3348(d)(1).

279.     The October 2019 fee-waiver actions and the 2020 Fee Rule have no force or effect, under the FVRA, and were adopted in violation of the law, without observance of proper procedure, and in excess of USCIS's and DHS's statutory authority, in contravention of the APA.

## ELEVENTH CAUSE OF ACTION
### (Non-statutory review of ultra vires action—2020 Fee Rule and October 2019 fee-waiver actions)

280.     Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

281.     The FVRA, 5 U.S.C. §§ 3345-3349, and the HSA, 6 U.S.C. § 113(g), limit which individuals may serve as acting officials within DHS and USCIS and the amount of time for which

they may do so.

282.    The FVRA directs that an action taken by a person "in the performance of any function or duty of a vacant office" covered by FVRA provisions "shall have no force or effect" if the action is taken by a person who is "not acting under" FVRA provisions. *Id.* § 3348(d)(1).

283.    The October 2019 fee-waiver actions were adopted by Cuccinelli while he was purporting to serve as acting USCIS director, in violation of the FVRA. These actions constitute "function[s] or dut[ies]" of the applicable "vacant office" under the FVRA, 5 U.S.C. § 3348(d)(1).

284.    The 2020 Fee Rule was adopted through a series of actions, including issuance of the Fee Proposal and approval of the final rule, that were taken by individuals while they were purporting to serve as acting officials, in violation of the FVRA and the HSA. These actions constitute "function[s] or dut[ies]" of the applicable "vacant office" under the FVRA. 5 U.S.C. § 3348(d)(1).

285.    The October 2019 fee-waiver actions and the 2020 Fee Rule were ultra vires.

## CLAIMS FOR RELIEF

WHEREFORE, Plaintiffs requests that this Court:

A.     Declare unlawful and set aside the October 2019 revisions to the I-912 form and its instructions;

B.     Declare unlawful and set aside the October 2019 revisions to USCIS's fee-waiver information-collection;

C.     Declare unlawful and set aside USCIS's decision to cease applying its 2011 Memorandum;

D.     Declare unlawful and set aside the October 2019 revisions to the USCIS Policy Manual;

E.        Declare unlawful and set aside the 2020 Fee Rule;

F.        Declare that the October 2019 fee-waiver actions and the 2020 Fee Rule were adopted in excess of authority and have no force or effect;

G.        Enjoin defendants from implementing the October 2019 revisions to the I-912 form and its instructions, the expiration date on the 2011 Memorandum, the October 2019 revisions to the USCIS Policy Manual, the October 2019 revisions to USCIS's fee-waiver information-collection, and the 2020 Fee Rule;

H.        Award plaintiffs their reasonable costs and attorney's fees under 28 U.S.C. § 2412; and

I.        Grant such other relief as this Court deems just and proper.

Dated: August 21, 2020

Respectfully submitted,

 /s/ Rebecca Smullin

Laurie Ball Cooper (D.C. Bar No. 1017998)
Ayuda, Inc.
6925 B Willow Street NW
Washington DC 20012
202-349-0656
laurie.ballcooper@ayuda.com

Counsel for Plaintiff Ayuda, Inc.

Nicholas Katz (MD Bar No. 1812100006)
CASA de Maryland, Inc.
8151 15th Avenue
Langley Park, MD 20783
(240) 491-5743
nkatz@wearecasa.org

Counsel for Plaintiff CASA
de Maryland, Inc.

Rebecca Smullin (D.C. Bar No. 1017451)
Adina H. Rosenbaum (D.C. Bar No. 490928)
Michael T. Kirkpatrick (D.C. Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
202-588-7714
rsmullin@citizen.org

Counsel for All Plaintiffs

Matt Adams (WSBA No. 28287)
Aaron Korthuis (WSBA No. 53974)
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
206-957-8611
matt@nwirp.org

Counsel for Plaintiff Northwest
Immigrant Rights Project