# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORTHWEST IMMIGRANT RIGHTS PROJECT, AYUDA, INC., and CASA DE MARYLAND, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 19-cv-03283-RDM |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, DEPARTMENT OF HOMELAND SECURITY, CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security, and KENNETH T. CUCCINELLI, in his official capacity as Senior Official Performing the Duties of the USCIS Director and Senior Official Performing the Duties of the Deputy Secretary of Homeland Security, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## MOTION FOR SECTION 705 RELIEF AND PRELIMINARY INJUNCTION

Plaintiffs move for a postponement of the effective date of the Department of Homeland Security's 2020 Fee Rule, 85 Fed. Reg. 46,788 (Aug. 3, 2020), and a stay of any implementation or enforcement of the rule "to preserve status or rights pending conclusion of the review proceedings," pursuant to the Administrative Procedure Act, 5 U.S.C. § 705. Plaintiffs also move for a preliminary injunction against implementation or enforcement of the rule. Plaintiffs seek this relief on the grounds that they are likely to succeed on the merits, they are likely to suffer irreparable harm in the absence of preliminary relief, and the balance of equities and public interest weigh in favor of the requested relief.

1

In support of this motion, plaintiffs submit the accompanying memorandum of law; the second declarations of Jorge L. Barón and Rebecca Smullin; declarations of Laurie Ball Cooper and George Escobar; and a proposed order. This motion is also supported by the declaration of Jorge L. Barón, Dkt. 11-1, the declaration of Rebecca Smullin, Dkt. 11-2, and the excerpts of the administrative record, Dkt. 33-1, previously filed in this case.

Dated: September 3, 2020

Respectfully submitted,

  /s/ Rebecca Smullin

Laurie Ball Cooper (D.C. Bar No. 1017998)
Ayuda, Inc.
6925 B Willow Street NW
Washington DC 20012
202-349-0656
laurie.ballcooper@ayuda.com

Counsel for Plaintiff Ayuda, Inc.

Nicholas Katz (MD Bar No. 1812100006)
CASA de Maryland, Inc.
8151 15th Avenue
Langley Park, MD 20783
240-491-5743
nkatz@wearecasa.org

Counsel for Plaintiff CASA
de Maryland, Inc.

Rebecca Smullin (D.C. Bar No. 1017451)
Adina H. Rosenbaum (D.C. Bar No. 490928)
Michael T. Kirkpatrick (D.C. Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
202-588-7714
rsmullin@citizen.org

Counsel for All Plaintiffs

Matt Adams (WSBA No. 28287)
Aaron Korthuis (WSBA No. 53974)
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
206-957-8611
matt@nwirp.org

Counsel for Plaintiff Northwest
Immigrant Rights Project

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NORTHWEST IMMIGRANT RIGHTS )
PROJECT, AYUDA, INC., and )
CASA DE MARYLAND, INC., )
)
         Plaintiffs, )
)
    v. )             Case No. 19-cv-03283-RDM
)
UNITED STATES CITIZENSHIP )
AND IMMIGRATION SERVICES, )
DEPARTMENT OF HOMELAND )
SECURITY, CHAD F. WOLF, in his )
official capacity as Acting Secretary of )
Homeland Security, and KENNETH )
T. CUCCINELLI, in his official capacity )
as Senior Official Performing the Duties of the )
USCIS Director and Senior Official Performing )
the Duties of the Deputy Secretary of )
Homeland Security, )
)
         Defendants. )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SECTION 705 RELIEF AND PRELIMINARY INJUNCTION**

Laurie Ball Cooper (D.C. Bar No. 1017998)    Rebecca Smullin (D.C. Bar No. 1017451)
Ayuda, Inc.    Adina H. Rosenbaum (D.C. Bar No. 490928)
6925 B Willow Street NW    Michael T. Kirkpatrick (D.C. Bar No. 486293)
Washington DC 20012    Public Citizen Litigation Group
202-349-0656    1600 20th Street NW
laurie.ballcooper@ayuda.com    Washington, DC 20009
    202-588-7714
Counsel for Plaintiff Ayuda, Inc.    rsmullin@citizen.org

    Counsel for All Plaintiffs

*(additional counsel on following page)*

Nicholas Katz (MD Bar No. 1812100006)
CASA de Maryland, Inc.
8151 15th Avenue
Langley Park, MD 20783
240-491-5743
nkatz@wearecasa.org

Counsel for Plaintiff CASA
de Maryland, Inc.

Matt Adams (WSBA No. 28287)
Aaron Korthuis (WSBA No. 53974)
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
206-957-8611
matt@nwirp.org

Counsel for Plaintiff Northwest
Immigrant Rights Project

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

    I.   Existing immigration fee and fee-waiver framework ........................................... 1

    II.  The 2020 Fee Rule and other DHS efforts to restrict fee waivers and increase fees.......... 5

    III. The effects of the 2020 Fee Rule ..................................................................... 8

ARGUMENT ................................................................................................................ 11

    I.   Plaintiffs are likely to succeed on the merits. ................................................... 12

        A.  The 2020 Fee Rule was adopted in violation of the HSA and/or FVRA. ................ 12

            1. McAleenan and Wolf served after the FVRA's 210-day time limit...................... 13

            2. McAleenan's appointment violated the HSA and FVRA......................................... 14

            3. Wolf's appointment violated the HSA and FVRA. ............................................... 15

            4. The 2020 Fee Rule is void. .............................................................................. 19

        B.  DHS failed to provide adequate notice and an opportunity to comment.................... 20

            1. DHS failed to provide models and assumptions.................................................. 20

            2. DHS adopted new provisions without notice...................................................... 24

        C.  The 2020 Fee Rule is arbitrary and capricious. ....................................................... 25

            1. DHS relied on unexplained and unreasonable calculations.................................. 25

            2. DHS failed in other ways to provide a reasoned explanation for its rule. .............. 29

            3. DHS repeatedly failed to consider the harm its rule will cause............................. 35

        D.  The 2020 Fee Rule violates the INA. .................................................................... 36

    II.  The other preliminary injunction and section 705 factors weigh in favor of relief. ......... 37

        A.  The 2020 Fee Rule inflicts irreparable harm on plaintiffs.......................................... 37

i

B.   The balance of equities and public interest weigh in favor of relief. .......................... 41

III. The Court should postpone the effective date and stay and enjoin implementation. ....... 45

CONCLUSION ................................................................................................................. 45

# TABLE OF AUTHORITIES

**CASES**                                                                                   **PAGE(S)**

*Adirondack Medical Center v. Sebelius*,
   891 F. Supp. 2d 36 (D.D.C. 2012) ....................................................................................19

*American Great Lakes Ports Ass'n v. Zukunft*,
   296 F. Supp. 3d 27 (D.D.C. 2017) ...................................................................................27

*American Radio Relay League, Inc. v. Federal Communications Commission*,
   524 F.3d 227 (D.C. Cir. 2008) ...................................................................................20, 22

*Aracely, R. v. Nielsen*,
   319 F. Supp. 3d 110 (D.D.C. 2018) ................................................................................44

*Central United Life, Inc. v. Burwell*,
   128 F. Supp. 3d 321 (D.D.C. 2015) ................................................................................44

*District Hospital Partners, L.P. v. Burwell*,
   786 F.3d 46 (D.C. Cir. 2015) .........................................................................................28

*District of Columbia v. U.S. Department of Agriculture*,
   444 F. Supp. 3d 1 (D.D.C. 2020) ................................................................32, 36, 44, 45

*East Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) .......................................................................................35

*Fred Meyer Stores, Inc. v. National Labor Relations Board*,
   865 F.3d 630 (D.C. Cir. 2017) .......................................................................................35

*General Dynamics Land System, Inc. v. Cline*,
   540 U.S. 581 (2004).......................................................................................................16

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   920 F.3d 1 (D.C. Cir. 2019) ...........................................................................................11

*Hermes Consolidated, LLC v. Environmental Protection Agency*,
   787 F.3d 568 (D.C. Cir. 2015) .......................................................................................28

*International Union, United Mine Workers of America v. Mine Safety & Health Administration*,
   407 F.3d 1250 (D.C. Cir. 2005) ................................................................................23, 24

*Kirwa v. United States Department of Defense*,
   285 F. Supp. 3d 21 (D.D.C. 2017) .................................................................................43

\* *League of Women Voters of the United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ...............................................................11, 20, 37, 38, 39, 44

\* *L.M.-M. v. Cuccinelli*,
  442 F. Supp. 3d 1 (D.D.C. 2020) .......................................................13, 17, 18, 19

*Mohamad v. Palestinian Authority*,
  566 U.S. 449 (2012) ........................................................................................17

\* *Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm*
  *Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .......................................25, 26, 28, 35

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C. 2018) ...................................................................45

*National Labor Relations Board v. SW General, Inc.*,
  137 S. Ct. 929 (2017) ...................................................................................18, 19

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................44

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ...................................................................38

*Open Communities Alliance v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ...............................................................38, 41

\* *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier*
  *Safety Administration*, 494 F.3d 188 (D.C. Cir. 2007) ....................................22, 25, 26

*People for the Ethical Treatment of Animals v. United States Department of Agriculture*,
  797 F.3d 1087 (D.C. Cir. 2015) ........................................................................38

*Public Citizen v. Federal Motor Carrier Safety Administration*,
  374 F.3d 1209 (D.C. Cir. 2004) ........................................................................29

*Public Citizen v. United States Department of Justice*,
  491 U.S. 440 (1989) ........................................................................................18

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) .....................................................................45

\* *Shands Jacksonville Medical Center v. Burwell*,
  139 F. Supp. 3d 240 (D.D.C. 2015) ...............................................................20, 24

iv

*Sierra Club v. Jackson,*
   833 F. Supp. 2d 11 (D.D.C. 2012) .......................................................12

*United States v. Cano-Flores,*
   796 F.3d 83 (D.C. Cir. 2015) .............................................................17

*United States v. Eaton,*
   169 U.S. 331 (1898) .........................................................................18

**CONSTITUTION**

U.S. Constitution, art. I, § 8, cl. 4 ............................................................45

U.S. Constitution, art. II, § 2, cl. 2 ..........................................................13

**STATUTES**

5 U.S.C. § 553 ..................................................................................20

5 U.S.C. § 705 ............................................................................12, 45

5 U.S.C. § 706 ............................................................................19, 25

5 U.S.C. § 3345 ...........................................................................12, 18

* 5 U.S.C. § 3346 .........................................................................12, 18

* 5 U.S.C. § 3347 ...........................................................12, 16, 17, 19

* 5 U.S.C. § 3348 ...................................................................16, 19

6 U.S.C. § 112 ......................................................................13, 19, 20

* 6 U.S.C. § 113 .................................................12, 13, 16, 17, 19

6 U.S.C. § 251 ...................................................................................37

6 U.S.C. § 271 ...................................................................................37

6 U.S.C. § 551 .....................................................................................2

6 U.S.C. § 557 .....................................................................................2

8 U.S.C. § 1101 ....................................................................30, 40, 44

8 U.S.C. § 1103 ...............................................................................19

8 U.S.C. § 1154 ............................................................................................................42

8 U.S.C. § 1158 ..............................................................................................35, 40, 44

8 U.S.C. § 1184 ............................................................................................................40

8 U.S.C. § 1186a ..........................................................................................................40

8 U.S.C. § 1229 ............................................................................................................41

8 U.S.C. § 1254a ........................................................................................................2, 3

8 U.S.C. § 1255 ..............................................................................................................3

* 8 U.S.C. § 1356 ......................................................................................2, 3, 35, 36, 37

8 U.S.C. § 1439 ..............................................................................................................3

8 U.S.C. § 1443 ............................................................................................................44

8 U.S.C. § 1612 ............................................................................................................40

**LEGISLATIVE MATERIALS**

Pres. Nom. 410, 116th Cong. (2019) .........................................................................15

Senate Report No. 105-250 (1998) .............................................................................13

**REGULATIONS, FEDERAL REGISTER NOTICES, AND RULEMAKING MATERIALS**

8 C.F.R. § 103.3 .....................................................................................................33, 41

8 C.F.R. § 103.7 .......................................................................................................3, 6

8 C.F.R. § 212.7 ..........................................................................................................43

8 C.F.R. § 216.4 ..........................................................................................................43

8 C.F.R. § 245.24 ....................................................................................................7, 43

8 C.F.R. § 336.2 ....................................................................................................30, 41

75 Fed. Reg. 58,962 (Sept. 24, 2010) ...................................................................3, 30

81 Fed. Reg. 73,292 (Oct. 24, 2016) .................................................................2, 4, 30

\* Executive Order No. 13,753, 81 Fed. Reg. 90,667 (Dec. 9, 2016) ..........................................14, 15

84 Fed. Reg. 62,280 (Nov. 14, 2019) ................................................................................ passim

84 Fed. Reg. 67,243 (Dec. 9, 2019) ..............................................................................6, 12

85 Fed. Reg. 4243 (Jan. 24, 2020) ...................................................................................12

Proclamation No. 9983, 85 Fed. Reg. 6699 (Jan. 31, 2020) ..............................................27

85 Fed. Reg. 11,866 (Feb. 28, 2020) .................................................................................2

85 Fed. Reg. 38,532 (June 25, 2020) ...............................................................................27

85 Fed. Reg. 46,788 (Aug. 3, 2020) ..............................................................................passim

DHS, *Regulatory Impact Analysis, USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements* (Oct. 30, 2019), https://www.regulations.gov/document?D=USCIS-2019-0010-0559 ....................................21

DHS, *Regulatory Impact Analysis, USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements* (July 22, 2020), https://www.regulations.gov/document?D=USCIS-2019-0010-12272 ..............................8, 28

USCIS, *IEFA Fee Review Supporting Documentation* (April 2019), https://www.regulations.gov/document?D=USCIS-2019-0010-0007 ..................20, 22, 23, 24

USCIS, *IEFA Fee Review Supporting Documentation with Addendum* (May 2020), https://www.regulations.gov/document?D=USCIS-2019-0010-12271 .................3, 25, 27, 37

**MISCELLANEOUS**

DHS, *Chad F. Wolf* (May 18, 2020), https://www.dhs.gov/person/chad-f-wolf ..............................................................................15

DHS, *Christopher C. Krebs* (Nov. 7, 2019), https://www.dhs.gov/person/christopher-c-krebs ................................................................15

DHS, *Privacy Impact Assessment Update for the Fraud Detection and National Security Directorate* (July 26, 2019), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-013-01-fdns-july2019_0.pdf ...................................................................................37

GAO, *Federal Vacancies Reform Act*, https://www.gao.gov/legal/other-legal-work/federal-vacancies-reform-act ...........................13

GAO, *Homeland Security*, File B-331650 (Aug. 14, 2020),
https://www.gao.gov/assets/710/708830.pdf ...........................................................14

GAO, *Homeland Security*, File B-332451 (Aug. 21, 2020),
https://www.gao.gov/assets/710/708944.pdf ...........................................................14

HHS, *Poverty Guidelines* (Jan. 8, 2020),
https://aspe.hhs.gov/poverty-guidelines................................................................7

IRS, *Welcome to Get Transcript* (Aug. 20, 2020),
https://www.irs.gov/individuals/get-transcript .....................................................33

IRS, *Get Transcript FAQs* (Apr. 21, 2020),
https://www.irs.gov/individuals/get-transcript-faqs ..............................................33

IRS, *When Would I Provide a Form W-2 and a Form 1099 to the Same Person?*
(Jul. 20, 2020), https://www.irs.gov/government-entities/federal-state-local-governments/
when-would-i-provide-a-form-w-2-and-a-form-1099-to-the-same-person ...........................34

Letter from Bennie G. Thompson, Chairman, House Committee on Homeland Security, and
Carolyn B. Maloney, Acting Chairwoman, House Committee on Oversight and Reform,
to Gene Dodaro, U.S. Comptroller General (Nov. 15, 2019), https://oversight.house.gov/
sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro%20re%20Letter%20
to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf ...............................................14

Memorandum from Chad F. Wolf, Acting Secretary, to Mark Morgan, Senior Official
Performing the Duties of Commissioner, CBP, *et al.*, (July 28, 2020),
https://www.dhs.gov/sites/default/files/publications/20_0728_s1_daca-reconsideration-
memo.pdf ................................................................................................27

OMB, *OMB Control Number History, OMB Control Number: 1615-0116*,
https://www.reginfo.gov/public/do/PRAOMBHistory?ombControlNumber=1615-0116 ......40

Social Security Administration, *Spotlight on SSI Benefits for Aliens—2020 Edition*,
https://www.ssa.gov/ssi/spotlights/spot-non-citizens.htm ......................................41

USCIS, *2018 USCIS Statistical Annual Report* (2019),
https://www.uscis.gov/sites/default/files/USCIS/statistics/2018_USCIS_Statistical_Annu
al_Report_Final_-_OPQ_5.28.19_EXA.pdf..............................................................2

USCIS, *Check Case Processing Times*,
https://egov.uscis.gov/processing-times/ ............................................................40

USCIS, *Form I-912 Request for Fee Waiver* (Mar. 2020),
https://www.uscis.gov/sites/default/files/document/data/Form_I-912_Request_for_Fee_
Waiver_Data_FY_2017-2019.pdf .................................................................5, 26

USCIS, *I-912, Request for Fee Waiver*,
  https://www.uscis.gov/i-912 ..................................................................................4

USCIS, *Provisional Unlawful Presence Waivers*,
  https://www.uscis.gov/family/family-of-us-citizens/provisional-unlawful-presence-
  waivers ...............................................................................................................43

USCIS, *Sample Memorandum of Agreement* (Jan. 23, 2019),
  https://www.uscis.gov/sites/default/files/document/legal-docs/save-non-fed_moa-
  sample.pdf ..........................................................................................................36

USCIS, *SAVE*,
  https://www.uscis.gov/save..................................................................................36

U.S. Senate, *Glossary Term: Fiscal Year*,
  https://www.senate.gov/reference/glossary_term/fiscal_year.htm .........................26

Virginia Department of Elections, *Registration*,
  https://www.elections.virginia.gov/registration/...................................................40

Virginia Department of Elections, *Schedule of General Elections* (Mar. 2020),
  https://www.elections.virginia.gov/media/boardpapers/calendar/mja-5-year-election-day-
  calendar-2020_2024_rev3_18_20.pdf ..................................................................40

*Written Testimony of Joseph B. Edlow for a Hearing on "Oversight of U.S. Citizenship and*
  *Immigration Services," Before the House Committee on the Judiciary, Subcommittee on*
  *Immigration and Citizenship*, *July 29, 2020*,
  https://docs.house.gov/meetings/JU/JU01/20200729/110946/HHRG-116-JU01-Wstate-
  EdlowJ-20200729.pdf. .........................................................................................29

## INTRODUCTION

The Department of Homeland Security (DHS) charges significant application fees for vital immigration benefits. At the levels set in 2016, those fees already could price immigrants out of employment authorization, naturalization, and other benefits that provide protections for vulnerable individuals or allow individuals to keep their families together in the United States. Beginning in 2019, DHS took a series of actions that could put immigration benefits even farther out of reach for low-income immigrants by making applications cost significantly more. The most recent action is DHS's August 3, 2020 rule that eliminates fee waivers for most immigrants, increases many existing fees, and imposes new fees for essential immigration benefits. Set to go into effect on October 2, 2020, the rule will be devastating for low-income immigrant families, who may be forced to choose between daily necessities and the pursuit of their legal rights to live, work, and become citizens in the United States. Some may face removal simply because they cannot afford application fees. For plaintiffs, three immigrant-services organizations, the rule will also cause significant and immediate harm. Two organizations will lose revenue. All three will suffer drains on their resources and ability to pursue their missions. They will have to spend more time helping individuals be able to afford immigration applications and be unable to help other individuals, including clients or members with urgent filing needs. Plaintiffs seek relief under section 705 of the Administrative Procedure Act (APA) and a preliminary injunction to prevent implementation of this 2020 DHS rule.

## BACKGROUND

### I.     Existing immigration fee and fee-waiver framework

Each year, individuals submit millions of applications or petitions to defendant U.S. Citizenship and Immigration Services (USCIS) for immigration benefits that can transform their

lives: naturalization, lawful permanent residence, employment authorization, humanitarian benefits, and other forms of legal status. *See* Second Smullin Decl. Ex. A.[1] Pursuant to regulations issued by DHS, its parent agency, USCIS charges application fees that can cost hundreds of dollars. *See generally* 81 Fed. Reg. 73,292, 73,294-95 (Oct. 24, 2016) (setting fees of more than $600 to seek naturalization (N-400) and more than $1,100 to become a lawful permanent resident (I-485)).

DHS has authority to impose certain USCIS fees under the Immigration and Nationality Act (INA), principally 8 U.S.C. § 1356(m). That provision creates an Immigration Examination Fee Account (IEFA), directs that "adjudication fees as are designated by the [Secretary] in regulations" be deposited into the IEFA, and allows that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services" and "any additional costs associated with the administration of the fees collected."[2] In addition to receiving standard USCIS fees, the IEFA receives premium processing fees, *id.* § 1356(u), fees paid by immigrants to the Department of Justice (DOJ) for immigration functions retained by DOJ, *see* 85 Fed. Reg. 11,866, 11,867 (Feb. 28, 2020), and fees paid by individuals seeking genealogy information, *see* 8 U.S.C. § 1356(t)(1). Other INA provisions address specific fees paid into IEFA. *See, e.g.*, *id.* § 1254a(c)(1)(B).

DHS is not required, however, to charge immigrants the full range of USCIS fees that it has set. Although the INA *permits* DHS to recover certain costs through fees, it does not require

---

[1] *See generally* USCIS, *2018 USCIS Statistical Annual Report* (2019), https://www.uscis.gov/sites/default/files/USCIS/statistics/2018_USCIS_Statistical_Annual_Report_Final_-_OPQ_5.28.19_EXA.pdf.

[2] Although 8 U.S.C. § 1356(m) refers to the Attorney General, the Homeland Security Act transferred DHS fee-setting authority to DHS. *See generally* 6 U.S.C. §§ 551(d)(2), 557.

2

DHS to do so. *Id.* § 1356(m). USCIS also has other potential funding sources, including appropriations, *see, e.g.*, 85 Fed. Reg. at 46,790, employer-paid fees, *see* 8 U.S.C. § 1356(s), (v), and fees it charges to government agencies for retrieving information on individuals' immigration status, *see* USCIS, *IEFA Fee Review Supporting Documentation with Addendum* 9 (May 2020), https://www.regulations.gov/document?D=USCIS-2019-0010-12271 (2020 IEFA document). Moreover, the INA allows fee waivers and other fee limits. It recognizes that immigration services can be "provided without charge to asylum applicants or other immigrants," 8 U.S.C. § 1356(m), and specifies certain fee exemptions and caps, *e.g.*, *id.* §§ 1439(b)(4), 1254a(c)(1)(B). It also requires that DHS "shall permit" individuals seeking or holding certain forms of humanitarian benefits "to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status." *Id.* § 1255(*l*)(7).

In 2010, as part of a comprehensive fee-schedule change, DHS adopted a revised fee waiver standard. *See* 75 Fed. Reg. 58,962, 58,973-74 (Sept. 24, 2010). Still in effect, the regulation allows waivers of a wide range of USCIS fees for any individual "unable to pay" them. 8 C.F.R. § 103.7(c)(1)(i); *also id.* § 103.7(c)(3) (listing waivable fees). In the same rule, DHS recognized that it was "provid[ing] for a number of exemptions, where fees are not charged because a large percentage of applicants would clearly be unable to pay"; these included "a range of humanitarian and protective services, such as refugee and asylum processing." 75 Fed. Reg. at 58,973.

Following the 2010 rule, USCIS issued a 2011 memorandum setting out a three-part framework for immigrants seeking fee waivers. *See* AR43-50.[3] The memorandum stated that USCIS would first consider whether the individual was receiving a government "means-tested"

---

[3] Cites to "AR" are to the excerpts of administrative record already filed. *See* Dkt. 33-1.

benefit, such as Medicaid or Supplemental Nutrition Assistance Program benefits. If so, "the fee waiver [would] normally be approved." AR47. Next, USCIS would consider whether an individual's income was at or under 150 percent of the federal poverty guidelines. AR49. Finally, if an individual did not establish eligibility based on a means-tested benefit or income, USCIS would consider whether the individual was suffering financial hardship. *See id.*

Even with the 2011 Memorandum's rubric, USCIS allowed substantial flexibility in how individuals could establish their inability to pay fees. For instance, the agency adopted a request form, labeled the I-912. But, USCIS noted that "use of a USCIS-published fee-waiver request form is not mandated by regulation," and stated that it would consider requests even if they did not use the form. AR44. Similarly, although the I-912 form's instructions have listed types of documentation, *see* AR173-74 (March 2018 version), the 2011 Memorandum recognized a wide range of options for documents that could be used to show income or hardship, including employer statements and tax returns, AR48-50, and stated that USCIS could approve fee-waiver requests without such documentation if applicants otherwise established their inability to pay fees, AR46-47. Further, for individuals using the I-912 form, the instructions allowed family members' related applications to be combined. *See* AR170; *see generally* Dkt. 11 at 15-17.[4]

In 2016, DHS adopted another comprehensive revision to its fee schedule. The 2016 rule created a reduced fee for low-income naturalization applicants to "help ensure that those who have worked hard to become eligible for naturalization are not limited by their economic means." 81

---

[4] The form has been updated multiple times. *See* OMB, *OMB Control Number History, OMB Control Number: 1615-0116,* https://www.reginfo.gov/public/do/PRAOMBHistory?ombControlNumber=1615-0116. The March 2018 version, which the October 24, 2019 version amended, is at AR157-178. On October 15, 2019, USCIS adopted other revisions; that version is on USCIS's website. *See* USCIS, *I-912, Request for Fee Waiver,* https://www.uscis.gov/i-912.

Fed. Reg. at 73,307. Additionally, recognizing "the potential impact of fee increases on low-income individuals," DHS continued an earlier practice of capping the increases for naturalization, employment authorization, and other fees "that USCIS believes may be overly burdensome on applicants, petitioners, and requestors if set at the recommended [financial] model output levels." *Id.* at 73,297. DHS also retained the principal fee-waiver regulation and exemptions from the 2010 rule, *see id.* at 73,307, and continued to apply USCIS's 2011 Memorandum.

Immigrants have used the 2011 Memorandum's fee-waiver framework to seek and receive hundreds of thousands of fee waivers per year. USCIS waived between 400,000 and 700,000 fees during each of the last several years. *See* AR138; USCIS, *Form I-912 Request for Fee Waiver* (Mar. 2020), https://www.uscis.gov/sites/default/files/document/data/Form_I-912_Request_for_Fee_Waiver_Data_FY_2017-2019.pdf. Among the methods in the 2011 Memorandum, the first—establishing eligibility through receipt of a means-tested benefit—has been the easiest, most reliable, and most common method for seeking fee waivers. Eligibility can be established with a single document from the benefits agency. *See* AR324, 1183, 2045, 2352, 2386, 2530, 2572, 2955, 2958, 3219, 3121, 3226, 3229; Dkt. 11-1 at 3 (Barón Decl. ¶ 15); Ball Cooper Decl. at 3-4 (¶¶ 8-9); AR172 (March 2018 version of form). Income- or hardship-based requests have generally taken longer to prepare and had a higher rate of denial. *See* AR2233, 2342, 2530, 2572, 2958, 3214, 3226, 3276, 3229-30; Dkt. 11-1 at 4 (Barón Decl. ¶¶ 16, 21); Ball Cooper Decl. at 3-4 (¶ 9).

**II.     The 2020 Fee Rule and other DHS efforts to restrict fee waivers and increase fees**

In October 2019, DHS began a series of actions that will make it harder for immigrants to pay for immigration benefits (October 2019 fee-waiver actions): USCIS changed its fee-waiver form, amended a policy manual, and decided to stop applying the 2011 Memorandum and other material that would be superseded by the new policy manual sections. Together, these actions will

restrict immigrants' access to fee waivers under 8 C.F.R. § 103.7(c) by eliminating individuals' ability to apply for waivers based on their receipt of means-tested benefits, mandating use of a USCIS form, and requiring that immigrants support fee-waiver applications with specific types of documents, often including tax transcripts or similar documents from the Internal Revenue Service (IRS). *See* Dkt. 11-2 at 3-24 (new form and instructions); AR407-449 (showing changes from March 2018 versions), 484 (policy alert), 491-514 (new policy manual material); *see generally* Dkt. 11 at 17-19. USCIS set the changes to go into effect on December 2, 2019. AR484.[5]

Then, in November 2019, DHS published a proposed rule that would narrow fee-waiver eligibility further and significantly increase USCIS fees. *See* 84 Fed. Reg. 62,280 (Nov. 14, 2019) (Fee Proposal); *see also* 84 Fed Reg. 67,243 (Dec. 9, 2019) (Supplemental Proposal). On August 3, 2020, DHS published its final rule in the Federal Register and set an effective date of October 2, 2020. *See* 85 Fed. Reg. 46,788 (2020 Fee Rule).

The 2020 Fee Rule eliminates fee waivers for most immigration applications. Only individuals seeking or holding certain forms of humanitarian protections remain eligible for fee waivers. Even for these individuals, waivers are limited to the fees associated with certain applications. Further, the rule replaces the 2010 regulation's "unable to pay" standard and the 2011 Memorandum with a single, lower income ceiling. Individuals can only receive fee waivers if their income is at or below 125 percent of the federal poverty guidelines: $15,950 per year for a single person. Additionally, the rule requires fee-waiver applicants to use a USCIS form and obtain required documentation, generally including a document from the IRS. *See* 85 Fed. Reg. at 46,920

---

[5] The 2019 actions are preliminarily enjoined. *See* Order Extending Stay; Directions to the Parties, *City of Seattle v. DHS*, No. 3:19-cv-07151-MMC (N.D. Cal. Aug. 17, 2020), ECF No. 84.

(to be codified at 8 C.F.R. § 106.3(a), (c), (d), (f)); *see also* HHS, *Poverty Guidelines* (Jan. 8, 2020), https://aspe.hhs.gov/poverty-guidelines. DHS defended the near elimination of fee waivers as necessary to limit the increases of other fees, force more immigrants to pay for applications, and reduce the dollar amount of fees waived. *See, e.g.*, 85 Fed. Reg. at 46,806, 46,818.

The 2020 Fee Rule also significantly increases the costs of immigration applications in other ways. It creates new USCIS fees, eliminates prior fee exemptions and caps, and raises existing fees. The rule nearly doubles the naturalization fee (to $1,170 for a paper filing) and eliminates the reduced fee option. It imposes non-waivable charges on asylum seekers for applications that never previously had a fee: a $50 application fee, plus a $550 application and a $30 biometrics fee for a first employment authorization application. Survivors of crime will have to pay $1,485—more than six times the current fee—to file the I-929 form to seek permission for their children or spouses to join or stay with them in the United States. Other fees will increase by 28 percent to 535 percent. *See id.* at 46,791-92 (fee schedule), 46,794 (regarding exemptions), 46,869 (regarding fee caps), 46,844-53 (regarding asylum fees); *see also* 8 C.F.R § 245.24(g) (I-929 standard). The rule creates a surcharge for filing paper applications, when online ones are available, *see* 85 Fed. Reg. at 46,831, and restricts the methods by which immigrants can receive certain documents, *see id.* at 46,868, 46,891. Further, the 2020 Fee Rule raise fees charged by another DHS component, Customs and Border Protection (CBP), *see id.* at 46,791, 46,877-88, and DOJ, whose fee rule refers to USCIS's, *see id.* at 46,793.

All told, under DHS's estimates, the 2020 Fee Rule will force immigrants to pay about $1 billion extra in USCIS fees per year, for the next two years. *See id.* at 46,794. The rule never states precisely how much revenue DHS estimates it will generate and many of its figures are not explained or supported, as described below. Still, DHS's estimates of the rule's impacts provide

some indication of the significant sources of new charges. For instance: DHS estimates that the new fees faced by individuals seeking asylum and related protections will add up to more than $120 million. *See id.* at 46,891, 46,894 (items (g), (p), (q)). The agency further suggests that it will raise approximately $400 million in fees per year from immigrants who, under current law, would receive fee waivers. *See id.* at 46,891 (item (e)). Many of these immigrants will be those eligible to become citizens; historically, naturalization applications have accounted for the greatest portion of fee waivers. *See* DHS, *Regulatory Impact Analysis, USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements* 59 (July 22, 2020), https://www. regulations.gov/document?D=USCIS-2019-0010-12272 (Final Impact Analysis).[6]

DHS claims some or all of the extra fee revenue its rule will capture is necessary to address a projected shortfall between the money the 2016 fee schedule would raise and budget figures that the agency asserted. *See* 85 Fed. Reg. at 46,794. But DHS's estimates were for fiscal years 2019 and 2020. DHS did not explain why it needs more revenue from individual applications now.

## III.     The effects of the 2020 Fee Rule

For immigrant families, the 2020 Fee Rule will create wrenching decisions and potentially devastating harm. With increased fees and severe restrictions on fee waivers, many immigrants will face additional costs of $1,000 or more, compared to what they would pay under current law. The expenses will multiply for families eligible to submit several applications at once. Without savings to spare, many low-income immigrants will be forced to choose between life-changing benefits and daily necessities. As commenters explained, and DHS itself acknowledges, some

---

[6] What DHS terms a "transfer of $368.3 million" is DHS's estimate of money individuals will have to pay under the new rule because they will no longer receive fee waivers. 85 Fed. Reg. at 46,891. The calculations assume immigrants will pay all no-longer-waivable fees and do not take into account USCIS's October 2019 fee-waiver actions. *See* Final Impact Analysis at 43-68.

8

individuals simply will not be able to pay for immigration applications at all—leaving them at risk of removal, without sources of income, or unable to reunite with their family members. *See e.g.*, 85 Fed. Reg. at 46,822, 46,891; Second Smullin Decl., Ex. D at 12-14, Ex. H at 7-8, 30-33.

The rule will also cause substantial and immediate harm to plaintiffs Northwest Immigrant Rights Project (NWIRP), Ayuda, Inc., and CASA de Maryland, Inc. (CASA). For example, the rule will make it harder for NWIRP and Ayuda, two immigrant-services organizations, to provide direct legal services to low-income immigrants seeking a wide range of benefits and to represent individuals in removal proceedings. This work is a core part of both organizations' missions and includes helping clients apply for fee waivers and, in some circumstances, advancing or paying clients' USCIS fees. Ball Cooper Decl. at 1-2, 3-4 (¶¶ 2-3, 7-11); Dkt. 11-1 at 1-2 (Barón Decl. ¶¶ 2-8); Second Barón Decl. at 1-2, 4, 18 (¶¶ 2-10, 13, 43). As explained more fully in the attached declarations, the 2020 Fee Rule will hamper these efforts because clients still eligible for fee waivers under the rule will need more help from Ayuda and NWIRP to gather the required documentation and complete forms. *See* Ball Cooper Decl. at 7-8 (¶ 21); Second Barón Decl. at 12-15 (¶¶ 28-35); *see also* Dkt. 11-1 at 10-11 (Barón Decl. ¶¶ 10-21). In many other cases, Ayuda and NWIRP will not be able to help clients apply for fee waivers at all, and those clients will need other additional assistance from Ayuda and NWIRP because they will face new and high fees. *See generally* Ball Cooper Decl. at 5-6 (¶¶ 14-19); Second Barón Decl. at 4-11 (¶¶ 14-27). Sometimes, Ayuda and NWIRP will have to provide help on a stop-and-start basis, while clients take extra time to gather funds to pay application fees. This stop-and-start assistance is more time-consuming than completing an application all at once. NWIRP's clients will also need more assistance to discuss their financial options. *See* Ball Cooper Decl. at 10 (¶¶ 24); Second Barón Decl. at 15-17 (¶¶ 37-39). In the limited circumstances when NWIRP and Ayuda can advance or pay for clients'

application fees, this assistance will cost more than it would under current law or reach a smaller portion of clients in need. Ball Cooper Decl. at 9-10 (¶ 23); Second Barón Decl. at 18 (¶¶ 43-44). In some cases, the 2020 Fee Rule means that NWIRP and Ayuda will be unable to provide help at all; the organizations will have to turn away individuals with no foreseeable way of paying fees. Ball Cooper Decl. at 11, 14 (¶¶ 25, 34); Second Barón Decl. at 16-17 (¶¶ 39-40).

The 2020 Fee Rule's surcharge for paper-filed applications will additionally frustrate Ayuda's and NWIRP's efforts to represent clients. To help clients avoid the surcharge, they will have to spend time helping clients sign up for and monitor email accounts. Ball Cooper Decl. at 11 (¶ 26); Second Barón Decl. at 17 (¶ 41). The rule will also cause Ayuda to spend more time receiving clients' documents, because the rule's requirement that attorneys provide certain signature confirmations will demand process changes. Ball Cooper Decl. at 11-12 (¶ 27).

Ayuda and NWIRP will thus spend extra time and money assisting individual clients, and screening potential ones, which will limit the total number of clients they can serve. Ball Cooper Decl. 12-13 (¶ 28); Second Barón Decl. at 17-18 (¶¶ 42-44). In response to the 2020 Fee Rule, NWIRP will also adjust its training and community-education materials, and Ayuda will divert resources from other efforts to raise more funds that the organization can use to pay for clients' USCIS fees. Ball Cooper Decl. at 13-14 (¶¶ 29-31); Second Barón Decl. at 19 (¶ 45).

The 2020 Fee Rule will harm CASA in similar ways. CASA is a membership-based immigrant rights organization whose mission is to create a more just society by building power and improving the quality of life in low-income immigrant communities. To advance this mission, and to help immigrants gain the right to vote, CASA helps low-income immigrants apply for naturalization, through an integrated program including financial education. Escobar Decl. at 1-2. 4-7 (¶¶ 3-8, 14-26). Under the 2020 Fee Rule, CASA members will face much higher fees. *See id.*

10

at 8-9 (¶¶ 28-30). Members will need more help from CASA than they would otherwise to seek naturalization, as explained more fully in the attached declaration. Those still eligible for fee waivers will need more help to gather the required documentation. Others seeking CASA's assistance—the great majority of individuals in the naturalization program—will need more help to identify whether and how they can afford the application fee. CASA will spend more time with these individuals than it would otherwise, to counsel them on other options. As a result, CASA will not be able to serve the same number of members that it currently does. CASA will also divert resources from other efforts to seek out new financial partnerships that could help more CASA members afford naturalization fees. *Id.* at 9-13 (¶¶ 31-40).

The 2020 Fee Rule will also cause Ayuda and CASA to lose revenue. Both charge fees to clients or members but waive them for those unable to pay or experiencing significant hardship. The 2020 Fee Rule means both organizations will serve fewer individuals. Further, they will have to waive fees more frequently, because the 2020 Fee Rule means that fewer immigrants will be able to pay Ayuda's or CASA's fee *in addition to* the new immigration fee. *See* Ball Cooper Decl. at 14 (¶ 32); Escobar Decl. at 13-14 (¶ 41).

## ARGUMENT

"A party seeking a preliminary injunction must make a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation and internal quotation marks omitted). "The last two factors merge when the Government is the opposing party." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (cleaned up). A request to "postpone the effective date of an agency action or to preserve

status or rights pending conclusion of the review proceedings" under the APA, 5 U.S.C. § 705, is evaluated based on the same factors. *See Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012). All four factors weigh in favor of the requested relief here.

**I.      Plaintiffs are likely to succeed on the merits.**

**A.  The 2020 Fee Rule was adopted in violation of the HSA and/or FVRA.**

Both DHS's proposal and final rule were issued by individuals purporting to serve as acting secretary without authority to do so. The proposal was signed on November 8, 2019, by Kevin K. McAleenan, as acting DHS secretary. 84 Fed. Reg. at 62,371. Chad F. Wolf, the current acting secretary, approved the final rule, as well as issued amendments to the proposal. *See* 85 Fed. Reg. at 46,913; *see also* 84 Fed. Reg. at 67,246; 85 Fed. Reg. 4243, 4244 (Jan. 24, 2020). But under the Federal Vacancies Reform Act (FVRA), 5 U.S.C. §§ 3345-3349d, and the Homeland Security Act (HSA), 6 U.S.C. § 113, neither McAleenan nor Wolf had authority to take such actions.

The FVRA specifies three categories of individuals who can serve as acting officials in positions requiring presidential appointment and Senate confirmation. The first category is the "first assistant" to the vacant office. 5 U.S.C. § 3345(a)(1). Alternatively, certain other officers or employees can be designated as acting officials by "the President (and only the President)." *Id.* § 3345(a)(2), (3). Absent exceptions inapplicable here, acting officials' service is limited to 210 days after the position becomes vacant. *See id.* § 3346(a). The FVRA is the "exclusive means" for designating acting officials, unless another statute "expressly" authorizes certain other mechanisms to fill positions in an acting capacity. *Id.* § 3347(a).

The HSA, 6 U.S.C. § 113, addresses the order of succession when the DHS secretary position is vacant. Section 113(a)(1)(A) designates the deputy secretary as "first assistant" for FVRA purposes. Section 113(g) provides that if the deputy secretary is unavailable, the under

secretary for management is the next in line, and the "Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id.* § 113(g)(1), (2).

The FVRA and HSA restrictions operate in light of the Constitution's Appointments Clause, which directs that principal officers (such as a DHS secretary) must be appointed by the President with "Advice and Consent of the Senate." U.S. Const., art. II, § 2, cl. 2; *see also* 6 U.S.C. § 112(a)(1) (requiring presidential appointment and Senate confirmation for the DHS secretary). "The Supreme Court has long recognized that, when a 'subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official.'" *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 23 (D.D.C. 2020) (*quoting United States v. Eaton*, 169 U.S. 331, 343 (1898)). Congress adopted the FVRA, however, "to reclaim its Appointments Clause power" and avoid executive branch "overreaching" through agency heads' assignment of acting officers "with little or no check from Congress." *Id.* at 29 (cleaned up). In particular, Congress was concerned about "permit[ing] positions to be held by acting officers for years without the submission to the Senate of a nominee." S. Rep. No. 105-250, at 5 (1998).

### 1. McAleenan and Wolf served after the FVRA's 210-day time limit.

By the time either McAleenan or Wolf took action related to the 2020 Fee Rule, the 210-day limit on acting service had expired. The position of DHS secretary became vacant by April 10, 2019, upon the resignation of Secretary Kirstjen Nielsen. *See* GAO, *Federal Vacancies Reform Act*, https://www.gao.gov/legal/other-legal-work/federal-vacancies-reform-act. The date 210 days after April 10, 2019, was November 6, 2019, two days before McAleenan signed the Fee Proposal.

### 2.   McAleenan's appointment violated the HSA and FVRA.

In addition, as the Government Accountability Office recently concluded, the appointment of McAleenan and the appointment of Wolf are both unlawful because they violated the HSA's succession-order provision. *See* GAO, *Homeland Security*, File B-331650 (Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf (GAO Decision); GAO, *Homeland Security*, File B-332451 (Aug. 21, 2020), https://www.gao.gov/assets/710/708944.pdf (denying reconsideration).[7]

When Nielsen resigned, a 2016 order issued by then-Secretary Jeh Johnson stated that if the secretary resigned, Executive Order No. 13,753, 81 Fed. Reg. 90,667 (Dec. 9, 2016), would control. A separate Annex A would govern if the secretary was unavailable due to a disaster or catastrophic emergency. Other annexes addressed other DHS positions. *See* Second Smullin Decl., Ex. C at 3-5. Since Johnson left office, the annexes have been amended several times. *See id.* at 6. As she was leaving office, Secretary Nielsen amended Annex A but not the instruction that, if the secretary resigned, Executive Order No. 13,753 would control. *See id.* at 6, 7 (reflecting April 2019 amendment to Annex A); *id.* at 69-70 (Nielsen-signed letter).

On April 10, 2019, therefore, Executive Order No. 13,753 controlled to the extent that DHS sought to use the Johnson order's list under the HSA.[8] The first position in line to serve as acting secretary under the Executive Order's list—and that was filled at the time—was the fourth: the

---

[7] DHS has long had notice of the defects in McAleenan's and Wolf's appointments. *See, e.g.,* Letter from Bennie G. Thompson, Chairman, House Committee on Homeland Security, and Carolyn B. Maloney, Acting Chairwoman, House Committee on Oversight and Reform, to Gene Dodaro, U.S. Comptroller General (Nov. 15, 2019), https://oversight.house.gov/sites/democrats. oversight.house.gov/files/191115%20T%20Dodaro%20re%20Letter%20to%20GAO%20on%20 Wolf-Cuccinelli%20Appointment.pdf.

[8] Executive Order No. 13,753 also allows that the President can depart from the list "to the extent permitted by" the FVRA.

undersecretary for national protection and programs, a position renamed in 2018 as director of DHS's Cybersecurity and Infrastructure Security Agency (CISA). *See* GAO Decision at 6 & n.8, 8; *see also* Exec. Order No. 13,753 (stating that an acting official could not, by virtue of the acting position, become acting secretary). But McAleenan was tapped to fill the spot. At the time, McAleenan was CBP Commissioner, the fourteenth-listed official. Although Nielsen's Annex A amendment would have allowed him to leapfrog the CISA director in event of disaster or catastrophic emergency, McAleenan could not do so when the vacancy was due to resignation. *See* GAO Decision at 8-9; Exec. Order No. 13,753 at § 1.

### 3. Wolf's appointment violated the HSA and FVRA.

On November 13, 2019, Wolf was confirmed by the Senate as DHS's first Under Secretary of the Office of Strategy, Policy, and Plans and, according to DHS's website, "was designated as the Acting Secretary of Homeland Security by President Donald J. Trump." DHS, *Chad F. Wolf* (May 18, 2020), https://www.dhs.gov/person/chad-f-wolf; *see also* Pres. Nom. 410, 116th Cong. (2019) (confirmed). DHS nevertheless represented to the GAO that Wolf became acting secretary by operation of the HSA and a secretary-designated order of succession. *See* GAO Decision at 10. But, again, Wolf's appointment was also not valid to the extent DHS sought to use a succession-order list from Johnson's order. Executive Order No. 13,753 still controlled and the CISA head remained the first listed, filled position. *See* DHS, *Christopher C. Krebs* (Nov. 7, 2019), https://www.dhs.gov/person/christopher-c-krebs (showing that CISA position remains filled).

The government has asserted that Wolf's position was valid under the HSA, and thus under the FVRA as well, due to a purported amendment to the Johnson order that McAleenan issued on November 10, 2019. McAleenan's amendment stated that Annex A, not the executive order, would

apply when the secretary has resigned; it also purported to revise Annex A to make Wolf's position the first listed position that was, at the time, filled. *See* Blackwell Dec. at 71; GAO Decision at 9.

But even if DHS was attempting to use the HSA and the Johnson order, rather than the FVRA, to fill the acting spot, McAleenan's amendment could not have elevated Wolf because that amendment was invalid. First, the amendment was void *ab initio* because McAleenan was purporting to serve as acting secretary in violation of the HSA and/or the FVRA, as described above. An action taken by a person "in the performance of any function or duty of a vacant office" covered by the FVRA "shall have no force and effect" if the action is taken by a person who is "not acting under" FVRA provisions, including section 3347 (permitting appointment pursuant to other statutes). 5 U.S.C. § 3348(d)(1). A "function or duty" includes one "established by statute" and "required by statute to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2). The amendment attempted by McAleenan is exactly such a "function or duty." The HSA permits only the secretary to designate a succession order. 6 U.S.C. § 113(g)(2).

Second, McAleenan's amendment was invalid because the HSA's succession-order provision does not give an *acting* secretary authority to change the order of succession. While in other cases, a reference to the secretary may encompass an acting secretary, the HSA succession-order provision does not allow for that reading of the term. *Cf. Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595-97 (2004) (concluding, based on context, that a single word has a narrower meaning in one part of a statute than in another). Here, "Secretary" means only a Senate-confirmed Secretary, since section 113(g) distinguishes the role of "Secretary" from that of "Acting Secretary." For example, it states that the "Under Secretary for Management shall serve as the *Acting* Secretary" when "neither the *Secretary* nor Deputy Secretary is available," 6 U.S.C. § 113(g)(1) (emphasis added); it goes on to state that "the *Secretary* may designate such other

officers … to serve as *Acting Secretary*," *id.* § 113(g)(2) (emphasis added). The Court should "respect Congress' decision to use different terms to describe different categories of people" in this context. *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012).

This reading is reinforced by Congress's direction that the FVRA is the "exclusive" mechanism for appointing acting officials unless another statute "expressly" "authorizes the President, a court, or the head of an Executive department" "to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." 5 U.S.C. § 3347(a). Even if the HSA arguably could authorize an *acting* secretary to change the succession order, it does not do so "expressly." Similarly, the FVRA does not indicate that an *acting* "head of an Executive department" can designate acting officials. This exception was "narrowly delineated" by Congress, S. Rep. 105-250 at 15, and reading the phrase "head of an Executive department" to *exclude* acting officials, is consistent with the FVRA's purpose to limit, not expand, the circumstances in which "[t]he President would be relieved of responsibility and accountability for selecting acting officials." *L.M.-M.*, 442 F. Supp. 3d at 28 (cleaned up).

The narrow meaning of the term "Secretary" in the HSA succession-order provision is also reinforced by "the canon of constitutional avoidance," which "requires that if one of two linguistically permissible interpretations raises serious constitutional problems and the other does not," a court should "choose the second unless it is plainly contrary to the intent of Congress." *United States v. Cano-Flores*, 796 F.3d 83, 94 (D.C. Cir. 2015) (internal quotation marks, citation omitted). Here, reading the provision to permit an *acting* secretary like McAleenan to amend an *actual* secretary's order of succession and hand-pick a new acting secretary would raise serious Appointments Clause concerns. Such a reading would place the designation of an acting official even farther away from any "check from Congress," *L.M.-M*, 442 F. Supp. 3d at 29, and increase

17

the chance that the position of "acting" secretary is no longer "special and temporary," *Eaton*, 169 U.S. at 343, by expanding "the universe of those eligible to serve in an acting capacity" and further "reliev[ing]" the President "of responsibility and accountability for selecting acting officials" *L.M.-M*, 442 F. Supp. 3d at 28. One acting official could, effectively, appoint the next, who then appoints the next (according to a new list), who then does the same, without input from the President or Senate—or even the direction of a Senate-confirmed Secretary. Whether the "structural protections of the Appointments Clause" can be thus avoided, *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 946 n.1 (2017) (Thomas, J., concurring), is a "difficult constitutional question[]" that this Court should avoid because "the text fairly admits of a less problematic construction," *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 455 (1989): the HSA enables *only* a Senate-confirmed secretary to designate a line of succession.

Finally, Wolf could not have been appointed to the position under the HSA because the FVRA's 210-day time limit expired even before McAleenan issued his purported succession-order amendment. That time limit applies to appointments under the HSA, as well as those under FVRA section 3345, because it applies to any "person serving as an acting officer as described under section 3345," 5 U.S.C. § 3346(a)—in other words, anyone "perform[ing] the functions and duties of [an] office temporarily" when a Senate-confirmed "officer of an Executive agency …. dies, resigns, or is otherwise unable to perform the functions and duties of the office," *id.* § 3345(a). Section 3346's time limit does not distinguish the relevant service according to the *authority* used to designate the individual, *i.e.*, section 3345(a) or the HSA.

The HSA's text underscores the applicability of the FVRA time limit. The HSA is structured to work with, rather than against, section 3346. For instance, the HSA designates the deputy secretary as first in the line of succession for the secretary, and allows that such individual

will serve as acting secretary by virtue of being the "first assistant" *under the FVRA*—in other words, subject to the FVRA time limits. 6 U.S.C. § 113(a)(1)(A), (g)(1). Moreover, although the HSA allows a non-FVRA mechanism for appointing individuals later in the line of succession, it cannot reasonably be read to allow individuals *other* than the deputy secretary to serve as acting officials *longer* than the deputy secretary could—and it certainly does not do so "expressly," as would be required under FVRA section 3347(a)(1). In other words, the "notwithstanding" clause introducing section 113(g)(2) refers to the method of designating acting officials, but not the time for which they can serve, since "notwithstanding" only indicates that section 113(g)(2) controls "to the extent that other provisions conflict with" it, *Adirondack Med. Ctr. v. Sebelius*, 891 F. Supp. 2d 36, 45 (D.D.C. 2012), *aff'd*, 740 F.3d 692 (D.C. Cir. 2014); here, there is no conflict between the HSA and the FVRA time limit. Finally, the doctrine of constitutional avoidance also supports reading the time limit to apply. *See SW Gen., Inc.*, 137 S. Ct. at 946 n.1 (Thomas, J., concurring) (recognizing that lengthy acting service is no longer "special and temporary").

### 4. The 2020 Fee Rule is void.

Because McAleenan, and Wolf were invalidly serving in their positions under the HSA and/or the FVRA, the issuance of the Fee Proposal and the approval of the 2020 Fee Rule "have no force or effect." 5 U.S.C. § 3348(d)(1). As noted above, section 3348(d)(1) of the FVRA applies to actions that are a "function or duty," under statute, of the vacant position alone. *Id.* § 3348(a)(2). Rulemaking is a "function or duty" of the DHS secretary alone. *See* 6 U.S.C. § 112(e); 8 U.S.C. § 1103(a)(3). Additionally, because McAleenan and Wolf were serving without authority, the 2020 Rule must be "set aside" as action that is contrary to law and taken "in excess of statutory … authority," as well as without observance of required rulemaking procedure, under 5 U.S.C. § 706(2). *See L.M.-M.*, 442 F. Supp. 3d at 35-36. It is of no significance that Wolf delegated

19

authority to sign the 2020 Fee Rule to another individual. Wolf was the official who approved the rule. *See* 85 Fed. Reg. at 46,913. Moreover, any delegation was also invalid, since delegation too is a "function or duty" of the Secretary alone. *See* 6 U.S.C. § 112(b)(1).

### B.  DHS failed to provide adequate notice and an opportunity to comment.

The 2020 Fee Rule is also unlawful because DHS failed to satisfy APA requirements. In notice-and-comment rulemaking under 5 U.S.C. § 553, a proposed rule must give notice of the "terms or substance of the proposed rule or a description of the subjects and issues involved" and provide an opportunity for "interested persons … to participate in the rule making through submission of written data, views, or arguments." *Id.* at 553(b)(3), (c). These requirements mean that an agency must enable meaningful comment, by "provid[ing] an accurate picture of the reasoning that has led the agency to the proposed rule," "identify[ing] and mak[ing] available technical studies and data that it has employed," and making public "[t]he most critical factual material that was used to support [its] position." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 261-62 (D.D.C. 2015) (citations omitted). DHS failed to satisfy these requirements.

### 1.  DHS failed to provide models and assumptions.

First, DHS violated the APA by issuing a Fee Proposal that was so vague as to force commenters "to play hunt the peanut with technical information." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) (Rogers, J., opinion for court) (quoting *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982)). Despite placing some supporting material in its docket, DHS did not provide the assumptions, models, data, or other explanations necessary to understand its proposal. *See* USCIS, *IEFA Fee Review Supporting Documentation* (April 2019), https://www.regulations.gov/document?D=USCIS-2019-0010-0007 (2019 IEFA document); DHS, *Regulatory Impact Analysis, USCIS Fee Schedule and Changes to*

*Certain Other Immigration Benefit Request Requirements* (Oct. 30, 2019), https://www.regulations.gov/document?D=USCIS-2019-0010-0559 (Proposed Impact Analysis).

At the heart of the Fee Proposal were stated budget amounts for fiscal years 2019 and 2020: $4.6 billion in 2019 and $4.8 billion in 2020. DHS asserted these amounts and stated that the current fee schedule was insufficient to fund them. *See* 84 Fed. Reg. at 62,288. But DHS revealed virtually nothing about how the agency arrived at the stated budget figures and asserted shortfall.

For example, the proposal stated that the budget figures "reflect[ed] the funding necessary to maintain an adequate level of operations" and "include[d] funding for enhancements that facilitate the processing of additional workload," but not "program increases for new development, modernization, or acquisition." 84 Fed. Reg. at 62,286. It also asserted that USCIS operations might "degrade" if the current fee schedule remained in place. *Id.* at 62,282. But the Fee Proposal left basic questions unanswered: What are "enhancements" and an "adequate level of operations," and why did DHS believe the it would need $4.6 billion in 2019, and even more the next year, to fund them? Why did new expenses need to be funded entirely with the proposed new fees, rather than (at least partly) with premium processing funds, carryover, or recovered funds from prior years?[9] What was DHS planning to do with non-premium revenue excluded from its budget modeling? *See* 84 Fed. Reg. at 62,293 (regarding excluded revenue); *id.* at 62,321-22 (regarding CBP revenue). What change in operations would happen without more funding, and why did DHS deem that a "degrading" of operations? What factors were driving the budget increase? What would happen if fees increased by a lesser amount?

---

[9] *See, e.g.*, 84 Fed. Reg. at 62,288 (stating that carryover and revenue recovery would not alone make up the purported budget gap, but not explaining why they could not be used to make up some of the gap or addressing the use of premium funds at all).

In discussing its budget, DHS presented piecemeal numbers and references to its operations but those seemed designed to "hid[e] or disguis[e]" information, rather than to promote "a genuine interexchange." *Am. Radio Relay*, 524 F.3d at 237 (quoting *Conn. Light*, 673 F.2d at 530). For instance, it compared *some* parts of the budget figures to a 2018 operating plan, but it did not provide the 2018 plan, explain its relevance to current or future operations, or identify all of the ways in which its 2019 figure reflected an increase beyond it 2018 plan; the associated table did not match even the sparse figures provided in text. *See* 84 Fed. Reg. at 62,286-87 & Table 2. Similarly, DHS stated it was planning for "additional staff" and "new staff enhancement requests," amounting to 2,098 positions, based on a "Staffing Allocation Model." *Id.* at 62,286. But it did not provide the model or its methodology "to allow for meaningful commentary." *Owner-Operator Indep. Drivers Ass'n, Inc. v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007) (citation omitted). The 2019 IEFA document (at 31) compared a 2019 staff-position estimate to 2016 *estimates* of staffing needs. But nowhere did DHS explain how 2019 staffing levels would compare to current levels, the type of work all the *new* employees would perform, or why all such work was necessary.

DHS's estimates of revenue were equally opaque. DHS estimated the number of applications it would receive in 2019 or 2020 and the proportion of those that would be fee-paying. But aside from passing references to use of certain data sets and models, USCIS did not explain its calculations or assumptions. And, again, DHS compared estimates of application volumes and fee-paying percentages only to 2016 *estimates*. *See* 84 Fed. Reg. at 62,889-91. Without even a comparison to current or actual figures, DHS left more critical questions unanswered: Would fee waivers, as a percent of total volume, be going up or down? To what extent was DHS assuming specific application volumes would be changing? And on what basis? DHS noted that its projections of how many applicants would pay fees reflected "filing trends and anticipated policy

changes" and mentioned some of the changes in the proposed rule. *Id.* at 62,290. But DHS did not identify all of the trends or policy changes it took into account (or those it did not).

Answers to basic questions about DHS's budget and revenue estimates would have been critical for commenters "to develop evidence in the record to support their objections to the rule." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). This is particularly true because since 2016 and 2017—the periods used to generate some of DHS's data—DHS has changed multiple aspects of immigration policy that could affect application volume, a variable "key" to DHS's calculations. 84 Fed. Reg. at 62,289. The extent to which DHS took these changes into account was thus critical to informing the extent to which commenters agreed or disagreed with DHS's forecasts. *See* Second Smullin Decl., Ex. B at 17-25, 28-38 (describing multiple changes in first two years of the current administration).

The vagueness of DHS's assertions extended even further. After asserting that revenue under the current fee schedule would fall short of its budget, DHS calculated new fees to make up the purported budget shortfall. But nowhere in the proposal did DHS state the total amount of revenue it aimed to earn with the new fee schedule—whether it matched or exceeded the stated shortfall, either through new USCIS fees or with the fees DHS set for CBP and DOJ. Additionally, DHS's method for calculating proposed new fees rested on other unexplained facts, assumptions, models, and methodologies. For instance, DHS used what it called an "ABC model" to divide the estimated budget into per-application fees. First, the agency distributed the stated 2019 and 2020 budget figures into various categories of costs using a "payroll title analysis" that DHS did not provide (and that may have been *different* from whatever categories of costs DHS had used to build the stated budgets). Then, the agency distributed those costs across various fee-paying benefit requests. *See* 2019 IEFA document at 6-9. But DHS never explained how its cost-allocation

exercise compared to the *actual* activities it sought to fund. It also noted that the ABC model omitted some of the allocation of costs. *See* 84 Fed. Reg. at 62,284 n.15. And DHS did not provide enough information for commenters to understand and address why DHS established particular fees at particular levels. For example, DHS proposed to increase the fee for a certain form of relief from removal by nearly six times, to $1,800 per application (on an I-881 form). This $1,800 fee was one of the highest proposed and reflected the highest proposed increase. *See* 84 Fed. Reg. at 62,327. But without "disclos[ure of] critical assumptions," "commenters had no basis to understand or to critique [DHS's] conclusion" about this fee—or any others. *Shands Jacksonville Med. Ctr.*, 139 F. Supp. 3d at 263. The proposed fee rested on DHS's allocation of $680 of "management and oversight" costs to each I-881 application and $221 for a "TECS check"— amounts higher than the comparable figures for other forms. *See* 2019 IEFA document at 29. The Fee Proposal provides no way for commenters to understand these apparent anomalies.

Thus, DHS's thinking was "a black box." *Shands Jacksonville Med. Ctr.*, 139 F. Supp. 3d at 266. And especially because the "validity of [DHS's] assumptions" regarding its budget, revenue, and fee calculations "is far from self-evident," DHS's error was prejudicial. *Id.*

### 2.  DHS adopted new provisions without notice.

DHS further violated the APA by adopting a final rule that differed from its proposal in a way that "interested parties" could not "have anticipated." *Int'l Union, United Mine Workers of Am.*, 407 F.3d at 1259 (citation omitted). Without prior notice, the rule imposes a surcharge on paper-filed applications, characterized as a discount for online applications, *see* 85 Fed. Reg. at 46,831, and creates a new $30 biometrics fees for asylum seekers and certain others seeking employment authorization, *id.* at 46,833. With notice, plaintiffs would have explained their opposition. *See* Ball Cooper Decl. at 16 (¶¶ 37-38); Second Barón Decl. at 21-22 (¶¶ 52-53).

24

### C.  The 2020 Fee Rule is arbitrary and capricious.

Even if it were adopted in accordance with APA procedure, the 2020 Fee Rule is unlawful because it is arbitrary and capricious under 5 U.S.C. § 706(2)(A). "To satisfy the APA's arbitrary and capricious standard, an agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' … The 'agency must cogently explain why it has exercised its discretion in a given manner,' … and that explanation must be 'sufficient to enable [a court] to conclude that the [agency's action] was the product of reasoned decisionmaking.'" *Owner-Operator*, 494 F.3d at 203 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, 48, 52 (1983)) (internal quotation marks omitted). The 2020 Fee Rule falls short of this standard, in multiple ways.

#### 1.   DHS relied on unexplained and unreasonable calculations.

The 2020 Fee Rule is arbitrary and capricious because it relies on budget, revenue, and fee calculations that are unexplained. Like the Fee Proposal, the 2020 Fee Rule states budget figures, asserts that revenue under the existing fee schedule would fall short of those figures, and goes on to calculate fees that it suggested would make up the shortfall. *See* 85 Fed. Reg. at 46,793. Again, DHS failed to answer basic questions about these figures. The rule does not identify the full scope of USCIS operations included, explain why DHS believed those operations would cost the asserted amount of money in total or on a per-application basis, describe the extent to which (or why) DHS was predicting filing trends would go up or down, or make clear how DHS's ABC modeling exercise relates to the actual costs DHS will incur. Again, DHS did not state how much revenue, total, it expects the new fees will raise or why any revenue, beyond the stated budget figures, is necessary. Nor does the rule explain what DHS plans to do with CBP fees, DOJ revenue, or USCIS revenue excluded from its ABC modeling. *See, e.g.*, 2020 IEFA document at 4 n.3. This "complete

lack of explanation for [many] important step[s] in the agency's analysis" alone renders DHS's rule unlawful under the APA. *Owner-Operators*, 494 F.3d. at 204.

DHS's rule is also arbitrary and capricious because it relied on calculations that are unsupported or "counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. Like the proposal, the 2020 Fee Rule used budget and revenue estimates for fiscal years 2019 and 2020. But the figures are not relevant to this rule; fiscal year 2020 will end on September 30, 2020. *See* U.S. Senate, *Glossary Term: Fiscal Year*, https://www.senate.gov/reference/glossary_term/ fiscal_year.htm. And DHS did not make any suggestion that its figures represented estimates of the agency's needs or operations in 2021 or beyond, when the rule will be in effect.

Moreover, when DHS adopted the rule, it knew that its predictions for 2019 and 2020 were wrong. Generated mostly in 2017, DHS's figures reflected predictions that "did not materialize" in 2019; DHS admitted that "filing trends have changed" since it calculated figures used in the proposal, but DHS did not change its modeling to reflect those changes, 85 Fed. Reg. at 46,870. For example, DHS relied on assumptions about naturalization applications, fee-waiver requests, and asylum applications increasing. *See* 84 Fed. Reg. at 62,300 (regarding fee waivers, "during periods of economic improvement"); *id.* at 62,316 & n.147 (regarding naturalization, compared to 2016 estimates); *id.* at 62,318 (regarding asylum, without clear reference to any period). DHS data shows, however, that since 2017, these volumes have decreased. *See* Second Smullin Decl., Ex. A; USCIS, *Form I-912 Request for Fee Waiver* (Mar. 2020), https://www.uscis.gov/sites/default/ files/document/data/Form_I-912_Request_for_Fee_Waiver_Data_FY_2017-2019.pdf.    Further, though legal and policy changes that could affect workload and revenue have continued even since

the Fee Proposal, DHS did not update its estimates to reflect those changes.[10] Additionally, DHS's figures did not account for "cost-savings initiatives" that had materialized when the calculations were made. 84 Fed. Reg. at 62,286; *see* 85 Fed. Reg. at 46,839. DHS stated it would "capture any relevant cost-savings data during its next biennial fee review." 84 Fed. Reg. at 62,286; *see also* 85 Fed. Reg. at 46,874 (similar); *id.* at 46,790 (adopting proposal reasoning). "But reasoned decisionmaking requires giving present consideration to important aspects of problems—not merely promising to consider those matters at some point *in the future*." *Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 51-52 (D.D.C. 2017), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020).

Relatedly, DHS ignored more recent data, including new operational results, *see, e.g.*, Second Smullin Decl. Ex. A, and multiple operating plans released since 2018, *see* 85 Fed. Reg. at 46,793 n.18, 46,873. DHS stated that it retained its 2017 calculations because "minor changes" would constitute a "logical outgrowth" problem, *i.e.*, a failure to provide notice, under the APA. But it also stated that DHS believed that changing its treatment of "substantial sums," such as $10 million it reallocated or more than $200 million it subtracted from its budget, would not constitute such a problem. *Id.* at 46,874. DHS's assertion is illogical and does not justify DHS's use of admittedly outdated figures. Indeed, DHS used some updated figures in its impact analysis. *See,*

---

[10] *See, e.g.*, Proclamation No. 9983, 85 Fed. Reg. 6699 (Jan. 31, 2020) (suspending certain countries' nationals from entering United States as immigrants, in most cases); 85 Fed. Reg. 38,532 (June 25, 2020) (restricting asylum-seekers' access to employment authorization); Memorandum from Chad F. Wolf, Acting DHS Secretary, to Mark Morgan, Senior Official Performing the Duties of Commissioner CBP, *et al*., at 5 (July 28, 2020), https://www.dhs.gov/sites/default/files/publications/20_0728_s1_daca-reconsideration-memo.pdf (doubling frequency with which DACA fees are required); Second Smullin Decl., Ex. B at 17-25, 28-38; *see generally* 2020 IEFA document at 20-21 (describing changes between proposed and final rule, none of which reflected new operational estimates or policy changes other than those in the final rule).

*e.g.*, Final Impact Analysis at 85 (reflecting March 2020 data). And if DHS was concerned about a logical outgrowth problem, it could have published a new rulemaking proposal. "[A]n agency cannot *ignore* new and better data," *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015), because the data is inconvenient or examining it might require more work.

DHS's calculations additionally ran "counter to the evidence before the agency," *State Farm*, 463 U.S. at 43, because they assumed that immigrants would find a way to pay for every new or increased fee, and thus file applications at the same rate as they would under current law. *See* 85 Fed. Reg. at 46,895 (stating that in its impact analysis, DHS did not calculate immigrants' sensitivity to application costs). DHS itself acknowledged that the 2020 Fee Rule will price some immigrants out of the opportunity to seek benefits for which they are eligible. *See id.* at 46,891 (recognizing that fee-waiver restrictions would "adversely affect some applicants' ability to apply for immigration benefits"); *id.* at 46,882 (concluding that "some applicants may no longer apply for asylum"). Commenters submitted studies and other data illustrating this dynamic. *See e.g., id.* at 46,806, 46,797-99, 46,818 (summarizing commenters' assertions that the rule would prevent immigrants from accessing immigration benefits). Indeed, the final rule adopted the reasoning stated in the proposed rule, *see* 85 Fed. Reg. at 46,790, that deterring certain asylum applications was a goal of charging asylum seekers new fees, 84 Fed. Reg. at 62,320. Nevertheless, DHS's analysis of the rule's impact ignored this effect, an error that could also have impacted DHS's estimates of the workload it needs to fund and the revenue the rule will generate. *See generally Hermes Consol., LLC v. EPA*, 787 F.3d 568, 580 (D.C. Cir. 2015) (vacating agency decision that relied on "substantial overstatement of [an entity's] net income").

DHS's attempts to explain away the problem do not constitute reasoned decisionmaking. At some points, DHS denied that its fees have any effect on filing patterns. *See, e.g.*, 85 Fed. Reg.

at. 46,798, 46,799. But those statements contradict DHS's recognition of the contrary effect and extensive record data. Elsewhere, DHS stated that it lacked data to estimate applicants' price sensitivity, and implied that on that basis, it had not attempted such a calculation. *See id.* at 46,798, 46,895. But, again, DHS had plenty of data regarding immigrants' price sensitivity. And "[t]he mere fact that the magnitude of [such] effects is *uncertain* is no justification for *disregarding* the effect entirely." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004). Given the apparent number of factors that DHS *did* estimate, it is hardly plausible that it could not estimate this one. Indeed, just before DHS issued the 2020 Fee Rule, USCIS's deputy director provided testimony to Congress suggesting the agency generally *can* "recognize and anticipate patterns and changes in immigration filing volumes" *including* due to "fee increases." *Written Testimony of Joseph B. Edlow for a Hearing on "Oversight of U.S. Citizenship and Immigration Services," Before the House Committee on the Judiciary, Subcommittee on Immigration and Citizenship, July 29, 2020*, at 2, https://docs.house.gov/meetings/JU/JU01/20200729/110946/HHRG-116-JU01-Wstate-EdlowJ-20200729.pdf.

### 2. DHS failed in other ways to provide a reasoned explanation for its rule.

In addition to relying on unexplained and unsupported financial estimates, DHS failed in other ways to provide a reasoned explanation for the rule.

For instance, DHS lifted prior caps of fee increases and fee exemptions and eliminated fee waivers for most individuals. *See* 84 Fed. Reg. at 62,293 (regarding fee caps); *id.* at 62,300 (regarding fee waivers); *id.* at 62,301 (regarding exemptions); 85 Fed. Reg. at 46,790 (comparing final to proposed rule). For fee waivers, DHS replaced the prior "unable to pay" standard with an income ceiling that was lower than what USCIS previously allowed, *and* eliminated the ability of individuals to submit hardship- and means-tested benefits-based applications. *See* 85 Fed. Reg. at

29

46,920 (to be codified at 8 C.F.R § 106.3(c)). But DHS never explained whether or why it reversed its former position that many applicants covered by exemptions "would clearly be unable to pay," 75 Fed. Reg. at 58,973, or that without fee caps, others would also struggle to pay fees, 81 Fed. Reg. at 73,297, 73,307. Nor did DHS explain why it sought to charge fees to individuals unable to pay them. As explained above, its assertions that individuals would find a way to pay with a credit card, *see id.* at 46,807, were unsupported and internally contradictory, *see id.* at 46,891.

DHS also did not explain some of the distinctions it made between individuals and forms eligible for fee waivers and those not. DHS retained fee-waivers for naturalization applications submitted by otherwise-eligible individuals (on the N-400 form); but, without explanation, it eliminated fee waivers for the N-336 form, used to appeal adverse naturalization decisions. *See* 85 Fed. Reg. at 46,811. Notably, the cost of an N-336 request for a hearing can cause even more hardship than the N-400 fee, as the N-336 form must be filed within 30 days and costs *more* than the N-400. *See* 8 C.F.R. § 336.2(a); 85 Fed. Reg. at 46,792. Also arbitrary is DHS's decision to permit youth with Special Immigrant Juvenile (SIJ) status—youth who have been abused, abandoned, or neglected—to seek fee waivers if they are in out-of-home care under state or court supervision, but to eliminate fee waivers for other youth with such status. DHS concluded that the SIJ population is so small that fee waivers would not significantly change revenue. *See* 85 Fed. Reg. at 46,809. DHS did not explain why the entirety of this population should not thus receive fee waivers, *id.* at 46,814, especially when Congress deemed all such youth status vulnerable enough to need the same protections. *See* 8 U.S.C. § 1101(a)(27)(J); Second Barón Decl. at 9-10 (¶¶ 24-25) (discussing vulnerabilities); Ball Cooper Decl. at 6 (¶ 17) (similar).

Moreover, DHS did not provide reasoned justifications for eliminating hardship- and benefits-based applications. It suggested that hardship-based fee-waivers were unnecessary

because they were rarely used in the past, 85 Fed. Reg. at 46,822, but that statement ignores that under the 2011 Memorandum, USCIS has considered *first* whether individuals were receiving means-tested benefits and granted most applications on that basis. *See* AR44-49, *supra* at 3-5. The small number of hardship applications reflects this framework, not any measure of whether individuals earning more than 125 percent of the federal poverty guidelines (and no longer able to apply for fee waivers) will be able to afford DHS's new fees. *See* Second Smullin Decl., Ex. Z at 15-16. Further, if few individuals need hardship-based waivers, that would be reason to retain them; elimination would not serve DHS's stated goal of reducing other fee increases.

Similarly unreasoned is DHS's assertion that it could not accept means-tested benefits-based fee-waiver applications due to concerns about "equity." 85 Fed. Reg. at 46,820. Commenters explained equitable and other reasons that DHS should continue to accept other agencies' determinations that individuals are facing financial limitations, *in addition to* any income measure, to ensure that immigrants with recognized financial limitations can seek fee waivers. *See, e.g.*, Smullin Decl., Ex. D at 15, 17, 20, Ex. G at pdf pg. 173 (exhibit G at 5-6), Ex. K at 2-3, Ex. Z at 14-15. DHS did not address these concerns. Further, DHS's support of its income threshold *conflicts* with its rejection of benefits-based applications. DHS asserted that it chose the 125-percent income standard because that figure is used in other "determinants of low-income or financial wherewithal." 85 Fed. Reg. at 46,820. But DHS failed to acknowledge that provision of a means-tested benefits is itself a government-issued "determin[ation] of low-income or financial wherewithal." *See id.* at 46,821 (summarizing comments).

Relatedly, DHS failed to explain its conclusion that the 125-percent income standard, *alone*, is an appropriate proxy for "low-income or financial wherewithal"; indeed, even USCIS's October 2019 fee-waiver form set a higher income criterion (*and* combined that criterion with

hardship-based applications). *See Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 25 (D.D.C. 2020) (appeal pending) (finding that agency had not adequately explained why narrowed criteria for waiver requests "taken alone" reflect the relevant metric). Importantly, the fee-waiver context is similar to determinations that individuals need means-tested benefits; in both circumstances, individuals are facing financial challenges related to particular types of necessary expenses. But the determination of whether an individual needs a fee waived is distinct from other immigration-law use of the 125-percent figure. *See* 85 Fed. Reg. at 46,819 (summarizing concerns); Second Smullin Decl., Ex. D at 20 (explaining differences), Ex. G at 25-26 (similar), Ex. T at 4 (similar).

To the extent DHS sought to "codify" form and documentation requirements or other aspects of the October 2019 fee-waiver actions, *see* 84 Fed. Reg. at 62,999, the 2020 Fee Rule is arbitrary and capricious for the same reason that those actions are. *See* Dkt. 11 at 39-43. Notably, the bare explanations DHS offered in the final rule were similar to USCIS's explanations and similarly unreasoned. For instance, in requiring tax transcripts and eliminating family members' combined applications, DHS referenced concerns about unsigned tax returns and applications and asserted that requiring applicants to submit tax transcripts and individual applications would reduce rejections and administrative burden. *See* 85 Fed. Reg. at 46,824, 46,825. But just like USCIS earlier, DHS "has provided no evidence" that any such rejection is "a real problem." *Dist. of Columbia*, 444 F. Supp. 3d at 27. DHS also did not explain why it chose to require tax transcripts and new forms to solve any such problem, as opposed to clarifying form instructions or requiring easier-to-obtain documentation. Nor did DHS consider the impact of its new requirements on those they affect, including the multiple difficulties applicants will face in obtaining tax transcripts. The IRS's tool for providing transcripts online is only available to individuals with certain types of loans and cell phone accounts in their names and a social security number, as well as the ability to

use an English website and no change in address since their last IRS filing. *See* IRS, *Welcome to Get Transcript* (Aug. 20, 2020), https://www.irs.gov/individuals/get-transcript. Immigrants forced to seek transcripts or other IRS documents by mail can also face language barriers, as well as IRS-generated delays that, depending on the circumstances, can last longer than the 30-day period allowed to file administrative appeals, *see* 8 C.F.R. § 103.3(a)(2)(i). *See* IRS, *Get Transcript FAQs* (Apr. 21, 2020), https://www.irs.gov/individuals/get-transcript-faqs (stating that mail delivery takes five to 10 days after a request is received but that an address change may be required first, and that process "[g]enerally … takes four to six weeks"). DHS's conclusory statement that tax transcripts are "easily requested," 85 Fed. Reg. at 46,824, ignored these and other practical challenges and the comments that explained them. *See e.g.,* Second Smullin Decl. Ex. D at 17-18 (also incorporating comments regarding 2019 form changes), Ex. I at 18-24; Dkt. 11 at 23-24 (citing AR522, 2102, 2235, 2329-30, 2469, 2548-49, 2769, 3119, 3254, 3340-3345, 5043, 5092).

DHS also fails to explain its other documentation requirements, which are stricter in some respects even than the October 2019 USCIS fee-waiver form. For instance, DHS decided to provide an exception to generally applicable documentation requirements for some applicants, but not others. For the individuals for whom it allows alternative documentation, it did not explain how it decided *which* alternative documentation it would accept; its decision to accept affidavits from religious organizations but not statements from benefits-issuing agencies that have assessed individuals' financial circumstances is illogical. *See* 85 Fed. Reg. at 46,920 (to be codified at 8 C.F.R. § 106.3(f)(5)). Nor did DHS explain why only some individuals were allowed exceptions, when commenters explained challenges in obtaining IRS documents that apply broadly. *See* 85 Fed. Reg. at 46,824; *e.g.,* Second Smullin Decl., Ex. D at 17-18. Further, while the rule permits income-earning applicants without tax returns to submit W-2s or statements of government

payments "if applicable," 85 Fed. Reg. at 46,920 (to be codified at 8 C.F.R. § 106.3(f)(2)), the choice of these documents is, again, illogical and unexplained. Requiring a W-2 from individuals earning non-government income will bar some from seeking fee waivers; individuals can earn income without ever receiving a W-2. *See* IRS, *When Would I Provide a Form W-2 and a Form 1099 to the Same Person?* (Jul. 20, 2020), https://www.irs.gov/government-entities/federal-state-local-governments/when-would-i-provide-a-form-w-2-and-a-form-1099-to-the-same-person.

DHS's decision to charge new fees to asylum seekers is also arbitrary and capricious for multiple reasons in addition to the agency's reliance on unreasonable calculations. For the first time, DHS established an asylum application fee of $50. And it did so on the assumption that asylum seekers could afford to pay that fee, before a statutory one-year application deadline expires, as well as a $550 employment authorization fee and $30 biometrics fee. *See* 85 Fed. Reg. at 46,844-45. That assumption is unsupported and ignores substantial evidence to the contrary. *See id.* (summarizing comments). And DHS did not even purport to consider the impact of new fees on individuals who will have to pay to seek asylum and related protections as defenses in removal proceedings, using USCIS forms. *See id.* at 46,793.

Equally implausible is the agency's suggestion that the $50 fee is to raise revenue. *See id.* at 46,844. The revenue at stake is a miniscule portion of the stated budget, *see id.* at 46,808, though the fee is a significant sum for individual applicants. Moreover, DHS has decided to effectively refund the fee later, through a discount offered only *after* an individual receives asylum. *See id.* at 46,842. That discount will erase revenue gains, but *not* the immediate burden on asylum seekers.

DHS's suggestion that an asylum fee will deter frivolous filers also does not support the rule. Its assumption that fees will deter frivolous filers, but not "legitimate" applicants, is unsupported. *See* 84 Fed. Reg. at 62,320 (reasoning adopted in final rule); 85 Fed. Reg. at 46,844.

Additionally, deterrence is a "factor[] which Congress has not intended [DHS] to consider" in setting fees. *State Farm*, 463 U.S. at 43. Under 8 U.S.C. § 1356(m), DHS's authority is to set fees to recoup costs, not to deter applicants. Moreover, using fees to deter filings contravenes the purpose of asylum law, which is to *enable* immigrants to seek protection. *See E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1274-77 (9th Cir. 2020). Indeed, though Congress allowed for asylum fees, it focused on making fees affordable, by permitting installment payments (an option DHS rejected). 8 U.S.C. § 1158(d)(3).

### 3.  DHS repeatedly failed to consider the harm its rule will cause.

The 2020 Fee Rule is also arbitrary and capricious because DHS failed to consider the harm its rule will cause to individuals unable to pay the new fees and their communities. Commenters explained this harm in detail. But instead of "reflect[ing] upon" and "grappling with" comments, *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017), DHS dodged the issue, by responding with conclusory statements, if at all. It repeatedly declared that it "does not believe" or "disagrees" with commenters' statements, but it offered no analysis to support its disbelief. *See, e.g.*, 85 Fed. Reg. at 46,805, 46,807, 46,821, 46,822, 46,846, 46,881. The agency shrugged off concerns about unaffordable fees with barebones references to the existence of fee waivers for some and the agency's desire to generate revenue or have more immigrants pay fees. *See, e.g.*, *id.* at 46,840, 46,855, 46,861. And DHS did not meaningfully consider alternatives for reducing its fees and the harm they will cause; these could have included measures to cut costs or increase other revenue, such as Congressional appropriations or premium processing revenue. *See, e.g.*, *id.* at 46,866 (declining to increase premium processing revenue now, without explanation), 46,881 (stating only that DHS will consider efficiency gains in the future). Nor did DHS address concerns about the burden its new mail restrictions will impose on attorneys seeking to serve immigrant

clients or explain why it rejected less burdensome alternatives. *See* Second Smullin Decl., Ex. I at 16, Ex. U at 21-23; 85 Fed. Reg. at 46,868. Finally, when it assessed the rule's impact on families, DHS rested on the unexplained and unsupported conclusion that "the benefits of the new fees justify the financial impact on the family." *Id.* at 46,906; *see generally id.* at 46,795, 46,797, 46,803, 46,841, 46,850 (summarizing comments regarding harm to families). Such "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Dist. of Columbia*, 444 F. Supp. 3d at 32 (citation omitted).

### D.  The 2020 Fee Rule violates the INA.

The 2020 Fee Rule's violations of the FVRA, HSA, and APA are each independently adequate to set the rule aside. The rule is also unlawful because it violates the INA's restriction on fee funding, which permits DHS to impose fees on immigrants only to recover the costs of providing "adjudication and naturalization services" and those "associated with the administration of the fees collected." 8 U.S.C. § 1356(m). Even with the bareness of its budget explanation, the 2020 Fee Rule makes clear that DHS violated this restriction by setting fees to recover other costs.

For instance, DHS seeks to charge immigrants fees to fund USCIS's SAVE program, which provides information about individuals' immigration status to government agencies to use in determining eligibility for non-immigration benefits, such as food stamps or professional licenses. *See* USCIS, *SAVE*, https://www.uscis.gov/save (visited Aug. 24, 2020). In the Fee Proposal, DHS claimed the service is an "immigration adjudication …service" to such other agencies. 84 Fed. Reg. at 62,284 n.13. But SAVE plainly is not; it does not involve "immigration adjudication" or any service offered to the immigrants being asked to pay for it. USCIS has already recognized as much, by also charging fees to the agencies that use SAVE. *See* USCIS, *Sample Memorandum of Agreement* (Jan. 23, 2019), https://www.uscis.gov/sites/default/files/document/legal-docs/save-

non-fed_moa-sample.pdf. And while the INA enables DHS to set fees to subsidize the cost of low-fee or no-fee services provided to "immigrants," 8 U.S.C. § 1356(m), it provides no authority to subsidize the cost of non-adjudication services for government agencies.

DHS has also transgressed the INA's limits by seeking to fund anti-fraud efforts, including efforts to "[d]eter[] immigration benefit fraud" and "address[] national security and intelligence concerns." 2020 IEFA document at 8. Immigration law distinguishes such "enforcement" activities from the adjudication of benefits requests. For instance, when Congress created DHS, it transferred all "adjudication" functions from the former Immigration and Nationality Service to USCIS. 6 U.S.C. § 271(b). But it separated those functions from "intelligence," "investigations," "inspections," and "detention and removal" functions, which were subject to a different transfer-of-functions provision in a part of the statute titled "Immigration Enforcement Functions." *Id.* § 251. Whatever delegations DHS may now have made to USCIS of such enforcement functions, it cannot use the 2020 Fee Rule to bring such activities within the scope of "adjudication and naturalization services" for fee-funding purposes, simply because they happen to be performed by USCIS. *See generally* DHS, *Privacy Impact Assessment Update for the Fraud Detection and National Security Directorate* 6 (July 26, 2019), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-013-01-fdns-july2019_0.pdf (describing delegation of authority to USCIS to investigate civil and criminal violations of immigration law).

## II. The other preliminary injunction and section 705 factors weigh in favor of relief.

### A. The 2020 Fee Rule inflicts irreparable harm on plaintiffs.

Relief under APA section 705 and a preliminary injunction are additionally warranted because the 2020 Fee Rule will inflict harm on plaintiffs that is "great," "imminent," and "beyond remediation." *League of Women Voters*, 838 F.3d at 7 (citation omitted).

The rule will "impair" plaintiffs' programs and "directly conflict with" their missions, *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017) (quoting *League of Women Voters*, 838 F.3d at 8), by making it harder for them to provide services that are vital to their organizational purposes: helping immigrants apply for benefits, and, in the case of CASA, thus enabling immigrants to register to vote. Because of the extra demands that it places on plaintiffs' time and the financial assistance they offer clients, the rule will mean that plaintiffs will be unable to serve the same number of individuals that they currently serve and will be forced to divert resources away from other efforts. Moreover, the rule will prevent plaintiffs from assisting some individuals at all. When individuals are unable to pay the fees set by the rule, and either unable to obtain the documentation required for a fee-waiver application or not eligible for such a waiver, plaintiffs may not have any way to help them seek immigration benefits. *See* Ball Cooper Decl. at 1-2, 6-14 (¶¶ 2-3, 20-28); Second Barón Decl. at 1-3, 12-19 (¶¶ 2-9, 28-45); Escobar Decl. at 2-3, 9-12 (¶¶ 4-8, 31-39). *Cf. O.A. v. Trump*, 404 F. Supp. 3d 109, 142-43 (D.D.C. 2019) (concluding that immigrant-services organizations will suffer injury from challenged action with similar effects); *see generally People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (recognizing that "a concrete and demonstrable injury to an organization's activities—with the consequent drain on the organization's resources" is injury (cleaned up)).

This harm to plaintiffs will be significant and immediate. As a result of the rule, CASA estimates that over the next year, it will only be able to serve about 60 percent of the number of individuals seeking naturalization as CASA could otherwise. CASA also estimates that it will be unable to help about 200 other individuals who have no way to pay USCIS fees. Escobar Decl. at 11-12 (¶¶ 37-38). NWIRP estimates that, in just a matter of weeks, it will exhaust its emergency

relief funds in order to advance the fees of clients facing urgent needs; it will then face the prospect of being unable to assist clients with 30-day appeal or other deadlines or being unable to help existing clients get out of immigration detention quickly. NWIRP focuses on helping marginalized individuals, but these effects will make it especially hard for NWIRP to continue serving some of the most marginalized immigrants, such as those in immigration detention, with no access to funds. Second Barón Decl. at 16, 19-20 (¶¶ 39, 46-47). Ayuda estimates that over the next year, it will be unable to serve dozens of clients, including those with imminent deadlines, because they are unable to pay USCIS fees. It will have to turn away others, due to lack of Ayuda resources, and delay hundreds of cases, while clients seek the funds necessary to apply. Ball Cooper Decl. at 14-15 (¶¶ 33-34).

Further, for this harm, "there can be no do over and no redress," *League of Women Voters*, 838 F.3d 1 at 9, even if plaintiffs prevail at the conclusion of this lawsuit. At that point, plaintiffs will face a new set of individuals' needs to address. Moreover, plaintiffs will lose the chance to help clients meet irretrievable deadlines. Ball Cooper Decl. at 15 (¶¶ 34-35); Second Barón Decl. at 20 (¶¶ 47-48); Escobar Decl. at 14 (¶ 42). *See League of Women Voters*, 838 F.3d at 9 (holding that voter-registration organizations would suffer irreparable harm from actions causing drop in registrations because if upcoming registration deadline passed, there could be "no do over").

For CASA, the irretrievable deadlines are voter registration ones. CASA's naturalization program is part of the organization's effort to enable immigrants to vote. Even a small delay in CASA being able to help a member submit a naturalization application now can mean missing the chance to help that member meet a 2021 or 2022 voter registration deadline. *See* Escobar Decl. at 2-3, 7-8, 12 (¶¶ 8, 25, 39). For instance, USCIS estimates that its Washington, D.C. office (serving parts of Virginia) takes 11 to 18.5 months to process an N-400 application and its Baltimore office

takes between 12.5 and 27.5 months. *See* USCIS, *Check Case Processing Times*, https://egov. uscis.gov/processing-times/ (visited Sept. 2, 2020). As a result, a small delay in helping a Virginia resident submit a naturalization application could mean the difference between that immigrant being able to vote in the state's 2021 gubernatorial election or not. In Maryland, a delay could change whether or not the individual is able to vote in 2022. *See* Escobar Decl. at 12 (¶ 39).[11]

For Ayuda and NWIRP, the irretrievable deadlines are those imposed by immigration law. Asylum-seekers generally must apply within one year of their arrival in the United States. 8 U.S.C. § 1158(a)(2)(B). A new non-citizen spouse of a U.S. citizen faces a deadline to apply to remove limitations on his or her lawful permanent residence and avoid removal. *See* 8 U.S.C. § 1186a(a)(1), (c), (d)(2)(A). Certain disabled, blind, and older immigrants—including NWIRP clients—can lose their access to Supplemental Security Income benefits if they do not naturalize by a certain date, and they have a very short window in which to apply. *See* Second Barón Decl. at 6-7 (¶ 18); *see generally* 8 U.S.C. § 1612(a)(2)(A); Soc. Sec. Admin., *Spotlight on SSI Benefits for Aliens—2020 Edition*, https://www.ssa.gov/ssi/spotlights/spot-non-citizens.htm. Victims of crime and trafficking, with T and U nonimmigrant status, which can enable them to gain financial independence, can have their status jeopardized if they cannot afford to apply for lawful permanent residence by a certain date. *See* 8 U.S.C. § 1184(o)(7)(A), (p)(6); *see generally id.* §§ 1101(a)(15)(T), (a)(15)(U); AR2192, 2465, 2467, 2711, 2814-17, 3276-77.[12] Individuals seeking

---

[11] The Virginia 2021 registration deadline is in October 2021. *See* Va. Dep't of Elections, *Registration*, https://www.elections.virginia.gov/registration/ (visited Sept. 2, 2020); Va. Dep't of Elections, *Schedule of General Elections* (Mar. 2020), https://www.elections.virginia.gov/media/ boardpapers/calendar/mja-5-year-election-day-calendar-2020_2024_rev3_18_20.pdf.

[12] The applications for certain humanitarian benefits do not have fees. But ancillary forms, such as inadmissibility waivers, do have fees. *See* Second Smullin Decl., Ex. Z at 7.

asylum and other protections in removal proceedings must be able to pay the USCIS fee by the deadline set by statute or the immigration judge. And to file an administrative appeal, immigrants must be able to take action within 30 days. *See* 8 C.F.R. §§ 103.3(a)(2)(i), 336.2(a). *See generally* Second Barón Decl. at 6, 7-8, 9, 10-11 (¶¶ 18, 20, 22-22 25); Ball Cooper Decl. at 14 (¶ 33).

Faced with multitudes of low-income clients newly unable to seek fee waivers, NWIRP and Ayuda will prioritize providing funds to help clients with especially dire needs, including clients at risk of removal or missing deadlines. But their funds available to advance or pay USCIS fees are limited, as is plaintiffs' time to serve new clients. Without preliminary relief, they will turn away clients due to the extra demands the rule puts on their time and their inability to help individuals with no foreseeable way to pay the new fees. *See* Ball Cooper Decl. at 14-15 (¶¶ 33-34); Second Barón Decl. at 19-20 (¶¶ 46-47).

Ayuda's and CASA's revenue losses also constitute irreparable harm. Ball Cooper Decl. at 14 (¶ 32); Escobar Decl. 13-14 (¶ 41). *See Open Communities*, 286 F. Supp. 3d at 178.

**B.  The balance of equities and public interest weigh in favor of relief.**

The balance of equities and public interest favor the requested relief because, without it, life-changing immigration benefits will be placed out of reach for many eligible, but low-income, immigrants. *See generally* Ball Cooper Decl. at 5-6 (¶¶ 14-19); Second Barón Decl. at 4-11 (¶¶ 14-27); Escobar Decl. at 8-9 (¶¶ 28-30); Second Smullin Decl., Ex. D at 7-11, Ex. E at 7, 13-14, Ex. F at 6-10, Ex. G at 7-9, Ex. H at 29-30, Ex. I at 7-8, 26, Ex. J at 6-7, Ex. K at 9, Ex. M at 2-3, Ex. Y at 3; 85 Fed. Reg. at 46,795, 46,797-99, 46,810, 46,818, 46,842, 46,844, 46,857 (summarizing comments). The new rule requires asylum seekers to pay fees for work authorization before they even have legal permission to work. *See* 84 Fed Reg. at 62,301, 62,320 (describing change); Ex. D at 10-11, Ex. G at 5, Ex. M at 2-3, Ex. N at 9, Ex. O at 4, Ex. V at 9-14. And some immigrants

will face more than $1,000 in fee expenses they would not have faced before: either because they are no longer eligible for a fee waiver or because DHS increased a prior fee by *more* than $1,000. For example, the 2020 Fee Rule requires that immigrants seeking lawful permanent residence, employment authorization, and travel permission at the same time pay fees for all three applications, when under current law, only the lawful permanent residence application requires a fee. The result is a fee increase of over $1,000: $10 less for the lawful permanent residence application (I-485) and no separate biometrics fee in most cases, but a new $550 fee for employment authorization (I-765) and a new $590 fee for the travel permission (I-131). *See* 84 Fed. Reg. at 62,303-05 (describing change); 85 Fed. Reg. at 46,791-92 (showing new fees). At the federal minimum wage of $7.25, an extra $1,000 would require more than 135 hours of extra work.

When immigrants are unable to afford immigration fees, the results can be devastating. An immigrant may have his or her legal status terminated and may become subject to removal proceedings. Individuals eligible for asylum may be forced back to countries where they risk persecution. An immigrant who cannot afford to apply for employment authorization may have no legal permission to work or ability to prove legal status. For certain immigrants, delaying naturalization can mean losing a lifeline: Supplemental Security Income. When a domestic violence victim cannot afford to seek protection through humanitarian benefits, she may suffer further abuse. And when individuals are in removal proceedings and immigration detention, a delay in being able to apply for relief can mean a longer time in detention. *See* Second Barón Decl. at 6, 7-11 (¶¶ 18, 20, 22-27); Second Smullin Decl., Ex. D at 7-13, 19, Ex. M at 2, Ex. O at 3-4, Ex. P at 3, Ex. Y at 4, 6; Dkt. 11 at 11-14 (and AR cited therein); *see also* 8 U.S.C. §§ 1154(b)(1)(B)(i) (regarding asylum deadline and standard).

In other circumstances, family members will be separated by the cost of immigration benefits. Under the 2020 Fee Rule, applications required to keep family members together have extraordinarily high fees. The I-929 petition for crime victims' family members to stay together will cost $1,485. The I-601A application, which spouses of U.S. citizens use to waive unlawful presence as they seek to gain legal status, will cost $960. The I-751 form that spouses of U.S. citizens use to remove limits on their lawful permanent residence will cost $760. *See* 8 C.F.R. §§ 212.7(a), 216.4(a)(1), 245.24(g), 85 Fed. Reg. at 46,791-92; USCIS, *Provisional Unlawful Presence Waivers*, https://www.uscis.gov/family/family-of-us-citizens/provisional-unlawful-presence-waivers. In some cases, due to cost, families will have to make difficult choices about whether to apply for benefits for all, or just some members of a family. *See* Ball Cooper Decl. at 5-6 (¶14, 16); Second Barón Decl. at 5, 8-9 (¶¶ 16, 20-21); Second Smullin Decl., Ex. D at 8, Ex. F at 8, Ex. G at 4, Ex. I at 32, Ex. L at 42, Ex. O at 3, Ex. Q at 5-6.

The 2020 Fee Rule will also mean that many individuals will delay naturalizing—and thus receiving the right to vote and to seek certain jobs, and other advantages—because the fee is too high. *See* Escobar Decl. at 8-9 (¶¶ 27-30); Second Smullin Decl., Ex. F at 6, Ex. G at 40, Ex. H at 28-31, Ex. L at 9, Ex. S at 2-3. Research confirms that, even at current levels, USCIS fees are a barrier to naturalization. *See* Second Smullin Dec. at Ex. H at 6, 29-30, Ex. S at 1-2, Ex. W at 3-5; *also id.* at Ex. X at 2-3, Ex. Y at 4-5, 6.

Avoiding these consequences is in the public interest. The public interest is served by individuals being able to take advantage of benefits created by statute to *enable* immigrants to live and work in the United States. *See generally Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 42-43 (D.D.C. 2017) (recognizing irreparable harm to individuals of living "in limbo and in fear of removal" due to "block[ed] access to an existing legal avenue for avoiding removal"). "[T]here is

a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009). Similarly, "[c]ontinued detention, where [individuals] might otherwise be eligible" for relief runs against the public interest, as it "constitutes serious potential damage." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 157 (D.D.C. 2018). Additionally, "[t]he public has a strong interest in exercising the fundamental political right to vote," *League of Women Voters*, 838 F.3d at 12 (citation omitted), which in these circumstances, is only possible if immigrants can afford to naturalize.

Some immigrants may decide to pay the new fees even when they cannot afford them, by putting off necessities such as medical care, rent, or food. *See* Ball Cooper Decl. at 5-6 (¶¶ 14, 16); Second Smullin Decl., Ex. D at 3, 14, Ex. E at 9, Ex. I at 32, Ex. R at 1, 2; 85 Fed. Reg. at 46,895 (recognizing immigrants may put off other expenses). But the public interest is served by allowing immigrants to *avoid* such a choice. As this Court has recognized, forcing people "to go without" as little as "$194 per month they need to buy food" constitutes a "grave harm." *Dist. of Columbia*, 444 F. Supp. 3d at 45.

Moreover, avoiding the "programmatic harm" to plaintiffs aligns with the public interest because "Congress emphasized the importance" of the type of assistance provided by plaintiffs. *League of Women Voters*, 838 F.3d at 13 (regarding statutory scheme supporting voter registration programs). *See, e.g.,* 8 U.S.C. §§ 1101(i)(1), 1158(d)(4), 1229(b)(2), 1443(h) (regarding referrals to or assistance from nongovernmental or pro bono organizations); *see generally* Second Smullin Decl. Ex. Y at 7.

Finally, the public interest is served by DHS's compliance with the APA, INA, FVRA, and HSA. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12; *see also Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321,

330 (D.D.C. 2015) ("Forcing federal agencies to comply with the law is undoubtedly in the public interest[.]"), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (similar).

**III.     The Court should postpone the effective date and stay and enjoin implementation.**

Because all factors weigh in favor of preliminary relief, this Court should postpone the effective date of the 2020 Fee Rule and stay or enjoin all implementation or enforcement of the rule. "[P]ostpon[ing] the effective date of an agency action" is a statutory remedy under the APA, 5 U.S.C. § 705, that, when issued by this Court, means that the rule will not go into effect while judicial review is pending. *See Dist. of Columbia*, 444 F. Supp. 3d at 48. Section 705 also enables this Court to take other measures, including the requested stay, "to preserve status or rights pending conclusion of the review proceedings." The requested stay matches, in scope, the request to postpone the effective date, as does the separate requested remedy, of a preliminary injunction. The requested relief is necessary to provide complete relief to plaintiffs, whose work extends across various geographies, *see* Ball Cooper Decl. at 2 (¶ 4), Second Barón Decl. at 4 (¶ 12); Escobar Decl. at 2 (¶ 5), as well as to respect the Constitution's command for a "uniform Rule of Naturalization," art. I, § 8, cl. 4. *See NAACP v. Trump*, 298 F. Supp. 3d 209, 243 (D.D.C. 2018), *aff'd and remanded sub nom. DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891 (2020).

## CONCLUSION

For the foregoing reasons, this Court should grant plaintiffs' motion for relief under section 705 of the APA and a preliminary injunction.

Dated: September 3, 2020                    Respectfully submitted,

                                             /s/ Rebecca Smullin
                                            Rebecca Smullin (D.C. Bar No. 1017451)
Laurie Ball Cooper (D.C. Bar No. 1017998)   Adina H. Rosenbaum (D.C. Bar No. 490928)
Ayuda, Inc.                                 Michael T. Kirkpatrick (D.C. Bar No. 486293)
6925 B Willow Street NW

Washington DC 20012
202-349-0656
laurie.ballcooper@ayuda.com

Counsel for Plaintiff Ayuda, Inc.

Nicholas Katz (MD Bar No. 1812100006)
CASA de Maryland, Inc.
8151 15th Avenue
Langley Park, MD 20783
240-491-5743
nkatz@wearecasa.org

Counsel for Plaintiff CASA
de Maryland, Inc.

Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
202-588-7714
rsmullin@citizen.org

Counsel for All Plaintiffs

Matt Adams (WSBA No. 28287)
Aaron Korthuis (WSBA No. 53974)
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
206-957-8611
matt@nwirp.org

Counsel for Plaintiff Northwest
Immigrant Rights Project