IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NORTHWEST IMMIGRANT RIGHTS PROJECT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-3283 (RDM) |
| | ) | |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SECTION 705 RELIEF AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

I.      Statutory Background ..............................................................................................3

II.     Regulatory Background ...........................................................................................3

III.    This Litigation .........................................................................................................6

STANDARD OF REVIEW ....................................................................................................6

ARGUMENT .......................................................................................................................7

I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ................................7

        A.      Mr. McAleenan and Mr. Wolf Lawfully Served Under the HSA ..................7

                1.      Mr. McAleenan lawfully served under the HSA................................8

                2.      Mr. McAleenan had statutory authority to designate an order of
                        succession...........................................................................................14

                3.      The FVRA's time limit does not apply to designations under the
                        HSA....................................................................................................17

        B.      Ratification Cures the Alleged Service-Related Defects in the Actions
                Challenged Here.............................................................................................19

        C.      The Rule Is Procedurally Proper. ..................................................................23

                1.      The Agency Provided a Reasonable Opportunity to Comment....................23

                2.      The Agency Provided Reasonable Notice of the Biometrics Fee and
                        the Discount for Online Submissions................................................26

        D.      The Rule Is Not Arbitrary and Capricious. ...................................................27

                1.      The Agency's Funding Calculations and Use of Available Data Were
                        Reasonable.........................................................................................27

                2.      The Agency Adequately Explained Its Choices. ................................31

                3.      DHS Fully Considered the Interests of Immigrant Applicants. ....................39

        E.      The Final Rule Is Consistent with the INA....................................................40

II.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST A
       STAY OR PRELIMINARY RELIEF.........................................................................43

III.   ANY REMEDY MUST BE LIMITED TO REDRESS ONLY THOSE SPECIFIC
       HARMS, IF ANY, THAT HAVE BEEN DEMONSTRATED. .............................................44

CONCLUSION......................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Agape Church, Inc. v. FCC,*
    738 F.3d 397 (D.C. Cir. 2013) ...................................................................................................26

*Air Transp. Ass'n of Am., Inc. v. USDA,*
    303 F. Supp. 3d 28 (D.D.C.) .............................................................................................*passim*

*Alaska Airlines, Inc. v. TSA,*
    588 F.3d 1116 (D.C. Cir. 2009) .................................................................................2, 28, 29

*Alaska Dep't of Env't Conservation v. EPA,*
    540 U.S. 461 (2004) ...................................................................................................................27

*Am. Fed. of Labor v. NLRB,*
    2020 WL 3605656 (D.D.C. July 1, 2020) ...............................................................................35

*Am. Hosp. Ass'n v. NLRB,*
    499 U.S. 606 (1991) ...................................................................................................................31

*Am. Med. Ass'n v. Reno,*
    57 F.3d 1129 (D.C. Cir. 1995) .................................................................................................40

*Am. Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) .................................................................................................23

*Azar v. Alina Health Serv.,*
    139 S. Ct. 1804 (2019) ...............................................................................................................15

*Casa de Md. v. Wolf,*
    Civ. A.,No. 8:20-cv-02118, 2020 WL 5500165 (D. Md. Sept. 11, 2020) .....................*passim*

*Cent. & S. Motor Freight Tariff Ass'n, Inc. v. United States,*
    777 F.2d 722 (D.C. Cir. 1985) .........................................................................................26, 30

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ...................................................................................................................43

*City of Waukesha v. EPA,*
    320 F.3d 228 (D.C. Cir. 2003) .................................................................................................40

*Clark v. Martinez,*
    543 U.S. 371 (2005) ...................................................................................................................16

*Consumer Elecs. Ass'n v. FCC,*
    347 F.3d 291 (D.C. Cir. 2003) .................................................................................................36

*Costanzo v. Tillinghast,*
    287 U.S. 341 (1932) ...................................................................................................................43

*CSX Transp., Inc. v. Surface Transp. Bd.*,
 584 F.3d 1076 (D.C. Cir. 2009) ..........................................................................26

*Dep't of Com. v. New York*,
 139 S. Ct. 251 (2019) ................................................................................. 2, 31

*DHS v. Regents of the Univ. of Cal.*,
 140 S. Ct. 1891 (2020)..........................................................................................31

*Dist. of Columbia v. USDA*,
 444 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................... 7, 36

*English v. Trump*,
 279 F. Supp. 3d 307 (D.D.C. 2018), *appeal dismissed*, 2018 WL 3526296
 (D.C. Cir. July 13, 2018) ..................................................................................10

*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009) ............................................................................................31

*Guedes v. ATF*,
 920 F.3d 1 (D.C. Cir. 2019)...................................................................... 7, 21, 22

*Guedes v. ATF*,
 356 F. Supp. 3d 109 (D.D.C. 2019) ................................................................ 16, 17

*Hooks v. Kitsap Tenant Support Servs.*,
 816 F.3d 550 (9th Cir. 2016) ..............................................................................17

*In re Grand Jury Investigation*,
 916 F.3d 1047 (D.C. Cir. 2019) ..................................................................... 14, 16

*Kisor v. Wilkie*,
 139 S. Ct. 2400 (2019), *remanded*, 969 F.3d 1333 (Fed. Cir. 2020) ......................12

*L.M.-M v. Cuccinelli*,
 442 F. Supp. 3d 1 (D.D.C. 2020) ................................................................... 22, 23

*Lexmark Int'l v. Static Control Components, Inc.*,
 572 U.S. 118 (2014) ............................................................................................40

*Long Island Care at Home, Ltd. v. Coke*,
 551 U.S. 158 (2007) ............................................................................................27

*Miss. Power & Light Co. v. U.S. Nuclear Reg. Comm'n*,
 601 F.2d 223 (5th Cir. 1979) ..............................................................................42

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto Ins. Co.*,
 463 U.S. 29 (1983) .......................................................................................*passim*

*Munaf v. Geren*,
 553 U.S. 674 (2008) ..............................................................................................7

*Nat. Res. Def. Council v. EPA*,
 529 F.3d 1077 (D.C. Cir. 2008) ...........................................................................28

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ................................................................................................30

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012) ...........................................................................33

*Nat'l Cable Television Ass'n v. FCC*,
    554 F.2d 1094 (D.C. Cir. 1976) ...........................................................................30

*Neb. Dep't of Health & Human Servs. v. HHS*,
    435 F.3d 326 (D.C. Cir. 2006) .............................................................................44

*New York v. United States*,
    331 U.S. 284 (1947) ..............................................................................................23

*Ozark Auto. Distrib., Inc. v. NLRB*,
    779 F.3d 576 (D.C. Cir. 2015) .............................................................................26

*Palisades Collections LLC v. Shorts*,
    552 F.3d 327 (4th Cir. 2008) ...............................................................................18

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .............................................................................43

*Ryan v. United States*,
    136 U.S. 68 (1890) ................................................................................................14

*Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*,
    81 F.3d 179 (D.C. Cir. 1996) ...............................................................................42

*Shands Jacksonville Med. Ctr. v. Burwell*,
    139 F. Supp. 3d 240 (D.D.C. 2015) .....................................................................23

*Singh v. Carter*,
    185 F. Supp. 3d 11 (D.D.C. 2016) .........................................................................7

*Stovic v. R.R. Ret. Bd.*,
    826 F.3d 500 (D.C. Cir. 2016) ........................................................................27, 28

*SW Gen., Inc. v. NLRB*,
    796 F.3d 67 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017)...................................22

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*,
    106 F. Supp. 3d 125 (D.D.C. 2015) .....................................................................44

*United Parcel Serv., Inc. v. USPS*,
    184 F.3d 827 (D.C. Cir. 1999) ........................................................................23, 30

*United States v. Eaton*,
    169 U.S. 331 (1898) ........................................................................................16, 19

*United States v. Freeman,*
 44 U.S. 556 (1845) ................................................................................................40

*United States v. Harris Cnty.,*
 No. 4:16-CV-2331, 2017 WL 7692396 n.5 (S.D. Tex. Apr. 26, 2017) .......................22

*United States v. Lucido,*
 373 F. Supp. 1142 (E.D. Mich. 1974) .......................................................................17

*United States v. McGee,*
 173 F.3d 952 (6th Cir. 1999) ...................................................................................15

*United States v. Pellicci,*
 504 F.2d 1106 (1st Cir. 1974) ..................................................................................15

*United States v. Smith,*
 962 F.3d 755 (4th Cir. 2020) ...................................................................................19

*United Steel v. Mine Safety & Health Admin.,*
 925 F.3d 1279 (D.C. Cir. 2019) ...............................................................................31

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs,*
 714 F.3d 186 (4th Cir. 2013) .....................................................................................8

*Weiss v. United States,*
 510 U.S. 163 (1994) .................................................................................................19

*Winter v. Nat. Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) ......................................................................................................7

*WJG Tel. Co., Inc. v. FCC,*
 675 F.2d 386 (D.C. Cir. 1982) .................................................................................23

**Statutes**

5 U.S.C. § 553 ...............................................................................................................23

5 U.S.C. § 705 ......................................................................................................6, 7, 44

5 U.S.C. § 706 ...............................................................................................................26

5 U.S.C. § 3345 ..........................................................................................10, 14, 17, 20

5 U.S.C. § 3346 ..........................................................................................14, 17, 19, 20

5 U.S.C. § 3347 ..............................................................................................10, 14,  17

5 U.S.C. § 3348 (1994) .................................................................................................19

5 U.S.C. § 3348 ..............................................................................................15, 21, 23

5 U.S.C. § 3349 .............................................................................................................19

6 U.S.C. § 112 .......................................................................................................................*passim*

6 U.S.C. § 113 .......................................................................................................................*passim*

6 U.S.C. § 252 ................................................................................................................................42

6 U.S.C. § 273 ................................................................................................................................42

8 U.S.C. § 1182 ........................................................................................................................... 5, 42

8 U.S.C. § 1158 ................................................................................................................................3

8 U.S.C. § 1356 .....................................................................................................................*passim*

15 U.S.C. § 633 ..............................................................................................................................15

31 U.S.C. § 902 ........................................................................................................................... 5, 29

31 U.S.C. § 1344 ............................................................................................................................22

31 U.S.C. § 9701 ............................................................................................................................42

38 U.S.C. § 304 ..............................................................................................................................15

40 U.S.C. § 302 ..............................................................................................................................15

42 U.S.C. § 902 ..............................................................................................................................15

Act of Feb. 13, 1795, 1 Stat. 415 ..................................................................................................19

Pub. L. No. 99-603, 100 Stat. 3359 (1986) ...................................................................................41

Pub. L. No. 107-296, 116 Stat. 2135 (2002) ...................................................................................3

Pub. L. No. 114-328, 130 Stat. 2000 (2016) (codified at 6 U.S.C. § 113(g) (Dec. 23, 2016) ...............10

Pub. L. No. 116-93, 133 Stat. 2317 (2020) ...................................................................................29

**Rules**

Federal Rule of Civil Procedure 65 ................................................................................................6

**Regulations**

8 C.F.R. § 103.2 ............................................................................................................................44

8 C.F.R. § 103.7 .......................................................................................................................... 3, 4

8 C.F.R. § 106.3 ..............................................................................................................4, 5, 34, 35

8 C.F.R. § 106.3 ............................................................................................................................34

8 C.F.R. § 211.1 ............................................................................................................................42

8 C.F.R. § 211.2 ...................................................................................................42

8 C.F.R. § 336.2 ...................................................................................................34

8 CFR Part 316 ....................................................................................................34

70 Fed. Reg. 56,182 (Sept. 26, 2005) ...................................................................29

81 Fed. Reg. 26,910 (May 4, 2016) .........................................................24, 27, 41

81 Fed. Reg. 73,292 (Oct. 24, 2016) .......................................................24, 27, 29

81 Fed. Reg. 90,667 (Dec. 9, 2016) ......................................................................20

83 Fed. Reg. 33,765 (July 17, 2018) .....................................................................42

84 Fed. Reg. 1,167 (Feb. 1, 2019) ........................................................................35

84 Fed. Reg. 62,280 (Nov. 14, 2019) ............................................................*passim*

84 Fed. Reg. 62,286 (Nov. 14, 2019) ............................................................*passim*

85 Fed. Reg. 46,788 (Aug. 3, 2020) .............................................................*passim*

OMB Circular A-25, "User Charges" (Revised),
    58 Fed. Reg. 38,142 (July 15, 1993) ..............................................................42

## Other Authorities

165 Cong. Rec. S.6519 ........................................................................................19

Executive Order 13753 .................................................................................*passim*

Homeland Security Delegation No. 0150.1 (2003), https://www.hsdl.org/
    ?abstract&did=234775 ...................................................................................41

*In re Dep't of Homeland Sec.–Legality of Service of Acting Secretary of Homeland Security and Service of Senior
Official Performing the Duties of Deputy Secretary of Homeland Security,*
    B-331650 (GAO Aug. 14, 2020) .....................................................................12

*In re Dep't of Homeland Sec.–Legality of Service of Acting Secretary of Homeland Security and Service of Senior
Official Performing the Duties of Deputy Secretary of Homeland Security–Reconsideration,*
    B-332451 (GAO Aug. 21, 2020) .....................................................................13

Instructions for Request for Fee Waiver,
    https://www.uscis.gov/sites/default/files/document/forms/i-912instr-pc.pdf. .................37, 38

Conf. Rep. 108-774, Making Appropriations for the [DHS] for the Fiscal Year Ending
    September 30, 2005, http://www.gpo.gov/fdsys/pkg/CRPT-108hrpt774/pdf/CRPT-
    108hrpt774.pdf ..............................................................................................41

Off. of Legal Counsel, *Acting Officers*, 6 Op. O.L.C. 119 (1982) .........................15

Office of the Assistant Sec'y of Planning & Evaluation, HHS, *FAQs Related to the Poverty Guidelines and Poverty: What Programs Use the Poverty Guidelines, https://aspe.hhs.gov/frequently-asked-questions-related-poverty-guidelines-and-poverty*..................................................................................................35

Policy Memorandum, PM-602-0011.1, *Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule*; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11-26 (Mar. 13, 2011)...............................................................................35

S. Rep. No. 105-250...................................................................................................... 17, 18

The Border Observer, *CBP Commissioner Kevin McAleenan sworn-in as the Acting DHS Secretary; Opens New DHS Headquarters* (Apr. 11, 2019), https://theborderobserver.wordpress.com/2019/04/11/cbp-commissionerkevin-mcaleenan-sworn-in-as-the-acting-dhs-secretary/..................................................................12

USCIS, *USCIS Adjusts Fees To Help Meet Operational Needs* (July 31, 2020), https://www.uscis.gov/news/news-releases/uscis-adjusts-fees-to-help-meet-operational-needs ........................................................................................................25

*Welcome to Get Transcript*, Internal Revenue Service, https://irs.gov/individuals/get-transcript..........37

## INTRODUCTION

When U.S. Citizenship and Immigration Services (USCIS) completed its biennial fee review for Fiscal Years (FY) 2019 and 2020, the agency identified an over $1 billion projected average annual revenue shortfall. USCIS Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280, 62,282 (Nov. 14, 2019) (Proposed Rule). By subsequent notice-and-comment rulemaking, and as contemplated by its statutory authority USCIS adjusted its fees to recover the full cost of providing immigration adjudication and naturalization services, revised fee waiver and exemption policies, and made form and fee structure changes. *See* USCIS Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46,788, 46,790-792 (Aug. 3, 2020) (Final Rule or Rule); *see also* 8 U.S.C. § 1356(m) (providing that USCIS fees "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," and "at a level that will recover any additional costs associated with the administration of the fees collected").

Disregarding both the plenary fee-setting discretion vested in the agency by 8 U.S.C. § 1356(m) and that statute's contemplation of full cost-recovery *via* such fees, Plaintiffs–organizations that provide legal and other services to immigrants–seek emergency injunctive relief against the Rule but fail to show entitlement to the extraordinary relief they seek against a proper exercise of fee authority.

Plaintiffs are unlikely to succeed on the merits. *First*, as to their vacancy claims, Plaintiffs disregard the pertinent signed order setting forth DHS's order of succession in favor of an administrative document that does not control. Their arguments parrot errors made in a Government Accountability Office (GAO) Decision that binds neither DHS nor this Court and confuses orders of succession and delegations of authority. Further, the order of succession was lawfully amended, and the Federal Vacancy Reform Act's (FVRA) 210-day limit does not apply to Mr. McAleenan's or Mr. Wolf's service. Finally, even if Plaintiffs are right that these officials were invalidly serving when issuing or approving the Final Rule, their claims still fail because Mr. Wolf, who is validly serving as Acting Secretary even under Plaintiffs' theory of the succession order and FVRA, has now ratified the agency actions Plaintiffs challenge.

*Second*, the agency exceeded the Administrative Procedure Act's (APA) procedural requirements for analyzing complex cost and revenue projection analyses and provided the public a reasonable opportunity to comment. Plaintiffs' arguments boil down to policy disagreements, which they could have raised (and largely did) in public comments. And the agency provided reasonable notice of aspects of the Rule Plaintiffs allege were excluded in the Proposed Rule.

*Third*, the Rule satisfied the APA because the agency adequately considered the data and comments before it. *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs' quibbling over "complex judgments about … data analysis that are within the agency's technical expertise" cannot overcome the "extreme amount of deference" owed to such judgments. *Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116, 1120 (D.C. Cir. 2009). Nor did the agency fail to explain its policy choices; on the contrary, Plaintiffs' challenges reflect mere policy disagreement and ask the Court to "improperly substitute its judgment for that of the agency." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2570 (2019), *remanded*, 2019 WL 3213840 (S.D.N.Y. July 16, 2019). Nor, as explained below, is the Rule's asylum fee improper.

*Finally*, the funding in the Rule for certain status-verification and counter-fraud activities comports with the Immigration & Nationality Act (INA), as well as the HSA, the Immigration Reform and Control Act, DHS's decades-long practices, and Congress's acquiescence in those practices.

Moreover, Plaintiffs cannot show that the balance of equities tips in their favor or that the public interest favors an injunction or stay of the Rule's effective date. Either of the remedies Plaintiffs seek would cause USCIS to continue to forgo millions of dollars of revenue daily, forcing corresponding funding cuts, furloughs, and swelling backlogs of the very applications Plaintiffs claim the Rule will delay, as well as likely greater fee increases down the line.

For all of these reasons, and as detailed below, Plaintiffs' motion should be denied.

# BACKGROUND

## I.     Statutory Background

The HSA created the Department of Homeland Security (DHS) and, within it, several entities including USCIS. *See* Pub. L. No. 107-296, § 451, 116 Stat. 2135 (2002). The HSA charged USCIS with adjudicating immigration benefits and naturalization requests. *Id.* § 451(b). The Act established accounts "for appropriated funds and other deposits for" USCIS and for the "Bureau of Border Security," requires that "[f]ees imposed for a particular service, application or benefit shall be deposited into the account … that is for the bureau with jurisdiction over the function to which the fee relates," and prohibits the transfer of fees between bureaus "for purposes not authorized by [8 U.S.C. § 1356]." *Id.* § 476(a), (c), (d). The entities now known as U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) were created from within the now-defunct Bureau of Border Security.

Congress structured USCIS to be fee-funded. 8 U.S.C. § 1356 (m). It created the "Immigration Examinations Fee Accounts" (IEFA), and authorized fees at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants," and "at a level that will recover any additional costs associated with the administration of the fees collected." *Id.* § 1356(m). DHS's "longstanding interpretation" of the "including" clause is that it "offers … a non-exhaustive list of some of the costs that DHS may consider [as] part of the full costs of providing adjudication and naturalization services." 85 Fed. Reg. 46,789 n.2. While the INA does not "require" DHS "to charge fees for adjudication services provided to asylum applicants," DHS may do so as long as "[s]such fees [do] not exceed the … costs in adjudicating the applications." 8 U.S.C. § 1158(d)(3). Further, IEFA funds may "reimburse any appropriation … for expenses in providing immigration adjudication and naturalization services." *Id.* § 1356(n).

## II.     Regulatory Background

### A.     *USCIS's Fee Waiver Regulations and Policies*

8 C.F.R. § 103.7(c) (2010) (the 2010 Fee Regulation), provides that fee waivers may be available

where:

> **(i)**  The party requesting the benefit is unable to pay the prescribed fee.
>
> **(ii)** A waiver based on inability to pay is consistent with the status or benefit sought[.]

8 C.F.R. § 103.7(c)(1) (2010). Further, to request a fee waiver, the "person requesting an immigration benefit must submit a written request for permission to have their" fee waived. *Id.* § 103.7(c)(2). The written request "must state the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated." *Id.* The 2010 Fee Regulation also lists the benefit applications for which a fee waiver is available. *Id.* § 103.7(c)(3) (listing waivable fees).[1]

On the basis of the 2010 Fee Regulation, USCIS announced various fee waiver revisions in October 2019. The 2019 Revisions took effect on December 2, 2019, and were preliminarily enjoined on December 11, 2019, on the ground that the agency did not conduct notice-and-comment rulemaking. *See* ECF No. 65, *City of Seattle v. DHS*, No. 3:19-cv-7151-MMC.

The Final Rule revises the 2010 Fee Regulation underlying the 2019 Revisions, and recodifies the revised provisions at 8 C.F.R. § 106.3 (2020) (the 2020 Fee Regulation). The 2020 Fee Regulation sets forth a general rule that "[n]o fee relating to any benefit request submitted to USCIS may be waived" unless the following conditions are met:

> (i)    There is a statutory or regulatory provision allowing for fee waivers, *id.* § 106.3(a)(1) (listing categories of requestors that may apply for fee waivers);
>
> (ii)   The requester is a Special Immigrant Juvenile (SIJ) who has "been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency at the time of filing;" or an "Afghan or Iraqi Translator or Interpreter, Iraqi National employed by or on behalf of the U.S. Government, or Afghan National employed by or on behalf of the U.S. government or employed by the International Security Assistance Forces[,]" *id.* § 106.3(a)(2);
>
> (iii)  The requester has an annual gross household income at or below 125 percent of the Federal Poverty Guidelines (FPG), *id.* § 106.3(c); and
>
> (iv)   The request is submitted "on the form prescribed by USCIS in accordance with the

---

[1] 8 C.F.R. § 103.7(d) authorizes the USCIS Director to approve and suspend exemptions from fees or provide that the fee may be waived for a case or class of cases that is not otherwise provided in 8 C.F.R. § 103.7(c).

instructions on the form," *id.* § 106.3(d), and includes the requisite documentary evidence of annual gross household income as described in § 106.3(f).

Additionally, the 2020 Fee Regulation grants the USCIS limited discretionary authority to "waive[], in whole or in part, of a form fee … that is not otherwise waivable under this section," if the Director "determines that such action is an emergent circumstance, or if a major natural disaster has been declared." *Id.* § 106.3(b). The Director's discretion in § 106.3(b) is limited in three ways. First, in exercising his discretion, the Director may not waive the requirements of § 106.3(c) that the requester have an annual household gross income at or below 125 percent of the FPG, or of § 106.3(d) that the request be submitted on the prescribed form in accordance with the form's instructions. Second, the Director may not waive fees for "a requester who is seeking an immigration benefit for which he or she" is "subject to the affidavit of support requirements," or "is already a sponsored immigrant" under the regulations, "unless the applicant is seeking a waiver of the joint filing requirement to remove conditions on his or her residence based on abuse." *Id.* § 106.3(b)(1). The Director also may not waive fees for "a requester who is seeking an immigration benefit for which he or she" is "subject to the public charge inadmissibility ground under … 8 U.S.C. § 1182(a)(4)." *Id.* § 106.3(b)(2).

Finally, the 2020 Fee Regulation grants the Director of USCIS limited discretionary authority to "provide an exemption for any fee," *id.* § 106.3(e), if the Director determines that an exemption "would be in the public interest, … is consistent with the applicable law, and … is related to": (i) Asylees; (ii) Refugees; (iii) National security; (iv) Emergencies or major disasters; (v) "An agreement between the U.S. government and another nation or nations"; or (vi) USCIS error. *Id.* § 106.3(e).

B.    *The Fee Review and the 2020 Rule's Revised Fee Schedule*

31 U.S.C. § 902 requires each agency, including DHS, to "review, on a biennial basis, the fees … imposed by the agency for services … it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services." In 2019, USCIS completed its review of non-statutory fees deposited into the IEFA for FY19-20. 84 Fed. Reg. 62,282. The "primary objective" was to determine whether USCIS's fees would cover its anticipated costs, *id.*, and it "identified a projected average annual cost and revenue differential" of over $1 billion. 85 Fed. Reg.

46,794. Accordingly, the Rule "adjust[s] USCIS' fee schedule to recover the full cost of providing immigration adjudication and naturalization services." *Id.* Additionally, DHS revised certain fee waiver and exemption policies (including the revision and recodification of the Fee Regulation, described above), established multiple fees for different categories of petitions for nonimmigrant workers, limited petitions for nonimmigrant workers, and made changes in USCIS's forms and fee structures. *See* 84 Fed. Reg. 62,295-331; 85 Fed. Reg. 46,790-92.

## III.   This Litigation

In October 2019, Plaintiff Northwest Immigrant Rights Project (NWIRP) filed this suit against USCIS to challenge the 2019 Revisions. Compl., ECF No. 1; Am. Compl., ECF. No. 9. NWIRP then moved for summary judgment, ECF No. 11. In February 2020, Defendant USCIS moved to dismiss and cross-moved for summary judgment, ECF No. 25. The parties' motions remain pending. In the interim, on December 11, 2019, the 2019 Fee Revisions were preliminarily enjoined nationwide in another action. *See* Order, *City of Seattle*, ECF No. 65 (Nationwide Preliminary Injunction Order). That preliminary injunction remains in place. *See* Order, *City of Seattle*, ECF No. 84.

On August 21, 2020, NWIRP, together with new parties Ayuda, Inc. and CASA de Maryland, Inc., moved for leave to file a Second Amended and Supplemental Complaint, ECF No. 42, against USCIS and new parties DHS, Chad F. Wolf, in his official capacity as Acting Secretary of Homeland Security, and Kenneth T. Cuccinelli, in his official capacity as Senior Official Performing the Duties of the USCIS Director and Senior Official Performing the Duties of the Deputy Secretary of Homeland Security. On August 29, 2020, the Court granted leave to amend and supplement. ECF No. 45. Now, on the basis of their APA claims, Plaintiffs seek postponement of the October 2, 2020 effective date, and a stay of any implementation or enforcement of the 2020 Rule pursuant to 5 U.S.C. § 705 or, in the alternative, a preliminary injunction preventing implementation or enforcement of the 2020 Rule. Pls.' Mot. For Prelim. Inj., ECF No. 50 (Mot.).

## STANDARD OF REVIEW

Plaintiffs move for a preliminary injunction under Federal Rule of Civil Procedure 65. "A preliminary injunction is an extraordinary and drastic remedy" and "should never be awarded as of

right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A plaintiff is entitled to such an "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To establish such entitlement, a plaintiff must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. "[T]he plaintiff bears the burden of persuasion on all four preliminary injunction factors in order to secure such an 'extraordinary remedy.'" *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) (citing authority). However, when the government is the opposing party, the last two factors merge. *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020).[2]

## ARGUMENT

## I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

Through its FY19-20 fee review, USCIS determined that it would face an over $1 billion projected average annual shortfall absent fee changes. Through notice-and-comment rulemaking, the agency–pursuant to Congress's instruction in 8 U.S.C. § 1356(m)–adjusted its fee schedule to recover the full cost of providing immigration adjudication and naturalization services, and, consistent with the plenary fee-setting discretion Congress vested in the agency, revised certain fee waiver and exemption policies, and made changes in USCIS's forms and fee structures. The changes effected by the Rule are consistent with the INA and HSA, and over the course of an 8.5-month rulemaking during which the public had the opportunity to submit tens of thousands of comments, the agency satisfied its obligations under the APA. Plaintiffs' claims lack merit and are belied by the record.

### A.   Mr. McAleenan and Mr. Wolf Lawfully Served Under the HSA

Plaintiffs argue that Mr. McAleenan had no authority to issue the Proposed Rule and that Mr. Wolf had no authority to approve the Final Rule. They argue (1) that then-Secretary Nielsen's April 9,

---

[2] Plaintiffs alternatively move for a stay under 5 U.S.C. § 705, which authorizes "the reviewing court" to stay "the effective date of an agency action" pending judicial review "to prevent irreparable injury." 5 U.S.C. § 705. The same four-factor test governing issuance of a preliminary injunction also governs issuance of a § 705 stay. *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing authority), *appeal filed*, No. 20-5136 (D.C. Cir. 2020).

2019 order did not properly designate an order of succession for the position of Acting Secretary and instead set only an order for delegating the Secretary's authority under limited emergency circumstances; (2) that Mr. McAleenan, as Acting Secretary, had no authority under the HSA to designate an order of succession; and (3) that the 210-day limit for acting service under the FVRA should apply to service under the HSA, which contains no time limit. Those arguments are wrong. In any event, Mr. Wolf's September 17, 2020 ratification cures the alleged service-related defects.

### 1.   Mr. McAleenan lawfully served under the HSA.

Mr. McAleenan and Mr. Wolf each were lawfully serving as Acting Secretary of DHS under the HSA when they took the challenged actions. On April 9, 2019, then-Secretary Nielsen exercised her authority under the HSA, 6 U.S.C. § 113(g)(2), to designate a new order of succession that governed all vacancies in the office of Secretary. *See* ECF No. 50-4 at 127. Under this order, Mr. McAleenan, as the Senate-confirmed CBP Commissioner, began serving as Acting Secretary when Ms. Nielsen resigned. In turn, Acting Secretary McAleenan later amended the succession order under § 113(g)(2). ECF No. 50-4 at 129. Under that order, Mr. Wolf, as the Senate-confirmed Under Secretary for Strategy, Policy, and Plans, began serving as Acting Secretary when Mr. McAleenan resigned. The FVRA does not apply here, and each official lawfully served (or serves) under the HSA.

Plaintiffs claim that Ms. Nielsen amended only Annex A, which sets an order for delegating authority during disasters or emergencies. Mot. 27. She did not–Ms. Nielsen also designated an order of succession that applied to all vacancies, regardless of reason. Thus, Mr. Nielsen's April 2019 signed order–not Executive Order (EO) 13753, as Plaintiffs allege–controlled the succession order when Ms. Nielsen resigned. The order says five times that Ms. Nielsen is designating a succession order for the Secretary. ECF No. 50-4 at 127-28. The order's unqualified language shows that it would apply to all vacancies. Although Plaintiffs attempt to manufacture a conflict between Ms. Nielsen's signed order and Revision 8.5 to DHS Delegation 00106, an administrative document that Ms. Nielsen did not sign, *see id.* at 61-93, that attempt should fail. *See* Mot. 27. An administrative document that collects orders from the Secretary cannot override the Secretary's signed order. *Cf. Vill. of Bald Head Island v.*

*U.S. Army Corps of Eng'rs*, 714 F.3d 186, 195 (4th Cir. 2013) (agency's "formal approval" of a project was the final agency action, not the agency's "subsequent activities in carrying it out").[3] So if Revision 8.5 inaccurately implemented the Secretary's change, given § 113(g)(2), that conflict should be resolved in favor of the Secretary's signed order, which was effective immediately when Ms. Nielsen signed it.[4]

Beyond Ms. Nielsen's unqualified language, the provision she relied on (§ 113(g)(2)) shows that she changed more than just the delegation of authority that applied "in the event of disaster or catastrophic emergency." *See* Mot. 27-28; *but see Casa de Md. v. Wolf*, Civ. A. No. 8:20-cv-02118, 2020 WL 5500165, at *21 (D. Md. Sept. 11, 2020) (finding that Ms. Nielsen's order applied only in the event of a disaster or emergency). Section 113(g)(2) empowers the Secretary to designate an "order of succession" for officers to serve as Acting Secretary in the event of a vacancy. Ms. Nielsen's order expressly cites this statutory authority three times. ECF No. 50-4 at 127-28. Crucially, an *order of succession* is different from a *delegation of authority*. The HSA reflects this: a different provision, 6 U.S.C. § 112(b)(1), empowers the Secretary to delegate her authority to other officials in the agency even when the Secretary continues to occupy her office. Plaintiffs cannot explain why Ms. Nielsen would have invoked her § 113(g)(2) authority to designate the order of succession (and repeatedly stated that she was doing so) if she was merely amending the order for delegated authority during an emergency.

The flaw in Plaintiffs' argument is even clearer when the April 2019 order is read in the context of the earlier revisions to DHS Delegation No. 00106. On December 16, 2016, then-Secretary Jeh Johnson signed Revision 8 to DHS Delegation No. 00106.[5] This signed revision addressed two different kinds of orders: (1) an order of succession, meaning a list of officials who could become Acting Secretary in the event of a vacancy, and (2) an order for delegating authority, meaning a list of officials who could exercise the Secretary's authority during a disaster or catastrophic emergency.

---

[3] *See also* Decl. of Charles Roberts (Roberts Decl.) at 1 (¶ 2), Ex. 1, Decl. of Neal J. Swartz (Swartz Decl.) at 2-3 (¶ 4), ECF No. 25-1 in *A.B.-B. v. Morgan*, No. 1:20-cv-846 (D.D.C. June 1, 2020).

[4] *See* Swartz Decl. at 2-3 (¶¶ 4-6).

[5] Roberts Decl. at 1 (¶ 3), Ex. 2, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08 (Dec. 15, 2016) (signed at page 3).

*First*, § II.A of Revision 8 explained that, "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," the order of succession would be governed by EO 13753. This was not an order of the Secretary and did not invoke any authority vested in the Secretary, because under the HSA that existed at that time, the Secretary had no authority to designate an order of succession. At that time, only the President had the authority (under the FVRA) to designate an order of succession. *See* 5 U.S.C. § 3345(a)(2)-(3) (allowing the President to designate an acting official). Section II.A thus expressly tracked the FVRA: it noted that the President's order of succession in EO 13753 would apply to a vacancy covered by the FVRA. Section II.A even listed the same triggering events as the FVRA. *Compare* 5 U.S.C. § 3345(a). *After* Mr. Johnson signed Revision 8, Congress gave the Secretary the power to designate an order of succession that would apply "[n]otwithstanding" the FVRA. *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903, 130 Stat. 2000 (2016) (codified at 6 U.S.C. § 113(g) (Dec. 23, 2016)).

*Second*, in § II.B, Mr. Johnson separately exercised his own authority under 6 U.S.C. § 112(b)(1)–authority that the Secretary had long possessed–and delegated the authorities of his office to a list of officials in the event that he was temporarily "unavailable to act during a disaster or catastrophic emergency." That list was set out in Annex A. This was not an order of succession–the circumstances addressed by § II.B are not the kind of vacancy that would trigger the FVRA, and the § II.B delegation would not make someone exercising that authority an Acting Secretary.[6] *Cf. English v. Trump*, 279 F. Supp. 3d 307, 322 (D.D.C. 2018) ("Defendants argue, with some force, that [unavailability to act is] commonly understood to reflect a temporary condition, such as not being reachable due to illness or travel," rather than a permanent condition such as a vacancy.), *appeal dismissed*, 2018 WL 3526296 (D.C. Cir. July 13, 2018). And the Secretary had no statutory authority at that time to designate an order of succession.

---

[6] The FVRA is generally the "exclusive means for temporarily authorizing an acting official," unless another statute provides otherwise or the President makes a recess appointment. *See* 5 U.S.C. § 3347(a). Until § 113(g)(2), there was no other statute providing for the designation of an Acting Secretary of Homeland Security.

This context, along with the text of Ms. Nielsen's April 2019 order, shows that when then-Secretary Nielsen changed Annex A's list of officers, she also provided that Annex A would now perform two separate roles. It would both (1) designate the agency's first order of succession under § 113(g)(2) and (2) amend the list of officials in the order for delegation of authority.

As to the first role, Ms. Nielsen established the first order of succession under § 113(g)(2); it would apply in the case of a vacancy that would otherwise have been covered by the FVRA. Before Ms. Nielsen's order, there was no order of succession under § 113(g)(2). Rather, as acknowledged by § II.A, the President's order of succession under EO 13753 governed when the Secretary's office was vacant, because then-Secretary Johnson lacked the authority to create an order of succession. Thus, when Ms. Nielsen _thrice_ invoked § 113(g)(2), she exercised the Secretary's authority under that statute and designated an order of succession that applied "[n]otwithstanding" the FVRA, _see_ 6 U.S.C. § 113(g)(2). As a matter of law, that order of succession would supersede EO 13753's FVRA order.

The text of Ms. Nielsen's order cited § 113(g)(2) and used that authority to "designate the order of succession for the Secretary of Homeland Security as follows." The order that "follows" was the amended list of officials in Annex A. Annex A was also introduced with another clause and title showing that it would simultaneously continue to serve its original function as an order for delegation of authority. But Annex A's amended list was followed by a new provision that had not appeared in the delegation-only version of Annex A. The new provision noted that "[n]o individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation." ECF No. 50-4 at 128. That reference to a "_designation_"–rather than a "delegation"–is yet another textual and structural acknowledgment that Annex A had executed the Secretary's new authority under § 113(g)(2). _See_ 6 U.S.C. § 113(g)(2) (authorizing the Secretary to "designate such other officers … in further order of succession to serve as Acting Secretary"). Accepting Plaintiffs' reading would thus require the Court to read _out_ of Ms. Nielsen's order all references to § 113(g)(2), to disregard its structure (what introduces and concludes its list of officials), and to read Mr. Johnson's document as creating a succession order he lacked the power to designate.

As to the second role, Ms. Nielsen's order changed the order for delegation of authority in the case of a disaster or catastrophic emergency by issuing a new version of Annex A. To do so, Ms. Nielsen did not need to expressly invoke § 112(b)(1), any more than Mr. Johnson had, because Annex A (via § II.B) already was, by its terms, a delegation of authority. Thus, by changing the officials listed in Annex A, she changed the order of delegation. But, by her express invocation of § 113(g)(2), Annex A's list would serve two different functions when Ms. Nielsen resigned: both the order of succession *and* the order for delegation of authority.

Ms. Nielsen's official acts after signing her order confirm that she did not merely alter Mr. Johnson's delegation order in § II.B but also designated a new order of succession for vacancies under § 113(g)(2). For example, on her last day as Secretary, Ms. Nielsen sent a farewell email to the agency and issued a press release announcing that Mr. McAleenan "will now lead DHS as your Acting Secretary."[7] The same day, she swore Mr. McAleenan in to that role.[8] Neither act is consistent with Plaintiffs' reading of the order. Instead of indulging Plaintiffs' unsupportable view, the Court should defer to DHS's interpretation of its own internal document. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (explaining that the Court "ha[s] deferred to 'official staff memoranda'"), *remanded*, 969 F.3d 1333 (Fed. Cir. 2020).

Plaintiffs rely on an August 14, 2020 GAO Decision that concluded Ms. Nielsen's order did not effectively change the order of succession.[9] Mot. 27-28. But the GAO's analysis–which binds neither DHS nor this Court–suffered from at least two fundamental flaws and should be disregarded.

*First*, the GAO Decision wrongly assumed that the controlling document is Revision 8.5 to

---

[7] Roberts Decl. at 1 (¶ 4), Ex. 3, Email from Kirstjen M. Nielsen, Secretary of Homeland Security (Apr. 10, 2019, 04:35 EST); *see also* Press Release, DHS, Kirstjen M. Nielsen, Sec'y of Homeland Sec., Farewell Message from Sec'y Kirstjen M. Nielsen (Apr. 10 2019), https://www.dhs.gov/news/2019/04/10/farewell-messagesecretary-kirstjen-m-nielsen.

[8] The Border Observer, *CBP Commissioner Kevin McAleenan sworn-in as the Acting DHS Secretary; Opens New DHS Headquarters* (Apr. 11, 2019), https://theborderobserver.wordpress.com/2019/04/11/cbp-commissionerkevin-mcaleenan-sworn-in-as-the-acting-dhs-secretary/.

[9] *In re Dep't of Homeland Sec.–Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, B-331650 (GAO Aug. 14, 2020).

DHS Delegation No. 00106 and hung its analysis on that administrative document. *See* GAO Decision at 6 & n.10 (identifying Revision 8.5 as "April Delegation"); *id.* at 9 (claiming that Ms. Nielsen "only amended Annex A "[w]hen [she] *issued* the April Delegation" (emphasis added)). The GAO Decision thus focused on the "plain language" and the "express terms" of the *wrong document*. *See id.* at 7, 8, 9. As Secretary, Ms. Nielsen was the only person in DHS who could designate an order of succession, 6 U.S.C. § 113(g)(2), and she never signed or otherwise issued Revision 8.5 to DHS Delegation No. 00106. But she did sign her April 9 order, which controls. In fact, the GAO Decision explicitly tossed aside the plain language in the approval memorandum that Ms. Nielsen signed. *See id.* at 9 ("Notwithstanding the General Counsel's statement in the Memorandum asserting the Secretary's intentions in amending the April Delegation, the plain language of the delegation [that Ms. Nielsen never signed] controls, and it speaks for itself."); *see also* GAO Decision on Reconsideration[10] at 2 ("There is no need to refer to the [April 9] Memorandum [that Ms. Nielsen did sign].").

The GAO Decision similarly erred in concluding that, in February 2019, Ms. Nielsen adopted EO 13753 as her own order of succession under § 113(g)(2). But in the February 2019 document the GAO Decision cites, Ms. Nielsen set an order of succession for the *Office of Strategy, Policy, and Plans*– not for the Office of the Secretary–in Annex U.[11] Based on the faulty assumption that Ms. Nielsen designated her own order of succession for the Office of the Secretary in February 2019, the GAO Decision wrongly assumed that Ms. Nielsen needed to say that her order superseded § II.A. GAO Decision at 9. She did not.

*Second*, the GAO Decision did not grapple with the consequences of its unusual reading of Ms. Nielsen's order because it confused orders of succession and delegations of authority. It concluded that Ms. Nielsen designated an order of succession when she amended Annex A because she altered

---

[10] *In re Dep't of Homeland Sec.–Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security–Reconsideration*, B-332451 (GAO Aug. 21, 2020).

[11] Roberts Decl. at 1 (¶ 5), Ex. 4, Memorandum from Kirstjen M. Nielsen, Secretary, DHS, to Claire M. Grady, Under Secretary for Management & Senior Official Performing the Duties of the Deputy Secretary, DHS.

§ II.B and "[e]ach ground," that is, § II.A and § II.B, "had its own order of succession." *Id.* at 5. Thus, the GAO concluded that Ms. Nielsen "effectively established two different orders of succession." *Id.* at 7. But this conclusion requires ignoring the difference between orders of succession and delegations of authority, and the different sources of the Secretary's statutory authority for each. *Compare* 6 U.S.C. § 113(g)(2), *with id.* § 112(b)(1). So if, as the GAO Decision concluded, Ms. Nielsen's order applied only to § II.B, then she set an order for delegation of authority, not an order of succession. And under that reading, the GAO Decision cannot explain how, by signing an order to "amend the order of succession" under § 113(g)(2), Ms. Nielsen actually did nothing but amend the order for delegation of authority under § 112(b)(1).[12]

Thus, Plaintiffs are unlikely to succeed on their claim that Mr. McAleenan was unlawfully serving when he issued the proposed rule and when he amended the order of succession.

### 2. Mr. McAleenan had statutory authority to designate an order of succession.

As the properly serving Acting Secretary, Mr. McAleenan was authorized to exercise all of the Secretary's authority. This included the Secretary's authority to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." *See* 6 U.S.C. § 113(g)(2). Plaintiffs argue that only the Senate-confirmed Secretary–but not the Acting Secretary–can designate a further order of succession under § 113(g)(2). This argument fails.

Section 113(g)(2) empowers "the Secretary" to designate other officials in "further order of succession to serve as Acting Secretary." As Acting Secretary, Mr. McAleenan had the power to designate an order of succession because "an acting officer is vested with the same authority that could be exercised by the officer for whom he acts." *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019); *see also Ryan v. United States*, 136 U.S. 68, 81 (1890) ("[I]n the abs[e]nce of the secretary, the

---

[12] Nor did the Court in *Casa de Maryland* grapple with this the consequences of this unusual reading of Ms. Nielsen's order: that despite relying on § 113(g)(2) to designate an order of succession, Ms. Nielsen instead exercised her § 112(b)(1) power and delegated the authority of her office in the event of an emergency. *See Casa de Md.*, 2020 WL 5500165, at *22-23.

authority with which he was invested could be exercised by the officer who, under the law, became for the time acting secretary").[13]

Congress itself has long understood that an "acting" official can exercise *all* authority of the vacant office, even those authorities that are required by statute or regulation to be performed by that officer and only that officer. *Cf.* 5 U.S.C. § 3348(b) (in certain cases, "only the head of [an] Executive agency may perform any function or duty of such office," "*[u]nless* an officer or employee is performing the functions and duties in accordance with sections 3345, 3346, and 3347" (emphasis added)); *id.* § 3348(a)(2) (defining "function or duty" as "any function or duty" of the office that is "established" by statute or regulation and "required" by statute or "such regulation" "to be performed by the applicable officer (and only that officer)"). And Congress regularly designates acting officials by statute. *See, e.g.*, 6 U.S.C. § 113(g)(1) ("Under Secretary for Management shall serve as the Acting Secretary" if both Secretary and Deputy Secretary are unable to exercise duties of Secretary); 15 U.S.C. § 633(b)(1) (designating "Acting Administrator" of Small Business Administration); 38 U.S.C. § 304 (designating "Acting Secretary of Veterans Affairs"); 40 U.S.C. § 302(b) (designating "Acting Administrator of General Services"); 42 U.S.C. § 902(b)(4) (designating "Acting Commissioner of [Social Security] Administration).

Plaintiffs argue that the reference to "Secretary" in § 113(g)(2) "means only a Senate-confirmed Secretary" because § 113(g) mentions both the "Secretary" and the "Acting Secretary." Mot. 29-30. Had Congress meant to limit the § 113(g)(2) power to only Senate-confirmed Secretaries, it easily could have done so. Given Congress's understanding that acting officials can exercise all authority of a vacant office, and given how frequently Congress provides for "acting" officials, there is no reason to indulge Plaintiffs' reading. Under their reading, each reference to "Secretary" in the HSA would refer to the Senate-confirmed Secretary. *Azar v. Alina Health Serv.*, 139 S. Ct. 1804, 1811 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the

---

[13] *See also United States v. McGee*, 173 F.3d 952, 956 (6th Cir. 1999) ("An acting official possesses all the powers that the official would normally possess."); Off. of Legal Counsel, *Acting Officers*, 6 Op. O.L.C. 119, 120 (1982) (same); *United States v. Pellici*, 504 F.2d 1106, 1107 (1st Cir. 1974) (acting Attorney General has "all the powers of that office").

same term in the same or related statutes."). Thus, there would be lot of action the Acting Secretary could not take, which would undermine the point of acting service. There is no reason to think this was Congress's intent. For the same reason, Plaintiffs' argument that the HSA does not "expressly" authorize an Acting Secretary to exercise the § 113(g)(2) power–meaning the FVRA would be the exclusive means for acting service, Mot. 30–falls short. By vesting the Secretary with the § 113(g)(2) power, it necessarily vested an Acting Secretary with the same power.

Nor does the canon of constitutional avoidance support Plaintiffs' "narrow" reading of the term "Secretary." Mot. 30. Plaintiffs claim that reading § 113(g)(2) as empowering an Acting Secretary to designate an order of succession would raise Appointments Clause concerns because it would (1) move the designation of an acting official further from any "check from Congress" and (2) increase the chance that acting service is not temporary. Mot. 30-31. Neither supposed concern is valid. *First*, there is no more a "check from Congress" on an acting official who is designated by a Senate-confirmed Secretary than on one designated by an Acting Secretary.  Here, in fact, Mr. McAleenen was Senate-confirmed in his position as Commissioner of CBP when he performed additional duties as Acting Secretary and issued the succession order.  Further, a Senate-confirmed Secretary might place in an order of succession an official who was not Senate-confirmed at all, because an individual temporarily performing the duties of a principal officer in an acting capacity would remain an inferior officer and would not require Senate confirmation. *See United States v. Eaton*, 169 U.S. 331, 343 (1898); *Guedes*, 356 F. Supp. 3d at 146-53. And the D.C. Circuit has held that an acting agency head may permissibly appoint inferior officers under the Appointments Clause. *See Grand Jury Investigation*, 916 F.3d at 1056 (concluding that the Deputy Attorney General, as Acting Attorney General, had authority to appoint a Special Counsel, an inferior officer). *Second*, there is no reason to think that acting service will be less temporary if the acting official is designated by an acting official. Indeed, the President, with the Senate's approval, could always terminate the official's acting service (no matter who designates him) by installing a Senate-confirmed Secretary. Finally, the canon of constitutional avoidance applies only where a statute is ambiguous. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005). As explained, § 113(g)(2) is not.

Acting Secretary McAleenan thus lawfully exercised his § 113(g)(2) authority when he amended the order of succession that Mr. Wolf serves under.

### 3. The FVRA's time limit does not apply to designations under the HSA.

Because each official served as Acting Secretary under the HSA, neither's service is subject to the FVRA's time limit, 5 U.S.C. § 3346. *See Casa de Md.*, 2020 WL 5500165, at *19 (FVRA did not "authorize[] th[e] Court to extend the FVRA's timing provision to selections made pursuant to the 'further order of succession' in section 113(g)(2)") (citation omitted). The FVRA is not the "exclusive means for temporarily authorizing an acting officer to perform the functions and duties" of a Senate-confirmed office when a vacancy arises in an office with an office-specific vacancy statute, 5 U.S.C. § 3347(a)(1); in such cases, the office-specific statute supplies an alternate means of designating an acting officer, *see Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 556 (9th Cir. 2016) (FVRA and office-specific statute co-exist as "statutory alternatives").

The FVRA's initial 210-day limit applies only to a "person serving as an acting officer *as described under section 3345*." 5 U.S.C. § 3346(a)(1) (emphasis added); *see Casa de Md.*, 2020 WL 5500165, at *16 ("Congress thus tied the timing provision of section 3346 only to offices filled under section 3345, and no others."). When enacting the FVRA, Congress was aware that "[m]ost" office-specific vacancy statutes "do not place time restrictions on the length of an acting officer." S. Rep. No. 105-250, at 17 (1998). But it still retained these statutes as alternatives to the FVRA. 5 U.S.C. § 3347(a)(1)(A)-(B). And it imposed the 210-day limit only on persons serving under the FVRA. *Id.* § 3346(a)(1). That is, Congress placed no time limit on service under *office-specific vacancy statutes. See Guedes v. ATF*, 356 F. Supp. 3d 109, 142 (D.D.C. 2019) (unlike Attorney General vacancy statute, service under FVRA was subject to "specific time limits").[14] The HSA is one such office-specific statute. *See* 6 U.S.C. § 113(g)(1)-(2). By § 3346's unambiguous text, the 210-day limit does not apply to designations under the HSA. The HSA contains no express time limit and provides that the Secretary's authority to designate an officer under § 113(g)(2) applies "*[n]otwithstanding*" the FVRA (emphasis

---

[14] *See also United States v. Lucido*, 373 F. Supp. 1142, 1150-51 (E.D. Mich. 1974) (Deputy could serve as Acting Attorney General under office-specific statute after pre- FVRA Vacancies Act time limit).

added). Thus, § 113(g)(2)–consistent with § 3347(a)(1)(A)–authorizes the Secretary to designate a line of succession under the HSA that is not subject to the FVRA's 210-day limit.

Plaintiffs argue that designations under HSA § 113(g)(2) are subject to the FVRA's time limit because § 113(a)(1)(A) makes the Deputy Secretary the "first assistant" to the Secretary "for purposes of" the FVRA. Mot. 31-32. To be sure, under § 113, in the event of a vacancy, the Deputy Secretary serves as the Acting Secretary under the FVRA's first-assistant rule and thus is subject to the limit. *See Casa de Md.*, 2020 WL 5500165, at *17 (Deputy Secretary "slot[s] into the Secretary position in accordance with the default provision of the FVRA"). But that is because § 113(g) does not itself designate or authorize the designation of the Deputy Secretary under the HSA. Plaintiffs suggest that this result (that the Deputy Secretary is subject to the limit while a subordinate officer designated under the HSA would not be) is unreasonable, Mot. 31, but the Court must "interpret the statute as it was written, not … rewrite it as [Plaintiffs] believe[] Congress *could have* intended to write it," *Palisades Collections LLC v. Shorts*, 552 F.3d 327, 336 (4th Cir. 2008).[15] Plaintiffs also argue § 113(g)(2) does not "expressly" allow an official to serve for more than 210 days, as the FVRA requires. Mot. 32. Yet this ignores § 113(g)(2)'s text, which does not include the 210-day limit, and the relevant statutory context.

Plaintiffs nonetheless insist that § 113(g)(1)'s "notwithstanding" clause refers to the method of designating acting service–but not to the length of service–because there is no conflict between the FVRA's time limit and the HSA. Mot. 32. Congress understood when enacting the FVRA that the lack of an express time limit in an office-specific vacancy meant that the statute did "not place time restrictions on the length of an acting officer." S. Rep. No. 105-250, at 17. And Congress decided *not* to include a time limit in the HSA.

Finally, declining to graft a 210-day limit onto the HSA raises no constitutional issues. *See Casa*

---

[15] Congress may have had reasons for imposing the FVRA time limit on the Deputy Secretary but not on other officers serving at a time when the offices of the Secretary and Deputy Secretary were vacant. In such instances, Congress may well have recognized that the absence of both of the two highest-ranking officials in DHS would justify the need for flexibility to ensure DHS could continue functioning. *Cf.* S. Rep. No. 105-250, at 18 (recognizing that provisions of FVRA would ensure that "[a]ll the normal functions of government … could still be performed").

*de Md.*, 2020 WL 5500165, at *19 ("[T]he Court is not as convinced as are Plaintiffs that its reading of the HSA raises 'serious constitutional doubts,' such that the Court must read the FVRA's timing provision into the statute.") (citation omitted). The Supreme Court has recognized that an acting designation must be "temporary." *Eaton*, 169 U.S. at 343. By definition, acting service cannot be permanent. But neither the Appointments Clause nor any other provision of the Constitution sets an express limit on acting service. Nor is there any reason to believe that 210-day period has any constitutional significance. Congress has repeatedly varied the time limits imposed on acting service under general vacancies provisions. *See, e.g.*, Act of Feb. 13, 1795, 1 Stat. 415 (six months); 5 U.S.C. § 3348(a) (1994) (120 days). Not even the FVRA limits all acting service to 210 days; acting officers can serve for substantially longer periods under 5 U.S.C. §§ 3346(b)(1)-(2) and 3349a(b). Thus, the doctrine of constitutional avoidance does not apply. *Contra* Mot. 32.[16]

### B. Ratification Cures the Alleged Service-Related Defects in the Actions Challenged Here.

Mr. McAleenan and Mr. Wolf were lawfully serving under the HSA when they took the challenged actions. But even if Plaintiffs are right that EO 13753 governed when Secretary Nielsen resigned, *see* Mot. 27, 28, their claims still fail because the subsequent ratification cures the alleged service-related defects in the actions challenged here. This is because Mr. Gaynor, in line with Plaintiffs' argument about the effect of Ms. Nielsen's order and the FVRA, designated an order of succession for the Secretary of Homeland Security on September 10, 2020. This order of succession is alternate basis to ensure that Mr. Wolf is properly serving as Acting Secretary.

---

[16] Mr. Wolf's service itself raises no constitutional doubts. He has been Acting Secretary for about ten months. He assumed that role via his Senate confirmation as the Under Secretary for DHS's Office of Strategy, Policy and Plans, *see* 6 U.S.C. § 113(a)(1)(K), and the duties of the Secretary are "germane" to that position. *See Weiss v. United States*, 510 U.S. 163, 176 (1994). Before he was confirmed, it was widely reported that he would become Acting Secretary once confirmed. The Senate thus confirmed him knowing it was vetting him, in part, to serve as Acting Secretary. 165 Cong. Rec. S.6519 (daily ed. Nov. 13, 2019) (statement of Sen. Van Hollen). Finally, an individual temporarily performing the duties of a principal officer in an acting capacity does not require Senate confirmation. *See Eaton*, 169 U.S. at 343; *United States v. Smith*, 962 F.3d 755, 764 (4th Cir. 2020).

On September 10, 2020, the President submitted Mr. Wolf's nomination to serve as Secretary of Homeland Security to the Senate. The FVRA imposes an initial 210-day time limit on acting service under the FVRA. 5 U.S.C. § 3346(a)(1). But "once a first … nomination for the office is submitted to the Senate," an acting official may serve under the FVRA "for the period that the nomination is pending." *Id.* § 3346(a)(2). Under Plaintiffs' theory, because Ms. Nielsen never set an order of succession under § 113(g)(2) that applies when a Secretary resigns, EO 13753 would govern the order of succession for the current vacancy in the office of the Secretary. EO 13753, in turn, sets the President's order of succession under the FVRA. *See* 5 U.S.C. § 3345(a)(2)-(3) (allowing the President to designate an acting official).[17]

Under Plaintiffs' theory, when Mr. Wolf's nomination was submitted to the Senate, Peter T. Gaynor, the Senate-confirmed Administrator of the Federal Emergency Management Agency, was the most senior successor in EO 13753,[18] and thus became the President's designated Acting Secretary under the FVRA. On September 10, 2020, "out of an abundance of caution," Mr. Gaynor exercised "any authority" he might possess as Acting Secretary and designated an order of succession for the office under § 113(g)(2), which applies "[n]otwithstanding" the FVRA.[19] Under Mr. this order of succession, Mr. Wolf, as the Under Secretary for Strategy, Policy, and Plans, was the most senior successor and immediately began serving as Acting Secretary under the HSA.[20] These events are consistent with Plaintiffs' claim that the FVRA applies when there is no governing HSA order of

---

[17] Executive Order 13753, *Amending the Order of Succession in the Department of Homeland Security*, 81 Fed. Reg. 90667 (Dec. 9, 2016) (relying on "the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Vacancies Reform Act of 1998, 5 U.S.C. 3345, *et seq.*," to set the order of succession).

[18] The first two offices listed in EO 13753, the Deputy Secretary of Homeland Security and the Under Secretary for Management, were at the time and still are vacant.

[19] *See* Roberts Decl. at 1-2 (¶ 6), Ex. 5, Order Designating the Order of Succession for the Secretary of Homeland Security (Sept. 10, 2020). For the reasons explained above, Mr. Gaynor had this authority even though he is not the Senate-confirmed Secretary of Homeland Security.

[20] The first three offices in Mr. Gaynor's order of succession, the Deputy Secretary of Homeland Security, the Under Secretary for Management, and the CBP Commissioner, were at the time and still are vacant.

succession. So even if Plaintiffs raise doubts about Mr. Wolf's earlier service, such doubt is gone: Mr. Gaynor's order is an alternate basis to ensure that Mr. Wolf is properly serving as Acting Secretary.

As the Acting Secretary under the HSA, even under Plaintiffs' theory, Mr. Wolf then ratified the Final Rule and the Proposed Rule that Mr. McAleenan issued.[21] Though Mr. McAleenan and Mr. Wolf were lawfully serving under the HSA when they took the challenged actions, the ratification cures the alleged service-related defects in the actions challenged here. The D.C. Circuit has "repeatedly held" that a "properly appointed official's ratification of an allegedly improper official's prior action, rather than mooting a claim, resolves the claim on the merits by 'remedy[ing] [the] defect' (if any) from the initial appointment." *Guedes*, 920 F.3d at 13 (alterations in original and citations omitted). The "ratification purges any residual taint or prejudice … from the allegedly invalid appointment" based on an FVRA violation. *Id.* Thus, even if Plaintiffs are right about any alleged unlawful service, the ratification cures the defect as of the dates of those original actions.

Plaintiffs argue Mr. McAleenan's issuance and Mr. Wolf's approval of the Rule "have no force or effect" under the FVRA, 5 U.S.C. § 3348(d)(1). *See* Mot. 32. So Plaintiffs might argue that these actions "may not be ratified." 5 U.S.C. § 3348(d)(2).[22] That would be incorrect.

Section 3348 of the FVRA bars ratification of an action taken by an invalidly serving official when the official is "perform[ing] … a[] function or duty of a vacant office." But, for the purposes of § 3348, the FVRA narrowly defines "function or duty" as "any function or duty" of the office that is "established" by statute or regulation and "required" by such provision "to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2). That is, it bars ratification of a limited class

---

[21] *See* Roberts Decl. at 2 (¶ 7), Ex. 6, Ratification of Actions Taken by the Acting Secretary of Homeland Security at 2 (Sept. 17, 2020).

[22] Alternatively, the FVRA's ratification bar may not apply at all to acting officials who serve under office-specific vacancy statutes–critically, those who serve under such statutes *do not* serve under the FVRA. *See Casa de Md.*, 2020 WL 5500165, at *17 ("[N]owhere does this enforcement provision [§ 3348(d)] specify that it applies to those acting officials who serve pursuant to an exception to the FVRA–one of the agency-specific succession statutes.").

of actions taken by an invalidly serving official that are, by statute or regulation, *exclusive* to the vacant office. *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 78 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017).

Neither issuing the Proposed Rule nor approving the Final Rule was an action "in the performance of any function or duty" of the office of the Secretary because there is no statute or regulation limiting authority for those actions to the Secretary only. Rather, the relevant rulemaking authority could be exercised by other officials, including the Deputy Secretary.[23] "[F]unction or duty" applies only to non-delegable functions made exclusive to a particular office by statute or regulation. *See Guedes*, 920 F.3d at 12 (citing § 3348(d) as "only prohibiting the ratification of nondelegable duties"); *United States v. Harris Cnty.*, No. 4:16-CV-2331, 2017 WL 7692396, at *3 n.5 (S.D. Tex. Apr. 26, 2017) (authorization of complaint by Principal Deputy Assistant Attorney General was not "function or duty" under FVRA because "the relevant duties of the [office] are delegable"). That conclusion is compelled by the plain text. If a function or duty is lawfully delegable, then necessarily, the statute or regulation creating that function or duty does not "require" it to be performed only by the vacant office. Rather, the statute or regulation permits *other individuals* to perform that function or duty by delegation.[24]

Here, the authority to issue and approve rules regarding immigration and naturalization benefits fees, fee waiver and exemption policies, forms, and fee structures is not only delegable, *see* 6 U.S.C. § 112(b)(1), it has long been *delegated*. Thus, under this Court's decision in *L.M.-M v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020), the challenged actions are not a function or duty of the office of the Secretary. In *L.M.-M.*, this Court concluded that a "function or duty" of a vacant office covered only functions that *both* are assigned by statute or regulation to a particular office *and* have not been reassigned by "the department head … using his vesting-and-delegation authority or any other authority at least 180 days before the vacancy occurred." *Id.* at 34. But here, the ability to propose and approve a rule is not a function or duty of the office of the Secretary even under *L.M.-M.*'s because

---

[23] *See* Roberts Decl. at 2 (¶ 8), Ex. 7, *Delegation to Deputy Secretary*, DHS Delegation No. 0100.2 ¶ II.G (June 23, 2003) (2003 Deputy Secretary Delegation).

[24] Congress knows how to specify when certain authorities are to be exercised *only* by the Secretary of Homeland Security and are not to be further delegated. *See, e.g.*, 31 U.S.C. § 1344(d)(3).

that authority was reassigned long ago to at least the Deputy Secretary. *See* 2003 Deputy Secretary Delegation. And because Defendants are not relying on the Secretary's vesting-and-delegation authority to show that an action assigned to a subcabinet office is not exclusive, there is no concern that Defendants' position will swallow the ratification bar. Nor will finding that the challenged actions are not a function or duty of the office render 5 U.S.C. § 3348(b) "meaningless." *Cf. L.M.-M.*, 442 F. Supp. 3d at 32 (noting that § 3348(b) "would be rendered meaningless" if it applied when "the relevant subcabinet office is the sole office permitted to perform the 'functions or duties' at issue *and* where the department head's vesting-and-delegation authority is insufficient to overcome that exclusive assignment of authority"). The ratification cures the alleged service-related defects.

## C.   The Rule Is Procedurally Proper.

### 1.   *The Agency Provided a Reasonable Opportunity to Comment.*

An APA "notice is sufficient 'if it affords interested parties a reasonable opportunity to participate in the rulemaking process,' and if the parties have not been 'deprived of the opportunity to present relevant information by lack of notice that the issue was there.'" *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (quoting *WJG Tel. Co., Inc. v. FCC*, 675 F.2d 386, 389 (D.C. Cir. 1982)); *see* 5 U.S.C. § 553(b)(3) (requiring notice of the "subjects and issues involved"). Accordingly, "an agency is not invariably required to disclose information on which it relies [if] the public already has that information." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 263-64 (D.D.C. 2015). Nor is the agency required to establish every element of complex cost and revenue projection analyses. *Air Transp. Ass'n of Am., Inc. v. USDA*, 303 F. Supp. 3d 28, 55-56 (D.D.C.), *amended in part*, 317 F. Supp. 3d 385 (D.D.C. 2018); *see United Parcel Serv., Inc. v. USPS*, 184 F.3d 827, 834 (D.C. Cir. 1999) (noting "projections are no more than educated guesses" and "'unlike a problem in calculus, cannot be proved right or wrong'" (quoting *New York v. United States*, 331 U.S. 284, 328 (1947))).

Plaintiffs and other interested parties had that reasonable opportunity to comment here. The NPRM is painstakingly detailed and the Court can reasonably discern the agency's path. For example, USCIS more than adequately explained why its fiscal situation justifies the Rule. *E.g.*, 84 Fed. Reg. 62,282-294; 2AR291-327 (FY 19-20 IEFA Fee Review Supporting Documentation (Apr. 2019)).

Because USCIS is fee-funded, it has to ensure that it maintains a carryover balance to continue operating. *See* 2AR304. And 8 U.S.C. § 1356(m) authorizes the agency to set fees at a level to recover "the *full* costs" of providing "*all*" "adjudication and naturalization services," and "the administration of the fees collected," (emphasis added). This necessarily includes support costs: physical overhead, information technology, management and oversight, and human resources, for example. *See* 84 Fed. Reg. 62,282-83 & n.7; *see also* 81 Fed. Reg. 73,292 (2016 fee rule). Although budget *forecasts* typically predict deficits based on fully funding all operations, in practice, agencies such as USCIS end up making up that difference either by cutting costs (curtailing operations) or increasing revenue (receiving more than predicted)–*i.e.*, their budgeting is dynamic. *See* 84 Fed. Reg. 62,286; 81 Fed. Reg. 26,910-11; Demonstrative 1 (charting recent years' forecasts and actual revenue and costs);[25] *see also Air Transp. Ass'n of Am., Inc.*, 303 F. Supp. 3d at 55 ("Agencies must often conduct analyses with imperfect data and can only be expected to do the best they can with the information available.").

Accordingly, when USCIS projected a budget deficit for FY17 of over $600 million (~25% over projected revenue), only through realized cost reductions and increased fee revenue was USCIS able to avoid a deficit. The same was true for FY19: USCIS projected a budget deficit of over $900 million (~27% over projected revenue). And again, in FY20 the forecast showed a deficit of over $1 billion (~33% over projected revenue). As the Proposed Rule shows, that worsening, unsustainable trend requires increasing revenues to fund USCIS operations. *See* 84 Fed. Reg. 62,286 (detailing payroll, workload, strategic investment, and other cost drivers). The agency proposed the Rule to close that gap. The alternative, curtailing operations, would only add to the agency's backlog of cases, as it becomes increasingly unable to keep up with new submissions because of funding cuts. *See* 84 Fed. Reg. 62,294; Dem. 1. Each day the agency goes without the Final Rule will require upwards of $4 million of cost cuts to avoid future deficits (*i.e.*, to avoid depleting the agency's carryover balance or substantially compounding the existing backlog). *See* Dem. 1. Because USCIS provided all of this information, it provided plaintiffs and interested parties a reasonable opportunity to comment.

---

[25] Demonstrative 1 (Dem. 1), attached, is a visual representation drawn from record evidence.

Plaintiffs' litany of questions and arguments ignores or confuses key aspects of the Proposed Rule and its supporting materials, in effect raising the standard of review from reasonableness to meticulousness. DHS's need for "more revenue from individual applications now" is unmistakable. *Compare* Mot. 8, *with supra*, 84 Fed. Reg. 62,325-27 (projected revenue by form), *and* Dem. 1. USCIS does not have sufficient resources to keep up with new work (on individual applications), fund necessary staff, or avoid massive budget cuts in this and future fiscal years unless it raises fees.[26] This rulemaking is not about each line item in the agency's dynamic budget; rather, it is about closing the gap between projected costs and revenues, the why and how of which the agency more than adequately explained. *See, e.g., State Farm*, 463 U.S. at 53; *Air Transp. Ass'n of Am., Inc.*, 303 F. Supp. 3d at 54-55.

More specifically, the agency explained, based on an ABC (Activity-Based Cost) Model using the best available data, its projected costs for FY19 and FY20, *e.g.*, 84 Fed. Reg. 62,284, 62,286-88, 2AR291-327; *see also Air Transp. Ass'n of Am., Inc.*, 303 F. Supp. 3d at 54-55 (upholding fee rule based on imperfect ABC model); it explained why it could and should recover those costs from fees rather than from other sources, *e.g.*, 84 Fed. Reg. 62,282-84 (citing 8 U.S.C. § 1356(m), (n)); it explained that non-premium revenue would go toward covering those costs, *e.g.*, *id.* at 62,283; it explained that operations would be degraded, as they have been in every fiscal year when revenues do not keep pace with costs, *e.g.*, *id.* at 62,294 ("Processing Time Outlook"); Dem. 1; *see also, e.g., supra* Note 26; it explained its need for additional staff and the roles they would fill, *e.g.*, 2AR300, 306, 321;[27] it explained its application volume and fee-paying percentage estimates, *e.g.*, 84 Fed. Reg. 62,289-91; it included

---

[26] *E.g.*, USCIS, *USCIS Adjusts Fees To Help Meet Operational Needs* (July 31, 2020), https://www.uscis.gov/news/news-releases/uscis-adjusts-fees-to-help-meet-operational-needs.

[27] Plaintiffs complain that the agency should have compared projected staffing needs to then-current staffing levels. *See* Mot. 35. But this ignores the agency's past practice (of which Plaintiffs never previously complained). In the last fee rule (2016), the agency set fees at a level to cover estimated costs based on projected FY16-17 staffing needs. 81 Fed. Reg. 73,308. In developing the current Rule, to ascertain cost growth from FY16-17 until FY19-20 (the most recent data available), the agency compared projected FY19-20 staffing needs to the same value–projected staffing needs–from FY16-17. The agency's method for determining its costs–based on the best, most current data *available to it*– is thus wholly reasonable. Plaintiffs offer no reason why their preferred method–which would, in fact, have the agency engage in an "apples to oranges" comparison–was necessary or more reasonable.

"the total amount of revenue it aimed to earn with the new fee schedule," *compare* Mot. 36, *with* 84 Fed. Reg. 62,286-88, *and* 2AR302-13; it explained the ABC model and payroll title analysis, *e.g.*, 2AR296-300, 9214-284;[28] and it explained why particular fees should be set at particular levels–which depends not just on the cost of processing a single application but the volume of fee-paying work to cover the costs of non-fee-paying work and support costs, 84 Fed. Reg. 62,293; *see* 8 U.S.C. § 1356(m). Cost and revenue forecasting are not a precise science, *see Air Transp. Ass'n of Am., Inc.*, 303 F. Supp. 3d at 55-56; *Cent. & S. Motor Freight Tariff Ass'n, Inc. v. United States*, 777 F.2d 722, 736 (D.C. Cir. 1985) ("scientific precision" not required in calculating agency cost projections), and the agency's efforts here easily demonstrate a reasonable opportunity to comment on the issues at stake in the Rule.

Moreover, Plaintiffs, who submitted lengthy comments on the Rule, have not met their burden to demonstrate prejudice from any procedural error. *See* 5 U.S.C. § 706; *Ozark Auto. Distrib., Inc. v. NLRB*, 779 F.3d 576, 582 (D.C. Cir. 2015); *Air Transp. Ass'n of Am., Inc.*, 303 F. Supp. 3d at 55; *see also* Mot. 37 (simply asserting "prejudic[e]"); 2AR23502-07, 23837-59, 24956-63, 26415-18 (Plaintiffs' comments).

## 2. The Agency Provided Reasonable Notice of the Biometrics Fee and the Discount for Online Submissions.

Plaintiffs wrongly contest the Rule's inclusion of a discount for online submissions and a new biometrics fee as announced "[w]ithout prior notice." Mot. 37. A final rule need not mirror the NPRM; "[r]ather, '[a]n agency's final rule need only be a logical outgrowth of its notice.'" *Agape Church, Inc. v. FCC*, 738 F.3d 397, 422 (D.C. Cir. 2013) (citation omitted). A rule is a logical outgrowth of the NPRM "if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009) (citation omitted). "The object, in short,

---

[28] The agency also publicly demonstrated the software used to calculate fees upon request. *See* 84 Fed. Reg. 62,281. Plaintiff CASA attended the one public demonstration requested. Plaintiffs now assert that the agency "never explained how its cost-allocation exercise compared to the *actual* activities it sought to fund," Mot. 36, but this is precisely what the ABC model does: assign actual costs to the actual activities to which they apply. 2AR291-327. And while the agency did not share the payroll title analysis (material that–as it contains payroll information–cannot be made public due to its inclusion of personally identifiable information), it explained that and other inputs, and how they serve as cost drivers for the ABC model. *See* 84 Fed. Reg. 62,286; 2AR291-327.

is one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007).

Plaintiffs had notice that the Rule would include these fee treatments. As to the biometrics fee, the agency provided fair notice twice. In the NPRM, the agency proposed "incorporat[ing] the cost of biometric services into the underlying immigration benefit request fees" for several reasons. 84 Fed. Reg. 62,302. In explaining this proposal, the agency noted that "[i]n previous fee rules," it had "evaluated the biometric activity cost as a single biometric service fee separate from the underlying application, petition, or request." *Id.* By this discussion, the agency put the public on notice that applicants for immigration benefits had been and would continue to be responsible for paying "the cost of biometric services" associated with their benefits requests, but that the agency was considering changing the method of collecting for those costs. All the agency did in the Final Rule was move this cost from within the "underlying immigration benefit request fee[]" into a standalone fee. 85 Fed. Reg. 46,833. The agency thus decided to maintain its practice of collecting the biometrics fee separately.[29]

Plaintiffs also identify a "paper-filing surcharge." This is, in fact, an online-filing *discount*, which reflects that electronic submissions "reduce the administrative burden" for USCIS. 84 Fed. Reg. 62,316; *see also id.* at 62,294 (agency commitment to migration from paper processing). Charging less for online submissions is wholly consistent with the overall beneficiary-pays model announced in the NPRM and adopted in the Final Rule, *see supra* Part I.D.2. *See also* 85 Fed. Reg. 46,832.

    **D.**    **The Rule Is Not Arbitrary and Capricious.**

        *1.*  *The Agency's Funding Calculations and Use of Available Data Were Reasonable.*

For many of the same reasons discussed above, Plaintiffs' substantive attack on the agency's funding calculations falls flat. *See supra* Part I.C.1.

If "the agency's path may reasonably be discerned" the challenged action survives arbitrary-and-capricious review. *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004); *Stovic v. R.R.*

---

[29] Moreover, a prior rulemaking invited comment on the policy "that persons filing any benefit request may be required to appear for biometrics services or an interview and may be required to pay the biometrics services fee." DHS, USCIS Fee Schedule, Proposed Rule, 81 Fed. Reg. 26,904, 26,906 (May 4, 2016); *see also* DHS, USCIS Fee Schedule, Final Rule, 81 Fed. Reg. 73,292-93 (Oct. 4, 2016).

*Ret. Bd.*, 826 F.3d 500, 506 (D.C. Cir. 2016) (limiting the inquiry to whether the agency's decision was "reasonable and reasonably explained"). Unless

> the agency has: relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]

it is entitled to deference. *State Farm*, 463 U.S. at 43 (defining "narrow" scope of review).

Here, Plaintiffs cannot overcome the "extreme degree of deference" owed to the agency's "complex judgments about … data analysis that are within the agency's technical expertise." *Alaska Airlines, Inc.*, 588 F.3d at 1120; *see State Farm*, 463 U.S. at 52 ("It is not infrequent that the available data do not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion."); *Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008) (noting similar "wide latitude"); *Air Transp. Ass'n of Am., Inc.*, 303 F. Supp. 3d at 56 ("The Court recognizes that an agency cannot be faulted for using the data available to it to the best of its ability …."). The "sole question" for a court considering an objection to an agency's data choice is "whether [the agency] has acted reasonably, not whether it has acted flawlessly." *Nat. Res. Def. Council*, 529 F.3d at 1086.

This Final Rule was the "product of reasoned decisionmaking" and should be upheld. *State Farm*, 463 U.S. at 43, 52. The agency explained its growing funding gap (which reflects *all* USCIS costs related to adjudications and other naturalization services, not just the direct costs), new funding allocations, and, therefore, why the Final Rule falls within its authority to set fees such that USCIS recovers total costs. *See, e.g.*, *supra* Part I.C.1; 85 Fed. Reg. 46,876 (explaining growth in non-revenue-generating workloads, increased time requirements per case, additional staff, and other growing cost drivers); *id.* at 46,788 (explaining that fee schedule reflects "a weighted average increase of 20 percent" to cover costs); *see* Dem. 1 (graphically rendering record data). Thus, it explained projected costs and revenues, as well as the scope of USCIS operations they would fund. *See, e.g.*, 84 Fed. Reg. 62,316; 85 Fed. Reg. 46,794, 46,835; 2AR791-843.[30] The agency further explained that, based on its experience,

---

[30] The agency also explained how DHS would use revenues to recover the costs of CBP adjudications.

it expected that filing trends would not be affected by the Final Rule's changes to fees. *E.g.*, 85 Fed. Reg. 46,797-98 ("DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 .…."), 46,793 (discussing COVID-19 pandemic's effect). That expertise is entitled to "extreme" deference. *Alaska Airlines, Inc.*, 588 F.3d at 1120.

Plaintiffs' cavil with the Rule's timing is similarly unpersuasive. *See* Mot. 39-40. In keeping with its statutory obligation, DHS completed its FY19-20 biennial fee review in 2019. *See* 31 U.S.C. § 902; 2AR791-843. Those results formed the basis for the Proposed Rule and Final Rule, just as the agency has used them for fee rules reaching back over a decade. *See* 84 Fed. Reg. 62,284; *see, e.g.*, 81 Fed. Reg. 73,292 (Oct. 24, 2016) (2016 fee rule); 70 Fed. Reg. 56,182 (Sept. 26, 2005) (2005 fee rule). That approach is neither uncommon nor unreasonable. *See Air Transp. Ass'n of Am., Inc.*, 303 F. Supp. 3d at 56-57 (upholding agency's reliance on FY10-11 data in a 2015 rulemaking). Plaintiffs' preferred standard would require updating that biennial fee review's projections annually, biannually, or even monthly—requiring the best data imaginable, rather than "the best data … available." *Id.* at 57. That is neither required nor a reasonable use of the agency's limited, fee-dependent resources.[31] Moreover, USCIS's projections accounted for relevant legal and policy changes, as well as "cost-savings initiatives," *e.g.*, 85 Fed. Reg. 46,875 (discussing Citizenship and Integration Grant Program and ICE appropriations' effects), while reasonably declining to revise the Proposed Rule *ad nauseam* or on the

---

*E.g.*, 84 Fed. Reg. 62,292, 62,321; 2AR803-04. The agency funds a $4 million transfer to DOJ, prescribed by statute, from fees that USCIS collects on DOJ's behalf. *See* 85 Fed. Reg. 46,793; *see, e.g.*, Cons. Approps. Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, Title II, Dep't of Justice (noting $4 million "shall be derived by transfer from the Executive Office for Immigration Review fees deposited in the [IEFA]"). Consistent with longstanding practice, premium processing and statutory revenue were excluded from ABC modeling because workload and costs associated with those activities are also excluded (*i.e.*, they are not part of an IEFA fee rule's focus on *non*-premium costs, workload, and revenue). *See* 84 Fed. Reg. 62,293; 2AR817; *see, e.g.*, 84 Fed. Reg. 62,311; 81 Fed. Reg. 73,312.

[31] Each fee review is necessarily a snapshot in time "as best can be determined." 85 Fed. Reg. 46,874; *see* 84 Fed. Reg. 62,288 ("USCIS' revenue projections are informed by internal immigration benefit request receipt forecasts and 12 months of historical actual fee-paying receipts to account for fee-waiver/fee-exemption trends."). The alternative (constantly shifting such projections) would create costs for the agency and confusion for public commenters on a fee rule. *See* 85 Fed. Reg. 46,874 (discussing "logical outgrowth" issues with revising forecasts). It was also reasonable for the agency to use some "more recent data" in its economic analysis of the Rule (as opposed to in its formulation of the Rule) where available. Mot. 40; *see* 85 Fed. Reg. 46,827 n.65 (citing IRS wage data from 2020).

basis of unavailable data. *See id.* at 46,874 ("DHS acknowledges that it did not incorporate cost increases or savings from policy initiatives for which data was not available at the time the USCIS conducted the FY 2019/2020 fee review." And the agency did "adjust for substantial sums based on intervening legislation" like the ICE appropriation and Citizenship and Integration Grant Program.). Thus, the dynamic nature of the agency's fiscal projections, budgeting, and fee-setting are reasonably reflected in and support the Final Rule, a "product of [particular] agency expertise." *State Farm*, 463 U.S. at 43; *see also United Parcel Serv., Inc.* 184 F.3d at 834; *Cent. & S. Motor Freight Tariff Ass'n, Inc.*, 777 F.2d at 736; *Nat'l Cable Television Ass'n v. FCC,* 554 F.2d 1094, 1105 (D.C. Cir. 1976) (noting cost computations "must necessarily be based on numerous approximations").

Moreover, the agency did not ignore data in the record, as Plaintiffs argue. Mot. 41-42. DHS simply and reasonably disagreed with certain comments and explained why. For example, "based on the numbers of filings received after past fee increases, DHS does not anticipate that the fees would affect application levels or that it will create barriers to family reunification or stymie noncitizens seeking to adjust their status or naturalize." 85 Fed. Reg. 46,805. "DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 ...." *Id.* at 46,797-98. And "DHS agrees ... that USCIS cannot reliably estimate the number of asylum applications who may not be able to afford the $50 fee" but "does not believe that the new fee will deter asylum applications," noting that "previous fee increases ... had no effect on the number of filings that USCIS received." *Id.* at 46,882; *see also, e.g., id.* at 46,795, 46,803, 46,807, 46,815, 46,860, 46,870 ("Workload Projections"), 46,881, 46,884, 46,886. In fact, deterring fee-paying filings would harm the fee-funded agency. *Cf.* 85 Fed. Reg. 46,793, 46,844.[32] At bottom, Plaintiffs' arguments reflect a mere "difference in view"–in an area of particular expertise for the agency–not a failure "entirely ... to consider an important aspect of the problem," much less any other ground for invalidating the Rule. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007).

---

[32] Plaintiffs' assertion that the agency intended to deter certain asylum applications and "ignored this effect" is wrong. *Compare* Mot. 41, *with infra* Part I.D.2 & n.40, *and* 85 Fed. Reg. 46,790. Moreover, as the agency must study its fee schedule biennially, that process provides the opportunity for it to address any unanticipated effects the Final Rule might have going forward.

## 2.   *The Agency Adequately Explained Its Choices.*

Plaintiffs' insistence that DHS failed to explain numerous other aspects of the Rule misperceives the law. The APA "requires agencies to engage in 'reasoned decisionmaking,'" *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1904-05 (2020), to be sure, but the "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 42. This requires a court to ensure that the decisionmaker "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Id.* at 43.

So long as reasoned consideration is evident from the record, the APA does not bind an agency to prior policies or prevent it from charting a new course in matters over which Congress has granted discretion. When an agency changes course it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one"; rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019) (holding that arbitrary action will be found where an agency gives "no explanation for the change" in prior policy or "completely ignore[s] its previous finding"). Critically, "the choice between reasonable policy alternatives" is "the Secretary's to make," requiring only that he "consider[] the relevant factors, weigh[] risks and benefits, and articulate[] a satisfactory explanation"; where those threshold requirements are met, the APA does not authorize a court to "overrid[e] that reasonable exercise of discretion" by "improperly substitut[ing] its judgment for that of the agency." *Dep't of Com. v. New York*, 139 S. Ct. 251, 2570 (2019); *see also Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 618-19 (1991) (that an agency "has changed its view about certain issues … does not undermine the validity of a rule that is based on substantial evidence and supported by a 'reasoned analysis'").

Here, the Final Rule demonstrates ample reasoned judgment. In its proposal DHS explained, based on its biennial review, that existing fees fall substantially short of covering the agency's adjudication and naturalization services, as well as support costs. 84 Fed. Reg. 62,280. Adjustments to

its revenue collection are needed, the agency explained, to ensure USCIS can fairly and efficiently adjudicate immigration-benefits requests. *Id.* Among other considerations, the agency found that, "given the significant increase in [naturalization] filings in recent years," "shifting costs to other applicants" by artificially holding those filings well below the cost to adjudicate "is not equitable." *See* 84 Fed. Reg. 62,316. And the Final Rule both acknowledges the agency's decision to move from an ability-to-pay model to a system where beneficiaries fund the cost of their own applications and discussed extensively the reasons for this change in policy, explaining that a substantial increase in the volume of no-or-reduced fee naturalization applications rendered the previous model less equitable.[33]

Rather than grapple with the agency's rationale, Plaintiffs attempt to poke holes in the Rule by insisting that discrete aspects lack explanation. Each of their examples resolves to a policy disagreement, however, and thus must fail. For example, Plaintiffs argue that DHS "never explained" its purported reversal of its prior statement that some individuals "would clearly be unable to pay" the full fee for services or that it failed to "explain why it sought to charge fees to individuals unable to pay them." Mot. 42-3. DHS was not required to align its decision with each prior statement it had made on the topic (or with Plaintiffs' view of the equities). Rather, the agency was required only to adequately explain *its decisions* to (1) alter its prior policy of artificially capping fees for certain benefit requests by shifting the costs to other immigrants, and (2) eliminate the use of fee waivers for certain applicants. It did so.[34] And "[a] change in administration brought about by the people casting their

---

[33] *See, e.g.*, 85 Fed. Reg. 46,806 ("DHS acknowledges that this is a change from its previous approach to fee setting and believes that these changes will make USCIS' fee schedule more equitable for all immigration benefit requests by requiring fees to be paid mostly by those who receive and benefit from the applicable service."); 46,825 ("DHS explained in the NPRM that fee waivers had increased to unmanageable levels and that DHS had to do something to curtail the amount of free services being provided … DHS noted that the estimated annual forgone revenue from fee waivers and exemptions has increased markedly … DHS is aligning USCIS' fees more closely to the beneficiary-pays principle. Without the changes to fee waiver policy … fees would increase by a weighted average of 30 percent, which is 10 percent more than in the fee schedule implemented in this final rule.").

[34] *See, e.g.*, 84 Fed. Reg. 62,293-94 ("If DHS were to propose limited fee increases for these immigration benefit requests, then other proposed fees would have to increase to recover full cost. For example, if DHS were to propose limited fee increases for all of the immigration benefit request fees that were limited in the previous fee rule, then some proposed fees could increase by as much as $1,185 …

votes is a perfectly reasonable basis for [the agency's] reappraisal of the costs and benefits of its programs and regulations." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1043 (D.C. Cir. 2012) (internal quotation marks and citation omitted).

Nor is there anything "unsupported [or] internally contradictory" in the agency's judgment that some individuals will use credit to pay their application fee. Mot. 43. DHS recognized that the increase in fees will require some applicants to save additional money, use a credit card, or delay filing, 85 Fed. Reg. 46,881, but for multiple reasons determined that a more-equitable model where beneficiaries generally pay the cost of their applications was warranted.

Plaintiffs' suggestion that DHS erred by failing to explain the basis for retaining fee waivers for certain applicants and forms is equally flawed. Mot. 43. Plaintiffs point to the fact that certain populations remain eligible for N-400 form waivers, while no waiver is available to appeal adverse naturalization decisions using form N-336, and that Special Immigrant Juveniles ("SIJs") may seek waivers only if they are in state or court custody. *Id.* As to the first complaint, the agency explained that, notwithstanding its concerns (expressed elsewhere in the Rule) about the increased volume of fee waivers, it will continue to offer limited waivers to some of "the most vulnerable populations," including "VAWA, T and U populations," 85 Fed. Reg. 46,815, but otherwise set fees–including the form N-336–according to the principles of beneficiary-pays and full-cost recovery, *see id.* at 46,861. That the agency departed from those policies to retain waivers for certain applicants demonstrates an

---

Generally, there are several potential ways to reduce IEFA fees: 1. Reduce projected costs or use other funding sources (such as appropriations, other fee accounts, carryover, or recoveries of prior year obligations); 2. Increase projected fee-paying receipts; or 3. Reduce completion rates. …[R]educing the projected costs to equal the projected revenue would risk degrading USCIS operations funded by the IEFA."); *id.* at 62,300 ("DHS determined that the current trends and level of fee waivers are not sustainable. Work that USCIS provides for free or below cost impacts other fee-paying applicants by making their fees higher so DHS can recover USCIS full cost. DHS is trying to make the USCIS fee schedule more equitable for all applicants and petitioners. As shown in the supporting documentation for this rule, the number and dollar volume of fee waiver requests and foregone revenue has trended upward during periods of economic improvement … should the economy worsen, the number of fee waiver requests will increase to a level that could threaten the ability of USCIS to deliver programs without disruption.").

awareness of the complexities of the fee scheme and responsiveness to commenters' concerns.[35] And its decision not to extend waivers to appeals from an adverse determination (which are optional, given that a *new* application always can be filed) provides no basis to set aside the rule. *See generally* 8 C.F.R. § 336.2 ("The applicant … *may* request a hearing on the denial of the applicant's application for naturalization") (emphasis added); 8 CFR Part 316, "GENERAL REQUIREMENTS FOR NATURALIZATION" (containing no limitation on re-filing following denial). So too for DHS's decision to permit only certain SIJs to apply for fee waivers; the 2019 Proposed Rule included no fee waivers for *any* SIJs, and no statute requires the agency to grant waivers to that population. *Compare* prop. 8 C.F.R. § 106.3, 84 Fed. Reg. 62,363 *with* 8 C.F.R. § 106.3(a)(2)(i), 85 Fed. Reg. 46,920. "Nevertheless, after considering the commenters' concerns, DHS agree[d] that SIJ petitioners who are wards of the state are particularly vulnerable," *id.* at 46,815, and it thus permitted those applicants to request fee waivers. Plaintiffs' preference that the agency grant waivers to *all* SIJ youth, not only those the agency deemed most vulnerable, reflects a policy disagreement rather than an APA violation.

Plaintiffs' other attacks on the agency's fee-waiver changes fare no better. DHS adequately explained its basis for standardizing waiver criteria, including eliminating means-tested benefits and hardship-based criteria: "By removing the more ambiguous term 'inability to pay' in favor of more clearly defined, straightforward requirements, DHS is imposing on the fee waiver request process greater consistency and equity." 85 Fed. Reg. 46,820. And Plaintiffs cherry-pick language out of context by suggesting "*conflicts*" between (1) DHS's selection of the "125-percent income standard" on the basis it "is used in other 'determinants of low-income or financial wherewithal," and (2) its elimination of means-tested benefits, which also constitute a (state *or* federal) government-issued financial determination. Mot. 44. In actuality, DHS specifically chose the 125-percent guideline "because it would be consistent with other determinants … *used in USCIS adjudications*, such as the affidavit of support requirements," 85 Fed. Reg. 46,819-20, and rejected means-tested benefits receipt

---

[35] Plaintiffs' challenges to DHS's deviations from beneficiary-pays are also highly selective; they fail to point out that the agency also set fees well below full-cost recovery in circumstances with which Plaintiffs presumably would support, including asylum applications, 85 Fed. Reg. 46,795, and requests to appeal or reconsider an adverse decision, *id.* at 46,840-41.

due to the significant variance between programs across jurisdictions. *Id.* For this same reason, Plaintiffs' assertion that DHS "failed to explain its conclusion that the 125-percent standard, *alone*, is an appropriate proxy" for need, Mot. 44, gets them nowhere; there is nothing mysterious or illogical in the agency's determination to mirror eligibility for fee waivers with income guidelines used in other immigration (and other federal benefit) contexts. 85 Fed. Reg. 46,820.[36] DHS "apparently *believes* that [the Rule] best furthers the objectives" of the agency, "which is not an entirely irrational or unreasonable view, all things considered, and … it is *the agency's* prerogative to weigh the downsides of the proposed policy change … against the beneficial outcomes that the agency is seeking." *Am. Fed. of Labor v. NLRB*, 2020 WL 3605656, at *8 (D.D.C. July 1, 2020) (appeal docketed).[37]

DHS's determination to reduce fee waivers was also fully consistent with its move to orient fees around beneficiary-pays. Plaintiffs' assertion that the agency should instead "determin[e] … whether an individual needs a fee waived," Mot. 45, is thus premised on the faulty assumption that the agency must offer a fee waiver to all applicants facing financial hardship. It need not. 8 U.S.C. § 1356(m); 8 C.F.R. § 106.3. Congress granted the agency discretion; its judgment is entitled to

---

[36] For example, USCIS must utilize the FPG when determining the sufficiency of an Affidavit of Support submitted on behalf of certain immigrants. 8 U.S.C. § 1183a(a)(1)(A). Moreover, an agency's reliance on an income threshold tied to the FPG in determining eligibility for a benefit is eminently reasonable as that is a primary purpose of the FPG. *See, e.g.*, Annual Updates of the HHS Poverty Guidelines, 84 Fed. Reg. 1,167-68 (Feb. 1, 2019). The FPG, or percentage multiples of the FPG, are incorporated into eligibility criterion for more than 30 federal programs. *See* Office of the Assistant Sec'y of Planning & Evaluation, HHS, *FAQs Related to the Poverty Guidelines and Poverty: What Programs Use the Poverty Guidelines, https://aspe.hhs.gov/frequently-asked-questions-related-poverty-guidelines-and-poverty.*

[37] Plaintiffs' challenge to the agency's elimination of hardship-based fee waivers also fails. Mot. 43-4. Most importantly, this move is entirely consistent with DHS's determination to move to a beneficiary-pays model. Plaintiffs suggest that the small number of applicants who used hardship-based waivers (1.2 percent, *see* Reg. Imp. Analysis, 2AR619-790, Table 12), was due to a "framework" where means-tested benefits were considered first. But that ignores the fact hardship-based waivers were meant to accommodate applicants suffering from a financial hardship due to extraordinary expenses or other circumstances affecting his or her financial situation to the degree of being unable to pay–situations that could not be anticipated such as medical bills or catastrophic illness–and thus are unrelated to whether an individual receives means-tested benefits. *See* Policy Memorandum, PM-602-0011.1, *Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule*; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11-26 (Mar. 13, 2011) at p.7 (basing hardship on "unexpected and uninsured … situations that could not normally be expected …").

deference "especially … when the agency is called upon to weigh the costs and benefits of alternative policies." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (citations omitted).

Plaintiffs next challenge DHS's decisions to require tax transcripts to substantiate income and to eliminate combined family applications. Mot. 45. In recognition, apparently, that DHS more than adequately explained[38] these decisions, Plaintiffs try a new tack–suggesting that DHS failed to proffer *evidence* that the problems the Rule sought to solve (insufficiently documented, rejected applications and processing burden on the agency) are "real." *Id.* But the case on which Plaintiffs rely, *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 27 (D.D.C. 2020), is readily distinguishable: There an agency had based its action on an unsubstantiated, serious assertion that states were fraudulently abusing a federal program. (Appeal docketed). Here, Plaintiffs do not dispute that USCIS receives and rejects incomplete and unsubstantiated income documents, or that it sometimes must reject fee waiver requests "for failure to obtain all signatures of included family members" for joint applications. 85 Fed. Reg. 46,824-25. DHS need not provide the public "evidence" to substantiate *its own* "*belie[f]* that the proposed change will reduce its administrative burden for fee waiver processing." *Id.* at 46,824 (emphasis added). On the contrary, the agency's judgment that these benefits outweigh the small added burdens was both well-explained and well within its discretion.

As in their challenge to the 2019 Form Revisions, *see* ECF No. 11 at 23-24, 39-43, Plaintiffs continue to assail the IRS tax-transcript-request process as unduly burdensome to individuals seeking a fee waiver. But as the agency explained in its prior briefing in this case, requesting a tax transcript is relatively straightforward. *See* ECF 25-1 at 16. An individual need only submit a request by mail that includes an individual tax identification number or social security number, date of birth, and the

---

[38] DHS fully explained that these changes are intended to reduce the number of fee waiver requests that are rejected because of improper documentation, inadequate information, and missing signatures from household members on joint applications. 85 Fed. Reg. 46,824-25. It also explained that "obtaining information from the IRS in transcripts, a W-2, or proof of non-filing, if applicable, is sufficient documentation to establish the necessary income or no income." *Id.* This decision is eminently reasonable and accords with many other common scenarios where individuals are required to verify income.

mailing address from the individual's last filed tax return. *Welcome to Get Transcript*, Internal Revenue Service, https://irs.gov/individuals/get-transcript (last visited September 18, 2020). An individual may also use the automated phone transcript service toll-free. *Id.* Transcripts then arrive in "5 to 10 calendar days." *Id.*[39] And Plaintiffs' claim that, due to the need for some applicants to change their address with the IRS, the tax-transcript process "can last longer than the 30-day period allowed to file administrative appeals," Mot. 33, is unavailing given that appeal requests are not eligible for a fee waiver and that one cannot appeal the denial of a fee-waiver request. Their contention that IRS transcript requests are problematic due to "language barriers," *id.*, is particularly flimsy because they provide no reason to believe that barriers accessing IRS forms are any different from barriers accessing USCIS forms and processes that Plaintiffs never challenge. Overall, Plaintiffs' complaints about the Rule's income-documentation requirements overstate the attendant difficulties and ignore both DHS's reasonable determination to require documentation that "validly reflect[s] the applicant's household income" and its discretion to weigh alternatives and decide "that, while this might place a small additional burden on applicants, the change will ultimately benefit applicants by mitigating future rejections and ensuring that fees are waived for deserving applicants." 85 Fed. Reg. 46,824.

Plaintiffs further challenge DHS's decision to accept W-2 statements or statements of government income from fee-waiver applicants who do not file tax returns, while not also accepting other income documents such as Form 1099-MISC. *See* Mot. 46-47. True, "individuals can earn income without ever receiving a W-2," Mot. 47, but that does not make a 1099-MISC–the form on which contract workers and sole proprietors often are paid–a reliable method, standing alone, with which to verify an individual's income, since contract workers often collect 1099-MISCs from numerous sources and thus are unlikely to give an accurate picture of overall income. But even putting that aside, Plaintiffs ignore the fact that a 1099-MISC is not *currently* acceptable as sole proof of income under the 2019 edition of the Form I-912. *See* Instructions for Request for Fee Waiver, at 7, at

---

[39] Plaintiffs focus (Mot. 47) on the fact that the IRS's online tool requires identity verification in the form of providing a social security number, cell phone in the applicant's name, and a personal credit account number. *Welcome to Get Transcript*, Internal Revenue Service. While true, that focus elides the straightforward and readily available mail and phone alternatives.

https://www.uscis.gov/sites/default/files/document/forms/i-912instr-pc.pdf.

Plaintiffs' other quibbles regarding DHS's income documentation requirements fall equally flat; they challenge as "illogical" decisions to allow affidavits of support from religious organizations but not state agencies and to restrict alternative income documentation to specific categories of applicants. Mot. 46-47, *citing* 85 Fed. Reg. 46,920. But the agency is not required to consider every alternative imaginable, including ones raised for the first time in litigation; the agency need only consider the important issues and provide a rational explanation for its decision. *State Farm*, 463 U.S. at 43. Here, the Rule amply demonstrates that the agency considered and thoroughly responded to comments. Plaintiffs fail to overcome the deference owed the agency's choice among types of evidence it will accept for fee waiver requests.

Finally, Plaintiffs' argument that the agency "ignored" an alleged deterrent effect of the new asylum fees must be rejected. First, the record makes clear that "deterring certain asylum applications" was *not* a "goal" of the asylum fee changes. *Compare* Mot. 41 *with*, *e.g.*, 85 Fed. Reg. 46,844 (explaining that $50 asylum fee is intended to "generate some revenue to offset adjudication costs," which, for asylum adjudications, exceeds $50, and specifically disclaiming intention to "discourage meritorious asylum claims or unduly burden any applicant, group of applicants, or their families"); *see also*, *e.g.*, 85 Fed. Reg. 46,842, 46,850, 46,882 (all explaining that $50 fee is intended to cover some operational costs of adjudicating asylum applications). Plaintiffs' contention to the contrary rests on their misreading of both the Proposed Rule and the Final Rule. Plaintiffs rely upon a single reference to "discourag[ing] frivolous filings" in the Proposed Rule. 84 Fed. Reg. 62,320. Whatever this phrase's intended meaning, in the Final Rule the agency specifically (and repeatedly) disclaimed that the fee was intended for deterrence. *See*, *e.g.*, 85 Fed. Reg. 46,844; *see also*, *e.g.*, 85 Fed. Reg. 46,842, 46,850, 46,882.[40] As the record makes clear, the assumption (based on the agency's experience, *see*, *e.g.*, 85 Fed.

---

[40] As to the Final Rule, Plaintiffs seize upon the agency's statement therein that "[t]his final rule … relies on all the justifications articulated in the NPRM, except as reflected below." 85 Fed. Reg. 46,790. Plaintiffs appear to read "below" to exclusively mean a list of "changes as compared to the NPRM" appearing in the succeeding paragraph. *Id.* But the word "below" does not, on its face, mean only in the immediately succeeding paragraph. Moreover, the Final Rule as a whole, in language and context,

Reg. 46,797) underlying the calculations *was*, in fact, "that immigrants would find a way to pay for every new or increased fee, and thus file applications at the same rate as they would under current law." Mot. 41. For that reason, the agency's calculations did not "r[u]n 'counter to the evidence before the agency.'" *Id.* And DHS did not "ignore" an alleged reduction in asylum applications, *id.*; rather, it disagreed (based on agency experience) that the reduction Plaintiffs allege would transpire.

### 3.  DHS Fully Considered the Interests of Immigrant Applicants.

Plaintiffs' final arbitrary-and-capricious argument–that DHS "failed to consider the harm its rule will cause to individuals unable to pay the new fees"–is meritless. Mot. 48-49. DHS undertook a holistic, biennial fee review to ensure it collects sufficient revenue to fund USCIS adjudication and naturalization services. During this review, the agency determined that the sharp rise in fee-waiver use coupled with its previous policy to orient fees around an individual's ability to pay was inequitable by requiring fee-paying applicants to subsidize other immigrants' fees and artificially hold down naturalization costs. Plaintiffs clearly disagree with the agency's judgments and would prefer that wealthier applicants continue to fund the services provided to those with fewer means. But they cannot show that the agency failed to consider the equities of its fee system. Indeed, the parts of the Rule cited by Plaintiffs demonstrate that, far from "dodg[ing] the issue" or "shrugg[ing] off concerns about unaffordable fees," Mot. 48, the agency responded cogently to commenters but weighed the costs and benefits differently, as is its prerogative.[41] Particularly unpersuasive is Plaintiffs' suggestion that the agency should have sought "Congressional appropriations," among other suggestions, to avoid fee

---

reflects a number of other differences from the Proposed Rule, most particularly in terms of "justifications" to the changes effected by the Rule. Thus, the "changes" listed on 46,790 do not reflect all of the "except[ions]" to the agency's "rel[iance] on all the justifications articulated in the NPRM."

[41] *See, e.g.*, 85 Fed. Reg. 46,797 ("The new fees are not insubstantial, but DHS disagrees with the commenters' assertions that the fees in this final rule will have an effect on the economic class or number of applicants. DHS has no data that would indicate that the populations noted by the commenters will be precluded from submitting benefit requests."); *Id.* at 46,882 ("DHS has not omitted data describing the price sensitivity to fees, rather, the agency has no data describing the myriad complex and changing unobservable factors that may affect each immigrant's unique decision to file for a particular immigration benefit. DHS notes that previous fee increases in 2007, 2010, and 2016 have had no discernible effect on the number of filings that USCIS received.); *id.* at 46,885 ("DHS carefully assessed the costs associated with the adjudication of asylum applications and other types of immigration benefits and concluded that the $50 fee for asylum applications is warranted.").

increases; Congress has determined that USCIS should remain fee-funded, despite the agency's well-known fiscal situation. The agency was not required to seek a change to that legislative determination.[42]

### E.      The Final Rule Is Consistent with the INA.

Plaintiffs' allegations that certain longstanding USCIS functions "transgress[]" the INA, Mot. 49-50, are belied by: the INA itself, the HSA, the Immigration Reform and Control Act (IRCA), DHS's practices for decades, Congress's apparent acquiescence in those practices, and common sense. Funding the SAVE Program and the Fraud Detection and National Security Directorate (FDNS) using, in part, IEFA funds is entirely consistent with the INA.

Plaintiffs' selective quotation of the statute omits its broad language. *See* 8 U.S.C. § 1356(m) (permitting fees to recover "the *full* costs" of providing "*all*" "adjudication and naturalization services," and "the administration of the fees collected" (emphasis added)); *id.* at (n) (permitting "*[a]ll*" IEFA deposits to "remain available … to reimburse *any* appropriation … for expenses in providing" the same (emphasis added)). This authority necessarily includes indirect and support costs.

Moreover, when the INA is read in conjunction with other statutes authorizing and recommending USCIS functions that are not directly adjudicatory, including the SAVE Program and counter-fraud efforts, but *not* appropriating funds to cover them, it is clear that the "resource allocation and policy priorities" in the Final Rule are consistent with USCIS's statutory funding scheme and of the kind "typically left to agency discretion." *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1135 (D.C. Cir. 1995); *cf. United States v. Freeman*, 44 U.S. 556, 564 (1845) ("[I]f divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them …."). Plaintiffs' alternative reading makes no sense.

Since 1987, USCIS (and its predecessor agencies) has assisted federal, state, and local benefits

---

[42] Equally baseless is the complaint that the agency failed to address "the burden its new mail restrictions will impose on attorneys … or why it rejected less burdensome alternatives." Mot. 48. There is no requirement for DHS to "address every comment," so long as it "respond in a reasoned manner to those that raise significant problems." *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003). Nor is it clear that the agency must take into account the purported "burden[s]" imposed *on attorneys*, rather than on applicants themselves, since immigration attorneys do not fall within the zone of interests served by the USCIS fee statute, 8 U.S.C. § 1356(m). *See Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014).

and licensing agencies, and other governmental entities, in determining the immigration status of benefit or license applicants (*i.e.*, providing a form of adjudication service) through the SAVE Program. Pub. L. No. 99-603, 100 Stat. 3359 (1986). The program has a dual funding structure, whereby some costs are covered by reimbursements and other costs from IEFA funds. *See* 81 Fed. Reg. 26,911. Fees–charged to SAVE users and deposited in the IEFA–do not cover the program's full costs. *See id.*

And in 2004, USCIS established the FDNS in response to a Congressional recommendation to establish an entity "responsible for developing, implementing, directing, and overseeing the joint [US]CIS-ICE anti-fraud initiative, and conducting law enforcement/background checks on every applicant, beneficiary, and petitioner prior to granting immigration benefits." Conf. Rep. 108-774, "Making Appropriations for the [DHS] for the Fiscal Year Ending September 30, 2005," at 74, http://www.gpo.gov/fdsys/pkg/CRPT-108hrpt774/pdf/CRPT-108hrpt774.pdf (last visited Sept. 17, 2020). FDNS–fully housed within USCIS because of its focus on the integrity of immigration benefit adjudications–primarily detects, combats, and deters immigration benefit fraud, pursuant to a delegation by the first Secretary of Homeland Security to USCIS in 2003 under the HSA. *See* 2AR798; Homeland Security Delegation No. 0150.1 (2003), https://www.hsdl.org/?abstract&did=234775 (delegating to USCIS authority to, *inter alia*, "investigate … alleged fraud with respect to applications or determinations within the USCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable").[43] FDNS further enhances the integrity of the immigration benefit system, while protecting the nation by: identifying threats posed by those seeking immigration benefits, identifying and mitigating vulnerabilities, and acting as a conduit for information-sharing and collaboration with other agencies and DHS components. *See* Delegation No. 0150.1; 84 Fed. Reg. 62,307 (discussing FDNS Data System).

It makes sense that "immigration adjudication and naturalization services" includes work

---

[43] Because USCIS does not prosecute immigration fraud or represent the Government in immigration court, FDNS refers cases to ICE and DOJ where it believes legal action or additional investigation is warranted. Otherwise, FDNS's work focuses on supporting adjudications.

related to determining whether applicants may receive such services, such as any investigatory work necessary to adjudicate applications or provide services and prevent benefit fraud. 8 U.S.C. § 1356(m), (n); *cf. Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 185-86 (D.C. Cir. 1996) (ruling that the Coast Guard may set fees to cover costs of FBI background checks); *Miss. Power & Light Co. v. U.S. Nuclear Reg. Comm'n*, 601 F.2d 223, 231-32 n.18 (5th Cir. 1979), *cert denied*, 444 U.S. 1102 (1980) (ruling that the NRC may set fees to cover costs of uncontested hearings as part of approval process for license). That work does not always end with a decision to grant or deny an application either; FDNS also supports ICE and DOJ in defending in administrative and federal court hearings the agency's determinations once made. *Accord, e.g.*, 31 U.S.C. § 9701 (noting the sense of Congress that services should be "self-sustaining to the extent possible" by setting fees "based on," among other things, "the costs to the Government"); OMB Circular A-25, "User Charges" (Revised), ¶ 6, 58 Fed. Reg. 38,142 (July 15, 1993) ("'Full cost' includes all direct and indirect costs to any part of the Federal Government of providing a good, resource, or service. These costs include, but are not limited to, an appropriate share of: … [t]he costs of enforcement."). And those are not the only programs that Congress assigned to USCIS without full funding, knowing that the agency generally funds operations out of IEFA. For example, the HSA created the USCIS Office of Investigations to investigate non-criminal allegations of misconduct, corruption, and fraud involving any USCIS employee or contractor that is not subject to investigation by the DHS Office of Inspector General. *See* 6 U.S.C. § 273(a)(1)-(2) (HSA § 451(a)(1)-(2)). And the Office of Citizenship, also established by the HSA, promotes instruction and training on "citizenship responsibilities." § 451(f).[44]

Congressional appropriations and two other small fee accounts represent between 2-5% (combined) of USCIS's annual budget. *See* 2AR817. Each has statutory limits for both amounts and uses. Appropriations are currently limited to use for E-Verify employment status verification and the

---

[44] That street runs both ways, as some seemingly adjudicatory or benefit-related functions fall to ICE or CBP. CBP adjudicates certain forms (*e.g.*, Forms I-192, I-193, I-212, I-824). *See* 85 Fed. Reg. 46,840; 84 Fed. Reg. 62,321; *cf.* 8 U.S.C. § 1182(a)(7), (c), (d)(4), (k); 8 C.F.R. §§ 211.1(b)(3); 212.1(g), (j). And ICE administers the Student Exchange Visitor Program, which oversees the certification process for schools and designated exchange programs for F, J, and M non-immigrants. 83 Fed. Reg. 33,765; *cf.* 6 U.S.C. § 252(a)(4) (HSA § 442(a)(4)). Parole and deferred action grants also plainly involve adjudicatory aspects.

Citizenship and Assimilation grant program. *See id.* The Fraud Prevention and Detection Account receives revenue from statutorily set fees that is shared among USCIS, State, and Labor (DOL). 2AR818. And the fees deposited in the H-1B Nonimmigrant Petitioner Account are also set by statute and shared among USCIS, DOL, and the National Science Foundation. *Id.* USCIS receives only 5% of these funds. *Id.* These sources are, therefore, neither the only way nor a feasible way for USCIS to fund all operations. Instead, Congress authorizes USCIS to carry out seemingly non-adjudicatory functions and approves the DHS budget, knowing that USCIS must use IEFA funds to cover those expenses which Congress does not otherwise fund through appropriations and statutory fees. Therefore, Congress has acquiesced to that arrangement. *Cf. State Farm*, 463 U.S. at 45 (noting "an agency's interpretation of a statute may be confirmed or ratified by subsequent congressional failure to change that interpretation"); *Costanzo v. Tillinghast*, 287 U.S. 341, 345 (1932) (discussing "presumption in favor of administrative interpretation" when Congress fails to change agency's "consistent construction").[45]

Plaintiffs ignore all of this. Yet with this background, the bright line that they would impose to defund USCIS's longstanding activities is contrary to the INA's broad language, the HSA and other statutes' allocation of functions, DHS's course of conduct since its earliest delegations, Congress's nonintervention as to that course, and reason.

## II.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST A STAY OR PRELIMINARY RELIEF.

Plaintiffs have not shown that the balance of equities tips in their favor or that the public interest favors an injunction. Where the Government is an opposing party, these final factors merge "because the government's interest is the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

Preserving the status quo would require USCIS to continue to forgo millions of dollars of revenue each day, forcing funding cuts, operational cutbacks, personnel furloughs, and further delays

---

[45] If the Court finds the INA ambiguous in this regard, it should defer to the agency's interpretation under *Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

adjudicating the very applications Plaintiffs claim the Final Rule will deter. *See supra* Part I.C.1.; Dem. 1 (charting increasing funding shortfall and processing backlog). The Rule's other policy changes also would be delayed, to the public's detriment. *See* 84 Fed. Reg. 62,295-324. If the changes to fee waivers and exemptions are not made, costs and backlogs will increase commensurately with foregone revenue (to the tune of hundreds of millions of dollars more than in the Rule's proposed fee schedule); again, the only way the agency can recover such deficits is by raising fees, sooner or later. *See id.* at 62,298.

The harms Plaintiffs purport to allege on behalf of non-parties are tenuous, at best. *See* Mot. 56-58.[46] The seeming Catch-22 of increasing fees or cutting services was not of the agency's design; it is the result of Congress's decision to structure USCIS as a fee-dependent entity. But Congress also left the agency the discretion to strike that balance. 8 U.S.C. § 1356(m).

## III. ANY REMEDY MUST BE LIMITED TO REDRESS ONLY THOSE SPECIFIC HARMS, IF ANY, THAT HAVE BEEN DEMONSTRATED.

"[A]n injunction must be 'narrowly tailored to remedy the specific harm shown.'" *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 126 (D.D.C. 2015), *aff'd sub nom. U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir. 2017) (quoting *Neb. Dep't of Health & Human Servs. v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006)). So, too, for relief under § 705, which authorizes a court to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," only "[o]n such conditions as may be *required* and to the extent *necessary* to prevent irreparable injury. 5 U.S.C. § 705 (emphasis added). "The need for narrow tailoring, moreover, is particularly important in the context of" emergency preliminary relief, "where the court has yet finally to resolve the merits of the dispute." *Reptile Keepers*, 106 F. Supp. 3d at 126.

---

[46] Some of those allegations are also inaccurate or misleading. Plaintiffs' complaint over fees for work authorization, Mot. 54, neglects to mention the fact that fees are *always* required at the time of filing, before an alien has been approved for any visa, status, or benefit, 8 C.F.R. § 103.2(a)(1). Their allegations about domestic violence victims "suffer[ing] further abuse" when they cannot afford a fee, Mot. 55, ignores that the Final Rule continues such victims' "fee exempt" status and eligibility for fee waivers to assure they can still seek critical benefits. *See* 85 Fed. Reg. 46,812. The Form I-929 fee that Plaintiffs complain will be too high, Mot. 56, may still be waived. *See* 85 Fed. Reg. 46,812. And individuals in immigration proceedings who may be unable to afford the asylum fee, *see* Mot. 56, may still apply for withholding of removal *without* a fee. 85 Fed. Reg. 46,793 n.17; *see supra* Part I.D.2.

The Final Rule adjusts the cost of applying for a wide range of immigration benefits, including naturalization and asylum, and revises certain fee waiver and exemption policies, forms, and fee structures. The harms Plaintiffs have alleged derive from only some of the Rule's adjustments and revisions.[47] *Compare supra* Part II (explaining profound harms to agency). Accordingly, any relief for Plaintiffs should be limited to, at most, those severable provisions underlying the identified fees and policies, not the entire Rule. *See* 85 Fed. Reg. 46,921 (severability provision).

## CONCLUSION

For reasons stated, the Court should deny Plaintiffs' Motion.

---

[47] *See* Second Declaration of Jorge L. Barón, ECF No. 50-1 at 6-7 (¶¶ 18-19) (naturalization fees); *id.* ¶ 20 (fee waiver policy for U visa petitioners filing Form I-192); *id.* at 7-8 (¶ 20) (fee waiver policy for U visa holders filing Form I-929); *id.* at 8-9 (¶¶ 22-23) (asylum fee, fee for request for employment authorization, and fee waiver policy for persons (including those in immigration detention) seeking asylum or in removal proceedings filing applications for asylum, withholding of removal, or protection under the Convention Against Torture); *id.* at 9-10 (¶ 24) (Form I-485 fee and fee waiver policy for persons with Special Immigrant Juvenile status (SIJS) who are not in out-of-home care under state court or agency supervision); *id.* 12-15 (¶¶ 29-34, 37) (fee waiver policy requiring individuals to use Form I-912, to complete a single form for each family member, and to provide specific documentation of income); *id.* at 15 (¶ 36) (fee waiver policy limiting availability to only some "categories of immigrants and applications" and eligibility to persons earning at or below 125 percent FPG); *id.* at 17 (¶ 41) (paper-filing surcharge); Escobar Decl., ECF No. 50-3 at 8, 10-14 (¶¶ 28, 34, 37-38, 41) (naturalization fees and fee waiver policy); *id.* ¶¶ 32-33 (fee waiver policy requiring specific documentation of income); Ball Cooper Decl., ECF No. 50-2 at 5-6, 12-15 (¶¶ 16, 28, 29, 32-34) (fee waiver policy and fee increases for immigration benefits); *id.* at 6 (¶ 17) (fee and fee waiver policy for persons with Special Immigrant Juvenile status (SIJS) who are not in out-of-home care under state court or agency supervision); *id.* (¶ 18) (fees and fee waiver policy for Form N-336 for persons seeking hearing on denial of naturalization); *id.* at 7-9, 12-13 (¶¶ 21-22, 28) (fee waiver policy requiring specific documentation of income); *id.* at 9-10, 12-13 (¶¶ 22-23, 28) (fee waiver policy limiting availability to only some "categories of immigrants and applications" and eligibility to persons earning at or below 125 percent FPG); *id.* at 11-13 (¶¶ 26, 28) (paper-filing surcharge); *id.* (¶¶ 27, 28) (requirement for signature confirmation to receive documents from USCIS). *But see* 85 Fed. Reg. 46,792 (adjusting genealogy services fees); *id.* at 46,791 (adjusting fees for: immigrant petition by alien investors, appeals, civil surgeon designations, regional center resignation under the immigrant investor program, annual certification of regional centers, waiver of the foreign residence requirement, petition by an investor to remove conditions, and adoptions).

Dated:  September 18, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director
Federal Programs Branch

JULIE STRAUS HARRIS
DC Bar No. 1021298
Senior Trial Counsel

 /s/ Charles E.T. Roberts
CHARLES E.T. ROBERTS
PA Bar No. 326539
CHETAN A. PATIL
DC Bar No. 999948
KATE TALMOR
Maryland Bar
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 305-8628
Fax: (202) 616-8470
Email: charles.e.roberts@usdoj.gov

*Attorneys for Defendant*