**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NORTHWEST IMMIGRANT RIGHTS PROJECT, AYUDA, INC., and CASA DE MARYLAND, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 19-cv-03283-RDM |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, DEPARTMENT OF HOMELAND SECURITY, CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security, and KENNETH T. CUCCINELLI, in his official capacity as Senior Official Performing the Duties of the USCIS Director and Senior Official Performing the Duties of the Deputy Secretary of Homeland Security, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SECTION 705 RELIEF AND PRELIMINARY INJUNCTION**

Laurie Ball Cooper (D.C. Bar No. 1017998)
Ayuda, Inc.
6925 B Willow Street NW
Washington DC 20012
202-349-0656
laurie.ballcooper@ayuda.com

Counsel for Plaintiff Ayuda, Inc.

Rebecca Smullin (D.C. Bar No. 1017451)
Adina H. Rosenbaum (D.C. Bar No. 490928)
Michael T. Kirkpatrick (D.C. Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
202-588-7714
rsmullin@citizen.org

Counsel for All Plaintiffs

*(additional counsel on following page)*

Nicholas Katz (MD Bar No. 1812100006)
CASA de Maryland, Inc.
8151 15th Avenue
Hyattsville, MD 20783
240-491-5743
nkatz@wearecasa.org

Counsel for Plaintiff CASA
de Maryland, Inc.

Matt Adams (WSBA No. 28287)
Aaron Korthuis (WSBA No. 53974)
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
206-957-8611
matt@nwirp.org

Counsel for Plaintiff Northwest
Immigrant Rights Project

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 1

    I.   The 2020 Fee Rule was issued without authority and cannot be ratified. ......................... 1

        A.  Nielsen did not give McAleenan authority to serve as acting secretary...................... 2

        B.  Wolf has never had authority to serve as acting secretary. ........................................ 5

        C.  DHS's *ultra vires* rule is void. ................................................................................. 7

        D.  Wolf's attempt at ratification does not cure the problem. ........................................ 7

    II.  DHS did not provide adequate notice of the rule and its calculations. .............................. 9

    III. The 2020 Fee Rule is arbitrary and capricious. ............................................................. 11

        A.  DHS's calculations are unexplained and unreasonable. ........................................... 11

        B.  DHS failed to explain its rule in other regards. ...................................................... 15

    IV. The 2020 Fee Rule violates the Immigration and Nationality Act. ................................. 20

    V.  Without temporary relief, the 2020 Fee Rule will cause irreparable harm...................... 21

    VI. The Court should grant relief against the entire rule. ...................................................... 22

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**                                                                                       **PAGE(S)**

*Air Transport Association of America, Inc. v. USDA*,
    303 F. Supp. 3d 28 (D.D.C. 2018) .............................................................................13, 14

*American Radio Relay League, Inc. v. Federal Communications Commission*,
    524 F.3d 227 (D.C. Cir. 2008) .................................................................................10

*ANR Storage Co. v. FERC*,
    904 F.3d 1020 (D.C. Cir. 2018) ...............................................................................11

*Bauer v. DeVos*,
    325 F. Supp. 3d 74 (D.D.C. 2018) ...........................................................................15

*Carlson v. Postal Regulatory Commission*,
    938 F.3d 337 (D.C. Cir. 2019) .................................................................................24

\* *CASA de Maryland, Inc. v. Wolf*, __ F. Supp. 3d ___,
    No. 8:20-CV-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020) ........................3, 4

*Citizens for Responsibility & Ethics in Washington v. FCC*,
    904 F.3d 1014 (D.C. Cir. 2018) ...............................................................................21

*DHS v. Regents of the University of California*,
    140 S. Ct. 1891 (2020) ...........................................................................................3, 4

\* *District of Columbia v. USDA*,
    444 F. Supp. 3d 1 (D.D.C. 2020) .....................................................................18, 23, 25

*District Hospital Partners, L.P. v. Burwell*,
    786 F.3d 46 (D.C. Cir. 2015) ..................................................................................14

*East Bay Sanctuary Covenant v. Trump*,
    950 F.3d 1242 (9th Cir. 2020) ................................................................................22

*Engine Manufacturers Ass'n v. EPA*,
    20 F.3d 1277 (D.C. Cir. 1984) ................................................................................12

*Freytag v. Commissioner*,
    501 U.S. 868 (1991)..................................................................................................6

*Gomez v. Trump*, __ F. Supp. 3d ___,
    No. 20-CV-01419 (APM), 2020 WL 5367010 (D.D.C. Sept. 4, 2020)..........................23

*In re Grand Jury Investigation*,
 916 F.3d 1047 (D.C. Cir. 2019) ............................................................... 4, 6

*INS v. Cardoza-Fonseca*,
 480 U.S. 421 (1987) ............................................................................... 22

*Kansas v. Nebraska*,
 574 U.S. 445 (2015) ............................................................................... 24

*Kisor v. Wilkie*,
 139 S. Ct. 2400 (2019) ........................................................................... 3

* *La Clinica De La Raza v. Trump*, ___ F. Supp. 3d. ___,
 No. 19-CV-04980-PJH, 2020 WL 4569462 (N.D. Cal. Aug. 7, 2020) ............................. 4

* *L.M.-M. v. Cuccinelli*,
 442 F. Supp. 3d 1 (D.D.C. 2020) ...................................................... 6, 7, 9, 23

*MD/DC/DE Broadcasters Association v. FCC*,
 236 F.3d 13 (D.C. Cir. 2001) .............................................................. 23, 24

*MD/DC/DE Broadcasters Association v. FCC*,
 253 F.3d 732 (D.C. Cir. 2001) ................................................................ 24

*Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm Mutual Automobile Insurance Co.*,
 463 U.S. 29 (1983) ............................................................................... 17

*NAACP v. Trump*,
 298 F. Supp. 3d 209 (D.D.C. 2018) ............................................................ 25

*National Fuel Gas Supply Corp. v. FERC*,
 468 F.3d 831, 843 (D.C. Cir. 2006) ........................................................... 18

*National Mining Association v. U.S. Army Corps of Engineers*,
 145 F.3d 1399 (D.C. Cir. 1998) ............................................................... 23

*O.A. v. Trump*,
 404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................ 25

*Open Communities Alliance v. Carson*,
 286 F. Supp. 3d 148 (D.D.C. 2017) ............................................................ 22

*Owner-Operator Independent Drivers Association, Inc. v.
 Federal Motor Carrier Safety Administration*, 494 F.3d 188 (D.C. Cir. 2007) ............ 9, 12

iii

*Pennsylvania v. President United States*,
  930 F.3d 543 (3d Cir. 2019)..................................................................................25

*Public Citizen v. Federal Motor Carrier Safety Administration*,
  374 F.3d 1209 (D.C. Cir. 2004) ...........................................................................14

*Rapanos v. United States*,
  547 U.S. 715 (2006).............................................................................................21

*Sampson v. Murray*,
  415 U.S. 61 (1974)...............................................................................................23

*Scripps-Howard Radio v. FCC*,
  316 U.S. 4 (1942).................................................................................................23

*Shands Jacksonville Medical Center v. Burwell*,
  139 F. Supp. 3d 240 (D.D.C. 2015) .....................................................................10

*Stewart v. Azar*,
  313 F. Supp. 3d 237 (D.D.C. 2018) .....................................................................12

*Tripoli Rocketry Association, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  437 F.3d 75 (D.C. Cir. 2006) ...............................................................................14

*U.S. House of Representatives v. Burwell*,
  130 F. Supp. 3d 53 (D.D.C. 2015) .......................................................................21

*United Steel v. Mine Safety & Health Administration*,
  925 F.3d 1279 (D.C. Cir. 2019) ...........................................................................15

## CONSTITUTION

U.S. Constitution art. I, § 8, cl. 4 ................................................................................25

## STATUTES AND LEGISLATIVE MATERIAL

Pub. L. No. 99-603, 100 Stat. 3359 (1986) ................................................................25

5 U.S.C. § 705..................................................................................................22, 23

5 U.S.C. § 706..................................................................................................7, 23

5 U.S.C. § 3345..............................................................................................................4

iv

5 U.S.C. § 3346 ...........................................................................................................6

5 U.S.C. § 3347 .........................................................................................................6, 9

5 U.S.C. § 3348 ......................................................................................................7, 8, 9

6 U.S.C. § 112 ..........................................................................................................5, 8

* 6 U.S.C. § 113 ................................................................................................... passim

6 U.S.C. § 271 ..............................................................................................................21

8 U.S.C. § 1103 ..............................................................................................................8

8 U.S.C. § 1356(m) .......................................................................................................20

Senate Report No. 105-250 (1998) ...............................................................................9

## REGULATIONS AND FEDERAL REGISTER NOTICES

75 Fed. Reg. 58,962 (Sept. 24, 2010) .........................................................................15

81 Fed. Reg. 73,292 (Oct. 24, 2016).......................................................................13, 15

* Executive Order No. 13,753, 81 Fed. Reg. 90,667 (Dec. 9, 2016)............................2, 8

84 Fed. Reg. 62,280 (Nov. 14, 2019)................................................................... passim

85 Fed. Reg. 46,790 (Aug. 3, 2020)..................................................................... passim

## MISCELLANEOUS

DHS, *DHS State and Local Law Enforcement Resource Catalog* (May 2018),
    https://www.dhs.gov/sites/default/files/publications/18_0703_OSLLE-Resource-
    Catalog-Volume-VI.pdf ........................................................................................20

DHS, *Delegation No. 0150.1* (June 5, 2003),
    USCIS https://www.hsdl.org/?view&did=234775 .........................................20

DHS, *Fusion Centers and Joint Terrorism Task Forces* (July 29, 2016),
    https://www.dhs.gov/fusion-centers-and-joint-terrorism-task-forces .............................20

Joseph B. Edlow*, Written Testimony for a Hearing on "Oversight of U.S. Citizenship and
    Immigration Services," Before the House Committee on the Judiciary, Subcommittee*

v

*on Immigration and Citizenship, July 29, 2020,*
https://docs.house.gov/meetings/JU/JU01/20200729/110946/HHRG-116-JU01-
Wstate-EdlowJ-20200729.pdf ........................................................................................13

GAO, *Federal User Fees: A Design Guide* (May 2008),
https://www.gao.gov/assets/210/203357.pdf ................................................................16

USCIS, *Fraud Detection and National Security Directorate* (Mar. 13, 2020),
https://www.uscis.gov/about-us/directorates-and-program-offices/fraud-detection-and-
national-security-directorate ............................................................................................20

## INTRODUCTION

Defendants' 2020 Fee Rule dramatically increases the fees charged to immigrants seeking to live and work in the United States. Because the rule is based on the actions of two people unlawfully serving as acting secretaries, it is void. In addition, the 2020 Fee Rule is unlawful in three other ways. It was issued in violation of Administrative Procedure Act (APA) notice-and-comment requirements; it is arbitrary and capricious; and it seeks to make immigrants pay for agency operations that, under the Immigration and Nationality Act (INA), the Department of Homeland Security has no authority to fund in this way. Defendants (hereafter, DHS) fail to rebut plaintiffs' arguments or their showing of the severe harms the rule will cause. This Court should grant plaintiffs' motion to postpone, stay, and enjoin unlawful immigration filing fees that, because they are unaffordable, will put immigrants at risk of removal and cause other immediate and irreparable harm.

## ARGUMENT

**I.      The 2020 Fee Rule was issued without authority and cannot be ratified.**

The 2020 Fee Rule was proposed by Kevin K. McAleenan and adopted by defendant Chad F. Wolf. Neither had authority to serve as acting DHS secretary at the time he took that action. *See* Dkt. 50 at 25-32. DHS does not dispute that each lacked authority under the Federal Vacancies Reform Act (FVRA). Instead, DHS argues that: (1) McAleenan had authority to serve under the Homeland Security Act (HSA), 6 U.S.C. § 113(g)(2), pursuant to Kirstjen Nielsen's April 2019 amendment to a 2016 order issued by Jeh Johnson, (2) Wolf had authority to serve pursuant to McAleenan's November 2019 amendment to the Johnson order, (3) earlier this month, Wolf was re-designated as acting secretary by Federal Emergency Management Agency (FEMA) Administrator Peter Gaynor who, purporting to exercise authority as acting secretary, signed a

document to supersede the Johnson order, and (4) Wolf has now ratified his own actions. *See* Dkt. 69-3 at 47-52. DHS's arguments lack merit.

**A.   Nielsen did not give McAleenan authority to serve as acting secretary.**

The Johnson order addresses who will fill certain DHS positions when the appointed official is absent. The order points to Executive Order No. 13,753, 81 Fed. Reg. 90,667 (Dec. 9, 2016), regarding the president's authority under the FVRA, for the line of succession after a secretary's resignation, death, or inability to perform the office's functions. *See* Dkt. 50-4 at 61. Through its Annex A, the Johnson order designates a different line of succession for when the secretary is "unavailable to act during a disaster or catastrophic emergency." *Id*. Pursuant to the HSA, 6 U.S.C. § 113(g)(2), Nielsen had authority to set a new order of succession that would apply when she resigned. But her April 2019 amendment did not do so. It amended only Annex A, regarding disasters and catastrophic emergencies. *See* Dkt. 50-4 at 128.

In April 2019, DHS recognized the limited scope of Nielsen's amendment. The agency incorporated Nielsen's amendment into the Johnson order, retaining its main text and updating only Annex A. *See* Dkt. 50-4 at 61-65. Months later, when McAleenan was purportedly in charge, he issued a separate order to revise the main text of the Johnson order, such that Annex A (not Executive Order No. 13,753) would govern when a secretary resigned, as well as in event of a disaster or emergency. *See id.* at 129; *see also id.* at 94 (revised Johnson order).

Now, however, DHS argues that Nielsen's April 2019 amendment accomplished what McAleenan later sought to do: change the text of the Johnson order to state that Annex A would control if the secretary resigned. *See* Dkt. 69 at 18. Although DHS asks for deference, *see id.* at 22, its post-hoc interpretation of Nielsen's amendment, which conflicts with the agency's earlier

2

understanding of the same document, should not be credited by this Court. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019).

Moreover, the plain text of Nielsen's amendment belies DHS's suggestion of ambiguity. Nielsen's order states that "Annex A … is hereby amended by striking the text of such Annex in its entirety and inserting [a new list] in lieu thereof." Dkt. 50-4 at 128. Nonetheless, DHS suggests Nielsen's amendment must apply to resignations because the cover memo and introduction refer to "order of succession" and 6 U.S.C. § 113(g)(2). *See* Dkt. 69 at 18, 19, 21, 22. But Nielsen's amendment stated that it did only one thing: "strik[e]" and replace Annex A. Dkt. 50-4 at 128. It made no mention of resignation or the body of the Johnson order. And Nielsen's amendment was entirely consistent with the term "order of succession" and section 113(g) because that provision uses "order of succession" to refer to what happens when a secretary is unavailable "by reason of absence [or] disability," as well as "vacancy of office." In amending Annex A, therefore, Nielsen *did* change an HSA order of succession: the one applicable during the secretary's unavailability due to a disaster or catastrophic emergency. *See CASA de Maryland, Inc. v. Wolf*, __ F. Supp. 3d ___, No. 8:20-CV-02118-PX, 2020 WL 5500165, at *22 (D. Md. Sept. 11, 2020). Indeed, if DHS were right that "order of succession" *excludes* reference to disasters or emergencies, Nielsen's amendment would make no sense, as it indisputably addresses *those* circumstances.

DHS suggests that Nielsen's amendment has a broader scope than its plain language by emphasizing that Johnson's order used the term "delegation of authority" to title the "order of succession" listed in Annex A. *See* Dkt. 69 at 20, 21. But, as DHS notes, when Johnson issued his order, section 113(g) was not yet law; his order mimicked the language of the FVRA, in addressing resignations, and put emergencies and disasters in a different category. *See* Dkt. 69 at 20. Unlike the FVRA, the HSA expressly uses the term "order of succession" to refer to *any* "absence" or

3

"disability" that means the secretary is not "available," which would include unavailability due to a disaster or emergency. *Compare* 5 U.S.C. § 3345(a) (FVRA) *with* 6 U.S.C. § 113(g)(1) (HSA). *Cf. In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019) (interpreting recusal to constitute a "disability" that "created a vacancy"). Notably, Nielsen's amendment both followed the Johnson order's format and accorded with section 113. While recognizing that she was amending an order of succession, Nielsen repeated the Johnson order's heading for Annex A. *See* Dkt. 50-4 at 128 ("Order for Delegation of Authority"). She did *not* use the more expansive heading that both Johnson and she used on annexes applying to resignations *and* disasters. *See, e.g.*, Dkt. 69-3 at 45 ("Orders of Succession and Orders for Delegations of Authorities"). For similar reasons, it is irrelevant that Nielsen's amendment used the term "designation." Nielsen's announcement regarding McAleenan also does not change her order's plain meaning.

DHS suggests that this Court should ignore DHS's updated version of the Johnson order, which is consistent with the plain text of Nielsen's amendment. *See* Dkt. 69 at 18, 23. But this document is an official agency order, recognized by the government as "the only written repository that memorializes Secretary's changes to the succession order." *CASA*, 2020 WL 5500165, at *22. Moreover, it reflects DHS's contemporaneous implementation of Nielsen's amendment, "not simply convenient litigating positions." *Regents*, 140 S. Ct. at 1909. DHS's suggestion that the updated order was a mistake is hardly plausible; DHS retained the order until McAleenan issued an amendment directing that Annex A would apply if the secretary resigned. *See* Dkt. 50-4 at 129. McAleenan's decision to issue a new amendment "reinforces the conclusion that at the time of Nielsen's resignation, Executive Order 13753 [not Annex A] governed the order of succession." *La Clinica De La Raza v. Trump*, ___ F. Supp. 3d. ___, No. 19-CV-04980-PJH, 2020 WL 4569462, at *14 (N.D. Cal. Aug. 7, 2020).

**B.  Wolf has never had authority to serve as acting secretary.**

McAleenan's November 2019 amendment purported to designate Wolf as the next available official in line to serve as acting secretary. *See* Dkt. 50-4 at 129. But McAleenan had no authority to pick a successor in this way. As explained above, McAleenan's designation was never lawful under Nielsen's order. Further, even if his initial designation was valid, he had no authority to amend the Johnson order when he did. *See* Dkt. 50 at 28-32.

First, an acting secretary does not have authority to change the order of succession under the HSA. DHS cites the authority of acting officials under *other* statutes. *See* Dkt. 69 at 24-25. But it makes no attempt to account for the HSA, which distinguishes the terms "Secretary" and "Acting Secretary" when discussing succession order. Section 113(g)(1) and (2) work together. The only way "Secretary" makes sense in this scheme is to refer to a Senate-confirmed Secretary. It uses "Acting Secretary" to refer to the person filling the position temporarily. Further, replacing "Secretary" with "acting secretary" makes paragraph 113(g)(1) illogical; because (g)(2) is inextricably linked, it should be read similarly. This narrow use of the term "Secretary" is consistent with 6 U.S.C. § 112(a), whose context also makes clear that it refers only to a Senate-confirmed Secretary. But contrary to DHS's suggestion, plaintiffs' argument does not mean that an acting secretary is barred from performing *other* duties of the secretary.

DHS's reading of the HSA also creates a constitutional concern. *See* Dkt. 50 at 30. DHS's reading would empower an acting secretary to choose a replacement, who could then do the same, over and over, just as McAleenan, and now Gaynor, have attempted. *See* Dkt. 69-3 at 47-48. And although DHS is right that a nomination interrupts this chain, it is also true that permitting officials to pass the buck in this way will both place the *choice* of an acting Cabinet official outside the hands of a Senate-confirmed officer and expand the ways for the President to *avoid* "accountability

5

for selecting acting officials," by enabling an ever-expanding pool of people to be put forward to take the role. *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 28 (D.D.C. 2020). The resulting risk of a lengthier series of acting officials and an expansion of appointment authority raise constitutional concerns. *See Freytag v. Comm'r*, 501 U.S. 868, 886 (1991) (interpreting Appointments Clause in a way that "constrains the distribution of the appointment power" to agency-heads who "share the President's accountability to the people" rather than "diffuse" it). Again, the present circumstances illustrate the problem. Here, the president declined to nominate anyone to replace Nielsen until Wolf's legitimacy was challenged. *See* Dkt. 69-3 at 50. *In re Grand Jury Investigation*, 916 F.3d at 1054, which DHS cites, involves statutory analysis and different facts: an acting attorney general appointing a *subordinate* inferior officer.

Second, McAleenan lacked authority because the FVRA imposes a 210-day time limit on acting service, 5 U.S.C. § 3346(a), which expired before his attempt to amend the Johnson order. DHS attempts to place the HSA outside the reach of the FVRA limit by discussing Congress's intent regarding statutes pre-dating the FVRA. But the FVRA's time limit regarding *later* enactments, like the HSA, is clear. A 210-day limit applies, *id.*, unless another statute "expressly" allows some other way to designate acting officials to serve "temporarily," *id.* at § 3347(a). The HSA is silent on a time limit, and thus does not "expressly" override this aspect of the FVRA. To the contrary, the HSA's text indicates that it was meant to incorporate the 210-day limit. And, if read to exclude the FVRA limit, the HSA would be inconsistent with section 3347's limit to officials serving "temporarily." *See* Dkt. 50 at 31-32; Dkt. 53 at 19-23.

DHS points to the term "notwithstanding" in the HSA, 6 U.S.C. § 113(g)(2), but as plaintiffs have explained, that term overrides only the part of the FVRA in conflict with the HSA: provisions regarding *who* can designate an acting official. *See* Dkt. 50 at 32; Dkt. 53 at 21. DHS

errs in reading the term to override the FVRA's separate time limit. The HSA, § 113(g)(2), states that it applies "notwithstanding" *all* of chapter 33 of title 5. Nothing suggests that through section 113(g), Congress intended to abrogate the large swaths of federal hiring law addressed in chapter 33, but that is what the provision would do under DHS's reading.

DHS acknowledges that the Constitution requires acting officials to be temporary; then it attempts to skirt the issue by suggesting the HSA incorporates some unwritten, unspecified time limit (but not the FVRA one). *See* Dkt. 69 at 29. This argument proves plaintiffs' point: Without a time limit (which the HSA does not provide), acting service raises a serious constitutional concern. *See* Dkt. 50 at 32.

### C.  DHS's *ultra vires* rule is void.

The remedy for DHS's *ultra vires* action is to recognize it as void and vacate it, under the FVRA and APA. Wolf performed a "function or duty of a vacant office to which … [section] 3347… applies," and he did so without authority "under section 3345, 3346, or 3347, or as provided by [3348](b)." 5 U.S.C. § 3348(d)(1). His action therefore has no "force or effect." *Id.* Even if section 3348(d)(1) does not apply, this Court must set aside the 2020 Fee Rule under APA principles because it is contrary to law, taken "in excess of statutory … authority," and, due to McAleenan's improper appointment, issued without observance of required rulemaking procedure, under 5 U.S.C. § 706(2). *See* Dkt. 50 at 32-33; *L.M.-M.*, 442 F. Supp. 3d at 35-36.

### D.  Wolf's attempt at ratification does not cure the problem.

DHS argues that any HSA and FVRA problem has been cured by Wolf's ratification, after FEMA Administrator Gaynor briefly purported to exercise the authority of acting secretary, apparently in order to designate Wolf as the acting secretary. *See* Dkt. 69 at 29-31. But the ratification does not apply. First, Gaynor's order did not make Wolf's appointment valid because,

as discussed above, an *acting* secretary cannot change the succession order. *See* Dkt. 50 at 29-31. Second, DHS has not suggested Gaynor was *actually* acting secretary (or that he resigned). *See* Dkt. 69-3 at 47; *see also* Executive Order No. 13,753 (stating that President can depart from list). Third, Wolf's ratification does not apply because FVRA section 3348(d)(2) prohibits ratification of actions that have "no force or effect" under section 3348(d)(1). Such actions are ones taken by improperly serving acting officials "in the performance of any function or duty of a vacant office." 5 U.S.C. § 3348(d)(1). As this Court has recognized, a "function or duty," in the meaning of section 3348, is one "assigned to one particular office" by "statute or regulation," even if that function is subject to a general "vesting-and-delegation" statute like 6 U.S.C. § 112(b)(1). *L.M.-M.*, 442 F. Supp. 3d at 31-32. Rulemaking is such a function. *See* 6 U.S.C. § 112(e); 8 U.S.C. § 1103(a)(3).[1]

DHS nevertheless asserts that section 3348(d)(2) does not apply here due to a 2003 delegation to the deputy secretary. *See* Dkt. 69 at 32. But DHS does not state that the 2003 document is still operative. Its text suggests that it is not, since it addresses what happens when the secretary resigns or is absent, a topic now addressed by the Johnson order and 6 U.S.C. § 113. *See* Dkt. 69-3 at 54-55. And even if still operative, the order only states that the deputy secretary may "*[a]ct for* the Secretary to *sign, approve, or disapprove*" proposed or final rules. Dkt. 69-3 at 54 (emphasis added). In other words, it makes the deputy secretary *the agent* of the secretary, with authority to act on the secretary's behalf (but not the agency's). And it does so only for a portion of the rulemaking process. The rulemaking function, therefore, remains exclusive to the Secretary

---

[1] DHS also suggests that section 3348(d) does not apply because Wolf was designated under the HSA. *See* Dkt. 69 at 31 n.22 But section 3348(d)(1) refers to actions taken without authority "under section 3345, 3346, or 3347," for offices to which section 3347 (and others) apply. It thus applies to offices governed by section 3347, regarding non-FVRA statutes like the HSA.

under 6 U.S.C. § 112(e) and 8 U.S.C. § 1103(a)(3). In any case, regardless of the 2003 document's meaning, it does not change that rulemaking is a function "established by *statute*" and that is "required by *statute* to be performed by the [Secretary] (and only [the Secretary])." 5 U.S.C. § 3348(a)(1)(A) (emphasis added). Indeed, if this Court accepted DHS's suggestion that a document like the 2003 one nullifies 3348(d)'s remedy, that would render section 3348(d) largely "meaningless" for an agency with a general "vesting-and-delegation" statute. *L.M.-M*, 442 F. Supp. 3d at 32. Upon her departure, Nielsen could have written an order to share all her duties with McAleenan, effectively making him acting secretary by delegation; indeed, the 2003 document attempts a similar "delegation" in event of resignation or absence, though DHS does not cite that part of it. *See* Dkt. 69-3 at 54-55. Such abuse of vesting-and-delegation is what the FVRA aims to prohibit. *See* 5 U.S.C. § 3347(b); *L.M.-M*, 442 F. Supp. 3d at 34; S. Rep. No. 105-250 at 3 (1998).

## II.      DHS did not provide adequate notice of the rule and its calculations.

As plaintiffs have explained, the 2020 Fee Rule is also unlawful because the barebones information in DHS's Fee Proposal was insufficient to enable meaningful comment on DHS's budget figures and its related calculations. *See* Dkt. 50 at 33-37. DHS responds by suggesting that its calculations were reasonable. *See* Dkt. 69 at 33, 35 & n.27. But that response does not address the point that DHS failed to provide notice. DHS also suggests that it should be enough for commenters to know that DHS thinks it needs more money. *See* Dkt. 69 at 35. DHS's budget estimates and its division of that budget into per-application fees, however, were "central to [the agency's] decision to adopt" the rule, and thus the agency was required to make available the underlying "model[s] and [their] methodology." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 201 (D.C. Cir. 2007). It is not enough to assert that, without more money, operations risk "degrading," without even explaining what that means

or how DHS reached that conclusion. DHS points to the proposal's acknowledgements that calculations were made and piecemeal numbers, but these do not satisfy notice-and-comment requirements when DHS "failed to reveal key assumptions" of even the most basic type, such as why it expects to need the asserted budget. *See* Dkt. 50 at 33-37. Similarly, in *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240 (D.D.C. 2015), the Department of Health and Human Services issued a rule reducing Medicare reimbursements to hospitals, based on the agency's estimates of the costs of implementing a new policy, *id.* at 248-49, but failed to disclose the "actuarial basis" for its cost predictions or "explain the underlying assumptions," *id.* at 261. This Court held that the agency thus "deprived … the public of a meaningful opportunity to comment." *Id.* at 263. The same is true here. DHS's failure is particularly grave because the rule rests on complicated calculations. "Public notice and comment regarding relied-upon technical analysis … are the safety valves in the use of sophisticated methodology." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (Rogers, J., opinion for court) (cleaned up).[2]

As plaintiffs explained, the error is prejudicial. *See* Dkt. 50 at 24. When, as here, the agency's calculations are a "black box," *Shands*, 139 F. Supp. 3d at 265, the agency's "failure to provide an opportunity for meaningful comment create[s] enough uncertainty as to its possible effect on the agency's disposition … to preclude reliance on the prejudicial-error doctrine," *id.* at 266 (cleaned up). "[A]bsent some insight into how" DHS's "conclusion[s] [were] reached it [wa]s not possible to explain where and why the agency went wrong." *Id.* at 265. *See also* Dkt. 50-1 at

---

[2] DHS notes that it provided a software demonstration to some commenters, but that did not satisfy DHS's notice obligation. Among other things, it was billed as an opportunity to access software, not understand DHS's budget. *See* 84 Fed. Reg. 62,280, 62,281 (Nov. 14, 2019). And according to DHS, it provided nothing "not in the record for the NPRM and in the docket." 85 Fed. Reg. 46,788, 46,869 (Aug. 3, 2020).

21 (Second Barón Decl. ¶¶ 49-52); Dkt. 50-2 at 15 (Ball Cooper Decl. ¶ 36), Dkt. 50-3 at 14 (Escobar Decl. ¶ 43) (explaining that plaintiffs would have responded if further detail had been provided).

In addition to failing to explain its calculations, DHS adopted new biometrics fees without notice. *See* Dkt. 50 at 37. DHS suggests, incorrectly, that those biometrics fees simply maintain DHS's current practice. The fees correspond to biometrics requirements that DHS introduced *after* it published the Fee Proposal. *See* 85 Fed. Reg. at 46,833. And, rather than maintaining the distinction between application and biometrics fees that is present under current law, the 2020 Fee Rule gives applicants the worst of both worlds. It generally subsumes biometrics fees into application fees *and* adds a new biometrics fee for certain applicants. The public could not anticipate this result, especially because the proposal suggested DHS would provide a new comment opportunity if a situation like this arose. *See* 84 Fed. Reg. at 62,302 (stating that if DHS decides to require new biometrics checks, it "may propose" a fee increase).

The public also could not have anticipated the rule's surcharge for paper-filed applications. *See* Dkt. 50 at 37. DHS does not deny that no notice was given but instead misleadingly defends the surcharge as a discount for online applications. DHS's rule "adjusts the fees for filing applications on paper when online filing is available to be *higher* than those fees would [otherwise] be." 85 Fed. Reg. at 46,832 (emphasis added). Moreover, DHS's description of the surcharge is irrelevant to whether the public had notice of the higher cost for paper-filed applications.

## III. The 2020 Fee Rule is arbitrary and capricious.

### A. DHS's calculations are unexplained and unreasonable.

The 2020 Fee Rule is arbitrary and capricious because it fails to explain the basis of DHS's asserted budget and its division of that budget into per-application fees. *See* Dkt. 50 at 38-49. In

response, DHS identifies no record material explaining the assumptions it made. DHS's assertion of a "growing funding gap," Dkt. 69 at 38, is not an explanation. *See, e.g.*, *Stewart v. Azar*, 313 F. Supp. 3d 237, 271 (D.D.C. 2018) (holding that the agency would not have been able to support a decision based on a concern about keeping a program financially afloat when the record "lacks substantial evidence" of such a problem, the agency "made no effort to contextualize" purported savings, "basic questions remain," and the agency did not explain why its action "would be the best remedy for budget woes"). DHS cites to a sentence in the 2020 Fee Rule, which lists some factors causing costs to grow "more than expected" since 2016. 85 Fed. Reg. at 46,876. But that sentence does not explain any "important step[s] in the agency's analysis." *Owner-Operator*, 494 F.3d at 204. It purports to respond to commenters' concerns about backlogged applications, not DHS's calculations. It does not explain the rule's assumptions or the extent to which, in the past four years, DHS has already accounted for the mentioned costs. And while the statement focuses on adjudicators, DHS asserts that compared to 2016 staffing estimates, it seeks to fund the largest increase in staff in a different area: its Fraud Detection and National Security Directorate. *See* Fee Rule AR 832 (2020 IEFA document at 42). None of the other material DHS cites provide the "basis for a number of key assertions." *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1277, 1282 (D.C. Cir. 1984). Its footnote 30 notes that its modeling excludes certain fees, but that fact underscores DHS's *lack* of reasoning: it claimed an impending deficit without considering all revenue.

DHS's attempts to reconcile other aspects of the rule with the record are also unavailing. For instance, DHS attempts to justify its assumption that immigrants are insensitive to filing fees by repeating its assertion that it saw "no or limited decreases" in benefit requests after other fee increases. Dkt. 69 at 39 (quoting 85 Fed. Reg. at 46,798); *see also id.* at 40 (similar). At most, that assertion creates an internal contradiction, because the 2020 Fee Rule elsewhere states that DHS

has no information on the topic, *see id.* at 46,895, and still elsewhere, acknowledges DHS's

conclusion, *see id.* 46,882, 46,891, and evidence, *see id.* at 46,799, 46,818, that fees *do* affect

immigrants' actions. Dkt. 50 at 41, 56. This inconsistency alone renders the rule arbitrary and

capricious. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

Moreover, DHS's cited data do not establish that immigrants are price *in*sensitive. DHS

only cites data regarding naturalization, recognizes that it has seen some filing *decreases* following

fee *increases*, and does not address the elimination of fee waivers. *See* 85 Fed. Reg. at 46,798; *see*

*generally* Dkt. 59 at 41-42.[3] DHS's suggestion that the pandemic caused applications to drop, *see*

Dkt. 69 at 39 (citing 85 Fed. Reg. at 46,793), supports the contrary conclusion: that when

immigrants are financially stressed, application rates drop.

DHS also relied on inaccurate data. Despite the references in its opposition memorandum

to 2019, DHS "conducted most of the FY 2019/2020 fee review in FY 2017." 85 Fed. Reg. at

46,793. DHS's citation to cases regarding agencies' use of reasonable estimates does not excuse

its use of these outdated figures: DHS admitted they were inaccurate, without providing any reason

to believe they approximated the agency's future experience. *See* Dkt. 50 at 39-41. For instance,

DHS cites *Air Transp. Ass'n of Am. Inc. v. USDA*, 303 F. Supp. 3d 28 (D.D.C.), *amended in part*,

317 F. Supp. 3d 385 (D.D.C. 2018). But that case stated that: "an agency cannot be faulted for

---

[3] The figures shed no light on price sensitivity for other reasons. The 2015 and 2017 figures relate to a 2016 rule that created a reduced fee for certain applicants, and thus had a mixed effect on fees. The rule went into effect in a presidential election year, which can change volumes, independently of fees. Fiscal year 2017 included months when the old fees were in effect. *See* 81 Fed. Reg. 73,292, 73,307 (Oct. 24, 2016); *Written Testimony of Joseph B. Edlow for a Hearing on* *"Oversight of U.S. Citizenship and Immigration Services," Before the House Committee on the* *Judiciary, Subcommittee on Immigration and Citizenship, July 29, 2020*, at 3, https://docs.house. gov/meetings/JU/JU01/20200729/110946/HHRG-116-JU01-Wstate-EdlowJ-20200729.pdf.

using the data available to it to the best of its ability, but must evaluate why limited data was available." *Id.* at 56. It concluded that the plaintiffs "provid[ed] no reason to believe data from other fiscal years would have been more reliable." *Id.* at 57. Here, DHS *ignored* "data available to it" and plaintiffs have shown plenty of reasons that "data from other fiscal years would have been more reliable." *See* Dkt. 50 at 39-41 & n.10. DHS's assertion to the contrary (at 39) is simply wrong. DHS suggests that DHS's treatment of two amounts made its figures current. But the description is inaccurate and does not address other changes in data and operations since 2017 or the cost savings that DHS ignored. *See* 85 Fed. Reg. at 46,839, 46,874, 46,876. This is not a question, therefore, of whether DHS used the "best data imaginable" as DHS suggests (at 39). DHS made no attempt even to *approximate* realized cost savings or consider recent data. Whatever latitude agencies have to make reasonable estimates, they "do *not* have free rein to use inaccurate data" and must "examine the relevant data … which … could reveal, *inter alia*, that the figures being used are erroneous." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015); *see also Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004) ("The mere fact that the magnitude of [certain] effects is *uncertain* is no justification for *disregarding* the effect entirely") (emphasis in original).

For these reasons, DHS's calls for deference fall flat. *See* Dkt. 69 at 38. Although this court may "defer[] to administrative agencies on matters relating to their areas of technical expertise," deference does not mean that a court "simply accept[s] whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment." *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006). This Court must always "ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence." *Id.* at 83 (citation omitted). DHS has not done so

here. And the rule does not rest on technical expertise; DHS disclaimed knowledge of how fees affect filings and the impact of cost-saving measures. *See* 85 Fed. Reg. at 46,868, 46,882, 46,895.

### B.  DHS failed to explain its rule in other regards.

Current law uses multiple measures to keep immigration filings affordable: fee waivers and exemptions, no-fee filings, and capped fee increases. *See* Dkt. 50 at 16-18. The 2020 Fee Rule gets rid of many of them. *See* Dkt. 50 at 20, 42-43. DHS asserts that these changes are supported by the agency's desire for more funds and what it terms a "beneficiary pays" principle. But DHS did not provide a reasoned justification for its choices. The changes are tied to an unexplained and unreasonable budget, as well as unreasonable assumptions about filing trends, and unsupported assertions about the impact of these changes. *See* Dkt. 50 at 39-42; *see, e.g.*, 84 Fed. Reg. at 62,292 (tying fee-waiver proposal to budget). Further, in multiple other ways, DHS relied on unsupported assertions, ignored important aspects of the problem, and failed to explain its reasoning.

For instance, DHS failed to acknowledge its earlier findings on which the current fee exemptions and other similar measures rest, such as: that "a large percentage of applicants would clearly be unable to pay" fees for which DHS provided exemptions, 75 Fed. Reg. 58,962, 58,973 (Sept. 24, 2010); a reduced fee would "help ensure that those …eligible for naturalization are not limited by their economic means," 81 Fed. Reg. at 73,307; and that otherwise-calculated fees (that DHS capped) could be "overly burdensome," *id.* at 73,297. DHS responds by suggesting that such detail was unnecessary. But since these conclusions underpin current law, DHS had an obligation to explain any "inconsistency between its current view … and its prior conclusion." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 109 (D.D.C. 2018). Indeed, DHS's calculations rest on a contrary assumption: that individuals no longer need measures to keep U.S. Citizenship and Immigration Services (USCIS) fees affordable. *See* Dkt. 50 at 41. Yet DHS failed to explain its "contrary-to-

fact position." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019).[4]

In other ways as well, DHS failed to explain it elimination of measures that keep fees affordable. Its revenue-raising goals cannot be reconciled with its decision to impose fees on individuals it earlier concluded could not pay them. Again, DHS did not explain whether or why it changed its earlier conclusions. *See* Dkt. 50 at 41-42, 43. Further, "beneficiary pays" does not accurately represent DHS's choices. The 2020 Fee Rule does not flip a switch from an "ability to pay" system to a "beneficiary pays" system. Current law generally forces immigrants to pay USCIS fees, but allows exceptions. The 2020 Fee Rule does the same, though with far fewer exceptions. Thus, both are "beneficiary pays" systems, and mere use of the term does not explain why DHS decided to keep some fees affordable but not others. *See* GAO, *Federal User Fees: A Design Guide* 10-11 (May 2008), https://www.gao.gov/assets/210/203357.pdf (citing 2007 DHS fee rule as *example* of a beneficiary pays system, while recognizing that fee exemptions can be *part* of such a system).[5]

As plaintiffs have explained, DHS also failed to justify excluding naturalization appeals and certain vulnerable youth from waivers that could make applications affordable. *See* Dkt. 50 at 43. DHS asserts that appeals need no fee waiver because they are optional, but that assertion makes

---

[4] DHS's focus on credit cards is unsupported, given the evidence of immigrants' *lack of access* to credit cards. *See* Dkt. 50-5 at 5. In any event, access to credit does not mean a person can afford to take out—and pay back—a loan.

[5] For instance, the 2020 Fee Rule caps adoption-related fee increases due to "public and humanitarian interests." 84 Fed. Reg. at 62,313 (reasoning adopted in final rule, *see* 85 Fed. Reg. at 46,790). DHS does not explain why the forms for which it eliminates cost-reducing measures do not involve similar interests. *See, e.g.*, 85 Fed. Reg. at 46,869 (listing fee caps that the rule retains and those that it lifts, without explaining the difference).

no sense and, as a post-hoc, litigation assertion, should not be credited. *See* Dkt. 69 at 44. DHS also does not identify any record support for DHS's apparent conclusion that only *some* "Special Immigrant Juveniles" would benefit from fee waivers. The rule suggests DHS's determination is based on comments, *see* 85 Fed. Reg. at 46,815, but commenters urged DHS to retain waivers for *all* Special Immigrant Juveniles. *See* Fee Rule AR 194491-92, 21960; *see also* Dkt. 55 at 24-25.

DHS also failed to justify its new income-based fee-waiver standard, which narrows eligibility by replacing USCIS's acceptance of fee-waiver applications based on receipt of means-tested benefits, a higher income ceiling, or hardship. *See* Dkt. 50 at 43-45. DHS responds by pointing to the federal poverty guidelines and variance in benefits standards. But those are litigation-only assertions that should be ignored. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983). These assertions also are not supported by the record, which includes no analysis of benefits standards and fails to consider other "equitable" alternatives. DHS's footnote regarding hardship-based applications (at 45 n.37) misunderstands current practice (under which individuals with hardship have multiple fee-waiver application options), and identifies no record support for DHS's assertion that they are unnecessary to keep filings affordable. *See* 85 Fed. Reg. at 46,822; Dkt. 50 at 43-44. Regarding the new income ceiling, DHS repeats the rule's assertion that immigration law *elsewhere* uses the same figure. But DHS failed to grapple with commenters' concerns that (a) the figure is too low and (b) the fee-waiver context is different from others. *See* Dkt. 50 at 44-45. Moreover, DHS did not consider the combined effect of its changes to the fee-waiver standard. Without any consideration of immigrants' financial circumstances, the rule fails to reconcile DHS's narrower standard with its focus on individuals' "financial wherewithal," *id.* at 46,820, its conclusory assertion that "aliens will [not] be prevented from filing application[s]," *id.* at 46,819, and its "belie[f]" that the new

standard will not "make immigration benefits inaccessible," *id.* at 46,822. *See Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 25 (D.D.C. 2020) (finding narrowing of criteria to be arbitrary and capricious when agency failed to explain why the criteria "taken alone" reflect relevant metric).

DHS also failed to provide a reasoned explanation for its burdensome fee-waiver documentation requirements. *See* Dkt. 50 at 45-46. DHS's opposition ignores many of plaintiffs' arguments. For instance, DHS does not dispute that it failed to consider alternatives or explain why it only permitted exceptions for some applicants. It attempts to place the burden on plaintiffs to *disprove* DHS's assertions about the application-rejection problems it purports to solve. *See* Dkt. 69 at 36. But it is DHS that is required to support its own rulemaking assertions. Regardless of the type of problem asserted, "[p]rofessing that an [action] ameliorates a real … problem but then citing no evidence demonstrating that there is in fact … [a] problem is not reasoned decisionmaking." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006).

DHS also ignored the burdens of obtaining tax transcripts, W-2 forms, and other documents. *See* Dkt. 50 at 45-46. Particularly illuminating is one comment's explanation of the challenges of obtaining required documentation. *See* Dkt. 50-5 at 345-50; *see also* Dkt. 50 at 46 (citing other comments). DHS points to no part of the rule or record that grapples with these burdens, considers alternatives, or explains DHS's documentation choices. Instead, DHS attempts (at 47) to minimize applicants' difficulties. But these litigating positions are also unreasoned, take no account of immigrants' circumstances, and reflect inaccuracies. For instance, it is not true that appeal requests (the I-290B form) are ineligible for fee waivers. *See* 85 Fed. Reg. at 46,812. DHS's attempt to distinguish 1099 and W-2 forms is inaccurate (since people can hold multiple jobs and receive more than one W-2 form), and its reference to the current fee-waiver form is misleading because the form is optional; DHS accepts any appropriate documentation. *See* Dkt. 50 at 17.

As to the ways in which DHS's imposition of new fees on asylum seekers is arbitrary and capricious, *see* Dkt. 50 at 47, DHS does not contest most of the arguments. Although DHS's opposition disclaims the Fee Proposal's assertion that the asylum fee was meant to deter frivolous filings, *see* Dkt. 69 at 48, the 2020 Fee Rule states that it "relies on all the justifications articulated in the" proposal "except as stated below." 85 Fed. Reg. at 46,790. By stating that DHS does not intend to deter "meritorious asylum claims," *id.* at 46,844, the 2020 Fee Rule effectively concedes, rather than backing away from, the proposal's statement that deterring claims DHS deems non-meritorious was an aim, *see* 84 Fed. Reg. at 62,320. Also meritless is DHS's suggestion that it concluded, based on "experience," that asylum seekers can pay fees. *See* Dkt. 69 at 49. DHS points to no support in the record; the suggestion conflicts with its statements disclaiming knowledge or recognizing that, due to the asylum fee, some may not apply. *See* 85 Fed. Reg. at 46,882, 46,895.

DHS also did not consider the harm the rule will cause. *See* Dkt. 50 at 48. DHS does not contest that it responded to commenters' concerns with unsupported, conclusory assertions. Instead, it repeats those assertions. When commenters presented extensive evidence of the rule's harms, responding that DHS has "no data," Dkt. 69 at 49 n.41 (quoting rule), does not constitute reasoned decisionmaking. *See Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) ("Nodding to concerns raised … only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."). Additionally, DHS is wrong to suggest (at 50 n.42) that it can ignore comments on the rule's mailing provision. That provision regulates how immigrants receive DHS mail through attorneys. *See* 85 Fed. Reg. at 46,914 (to be codified at 8 C.F.R. § 103.2(a)(19)(iii)). DHS thus must consider comments about this provision's effects on immigrants and their attorneys. Finally, DHS does not establish that it considered alternatives. Its opposition mentions appropriations, one of many alternatives, but points to no actual consideration or effort by DHS.

19

IV.     **The 2020 Fee Rule violates the Immigration and Nationality Act.**

The 2020 Fee Rule violates the INA, 8 U.S.C. § 1356(m), by raising fees to fund costs other than "the full costs of providing" "adjudication and naturalization services" and administering the IEFA fees. *See* Dkt. 50 at 49-50. The unlawfully funded costs include those of SAVE (a USCIS program for providing information to government agencies), fraud deterrence activities, and national intelligence and security work. *See* Dkt. 50 at 49-50. DHS does not attempt to argue that these activities constitute "providing" "adjudication and naturalization services."[6] SAVE addresses *non-adjudication* needs of *agencies*. Deterrence is distinct from individual benefits determinations. And USCIS's Fraud Detection and National Security Directorate (FDNS) pursues a variety of activities other than immigration "adjudication … services." For instance, FDNS "aid[s] in the resolution of national security or criminal concerns,"[7] and "support[s] programs sponsored by law enforcement agencies, such as Joint Terrorism Task Forces …. and … fusion centers," that address crime and terrorism, not benefits requests.[8] Indeed, the order that DHS cites shows that USCIS has been delegated general "[a]uthority to investigate alleged civil and criminal violations of the immigration law," which extends far beyond benefits adjudications. DHS, *Delegation No. 0150.1*, at 2 (June 5, 2003), https://www.hsdl.org/?view&did=234775 (cited

---

[6] DHS suggests this Court should defer to DHS's interpretation. But section 1356(m) unambiguously excludes the cost at issue.

[7] USCIS, *Fraud Detection and National Security Directorate* (Mar. 13, 2020), https://www.uscis.gov/about-us/directorates-and-program-offices/fraud-detection-and-national-security-directorate ("What we do").

[88] DHS, *DHS State and Local Law Enforcement Resource Catalog* 9 (May 2018), https://www.dhs.gov/sites/default/files/publications/18_0703_OSLLE-Resource-Catalog-Volume-VI.pdf; *see also* DHS, *Fusion Centers and Joint Terrorism Task Forces* (July 29, 2016), https://www.dhs.gov/fusion-centers-and-joint-terrorism-task-forces.

at Dkt. 69 at 51). The fact that USCIS relies on delegations to conduct some or all the work at issue is further indication that such work is *not* part of providing "adjudication and naturalization services." If it were, no delegation would be required; USCIS received adjudication authority by statute. *See* 6 U.S.C. § 271(b).

DHS suggests that Congress acquiesced in its use of IEFA funds. *See* Dkt. 69 at 56, 59-53. But section 1356(m)'s outer bounds are clear, and "the suggestion of congressional acquiescence cannot change the plain meaning of enacted text." *Citizens for Responsibility & Ethics in Wash. v. FCC*, 904 F.3d 1014, 1018 (D.C. Cir. 2018) (per curiam). The age of DHS's violation cannot either. *See id.* And at most, DHS shows Congress's "failure to express any opinion," which does not establish acquiescence. *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (plurality).

DHS complains that USCIS does not have enough appropriated funds for its desired activities. *See* Dkt. 59 at 52-53. But *authorization* of activities is distinct from *appropriations* for any particular work. *See U.S. House of Reps. v. Burwell*, 130 F. Supp. 3d 53, 58-59 (D.D.C. 2015). If there is a mismatch between the two, that is for Congress and the Executive Branch to resolve.

**V.     Without temporary relief, the 2020 Fee Rule will cause irreparable harm.**

Plaintiffs have established that they will suffer great, immediate, and irreparable harm from the 2020 Fee Rule. *See* Dkt. 50 at 50-54; Dkt. 50-1 at 12-20 (Second Barón Decl. ¶¶ 28-48); Dkt. 50-2 at 6-15 (Ball Cooper Decl. ¶¶ 20-35); Dkt. 50-3 at 9-14 (Escobar Decl. ¶¶31-42).

The public interest also weighs strongly in favor of the requested relief. Plaintiffs have shown the devasting and irreparable harms the 2020 Fee Rule will cause to immigrants across the country. *See* Dkt. 50 at 54-58; *see also* Dkt. 51 at 6-8; Dkt. 54 at 14-18; Dkt. 55 at 10-29. Amici emphasize that the harm will extend to cities' and states' economic, public safety, and health goals. *See* Dkt. 51 at 8-13; Dkt. 54 at 11-14, 18-25. DHS's attempts (at 54 n.46) to minimize this harm

misrepresents the rule. The suggestion that domestic violence victims are fee-exempt ignores that fee-exempt forms often require ancillary applications with high fees. *See* 85 Fed. Reg. at 46,840, 46,886; Dkt. 50 at 53 n.12. DHS cites the availability of fee waivers, but ignores that the 2020 Fee Rule drastically reduces the availability of such waivers. *See* Dkt. 50 at 16-20. It downplays the hardship caused by asylum fees by suggesting immigrants can seek "withholding of removal" instead. But DHS cites a *proposed* rule, not a final one, regarding exempting withholding applications from fees. *See* 85 Fed. Reg. at 46,793 n.17 (citing 85 Fed. Reg. 11,866, 11,871 (Feb. 28, 2020)). Moreover, withholding is not a substitute for asylum. Withholding is only available in removal proceedings and provides *less* protection. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 429 n.6 (1987); *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1276-77 (9th Cir. 2020).

DHS's assertion about revenue also does not overcome the extensive harm the rule will cause. The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). Moreover, DHS's assertions about lost funds and their effects are unsupported. In issuing the rule, DHS did not explain why this level of funding is needed or take into account the *decreases* in application volume (and thus revenue) that it will cause. *See* Dkt. 50 at 38-48. DHS also does not do so now. Moreover, to address short-term needs, the agency has already stated it is *not* relying on the 2020 Fee Rule. *See* 85 Fed. Reg. at 46,793 (discussing impact of coronavirus pandemic). Further, DHS "recently determined" it can charge premium processing fees for new categories of applications, *id.* at 46,866—another option it could exercise to address budget concerns.

## VI.    The Court should grant relief against the entire rule.

The Court's remedy should apply to the entire rule and any effort by DHS to implement or enforce it. By the plain language of the APA, the Court has authority under section 705 to stay the

effective date of the challenged rule. That authority corresponds to the remedy authorized under section 706 of the APA: set aside of an unlawful rule. *See Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see L.M.-M.*, 442 F. Supp. 3d at 36 (regarding remedy for FVRA violation); *see also Gomez v. Trump*, __ F. Supp. 3d ___, No. 20-CV-01419 (APM), 2020 WL 5367010, at *37 (D.D.C. Sept. 4, 2020) (discussing section 705 relief); *Dist. of Columbia*, 444 F. Supp. 3d at 48 (similar). Indeed, this Court could only "preserve status or rights pending conclusion of the review," 5 U.S.C. § 705, with a preliminary remedy that matches the final relief in scope because without it, immigrants across the country will lose the chance to seek benefits for which they are eligible and, as a result, face devasting harm. *See* Dkt. 50 at 54-58; Dkt. 51 at 6-13; Dkt. 54 at 11-25; Dkt. 55 at 10-29.

DHS suggests that a section 705 order should be narrowed to some provisions, but fails to specify how. Importantly, the authority granted to courts by section 705 is designed not just to protect plaintiffs, but also to prevent injury to "the public resulting from the premature enforcement of a determination which may later be found to be wrong." *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 9 (1942); *see also Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974) (Section 705 "was primarily intended to reflect …the Scripps-Howard doctrine). Plaintiffs, as well as CASA's members, are harmed by a wide range of the rule's provisions. *See* Dkt. 50-1 at 2-4 (Second Barón Decl. ¶¶ 3-14); Dkt. 50-2 at 2, 3, 11 (Ball Cooper Decl. ¶¶ 3, 7, 26, 27); Dkt. 50-3 at 2, 3-4 (Escobar Decl. ¶¶ 7, 13). And protecting the public requires action against all of the rule's harmful effects.

DHS suggests some unidentified provisions are severable. But a rule is severable only if "the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001). That is not the case here. The rule's central purpose is to fund a budget that depends on the sum of its parts, and that

DHS, in proposing the rule, suggested was an all-or-nothing proposition. *See* 84 Fed. Reg. at 62,288 (declining to consider ways to reduce the budget increase). Further, each fee affects others, since DHS set individual fees to subsidize operations *other than* the processing of the applications, and, in some cases, the costs of processing other applications. *See generally* 85 Fed. Reg. at 46,791-92 (fee changes), 46,856 (recognizing that naturalization fee subsidizes overhead and other costs). Even fee increases cannot neatly be separated from decreases. What may appear on the face of the rule to be a decrease will be an increase for individuals who lose access to fee waivers or who must pay new costs for related applications that are free under current law. *See* 84 Fed. Reg. at 62,303-04 (describing new charges for previously-free "interim benefits"). Because the rule's provisions are thus "intertwined," *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019), to postpone, stay, or enjoin some, but not all, of the rule's provisions would "severely distort" DHS's fiscal program, *MD/DC/DE*, 236 F.3d at 23, and not accomplish DHS's "goals as it described them," *MD/DC/DE Broadcasters Ass'n v. FCC*, 253 F.3d 732, 736 (D.C. Cir. 2001) (denying rehearing of earlier ruling). Indeed, the structure of DHS's rule is analogous to a set of first-class mail price-changes that the D.C. Circuit concluded could not be severed in *Carlson*. Though the plaintiff had challenged only the first-class *stamp* price, that price was not severable from other first-class prices, because, due to a class-wide rate cap, the stamp price affected the rate that could be charged for other mail products. *Carlson*, 938 F.3d at 351.

A preliminary injunction under Rule 65 should also operate against the rule in its entirety. Again, DHS does not contest that a preliminary injunction should operate across the country, and for good reason. The violation operates nationwide, and as in the context of section 705, the harms to the public interest require a nationwide remedy. *See Kansas v. Nebraska*, 574 U.S. 445, 456 (2015) ("When federal law is at issue and the public interest is involved, a federal court's equitable

powers assume an even broader and more flexible character than when only a private controversy is at stake." (cleaned up)). Additionally, "the immigration context counsels strongly in favor of nationwide relief," *NAACP v. Trump*, 298 F. Supp. 3d 209, 243 (D.D.C. 2018), *aff'd on other grounds and remanded sub nom. DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891 (2020), given the Constitution's requirement for a "Uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and Congress's direction that "the immigration laws … should be enforced … uniformly," Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384 (1986). Furthermore, any geographically-limited injunction would cause multiple practical problems, especially if it means that other entities file duplicative litigation and receive other, limited injunctions. *Cf., e.g.*, *Gomez*, 2020 WL 5367010, at *37; *Dist. of Columbia*, 444 F. Supp. 3d at 52; *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019). It would also risk *underprotecting* plaintiffs from irreparable harm, given their broad and imprecise geographical reach, *see* Dkt. 50-2 at 2 (Ball Cooper Decl. at ¶ 4), Dkt. 50-3 at 2 (Escobar Decl. ¶ 5), and inter-relationship with other providers, *see* Dkt. 50-1 at 2, 16-17 (Second Barón Decl. ¶¶ 5, 39-40). *Cf. Pennsylvania v. President United States*, 930 F.3d 543, 576 (3d Cir. 2019), as amended (July 18, 2019) (recognizing necessity of nationwide relief to prevent harm to states due to interstate effects), *rev'd and remanded on other grounds sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020).

Finally, as explained above, the Court should reject DHS's suggestion that any preliminary injunction be limited to a subset of the rule's provisions. DHS's apparent inability to specify what such an injunction would look like underscores its inappropriateness.

## CONCLUSION

For the foregoing reasons, this Court should grant plaintiffs' motion for relief under section 705 of the APA and a preliminary injunction.

Dated: September 23, 2020

Respectfully submitted,

 /s/ Rebecca Smullin

Laurie Ball Cooper (D.C. Bar No. 1017998)
Ayuda, Inc.
6925 B Willow Street NW
Washington DC 20012
202-349-0656
laurie.ballcooper@ayuda.com

Rebecca Smullin (D.C. Bar No. 1017451)
Adina H. Rosenbaum (D.C. Bar No. 490928)
Michael T. Kirkpatrick (D.C. Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
202-588-7714
rsmullin@citizen.org

Counsel for Plaintiff Ayuda, Inc.

Counsel for All Plaintiffs

Nicholas Katz (MD Bar No. 1812100006)
CASA de Maryland, Inc.
8151 15th Avenue
Hyattsville, MD 20783
240-491-5743
nkatz@wearecasa.org

Matt Adams (WSBA No. 28287)
Aaron Korthuis (WSBA No. 53974)
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
206-957-8611
matt@nwirp.org

Counsel for Plaintiff CASA
de Maryland, Inc.

Counsel for Plaintiff Northwest
Immigrant Rights Project

26