# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORTHWEST IMMIGRANT RIGHTS PROJECT, AYUDA, INC., and CASA DE MARYLAND, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 19-cv-03283-RDM |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, DEPARTMENT OF HOMELAND SECURITY, CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security, and KENNETH T. CUCCINELLI, in his official capacity as Senior Official Performing the Duties of the USCIS Director and Senior Official Performing the Duties of the Deputy Secretary of Homeland Security, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' SUPPLEMENTAL SUBMISSION IN SUPPORT OF
## MOTION FOR SECTION 705 RELIEF AND PRELIMINARY INJUNCTION

Laurie Ball Cooper (D.C. Bar No. 1017998)
Ayuda, Inc.
6925 B Willow Street NW
Washington DC 20012
202-349-0656
laurie.ballcooper@ayuda.com

Counsel for Plaintiff Ayuda, Inc.

Rebecca Smullin (D.C. Bar No. 1017451)
Adina H. Rosenbaum (D.C. Bar No. 490928)
Michael T. Kirkpatrick (D.C. Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
202-588-7714
rsmullin@citizen.org

Counsel for All Plaintiffs

*(additional counsel on following page)*

Nicholas Katz (MD Bar No. 1812100006)
CASA de Maryland, Inc.
8151 15th Avenue
Hyattsville, MD 20783
240-491-5743
nkatz@wearecasa.org

Counsel for Plaintiff CASA
de Maryland, Inc.

Matt Adams (WSBA No. 28287)
Aaron Korthuis (WSBA No. 53974)
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
206-957-8611
matt@nwirp.org

Counsel for Plaintiff Northwest
Immigrant Rights Project

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

DISCUSSION ..................................................................................................................... 1

   I.  The record supports plaintiffs' arguments. ...................................................... 1

     A. Commenters raised concerns about DHS's use of IEFA funds for costs other than those of adjudication and naturalization services........................................... 1

     B. DHS had updated figures available to it when it published its Fee Proposal. .............. 3

     C. The record includes data regarding immigrants' price sensitivity. ............................ 7

     D. Plaintiffs have standing. ............................................................................... 8

   II. Allowing an acting DHS secretary to appoint another acting DHS secretary would raise a serious constitutional question. ...................................................... 8

     A. The Appointments Clause preserves political accountability by limiting appointments authority................................................................................... 9

     B. An acting DHS secretary is not a department head within the meaning of the Appointments Clause. ............................................................................... 11

     C. A germaneness inquiry does not cure the constitutional problem. ............................ 15

   III. A motion for a temporary restraining order can be made orally...................................... 17

CONCLUSION................................................................................................................. 18

i

# TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE(S)**

*In re al-Nashiri*,
   791 F.3d 71 (D.C. Cir. 2015) ...............................................................................17

*Buckley v. Valeo*,
   424 U.S. 1 (1976)..................................................................................................11

*Bullock v. United States Bureau of Land Management*,
   No. 4:20-cv-000062-BBM, 2020 WL 5746836 (D. Mont. Sept. 25, 2020) ............................14

*Contech Construction Products, Inc. v. Heierli*,
   764 F. Supp. 2d 96 (D.D.C. 2011) .......................................................................18

*Edmond v. United States*,
   520 U.S. 651 (1997).......................................................................................9, 11, 13

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
   561 U.S. 477 (2010)....................................................................................10, 12, 13

*\* Freytag v. Commissioner*,
   501 U.S. 868 (1991).................................................................................9, 10, 11, 12

*Hispanic Affairs Project v. Acosta*,
   901 F.3d 378 (D.C. Cir. 2018) ...............................................................................1

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018)...........................................................................................9

*M.G.U. v. Nielsen*,
   316 F. Supp. 3d 518 (D.D.C. 2018).......................................................................18

*Morrison v. Olson*,
   487 U.S. 654 (1988)........................................................................................10, 11

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014)...............................................................................................12

*Olympic Federal Savings & Loan Ass'n v. Director, Office of Thrift Supervision*,
   732 F. Supp. 1183 (D.D.C. 1990) ..........................................................................17

*United States v. Eaton*,
   169 U.S. 331 (1898)........................................................................................11, 13

*United States v. Germaine*,
  99 U.S. 508 (1878)................................................................................................10, 12

*United States v. Hartwell*,
  73 U.S. (6 Wall.) 385 (1867) ...............................................................................10

*United States v. Smith*,
  124 U.S. 525 (1888).............................................................................................10

*Weiss v. United States*,
  510 U.S. 163 (1994).......................................................................13, 15, 16, 17

*Women's Medical Professional Corp. v. Baird*,
  No. 03-CV-162, 2008 WL 545015 (S.D. Ohio Feb. 27, 2008) .............................18

## CONSTITUTION

U.S. Constitution, art. II, § 2, cl. 1 ..............................................................................12

U.S. Constitution, art. II, § 2, cl. 2 ................................................................................9

## STATUTES AND RULES

8 U.S.C. § 1103 ............................................................................................................17

8 U.S.C. § 1356 ........................................................................................................1, 3

6 U.S.C. § 113.........................................................................................12, 15, 16, 17

Federal Rule of Civil Procedure 7 ...............................................................................18

Local Civil Rule 65.1 ...................................................................................................18

## FEDERAL REGISTER NOTICES

84 Fed. Reg. 62,280 (Nov. 14, 2019).........................................................................1, 3

84 Fed. Reg. 67,243 (Dec. 9, 2019).............................................................................1, 2

85 Fed. Reg. 46,788 (Aug. 3, 2020).........................................................................3, 6, 7

**MISCELLANEOUS**

*Designation of Acting Director of the Office of Management & Budget*,
    27 Op. O.L.C. 121 (2003) ..............................................................................................11, 15

DHS, *Congressional Budget Justification FY 2019*,
        https://www.dhs.gov/publication/congressional-budget-justification-fy-2019 ........................6

DHS, *Congressional Budget Justification FY 2020*,
        https://www.dhs.gov/publication/congressional-budget-justification-fy-2020 ........................6

DHS, *Immigration and Citizenship Data*,
        https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-
        data?topic_id%5B33700%5D=33700&ddt_mon=&ddt_yr=&query=&items_per_page=1
        0&options%5Bvalue%5D&page=1 .........................................................................................5

*Recess Appointments-Constitution (Art. II, § 2, cl. 3)–Legal Services Corp.—Effect of
    Statutory Holdover* Provisions, 2 Op. O.L.C. 398 (1978) ....................................................15

## INTRODUCTION

This supplemental memorandum responds to the questions raised by this Court in the September 23, 2020, hearing on plaintiffs' motion for section 705 relief and a preliminary injunction, Dkt. 50.

## DISCUSSION

I.     **The record supports plaintiffs' arguments.**

A.   **Commenters raised concerns about DHS's use of IEFA funds for costs other than those of adjudication and naturalization services.**

Plaintiffs argue that DHS's rule violates the Immigration and Nationality Act, 8 U.S.C. § 1356(m), by seeking to collect fees to fund activities that are not "adjudication and naturalization services," including fraud deterrence, national security and intelligence work, and the SAVE program run by U.S. Citizenship and Immigration Services (USCIS). *See* Dkt. 50 at 49-50; Dkt. 74 at 28-29; *see also* Dkt. 74-1 at 11 (AR 798) (mentioning these activities). At the hearing, the Court requested citations to comments that raised concerns about DHS setting fees to recover the costs of activities other than "adjudication and naturalization services."[1]

Regarding USCIS's fraud, national security, and intelligence work, the Fee Proposal, 84 Fed. Reg. 62,280 (Nov. 14, 2019), and the Supplemental Proposal, 84 Fed Reg. 67,243 (Dec. 9, 2019), did not list the specific USCIS Fraud Detection and National Security Directorate (FDNS) programs that DHS sought to fund with Immigration Examination Fee Account (IEFA) fees. *See,*

---

[1] DHS did not argue that there was a failure to exhaust this issue. The comments cited here show that the issue was exhausted. Moreover, the agency's legal authority to fund the operations covered by its budget is a "key assumption" that the agency had an "affirmative burden" to examine, and is thus "fair game for judicial review." *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 389, 390 (D.C. Cir. 2018).

1

*e.g.*, AR 17463 (noting lack of clarity about why DHS sought to fund so many more USCIS fraud staff). Nevertheless, commenters expressed concern about the scope of activities within this category that DHS sought to fund.

- A commenter stated that DHS's use of fees to fund USCIS's Fraud Detection and National Security Directorate (FDNS) is unlawful. AR 17033.

- A commenter who attended a meeting with DHS officials during the comment period submitted a summary of those officials' representations. That summary categorizes most of the work of USCIS FDNS as prorated overhead, "not directly tied to adjudications," and distinct from both "[t]he costs of adjudicating an actual case," and any direct costs to support a specific benefit type. AR 26982.

- A commenter expressed concern that USCIS's fraud detection and national security work constitutes enforcement work, rather than case processing. *See* AR 16937.

Other commenters raised concerns about DHS's use of IEFA fees to cover the costs of anti-fraud efforts in the context of opposing DHS's proposal to transfer some IEFA funds to Immigration and Customs Enforcement (ICE). The final rule did not adopt that proposed transfer. But the Supplemental Proposal provided more detail about the specific ICE programs that DHS sought to fund than DHS had provided in its Fee Proposal about the USCIS programs it sought to fund. *See* 84 Fed. Reg. at 67,244. Focusing on the particular details provided in the notice about ICE activities, commenters expressed concerns about the use of IEFA funds for costs other than those of adjudication and naturalization services, including the costs of work similar to what publicly available materials reveal about USCIS's FDNS national security, intelligence, and fraud deterrence work, *see* Dkt. 74 at 28. For instance:

- A commenter stated that IEFA funds cannot pay for investigation or enforcement activity, including fraud detection and enforcement activities. *See* AR 22657-58.

- A commenter stated that 8 U.S.C. § 1356(m) does not permit funding of "support" of adjudication and naturalization services, when such "support" includes fraud investigations that are not related to individual benefits requests. AR 17483-85; *see also* AR 17102, 22057-58 (similar, also characterizing disputed work as efforts to deter fraud).

- Other commenters expressed similar concerns, raising questions about whether DHS sought to use funds to cover costs other than those of "adjudication and naturalization services." *See, e.g.*, Dkt. 50-4 at 8, 36-37, 121-23, 367-68, 383, 501, 528.

Regarding USCIS's SAVE program, a commenter stated that the program does not constitute adjudications work and thus should be funded by appropriations. *See* AR 22962. Another commenter, summarizing representations made by DHS officials at a meeting, reflected that SAVE "is separate from adjudications." AR 26983.

**B.  DHS had updated figures available to it when it published its Fee Proposal.**

DHS "conducted most of the FY 2019/2020 fee review in FY 2017," 85 Fed. Reg. 46,788, 46,793 (Aug. 3, 2020), including its "workload volume projections," *id.* at 46,870. *See also id.* at 46,870, 46,878 (also regarding 2017 data and calculations); Dkt. 51-2 at 4, 7 (showing that notes from DHS "Volume Projection Committee" that are in the record are dated June and July 2017). At the hearing, the Court requested citations showing that between 2017 and November 14, 2019, when DHS's Fee Proposal was published, *see* 84 Fed. Reg. 62,280, new sources of data became available to DHS. Plaintiffs list such citations below and note that even though this material is included in the record, the rule indicates that DHS did not use this more recent information to

3

update its budget, revenue, and fee calculations, even though it used updated figures in its separate economic analysis. *See* Dkt. 50 at 40-41. Moreover, plaintiffs note that outside-of-record sources also contain relevant new data that DHS did not consider in developing its Fee Proposal.

a) Updated figures regarding filing trends for individual application types.

First, the record includes several examples of post-2017 application volume data that was available to DHS before it released the Fee Proposal. For instance, AR 3579, 3580, and 3581 reflect October 2019 database queries with 2019 figures related to specific types of USCIS applications. In addition, AR 8517-8534 and 8538 reflect database queries made in November and December 2019 and including 2019 data, suggesting that DHS could have identified post-2017 data if it had conducted such queries prior to the publication of the Fee Proposal.

Second, the record includes "National Performance Reports" for past years, dated for July of each year. Two such reports were released between the end of fiscal year 2017 and the publication of the Fee Proposal. *See* Dkt. 51-2 at 33 (regarding Appendix D).

Third, the record includes DHS's website regarding USCIS immigration and citizenship statistics. *See* AR 3790-92 (print out of website); Dkt. 51-2 at 7 (stating website).[2] Between the end of fiscal year 2017 and the Fee Proposal, DHS published several sets of new statistics on that website. For example, the website includes quarterly reports for "All USCIS Applications and Petition form types." In the relevant time period, DHS published this report for the last quarter of 2017, every quarter in 2018, and the first three quarters of 2019 (whose report was published on

─────────────────

[2] That website is the one from which the material comprising Exhibit A to the Second Smullin Declaration was downloaded. *See* Dkt. 50-4 at 2.

September 18, 2019).[3] As described in plaintiffs' opening memorandum, although the Fee Proposal referenced an increase in naturalization and asylum filings, the figures for 2018 and 2019 showed decreases. *See* Dkt. 50 at 39.

Fourth, in the relevant time period, DHS received new information about fee-waiver filing volumes. Commenters noted that although the Fee Proposal referred to an increase in fee-waiver filings, DHS's 2017 and 2018 data showed a decrease in the volume of fees waived. DHS published that data before releasing the Fee Proposal, to support USCIS's October 2019 changes to the fee-waiver form. *See* Dkt. 50-5 at 16, 299.

b) Updated cost data and budget estimates.

First, DHS had new information about the actual cost of payments that DHS makes to the Department of State to reimburse certain work. The Fee Proposal stated that at the time it was released, DHS had renegotiated its agreement with the Department of State to lower those costs. Nevertheless, the Fee Proposal used an older and higher figure in its calculations. *See* 84 Fed. Reg. at 62,307 & n.115.

Second, DHS had new information about other costs related to operations abroad. The Fee Proposal stated that one of the reasons that it needed to reimburse the Department of State for certain work is that USCIS had closed some international offices. *See id.* at 62,306. The Fee Proposal cited an August 8, 2019, press release regarding those closures, but DHS did not incorporate in its calculations any estimate of the cost savings associated with closing USCIS's

---

[3] The available statistics can be filtered for this specific report. *See* DHS, *Immigration and Citizenship Data*, https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data?topic_id%5B33700%5D=33700&ddt_mon=&ddt_yr=&query=&items_per_page=10&options%5Bvalue%5D&page=1 (visited Sept. 28, 2020).

offices. *See id.* at 62,306 & n.114; *see* also 85 Fed. Reg. at 46,874 (regarding commenters' concerns).

Third, between 2017 and the Fee Proposal, DHS produced new estimates of its 2019 and 2020 budgets. The record includes portions of DHS's fiscal year 2019 and 2020 congressional budget justifications, related to one DHS component: ICE. *See* Dkt. 51-2 at 4 (regarding AR2249-2781). These budget justifications, which also covered USCIS, were published before the Fee Proposal was released.[4] The December 2019 Supplemental Proposal, regarding the proposed transfer to ICE, cited fiscal year 2019 figures regarding ICE and made projections into fiscal years 2020 and 2021. *See* 84 Fed. Reg. at 67,245. But the final rule does not seek to fund ICE. And regarding the DHS components at issue in the final rule, USCIS and Customs and Border Protection (CBP), the record does not indicate that 2019 or 2020 budget justifications for USCIS were considered by the agency or that estimates were produced for fiscal year 2021. *See* 85 Fed. Reg. at 46,873 (discussing comments about the differences between DHS's figures and the budget justifications).

Fourth, after 2017, USCIS released new "annual operating plans." Each plan was a "detailed budget execution plan" that USCIS created "at the beginning of each fiscal year." *Id.* The

---

[4] DHS's fiscal year 2019 justification was published around February 9, 2018. *See* DHS, *Congressional Budget Justification FY 2019*, https://www.dhs.gov/publication/congressional-budget-justification-fy-2019 (stating page was created on Feb. 9, 2018 and last updated on Sept. 20, 2019). DHS's fiscal year 2020 justification was published around March 8, 2019. *See* DHS, *Congressional Budget Justification FY 2020*, https://www.dhs.gov/publication/congressional-budget-justification-fy-2020 (stating that page was created on March 8, 2019 and last updated on Oct. 21, 2019).

Fee Proposal cited the FY 2018 plan as a point of comparison for the budget figures, but the rule does not suggest that the inputs into the FY 2018 plan (such as assumptions regarding staffing needs or filing trends) were incorporated into the rule's 2017 calculations. *See* 85 Fed. Reg. at 46,868. Further, the schedule for such plans suggests DHS would have had the 2019 annual operating plan available *before* releasing the Fee Proposal. Consistent with USCIS's apparent planning, the "volume projection committee" meeting notes in the record reflect that in 2017, the committee planned to "revisit" projections the following year "for annual staffing, budget, and revenue forecasts," AR 3299, but the rule used the 2017 forecasts, *see* 85 Fed. Reg. at 46,870.

c) Updated data regarding DHS operations and/or immigration policy. The record includes several federal register notices that were issued after 2017 and before the Fee Proposal regarding changes in the law that could affect filing trends and DHS's revenue and cost estimates. *See, e.g.*, Dkt. 51-2 at 2 (listing rule regarding "inadmissibility of public charge grounds"); *see generally* 84 Fed. Reg. 41,292, 41,488 (Aug. 14, 2019) (public charge rule, reflecting DHS's assessment that it will led to USCIS denying more adjustment of status applications). In addition, other DHS documents, not in the record, could reveal other relevant changes between 2017 and the Fee Proposal. *See* Dkt. 50 at 36 (citing Dkt. 50-4 at Ex. B).

**C. The record includes data regarding immigrants' price sensitivity.**

In response to the Court's request, below is a list of comments showing that immigrants are sensitive to the cost of USCIS fees and that some immigrants will be deterred from filing due to such cost. These comments show that DHS had data regarding elasticity, *i.e.*, immigrants' sensitivity to higher fees and/or lack of access to fee waivers. *See* Dkt. 50 at 41-42.

- Comments reflecting research studies or other qualitative analysis showing that individuals eligible to naturalize are sensitive to price, and that fees can serve as a

barrier to naturalization. *See, e.g.*, Dkt. 50-5 at 255, 298, 460-474, 534, 535-36, 546, AR 16539, AR 19909, AR 21716, AR 22974-75.

- Comments reflecting information from commenters' experiences serving low-income immigrants. *See, e.g.*, Dkt. 50-5 at 8, 9, 10, 11, 12, 14, 32-33, 38, 333, 413-14, 514; AR 19102, AR 19910, AR 20459, AR 22095-96, AR 22965.

- Comments reflecting comparisons between the new fees and the budgets available to low-income immigrants. *See, e.g.*, Dkt. 50-5 at 555, AR 22967-68.

The record also includes DHS data on prices sensitivity, reflected in notes for a meeting in which DHS officials discussed projections on filing volumes. Those notes reflect a participant's statements that a change in fee waiver policy could reduce filings of certain applications. *See* AR 3305, 3306.

### D.  Plaintiffs have standing.

The Court asked about associational standing. As plaintiffs explained at the hearing, all three plaintiffs are asserting standing on their own behalf. *See generally* Dkts. 50-1, 50-2, 50-3. Plaintiff CASA de Maryland, Inc. is also asserting associational standing on behalf of its members, relying on facts set forth in the declaration of George Escobar. *See* Dkt. 50-3 at 3-4, 8-9 (¶¶ 9-13, 27-30). Plaintiffs believe their showing of both organizational and associational standing is sufficient at this stage. If this Court believes that a declaration from a CASA member with standing is necessary at this stage, plaintiffs will seek to provide one promptly.

## II.  Allowing an acting DHS secretary to appoint another acting DHS secretary would raise a serious constitutional question.

The Court also asked for briefing on the meaning of the term "Heads of Department" in the Appointments Clause. The "Excepting Clause" in the Appointments Clause allows Congress

to "vest the Appointment" of an inferior officer "in the President alone, in the Courts of Law, or in the Heads of Department." U.S. Const., art. II, § 2, cl. 2. The text, purpose, history, and application of the Appointments Clause show that "heads of department" should be read narrowly to exclude an acting department head, such as an acting DHS secretary.

### A. The Appointments Clause preserves political accountability by limiting appointments authority.

The Appointments Clause is "among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). It "prevents congressional encroachment upon the Executive and Judicial Branches" by giving the President exclusive nomination authority for principal officers. *Id.* At the same time, "the Appointments Clause was designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one." *Id.* at 660. It accomplishes this goal not only "[b]y requiring the joint participation of the President and the Senate," *id.*, but also by "specifying only a limited number of actors who can appoint inferior officers without Senate confirmation," *Lucia v. SEC*, 138 S. Ct. 2044, 2056 (2018) (Thomas, J., concurring).

Thus, while the Excepting Clause creates an alternative appointment mechanism for inferior officers for the purpose of "administrative convenience," *Edmond*, 520 U.S. at 660, it respects the "Framers' conclusion that widely distributed appointment power subverts democratic government," *Freytag v. Comm'r*, 501 U.S. 868, 885 (1991), by providing appointment authority to only three categories of officials: the President, courts, and department heads. The history of the Excepting Clause is sparse, *see Edmond*, 520 U.S. at 660, but reflects a focus on limiting the officials with appointment authority. The Framers rejected a concern that the Excepting Clause's

list should be expanded to include subordinate officials. *See Morrison v. Olson*, 487 U.S. 654, 675 (1988).

Consistent with the text and animating purposes of the Appointments Clause, the Supreme Court has applied the Excepting Clause narrowly. It has interpreted "heads of departments" to exclude "inferior commissioners and bureau officers," *United States v. Germaine*, 99 U.S. 508, 511 (1878), and to apply only to a head of an agency that is a "freestanding component of the Executive Branch," *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 511 (2010).[5]

These applications of the Excepting Clause preserve the structural protections of the Appointments Clause. As the Supreme Court explained in concluding that the chief Tax Court judge is not a head of department, constraining appointments authority, rather than "diffus[ing] it," protects accountability. *Freytag*, 501 U.S. at 886. Thus, in *Freytag*, constraint ensured that appointment authority would be held by agency heads who "share the President's accountability to the people." *Id.*

---

[5] *Germaine*, 99 U.S. at 511, uses the term "acting head" to describe an Assistant Secretary of Treasury whose appointment of a clerk was addressed in *United States v. Hartwell*, 73 U.S. (6 Wall.) 385 (1867). In that case, however, the Assistant Secretary was not an "Acting Secretary," as Hugh McCulloch served throughout that period. Rather, the Assistant Secretary appointed the clerk pursuant to a statute that authorized him to do so, subject to "the approbation of the Secretary." *See id.* at 392-93. "This fact, in the opinion of the court, rendered his appointment one by the head of the department within the constitutional provision upon the subject of the appointing power." *United States v. Smith*, 124 U.S. 525, 532 (1888).

**B. An acting DHS secretary is not a department head within the meaning of the Appointments Clause.**

The Supreme Court has characterized acting officials serving temporarily as inferior officers. *See Morrison*, 487 U.S. at 672 (discussing *United States v. Eaton*, 169 U.S. 331, 343 (1898)). Generally, "[w]hether one is an 'inferior' officer depends on whether he has a superior." *Edmond*, 520 U.S. at 662. Although this standard suggests an acting secretary may be a principal officer, because he or she does not have a "relationship with some higher ranking officer or officers below the President," *id.*, *Morrison* and *Eaton* explain that "under special and temporary conditions," an acting officer remains an inferior officer, *Morrison*, 487 U.S. at 672. In briefing, DHS characterized the acting secretary as an inferior officer (Dkt. 69 at 26), and then changed position in the hearing on plaintiffs' motion, suggesting that an acting DHS secretary may merely be an employee. But employees are "lesser functionaries subordinate to officers of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 n.12 (1976) (per curiam). With "significant authority pursuant to the laws of the United States" and no superior, short of the President, an acting secretary does not fall into this category. *Freytag*, 501 U.S. at 881; *see also Morrison*, 487 U.S. at 671 n.12 (stating that it is "clear" that independent counsel is an officer, even though position is temporary); *Designation of Acting Dir. of the Office of Mgmt. & Budget*, 27 Op. O.L.C. 121, 2003 WL 24151770, at *3 (2003) (concluding that acting officer is officer, for the purposes of the Appointments Clause).

If an acting DHS secretary is a principal officer, presidential nomination and Senate confirmation would be required. The absence of such confirmation would alone make McAleenan's and Wolf's service unlawful. If the acting DHS secretary is an inferior officer

(because the position is filled *without* the procedures required for a principal officer), the presence of the word "secretary" in the position's title cannot provide the authority of a principal officer.

Defendants nevertheless read the Homeland Security Act (HSA), 6 U.S.C. § 113(g)(2), to enable an acting secretary to adopt the authority of an *actual* secretary and, through a succession order, appoint other acting secretaries. But without appointment as a principal officer, an acting secretary is no more the "head of department" for Appointments Clause purposes than any other inferior officer. Defendants' reading of the HSA would undermine the Appointment Clause's structural protections and conflict with the Supreme Court's description and application of these protections.

To start, equating an acting secretary (as an inferior officer) with a department head for constitutional purposes would be inconsistent with *Freytag* and *Germaine*, which instructed that the phrase "heads of departments" should be interpreted consistently with the term "*principal* officer" in the Constitution's Opinion Clause. *See Freytag*, 501 U.S. at 886; *United States v. Germaine*, 99 U.S. at 511; *see generally* U.S. Const. art. II, § 2, cl. 1 (stating that the President "may require the Opinion, in writing, of the principal officer in each of the executive Departments"). *But see Free Enter.*, 561 U.S. at 511 n.11 (concluding that Securities and Exchange Commission is "head of department" under the Appointments Clause without expressing view on whether Commission is an "executive Departmen[t]" under the Opinion Clause or the Twenty-Fifth Amendment).

Giving appointments authority to an inferior officer would also be inconsistent with the Framers' rejection of a proposal to grant appointment authority below department heads. Moreover, allowing Congress to "dispens[e] power" to acting department heads, *Freytag*, 501 U.S. 885, would weaken the political accountability that the Appointments Clause aims to protect.

Reliance on acting officers, in general, "limit[s] the President's control and political accountability." *NLRB v. Noel Canning*, 573 U.S. 513, 541 (2014). Allowing an acting secretary to appoint another inferior officer would exacerbate the problem. "If an ill appointment should be made" by an *acting* secretary, elected officials would be less likely to "participate … in the opprobrium and disgrace," *Edmond*, 520 U.S. at 660 (quoting The Federalist No. 77, at 392 (M. Beloff ed. 1987) (A. Hamilton)), when neither the new appointee nor the appointing authority was elected or appointed by elected officials. And a series of appointments by acting secretaries of other acting secretaries would leave no "clear and effective chain of command," making it harder for the public to "'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Free Enter.*, 561 U.S. at 498 (quoting The Federalist No. 70, at 476 (J. Cooke ed.1961) (A. Hamilton)).[6] The Appointments Clause is designed to prevent such "abdication," as well as "aggrandizement" of authority. *Weiss v. United States*, 510 U.S. 163, 188 (1994) (Souter, J., concurring). The "'structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic,' and '[n]either Congress nor the Executive can agree to waive th[e] structural protection[s]' the Clause provides." *Id.* at 188-89 (alterations in original) (quoting *Freytag*, 501 U.S. at 880). *See Free Enter.*, 561 U.S. at 497, 498 (holding unconstitutional a statute "granting [a] Board executive power without the Executive's oversight," even while recognizing that "an individual President might find advantages in tying his own hands").

---

[6] In addition, after a series of acting secretary appointments, the position of acting secretary becomes more like a principal officer position, requiring Senate confirmation, because it is far less like the vice consul "substituted temporarily" to fill the position of the sick consul general in *Eaton*, 169 U.S. at 340.

A recent case illustrates what happens when elected officials abdicate their Appointments Clause duties, to allow agencies to perpetuate their own leadership successions. The Senate-confirmed director of the Bureau of Land Management (BLM) left that position on January 19, 2017. *See Bullock v. U.S. Bureau of Land Mgmt.*, ___ F. Supp. 3d. ___, No. 4:20-cv-000062-BBM, 2020 WL 5746836, at *1 (D. Mont. Sept. 25, 2020). Over the course of more than 3½ years, the agency was led by a series of officials, all without Senate confirmation (which is required by statute). First, the outgoing interior secretary delegated the BLM director's duties to another agency official. Then, over the next three years, that delegation order was amended 32 times to change the delegations (which covered positions in addition to the BLM director). By July 29, 2019, William Pendley became the fifth individual to be delegated the BLM director's duties. Although the position was purportedly temporary, Interior Secretary David Bernhardt extended Pendley's tenure four times. *See id.* at *1-*2. Then, purporting to exercise authority as the BLM director, Pendley signed a memorandum that designated *himself* to serve as first assistant for the purposes of the Federal Vacancies Reform Act, under which Pendley then began to "exercise[] the authority of BLM Director under color of this self-delegation." *Id.* at *2. The district court held that Pendley served unlawfully as the acting BLM Director for 424 days; enjoined Pendley from exercising authority of BLM Director; and enjoined the Interior Secretary from unlawfully delegating the authority of the BLM Director. *Id.* at *11.

Likewise here, DHS has sought to circumvent the process for presidential nomination and Senate confirmation of an accountable agency-head by using other tools to pass on authority to officials divorced from the political process. If McAleenan, as acting secretary, has the authority to appoint another acting secretary, Congress could empower *any* inferior officer in DHS to

14

appoint another, enabling not just the office of the secretary, but also DHS's components, to become self-perpetuating, as the Bureau of Land Management has attempted.

Confining Article II appointments authority to *actual* department heads, rather than inferior officers, is also consistent with how the Office of Legal Counsel (OLC) has characterized acting officials with regard to other constitutional appointments questions. OLC has advised that the "interim filling" of a position "does not fill a vacancy in the constitutional sense," which means that the President retains authority to make a recess appointment to fill the vacancy. *Recess Appointments-Constitution (Art. II, § 2, cl. 3)–Legal Services Corp.—Effect of Statutory Holdover Provisions*, 2 Op. O.L.C. 398, 399 (1978).

**C.  A germaneness inquiry does not cure the constitutional problem.**

DHS has suggested that Wolf's appointment to acting secretary raises no constitutional concerns because the Secretary's duties are germane to Wolf's and because the Senate knew, when it confirmed Wolf to a *different* position, that Wolf would become acting DHS secretary. Dkt. 69 at 29 n.16. The doctrine of germaneness does not solve the problem here.

As an initial matter, whether or not duties are "germane" to an officer's other duties is relevant when Congress assigns new duties to an existing office. The inquiry helps "ensure that Congress [is] not circumventing the Appointments Clause by unilaterally appointing an incumbent to a new and distinct office." *Weiss*, 510 U.S. at 174. Here, Congress has not assigned new duties to an existing office. Instead, Congress created a mechanism (6 U.S.C § 113(g)(2)) for the "Secretary" to designate an acting secretary, through an order of succession. *See Designation of Acting Dir. of the Office of Mgmt. & Budget*, 27 Op. O.L.C. 121, 2003 WL 24151770, at *3 (2003) (opining that "designation" of acting officer under FVRA is "appointment"). Moreover, Congress did not attach the acting secretary position to a specific office. To the extent an order of succession

extends beyond the deputy secretary and under secretary for management, Congress permitted the "Secretary" to choose among all DHS officers in designating a line of succession. *See* 6 US.C. § 113(g)(2).

Moreover, an inquiry into the relationship between the position of acting secretary and the duties of McAleenan's or Wolf's original (Senate-confirmed) positions would not resolve the constitutional concerns here. The facts surrounding Wolf's appointment, as defendants describe them, heighten, rather than mollify, any concern of Congress "circumventing the Appointments Clause." Congress did *not* make a decision to add specific duties to Wolf's office; if, in confirming Wolf to a different position, Congress nevertheless intended to install Wolf, in particular, as acting secretary, that is exactly the type of abuse the germaneness inquiry is supposed to prevent. *See Weiss*, 510 U.S. at 173 ("The argument is, that while Congress may create an office, it cannot appoint the officer") (cleaned up). More generally, an inquiry as to whether the acting secretary's duties are "germane" to any other office does not address the Appointments Clause problem created by DHS's reading of the HSA succession-order provision. If 6 U.S.C. § 113(g)(2) were interpreted to allow any acting secretary to serve as "head of department" and appoint another acting secretary, the statute would create a "diffusion of appointment power" that could extend to any DHS officer, and would exist regardless of the relationship between any *particular* acting secretary's prior job and the role of acting secretary. *Weiss*, 510 U.S. at 174 (quoting *Freytag*, 501 U.S. at 878).[7]

---

[7] Concerns for the "diffusion of appointment power" would be lessened in the case of a statute designating a particular office-holder to be acting secretary. But section 113(g)(2) is a different type of statute altogether.

The duties that DHS associates with an "acting secretary" also cannot be considered "germane" to the body of officers covered by section 113(g)(2). The DHS Secretary's statutory duties are unique in the agency. *See, e.g.*, 8 U.S.C § 1103(a)(3) (permitting only the Secretary to establish regulations). And the distinction between an acting secretary and other officers' roles would be even greater if the acting secretary were given appointment authority. *See Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183, 1193 (D.D.C. 1990) (concluding that germaneness doctrine does not apply when Congress transforms the role of agency official from one of three members of a board to the single director of a new agency, because the change goes "beyond simply changing the duties of the office").

Using a germaneness inquiry to justify seriatim acting secretary appointments would also have absurd results. Deeming the appointments authority—a function restricted by the Constitution to the President, department heads, and courts—germane to *any* officer's role would lack a limiting principle. Such a broad application of the term "germane" would suggest that Congress could itself assign *any* officer within DHS *any* new role in DHS by statute, without a separate appointment—thus circumventing the Appointment Clause's distribution of (and limits on) appointments authority. *See Weiss*, 510 U.S. at 190 (Souter, J., concurring) (stating that using the germaneness doctrine to permit an inferior officer to assume principal-officer duties without a separate appointment would amount to "impermissible abdication by both political branches of their Appointments Clause duties"); *see also In re al-Nashiri*, 791 F.3d 71, 85 (D.C. Cir. 2015) (discussing Souter's concurrence).

### III.    A motion for a temporary restraining order can be made orally.

The Court inquired at the hearing whether it could issue a temporary restraining order (TRO) before ruling on the motion for a preliminary injunction, and plaintiffs then made an oral

motion for a TRO. Under the local rules, TROs must be sought by motion. Local Civ. R. 65.1(a). A motion can be made orally when, as here, it is made during a hearing. Fed. R. Civ. P. 7(b)(1)(A); *see*, *e.g.*, *M.G.U. v. Nielsen*, 316 F. Supp. 3d 518, 520 (D.D.C. 2018) (construing "oral motion … as a motion for a temporary restraining order," in the context of a hearing on a pending motion for preliminary injunction, and granting a TRO); *Women's Med. Prof'l Corp. v. Baird*, No. 03-CV-162, 2008 WL 545015, at *2 (S.D. Ohio Feb. 27, 2008) (granting oral motion for TRO); *cf. Contech Constr. Prods., Inc. v. Heierli*, 764 F. Supp. 2d 96, 106 (D.D.C. 2011) (recognizing court's "discretion to allow a party to submit a 'motion' that does not include a memorandum of law and authorities if the other party is not prejudiced"). Plaintiffs' motion was made with notice to DHS, in the presence of counsel for all parties. *See* Local Civ. R. 65.1(a). Moreover, there is no prejudice to defendants in considering plaintiffs' oral motion, which is based on the same arguments supporting their written motion for relief under 5 U.S.C. § 705 and a preliminary injunction.

That said, plaintiffs believe that their papers provide strong support for granting a preliminary injunction and an order under section 705, and they urge the Court to do so.

## CONCLUSION

For the foregoing reasons, this Court should grant plaintiffs' motion for relief under section 705 of the APA and a preliminary injunction.

Dated: September 28, 2020                    Respectfully submitted,

                                                                  /s/ Rebecca Smullin
Laurie Ball Cooper (D.C. Bar No. 1017998)    Rebecca Smullin (D.C. Bar No. 1017451)
Ayuda, Inc.                                  Adina H. Rosenbaum (D.C. Bar No. 490928)
6925 B Willow Street NW                      Michael T. Kirkpatrick (D.C. Bar No. 486293)
Washington DC 20012                          Public Citizen Litigation Group
202-349-0656                                 1600 20th Street NW
laurie.ballcooper@ayuda.com                  Washington, DC 20009

18

Counsel for Plaintiff Ayuda, Inc.

Nicholas Katz (MD Bar No. 1812100006)
CASA de Maryland, Inc.
8151 15th Avenue
Hyattsville, MD 20783
240-491-5743
nkatz@wearecasa.org

Counsel for Plaintiff CASA
de Maryland, Inc.

202-588-7714
rsmullin@citizen.org

Counsel for All Plaintiffs

Matt Adams (WSBA No. 28287)
Aaron Korthuis (WSBA No. 53974)
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
206-957-8611
matt@nwirp.org

Counsel for Plaintiff Northwest
Immigrant Rights Project