## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTHWEST IMMIGRANT RIGHTS
PROJECT, *et al.*,

       *Plaintiffs*,

    v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, *et al.*,

       *Defendants*.

Civil Action No. 19-3283 (RDM)

## MEMORANDUM OPINION

The United States Citizenship and Immigration Services ("USCIS"), a component of the

Department of Homeland Security ("DHS"), Dkt. 1 at 3 (Compl. ¶ 12), receives millions of

applications and petitions each year for immigration benefits. Dkt. 50 at 14–15. Many of these

benefits are of no small consequence to applicants; they include "naturalization, lawful

permanent residence, employment authorization, humanitarian benefits, and other forms of legal

status." *Id.* at 15.

These benefits must be funded somehow, and DHS generally does so by charging fees for

its services. In recent years, however, its costs have outstripped the fees it collects. *See* Dkt. 69-

1 at 2; U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other

Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280, 62,288 (Nov. 14, 2019)

("Proposed Rule"). To address this shortfall and to make various policy changes, DHS proposed

a rule in November 2019 altering the fees it charges, shifting from an "ability-to-pay" to a

"beneficiary-pays" model, charging a fee to apply for asylum for the first time, and reducing the

availability of fee waivers for those of limited means. *Id.* at 62,280, 62,298. On August 3, 2020,

the Department finalized that rule.  *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46,788 (Aug. 3, 2020) ("Final Rule" or "Rule").  The rule was set to take effect on October 2, 2020, *id.*, but was recently enjoined by the United States District Court for the Northern District of California, *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-05883-JSW, 2020 WL 5798269 (Sept. 29, 2020).

Plaintiffs Northwest Immigrant Rights Project ("NWIRP"), Ayuda, Inc. ("Ayuda"), and CASA de Maryland, Inc. ("CASA") seek a stay of implementation or enforcement of the Rule pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 705, or in the alternative, a preliminary injunction against implementation and enforcement of the Rule.  Dkt. 50 at 1. Defendants USCIS, DHS, Chad F. Wolf in his official capacity as Acting Secretary of Homeland Security, and Kenneth T. Cuccinelli in his official capacity as Senior Official Performing the Duties of the USCIS Director and Deputy Secretary of Homeland Security oppose Plaintiffs' motion.  Dkt. 69 at 12, 16.  The Court heard oral argument on September 24, 2020, and received supplemental briefing on September 28, 29 and 30, 2020.  Dkts. 78–82.

Upon consideration of the parties' arguments and submissions, and for the reasons explained below, the Court will **GRANT** Plaintiffs' motion for a preliminary injunction.

## I.  BACKGROUND

### A.    Statutory and Factual Background

DHS promulgated the Rule pursuant to the Immigration and Nationality Act ("INA"), which establishes the "Immigration Examinations Fee Account" ("IEFA") for the receipt of fees the Department charges.  8 U.S.C. § 1356(m).  The INA allows DHS to set "fees for providing adjudication and naturalization services . . . at a level that will ensure recovery of the full costs of

providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.* The INA further provides that "[s]uch fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.*

In 2010, DHS conducted a comprehensive review of and revision to its fee structure. *See* U.S. Citizenship and Immigration Services Fee Schedule, 75 Fed. Reg. 58,962 (Sept. 24, 2010) ("2010 Rule"); Dkt. 50 at 16. The revised fee-schedule exempted "a range of humanitarian and protective services, such as refugee and asylum processing," from fees, explaining that "a large percentage of applicants would clearly be unable to pay" any fees. 2010 Rule, 75 Fed. Reg. at 58,973; Dkt. 50 at 16. For other services to which fees did apply, DHS allowed waivers for individuals "unable to pay the prescribed fee" if such a waiver would be "consistent with the status or benefit sought." 8 C.F.R. § 103.7(c)(1); Dkt. 69 at 13–14.

To determine what constitutes an inability to pay, USCIS issued a memorandum in 2011 ("2011 Memorandum") that established a three-part test. AR 43–50. First, if the applicant received a "government 'means-tested' benefit, such as Medicaid or Supplemental Nutrition Assistance Program benefits," the applicant would be deemed ineligible to pay and the fee waived. AR 47; Dkt. 50 at 16–17. Second, if the applicant received no means-tested benefit, USCIS would consider whether the applicant's income was less than or equal to 150% of the Federal Poverty Guidelines ("FPG"). AR 48–49; Dkt. 50 at 17. If so, the applicant was deemed unable to pay and the fee was waived. Finally, if neither of the first two prongs applied, USCIS would consider whether the individual was otherwise "suffering financial hardship" and, if so, waive the fee. AR 49.

The 2011 Memorandum also addressed how applicants could show that they satisfied these tests.  The approach was a flexible one.  Although USCIS created an official form for applicants to request fee waivers, it explained that use of the form was not mandatory.  AR 46–47.  Although the form identified certain types of documentation accepted as proof of inability to pay, the Memorandum recognized that other forms of documentation could accompany the waiver request, including pay statements, statements from employers, and tax returns.  AR 48.

In 2016, DHS issued another comprehensive revision to its fees, retaining the 2010 fee waivers and exemptions and capping increases to naturalization, employment authorization, and other fees, which the Department deemed "overly burdensome on applicants, petitioners, and requestors if set at the recommended [financial] model output levels."  U.S. Citizenship and Immigration Services Fee Schedule, 81 Fed. Reg. 73,292, 73,297, 73,307–08 (Oct. 24, 2016) ("2016 Rule").  DHS also "created a reduced fee for low-income naturalization applicants" with family incomes greater than 150%, but less than 200%, of the FPG.  *Id.* at 73,326; Dkt. 50 at 17. The Department created this reduced fee to "ensure that those who have worked hard to become eligible for naturalization are not limited by their economic means."  2016 Rule, 81 Fed. Reg. at 73,326.

In October 2019, USCIS revised the form and instructions governing fee waivers (as well as a related policy manual) in a manner that abandoned the 2011 Memorandum, narrowed eligibility for fee waivers, and imposed new hurdles to obtaining waivers.  Dkt. 11-2; AR 484. The agency restricted fee waivers to those who can demonstrate that their "documented annual household income" was at or below 150% of the FPG or can establish "financial hardship including, but not limited to, medical expenses of family members, unemployment, eviction, victimization, and homelessness."  Dkt. 11-2 at 14.  The new standards also eliminated an

4

applicant's option of demonstrating inability to pay based on the receipt of means-tested benefits, mandated use of the USCIS form, and imposed new evidentiary requirements. AR 484. Before the new standards took effect, however, the United States District Court for the Northern District of California preliminarily enjoined the changes on the ground that the Department failed to conduct notice-and-comment rulemaking. *City of Seattle v. DHS*, No. 3:19-cv-7151-MMC (N.D. Cal. Dec. 11, 2019); Dkt. 69 at 14; Dkt. 50 at 19 n.5.

Meanwhile, DHS issued a Notice of Proposed Rulemaking in November 2019, proposing a new fee schedule and further limiting the availability of free waivers. *See* Proposed Rule, 84 Fed. Reg. 62,280. In response to the Proposed Rule, DHS received 43,108 comments, which the Department reviewed before issuing the Final Rule. Final Rule, 85 Fed. Reg. at 46,794. The "vast majority of commenters opposed all or part of" the Rule, raising concerns, among other things, about the effect the Rule would have on the availability of immigration benefits for low-income immigrants and the demand for those benefits. *Id.* at 46,795.

The Rule is designed to serve two purposes: (1) it makes "[f]ee schedule adjustments . . . necessary to recover the full operating costs associated with administering the nation's lawful immigration system," *id.* at 46,789; and (2) it shifts from an "ability-to-pay" model to a "beneficiary-pays" model, which "ensure[s] that those who benefit from immigration benefits pay their fair share of costs," *id.* at 46,795. To serve these purposes, the Rule curtails the availability of fee waivers. *Id.* at 46,806. The Rule does not permit fee waivers unless "[t]here is a statutory or regulatory provision allowing for fee waivers" or the applicant belongs to specific protected groups. *Id.* at 46,920 (to be codified at 8 C.F.R. § 106.3). Even with respect to this limited class, moreover, the Rule permits fee waivers only if (a) the applicant's annual gross household income is less than or equal to 125% of FPG (amounting to $15,950 annually for a

single person) and (b) the applicant submits the required USCIS form and accompanying documents. *Id.* at 46,920; Dkt. 50 at 19; Dkt. 69 at 14–15.  Although the USCIS Director reserves discretion to waive fees "in whole or in part" in "an emergent circumstance, or if a major natural disaster has been declared," he may not waive the 125% requirement or the requirement that the applicant satisfactorily complete the USCIS fee-waiver-application form. Final Rule, 85 Fed. Reg. at 46,920; Dkt. 69 at 15.  These regulations displace the 2011 Memorandum's test for ability to pay, including the "means-tested" approach to fee-waivers, which Plaintiffs characterize as "the easiest, most reliable, and most common method for seeking fee waivers."  Dkt. 50 at 18.

Restricting fee waivers is not the only way in which the Rule seeks to raise additional revenue and to shift to a beneficiary-pays model.  The Rule also increases some fees and imposes some new fees.  Notably, the Rule almost doubles the fee for filing an application for naturalization and eliminates the pre-existing reduced fee option for low-income applicants. Final Rule, 85 Fed. Reg. at 46,792, 46,792 n.8.  For the first time, moreover, asylum seekers must pay a non-waivable $50 application fee, and if they seek employment, they must pay a $550 application fee and $30 biometrics fee.  *Id.* at 46,808, 46,833, 46,851–52; Dkt. 50 at 20. Survivors of crime will now have to pay $1,485 to seek permission for their children or spouses to join or to stay with them in the United States, more than six times the current fee.  Dkt. 50 at 20.  This is the most dramatic increase, but the Rule also increases an array of other fees.  *See* Final Rule, 85 Fed. Reg. at 46,791–92.  At the same time, as part of the shift to a beneficiary-pays model, the Rule reduces some fees that previously set off revenue shortfalls resulting from fee waivers and from fees that did not reflect the full cost of the service provided.  *See, e.g.*, *id.* at 46,791, 46,838 (discussing decreases to fees for replacing lawful permanent residence cards).

B.      **Procedural Background**

Northwest Immigrant Rights Project filed this action on October 31, 2019 to challenge a

range of DHS policy changes relating to fees and fee waivers.  Dkt. 1 (Complaint); Dkt. 9 (First

Amended Complaint).  NWIRP moved for summary judgment in December 2019, Dkt. 11, and

Defendants moved to dismiss, or in the alternative, cross-moved for summary judgment, Dkt. 25.

On August 29, 2020, NWIRP, together with new parties Ayuda and CASA de Maryland,

filed a second amended and supplemental complaint.  Dkt. 45.  Approximately a month after the

Department promulgated the Final Rule, Plaintiffs moved for a preliminary injunction or to stay

implementation of the Rule pursuant to 5 U.S.C. § 705.  Dkt. 50.  Defendants oppose both

requests.  Dkt. 69.

## II.  ANALYSIS

To prevail on a motion for a preliminary injunction, the moving party must show [1]

"'that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the

absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an

injunction is in the public interest.'"  *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (quoting *Winter*

*v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).  "The last two factors merge

when the government is the opposing party."  *Guedes v. Bureau of Alcohol, Tobacco, Firearms,*

*and Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (citation omitted).

For many years, the D.C. Circuit evaluated these factors on a "sliding scale."  *E.g.*,

*Davenport v. Int'l Bhd. of Teamsters, AFL–CIO*, 166 F.3d 356, 360–61 (D.C. Cir.1999).  It has

read the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555

U.S. at 20-24, however, "at least to suggest if not to hold" that plaintiffs face "a more demanding

burden" under which "a likelihood of success is an independent, freestanding requirement for a

preliminary injunction," *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (quotation

marks omitted).  This issue remains the subject of some uncertainty in this Circuit.  *See*

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018)

("This court has not yet decided whether *Winter v. Natural Resources Defense Council . . .* is

properly read to suggest a sliding scale approach to weighing the four factors is abandoned."

(cleaned up));  *Am. Meat Inst. v. USDA*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in*

*relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc) ("[t]his circuit has repeatedly declined to

take sides ... on the question of whether likelihood of success on the merits is a freestanding

threshold requirement to issuance of a preliminary injunction").  Nonetheless, it is clear that the

plaintiff's likelihood of success on the merits is a "key issue [and] often the dispositive one" at

the preliminary injunction stage, *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of*

*Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011), and that, even if the sliding-scale

approach survived *Winter*, "a plaintiff with a weak showing on the" likelihood-of-success factor

"would have to show that all three of the other factors so much favor the [movants] that they

need only have raised a serious legal question on the merits."  *Am. Meat Inst.*, 746 F.3d at 1074

(quotation marks omitted).

 "On such conditions as may be required and to the extent necessary to prevent irreparable

injury," the APA allows a reviewing court to "issue all necessary and appropriate process to

postpone the effective date of an agency action or to preserve status or rights pending conclusion

of the review proceedings."  5 U.S.C. § 705.  The standard of review for relief under 5

U.S.C. § 705 is the same as the standard of review for preliminary injunctions: "[E]ach is

governed by the four-part preliminary injunction test applied in this Circuit."  *Sierra Club v.*

*Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012).

A.      **Standing**

The Court starts, as it must, with standing.  A plaintiff that is unlikely to prevail on the

question of standing is unlikely to prevail on the merits and, accordingly, "is not entitled to a

preliminary injunction."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir.

2015); *see also U.S. House of Representatives v. Mnuchin*, No. 19-5176, 2020 WL 5739026, at

*3 (D.C. Cir. Sept. 25, 2020).

Article III of the Constitution limits "[t]he judicial power of the United States" to "Cases"

and "Controversies."  U.S. Const. art. III, §§ 1–2.  "To state a case or controversy under Article

III, a plaintiff must establish standing," *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125,

133 (2011), "the 'irreducible constitutional minimum' of" which requires "'the plaintiff [to] have

suffered an injury in fact'" that has a "'causal connection'" to "the challenged conduct," and that

can be "be 'redressed by a favorable decision,'" *Env't Integrity Project v. McCarthy*, 139 F.

Supp. 3d 25, 36 (D.D.C. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61

(1992)).  When, as here, the plaintiff is an organization, it may assert standing on its own behalf

("organizational standing") "or on behalf of [its] members ('associational standing')."

*McCarthy*, 139 F. Supp. 3d at 36; *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 142 (D.D.C.

2019).

"A plaintiff bears the burden of demonstrating its standing at every stage of the

litigation," *California v. Trump*, No. 19-960 (RDM), 2020 WL 1643858, at *4 (D.D.C. Apr. 2,

2020), and must do so "with the manner and degree of evidence required at the successive stages

of the litigation," *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  As a result, to establish

standing at the preliminary injunction stage, a plaintiff "must show a 'substantial likelihood' of

standing."  *Food & Water Watch*, 808 F.3d at 913.  When multiple plaintiffs pursue the same

claim, as long as one plaintiff has standing, the Court "'need not consider the standing of the other plaintiffs to raise that claim.'" *Bauer v. DeVos*, 325 F. Supp. 3d 74, 88 (D.D.C. 2018) (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)); *see also Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

Plaintiffs offer two theories of standing.  First, they assert that "they have established harm to their organizations" "on multiple grounds."  Dkt. 77 at 47.  And second, they contend that "CASA is likely to be able to assert membership [*i.e.*, associational] standing" because it has submitted a declaration "describ[ing] a circumstance of one member who is facing a naturalization fee that will now be much higher than it would be otherwise."  *Id.* at 46:19–20; *see also* Dkt. 50-3 at 9 (Escobar Decl. ¶ 30).

1.   *Organizational Standing*

To establish organizational standing, Plaintiffs "must make the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision."  *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc. ("ASPCA")*, 659 F.3d 13, 24 (D.C. Cir. 2011).  "It is not enough for the organization to show that its 'mission has been compromised,' *Food & Water Watch*, 808 F.3d at 919, or that it has experienced a 'setback to its abstract social interests,' *Equal Rights Ctr.* [*v. Post Props., Inc.*], 633 F.3d [1136, 1138 (D.C. Cir. 2011)]."  *Pub. Citizen v. Trump*, 297 F. Supp. 3d 6, 36 (D.D.C. 2018).  Rather, "[t]o establish organizational standing a party must show that it suffers" or will imminently suffer "a concrete and demonstrable injury to its activities, distinct from a mere setback to the organization's abstract social interests . . . [and] the presence of a direct conflict between the defendant's

conduct and the organization's mission." *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (internal citations, brackets, quotation marks, and emphasis omitted).

Plaintiffs contend that they have organizational "standing because [the] [R]ule makes the overall task of their work more difficult." Dkt. 77 at 44:4–6 (Tr. of Oral Arg.). In *Havens Realty Corp. v. Coleman*, the Supreme Court held that a "concrete and demonstrable injury to [an] organization's activities"—there, providing "counseling and referral services"—can support Article III standing if the organization can show a "consequent drain on [its] resources" and "more than simply a setback to the organization's abstract social interests." 455 U.S. 363, 379 (1982). D.C. Circuit "case law, however, establishes two important limitations on the scope of standing under *Havens*." *ASPCA*, 659 F.3d at 25. First, the plaintiff "must show a 'direct conflict between the defendant's conduct and the organization's mission.'" *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)). Second, the plaintiff must show that it has "used its resources to counteract [the asserted] harm." *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (quotation marks omitted). That harm, moreover, cannot be "self-inflicted" by, for example, diverting resources to the "very suit" challenging the defendant's conduct, *ASPCA*, 659 F.3d at 25, and cannot result from "expend[ing] resources to educate [the organization's] members and others unless doing so subjects the organization to operational costs beyond those normally expended," *Food & Water Watch*, 808 F.3d at 920 (internal quotation marks and citation omitted). All three Plaintiffs have shown that they are likely to meet this burden.

First, NWIRP has offered unrebutted evidence that the Rule directly conflicts with its mission of providing a broad array of legal services to low-income immigrants and will impose new burdens and costs on the organization. *See generally* Dkt. 50-1 (Barón 2d Decl.). The

organization's Executive Director attests that the Rule will (1) "cause NWIRP clients to need more help from NWIRP than they would otherwise [need] to prepare and submit fee waiver applications," Dkt. 50-1 at 12 (Barón 2d Decl. ¶ 29); (2) cause NWIRP "to spend more time than [it] previously [spent] helping fee-waiver eligible clients seek and obtain IRS documents," *id.* at 13 (Barón 2d Decl. ¶ 32); (3) increase the risk that NWIRP must "spend additional time re-submitting fee-waiver applications," *id.* at 14 (Barón 2d Decl. ¶ 33); (4) "cause NWIRP to spend additional time preparing individual fee-waiver requests . . . for each client seeking a fee waiver, rather than combining family members' related applications into one," *id.* (Barón 2d Decl. ¶ 34); (5) "hamper NWIRP's work by restricting NWIRP's ability to help clients seek fee waivers at all . . . [because] fewer than half of the NWIRP clients who would be eligible for fee waivers under current law will be eligible for fee waivers of the [Final Rule]," *id.* at 15 (Barón 2d Decl. ¶ 36); and (6) "make it harder for NWIRP to help immigrants find other assistance, when NWIRP is unable to help . . . [because] the significant increase in fees that many immigrants will face [will make] . . . referrals to fee-charging attorneys . . . far more difficult," *id.* at 17 (Barón 2d Decl. ¶ 40). These "additional demands," NWIRP contends, "will divert NWIRP's resources from other work and mean that NWIRP cannot serve as many clients as it would otherwise," *id.* at 18 (Barón 2d Decl. ¶ 42); will increase the per-client cost that NWIRP incurs for providing many types of assistance, *id.* (Barón 2d Decl. ¶ 44); and will require that it both "triage client needs even more so than normal" and "spend its emergency funds to advance fees for clients facing urgent needs," *id.* at 20 (Barón 2d Decl. ¶ 47).

Plaintiffs make a similar showing with respect to Ayuda's standing. Like NWIRP, Ayuda provides legal services "to low-income immigrants seeking a wide range of immigration benefits." Dkt. 50-2 at 2 (Cooper Decl. ¶¶ 3–5). According to the organization's Legal Director,

"[t]he [Final Rule] will make it more difficult for Ayuda to serve its clients in several ways." *Id.*
at 6 (Cooper Decl. ¶ 20).  Ayuda staff will, for example, have to spend more time and resources
helping clients (1) "obtain the required documents [to] complete fee-waiver requests," *id.* at 7
(Cooper Decl. ¶ 21); (2) complete fee-waiver applications, some of which will require "at least
two meetings with the client . . . when, earlier, a single meeting might have sufficed," *id.* at 8
(Cooper Decl. ¶ 21); and (3) "apply for immigration benefits[] when Ayuda grant funds are
unavailable" because "during the period when a client is searching for funds, USCIS may change
the necessary forms or certain documentation may expire," thereby requiring Ayuda to "re-do
[clients'] applications or collect new documentation," *id.* at 10 (Cooper Decl. ¶ 24).  Ayuda will
also have to "devote more time to assessing the circumstances of potential clients" to ensure that
they are able to pay the increased fees, thus lessening the time that Ayuda can spend helping
clients obtain the immigration benefits they seek.  *Id.* at 11 (Cooper Decl. ¶ 25); *see also id.* at 12
(Cooper Decl. ¶ 28) ("[Ayuda] will also spend more time screening potential clients, whom it
may ultimately be unable to serve due to those individuals' lack of funds . . . .").  Finally, Ayuda
asserts that it will lose revenue because its clients will need to "devote their limited resources to
paying newly required or higher USCIS fees," resulting in "fewer clients . . . able to pay any
Ayuda fee." *Id.* at 14 (Cooper Decl. ¶ 32); *see also id.* at 15 (Cooper Decl. ¶ 34) ("[B]ecause of
the new demands that the [Final Rule] puts on Ayuda's staff's time, Ayuda will have to turn
away many other potential clients.").

Although CASA is differently situated, Plaintiffs have shown that the Rule directly
conflicts with its mission as well and is likely to impose new burdens and costs on the
organization.  "CASA is a nonprofit, membership-based immigrant rights organization," Dkt. 50-
3 at 2 (Escobar Decl. ¶ 3), with "over 100,000 all-time members," *id*. at 3 (Escobar Decl. ¶ 9),

including "noncitizens, from countries around the world, with low incomes and limited financial means," *id*. (Escobar Decl. ¶ 12), who will need assistance in seeking an array of USCIS "benefits in coming years," *id*. 3 (Escobar Decl. ¶ 13).  According to the organization's Chief of Programs and Services, the Rule will make it more difficult, for example, for CASA "to help lawful permanent residents apply for naturalization" because (1) those seeking fee waivers will need to "submit certain specified income documentation," which will require CASA personnel to offer additional assistance to its members, and (2) others will no longer qualify for fee waivers, which will require CASA personnel to assist those members in "understanding and applying for" loans or in exploring other options.  *Id*. at 9–10 (Escobar Decl. ¶¶ 31–35).  "To respond to . . . the [Final Rule], CASA personnel will provide more assistance to fee-waiver applicants and more in-depth financial education services to many of [its] members participating in its naturalization program."  *Id*. at 12 (Escobar Decl. ¶ 38).  This increased strain on CASA's resources will, in the estimation of its Chief of Programs and Services, limit CASA "to help[ing] about 900 members complete the naturalization application process, compared to the 1,500 individuals whom CASA helped seek naturalization last year."  *Id*.  CASA's Chief of Programs and Services further attests that the Rule "will cause CASA to lose revenue" because the organization "charges [its members] a program fee of $50, and slightly more if a legal consultation is involved," for "its naturalization program," and it charges those "who are not yet CASA members" "a $35 membership fee."  *Id*. at 13 (Escobar Decl. ¶ 41).  "CASA waives its fees when members demonstrate significant financial hardship."  *Id.*  Consequently, the Rule will (1) require that it waive its membership fee in more cases and (2) reduce the number of individuals the organization can assist, resulting in lost revenue that "could" amount to "tens of thousands of dollars per year."  *Id.*

14

The injuries that Plaintiffs have identified are the type of "substantial, tangible costs" that are cognizable for purposes of organizational standing.  *O.A.*, 404 F. Supp. 3d at 142.  This is not a case in which an organization simply diverted "resources to litigation or to investigation in anticipation of litigation"—a "self-inflicted budgetary choice that cannot qualify as an injury in fact for purposes of standing."  *ASPCA*, 659 F.3d at 25 (quotation marks omitted).  Plaintiffs have not "manufacture[d] the injury necessary to maintain a suit from its expenditure of resources on that very suit."  *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (quotation marks omitted).  And, their injuries do not "arise[] from the effect of the regulations on [their] lobbying activities" or any "pure issue-advocacy" on their part.  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005).  Rather, as in *Havens*, Defendants' actions "have perceptibly impaired [Plaintiffs'] ability to provide counseling and [application] services for low-and moderate-income [immigrants]."  *Havens Realty*, 455 U.S. at 379.  "[T]here can be no question that the organization[s]" have shown that they are likely to "suffer[] injury in fact," *id.*, and that the Rule, if permitted to take effect, will directly conflict with their missions, *see Elec. Priv. Info. Ctr.*, 892 F.3d at 1255.

The Court is also persuaded that, if the Rule is allowed to take effect, Plaintiffs will "use[] [their] resources to counteract th[eir] injuries."  *ASPCA*, 659 F.3d at 25.  Plaintiffs have explained in detail why they will need to spend greater time helping clients meet the Rule's demands, *see, e.g.*, Dkt. 50-1 at 12–15, 17–18 (Barón 2d Decl. ¶¶ 28, 29, 32–34, 36, 42–43); Dkt. 50-2 at 7–12 (Cooper Decl. ¶¶ 21–28); Dkt. 50-3 at 9–11 (Escobar Decl. ¶¶ 31–33, 35), and how it will affect their funding and costs, *see, e.g.*, Dkt. 50-1 at 18–20 (Barón 2d Decl. ¶¶ 42–47); Dkt. 50-2 at 12–14 (Cooper Decl. ¶¶ 28–32); Dkt. 50-3 at 13–14 (Escobar Decl. ¶¶ 40–41). These uncontested declarations establish that the Rule will require Plaintiffs "to use substantial

'resources to counteract th[eir] injur[ies].'" *O.A.*, 404 F. Supp. 3d at 143 (quoting *ASPCA*, 659 F.3d at 25).  "No more is required to establish standing under *Havens*."  *Id.*

Although Defendants do not address standing in their opposition to Plaintiffs' motion for a preliminary injunction, they did raise standing in their motion to dismiss Plaintiffs' first amendment complaint, which challenged USCIS's 2019 revisions to Form I-912 and the accompanying instructions.  Dkt. 25-1.  Plaintiffs' motion for a preliminary injunction is premised exclusively on their challenge to the 2020 Final Rule, Dkt. 50, which Plaintiffs did not raise until they filed their second amended complaint, Dkt. 45.  But giving Defendants the benefit of the doubt, and because the Court must, in any event, satisfy itself that Plaintiffs have standing to seek a preliminary injunction, the Court will treat Defendants' arguments respecting the first amended complaint as though they were also raised in Defendants' opposition to Plaintiffs' motion for a preliminary injunction and as though they applied with equal force to the distinct claims asserted in the second amended complaint.

Framed in this manner, Defendants raise two challenges to Plaintiffs' organizational standing.  First, they contend that Plaintiffs' allegations of organizational harm "are speculative and rely on the decisions of independent third parties."  Dkt. 25-1 at 23 (capitalization altered).  Defendants note that (1) "while NWIRP may desire that its staff and volunteers spend more time on some applicants because of the revised Form, nothing about the revisions requires they do so," *id.* at 24; (2) "there are several steps [NWIRP] can, and presumably already does, use to reduce the time spent on an applicant," *id.* at 26; and (3) the revisions to Form I-912 and the accompanying instructions (and, presumably, the 2020 Final Rule) will either negligibly impact or actually benefit Plaintiffs' practices, *id.* at 26–27.  Second, Defendants argue that Plaintiffs' "diversion-of-resources allegations relate only to expenditures on ordinary program costs, which

cannot constitute an injury in fact." *Id.* at 28 (capitalization altered and internal quotation marks omitted). The Court is unpersuaded.

To start, the Court is unconvinced that Plaintiffs' harms are speculative. It is true that "nothing about [USCIS's actions] *requires*" Plaintiffs to spend more time on their clients' applications. *Id.* at 24 (emphasis added). But the challenged laws need not themselves compel Plaintiffs into action; it is enough that they "perceptibl[y] impair[]" the organizations' missions in a manner that makes their "overall task more difficult." *Nat'l Treasury*, 101 F.3d at 1429; *see also Equal Rights Ctr.*, 633 F.3d at 1140 ("[O]ur standing analysis [does not] depend on the voluntariness or involuntariness of the plaintiffs' expenditures. Instead, we focus[] on whether [the plaintiffs] undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged [unlawful acts] rather than in anticipation of litigation."). Defendants' contention that Plaintiffs can preemptively reduce the time spent on applications also misses the mark. Dkt. 25-1 at 26–27. They fail to offer any evidence controverting Plaintiffs' declarations, nor do Defendants dispute that the Rule will require Plaintiffs to increase their efforts in at least some respects. *Id.* Finally, Defendants' contention that the new Form I-912 (and, presumably the Rule) may benefit Plaintiffs because it will "*reduce* the number of rejected applications," *id.* at 27, and "increase the agency's efficiency and speed processing applications" is unsupported by any evidence that directly or convincingly controverts Plaintiffs' declarations. Plaintiffs have explained in detail how the Rule will increase their workload in numerous respects. Any aspiration that the Rule might improve the efficiency of the administrative process for all involved fails to negate the Plaintiffs' showing that their workloads will still increase because of the greater difficulty of completing applications in the first instance under the new standards. Dkt. 11-1 at 9–10 (Barón Decl. ¶ 39); Dkt. 50-1 at 12–15, 17–18 (Barón 2d Decl. ¶¶ 28, 29, 32–

34, 36, 42–43); Dkt. 50-2 at 7–12 (Cooper Decl. ¶¶ 21–28); Dkt. 50-3 at 9–11 (Escobar Decl. ¶¶ 31–33, 35).

The Court is also unpersuaded that Plaintiffs' asserted injuries merely constitute "ordinary program costs, which cannot constitute an injury in fact." Dkt. 25-1 at 28 (capitalization altered and quotation marks omitted). The principal decision on which Defendants rely in their motion to dismiss the first amended complaint, *National Taxpayers Union v. United States*, held that "a nonprofit organization formed to promote fair, responsible, and legal revenue-raising practices by the United States government" did not have standing to challenge a provision of the Omnibus Budget Reconciliation Act of 1993 setting tax rates. 68 F.3d 1428, 1430, 1434 (D.C. Cir. 1995). The court reached that conclusion because the provision did not "perceptibly impair[]" the organization "from pursuing its true purpose of monitoring the government's revenue practices" and, instead, merely required that it expend "operational costs . . . normally [associated with] review[ing], challeng[ing], and educat[ing] the public about revenue-related legislation." 68 F.3d at 1434. Those "ordinary program costs," the court concluded, could not be "convert[ed] . . . into an injury in fact." *Id.* Here, unlike in *National Taxpayers Union*, Plaintiffs have identified "perceptible" burdens that will "impair" their ability to "pursue" their "purpose[s]" if the Rule takes effect. These burdens are of the type necessary to establish *Havens* standing.

That leaves causation and redressability. Having concluded that Plaintiffs are likely to succeed in establishing a cognizable injury, the two remaining *Lujan* factors are easily satisfied. As to causation, Plaintiffs have established that their injuries are fairly traceable to the Rule; it is the Rule that will increase the costs of seeking the immigration benefits at issue and that will make it more difficult for low-income individuals (including Plaintiffs' clients and members) to

18

qualify for those benefits, and Plaintiffs' asserted injuries are the product of those changes. As to redressability, the relief Plaintiffs seek would eliminate (or postpone) the Rule and the corresponding injuries that Plaintiffs assert. Dkt. 45 at 73–74.

The Court, accordingly, concludes that Plaintiff have shown that they are likely to establish that they have organizational standing.

2. *Associational Standing*

Plaintiffs also assert that CASA has associational standing. CASA has submitted a declaration "describ[ing] a circumstance of one member who is facing a naturalization fee that will now be much higher than it would be otherwise." Dkt. 77 at 46; *see also* Dkt. 50-3 at 9 (Escobar Decl. ¶ 30). "To establish associational standing, an organization must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *McCarthy*, 139 F. Supp. 3d at 38 (quotation marks omitted); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011).

CASA asserts associational standing based on the following averment from its Chief of Programs and Services:

> [O]ne member has informed CASA that she had been intending to apply for naturalization in December 2020, when she believes she will become eligible to naturalize, with an exemption from the English test requirements. The English test is not required of individuals who are above a certain age and have held lawful permanent residence for a certain period of time. That member will face a fee of $1,170 for a paper application or $1,160 for an online application, which is higher than what she would have to pay under current law. Given her financial circumstances, the member does not know whether she will be able to afford the fee at that time, and may have to delay her application further.

Dkt. 50-3 at 9 (Escobar Decl. ¶ 30).  The Court is unpersuaded that this isolated averment is sufficient to establish associational standing.

The D.C. Circuit has repeatedly opined that "it is not enough" for a plaintiff asserting associational standing "to aver that unidentified members have been injured."  *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–500 (2009)).  "Rather, the [plaintiff] must specifically 'identify members who have suffered the requisite harm.'"  *Id.* at 200–01 (quoting *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815, 820 (D.C. Cir. 2006)); *see also Pub. Citizen*, 297 F. Supp. 3d at 18.  Here, Plaintiffs refer to a specific member who, they assert, will suffer a cognizable injury—the increased cost of applying for naturalization—but they do not *identify* that individual.  That omission has deprived Defendants of the ability to dispute Plaintiffs' claim of associational standing; Defendants cannot, for example, argue that the unidentified member is ineligible for naturalization.  Moreover, even if the Court might under certain circumstances permit a member of an association to proceed anonymously, *see Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 226 & n.10 (D.D.C. 2018) (subsequent history omitted), Plaintiffs have failed to lay a proper foundation for making such a request.  Beyond that threshold difficultly, Plaintiffs have at most shown that a member of CASA might be adversely affected by one of the many fee changes that Plaintiffs challenge.  That is problematic because "standing is not dispensed in gross," *Laroe Estates*, 137 S. Ct. at 1650, and thus a plaintiff must "demonstrate standing for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006), and "for each form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

Accordingly, it is unlikely that Plaintiffs' limited showing, even if accepted for present purposes, would suffice to establish CASA's associational standing to challenge the entirety of the Rule.

### 3.   *Prudential Standing*

Defendants make a passing reference to Plaintiffs' prudential standing to seek a preliminary injunction in a single sentence in a footnote in their opposition brief.  Dkt. 69 at 50 n.42; *see also* Dkt. 26 at 30 (motion to dismiss first amended complaint) ("Even if Plaintiff could establish standing, its claims would still fail because they are outside the zone of interests served by the fee statute, 8 U.S.C. § 1356(m), and fee waiver regulation, 8 C.F.R. § 103.7(c)(3).").  Citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014), the sentence asserts:  "Nor is it clear that the agency must take into account the purported 'burden[s]' imposed on attorneys, rather than on applicants themselves, since immigration attorneys do not fall within the zone of interests served by the USCIS fee statute, 8 U.S.C. § 1356(m)."  Dkt. 69 at 50 n.42.  To the extent Defendants intend to raise a prudential standing defense, their effort fails.

As an initial matter, the Court is unpersuaded that this brief, conditional assertion in a footnote is sufficient to preserve the issue.  The-zone-of-interests test "is not a jurisdictional doctrine but, rather[,] . . . a tool for determining who may invoke the cause of action created in the statute at issue."  *O.A.*, 404 F. Supp. 3d at 144 (quotation marks omitted).  In opposing Plaintiffs' motion for a preliminary injunction, Defendants never assert that Plaintiffs fail the zone-of-interest test; they merely assert that it is *unclear* that *DHS was required to consider* the interests of attorneys, as opposed to "applicants themselves."  Dkt. 69 at 50 n.42.  That passing reference—without even taking a definitive view on the issue—fails to preserve what is a forfeitable argument.

But, even if Defendants had raised the defense in opposing Plaintiffs' motion for a preliminary injunction, the Court would be unpersuaded.  As the Supreme Court has emphasized, "in keeping with Congress's evident intent when enacting the APA "to make agency action presumptively reviewable," the zone-of-interests test "is not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quotation marks omitted).  "[T]he benefit of any doubt" as to the APA's zone-of-interests test "goes to the plaintiff," and the test therefore "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Id.* (quotation marks omitted).

The undemanding zone-of-interests test is satisfied here.  Plaintiffs' daily work is governed by the INA and the fee provisions at issue here.  Provision 8 U.S.C. § 1255(l)(7) requires the Secretary of Homeland Security to permit individuals seeking certain humanitarian benefits to apply for fee waivers, Dkt. 27 at 28, and, as discussed, a non-trivial portion of each organization's work is helping individuals apply for those waivers.  Similarly, the INA requires the government to give T- and U-visa holders—two major client groups of NWIRP, Dkt. 11-1 at 2 (Barón Decl. ¶ 6)—"referrals to nongovernmental organizations [like NWIRP] to advise [T- and U-visa holders of] their options," 8 U.S.C. § 1184(p)(3) (U visas); *id.* § 1101(i)(1) (T visas). Finally, the INA requires the government to "seek the assistance of . . . private voluntary agencies" distributing information about naturalization.  *Id.* § 1443(h).  On its own terms, then, the INA contemplates an important role for organizations like Plaintiffs.  It "cannot reasonably be assumed that Congress intended to" prevent suit from those entities.  *Patchak*, 567 U.S. at 225 (quotation marks omitted).

\*   \*   \*

22

The Court, accordingly, concludes that Plaintiffs have shown that they are likely to prevail with respect to organizational and prudential standing.

**B.     Likelihood of Success on the Merits**

The Court also concludes that Plaintiffs are likely to prevail on the merits in two respects: (1) whether Chad Wolf had authority to act as the DHS Secretary when he approved (or ratified) the Rule, and (2) whether the Rule was adopted in conformity with the APA.  Because Plaintiffs are likely to succeed on these claims, the Court does not consider other claims brought by Plaintiffs.

1.     *Appointments Issues*

Plaintiffs raise a host of challenges to the authority of Kevin McAleenan, who approved the 2019 Proposed Rule, and Chad Wolf, who approved the 2020 Final Rule, to serve as Acting Secretary of DHS.  Dkt. 50 at 25–33.  Plaintiffs argue that both officials were appointed in contravention of the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, and the Homeland Security Act ("HSA"), 6 U.S.C. § 101 *et seq.  Id.*  Plaintiffs further contend that because the officials were serving without lawful authority, the Final Rule is void.  *Id.* at 32–33.

Assessing Plaintiffs' claims, which depend on the interplay between the FVRA and the HSA, requires consideration of both of these statutory provisions and the series of orders that have purported to govern the line of succession at DHS in recent years.  Figuring out who, if anyone, was the rightful Acting Secretary at any given time is like divining the true heir to the Iron Throne at the end of the *Game of Thrones*, Season 8, Episode 6, *Game of Thrones* (HBO 2019).  Neither is an easy task.

The FVRA, enacted in 1998, provides a framework for temporarily filling vacancies in offices for which presidential appointment and Senate confirmation ("PAS") is required.  5

U.S.C. § 3345 *et seq.*  The operative provision of the FVRA, 5 U.S.C. § 3345, sets a default that if a PAS official "dies, resigns, or is otherwise unable to perform the functions and duties of the office," then "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." *Id.* § 3345(a)(1).  Otherwise, "the President (and only the President)" may fill vacant PAS offices on a temporary, acting basis with certain other federal officers.  *Id.* § 3345(a)(2)–(a)(3).  With certain exceptions not relevant here, the next provision of the FVRA, 5 U.S.C. § 3346, then limits an acting officer to service of "no longer than 210 days," *id.* § 3346(a)(1), or, if a nomination for the office has been submitted to the Senate, "for the period that the nomination is pending in the Senate," *id.* § 3346(a)(2).  The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any" PAS officer, unless another statute "expressly" creates an alternative mechanism for filling vacancies in a given agency.  *Id*. § 3347.  And violations of the FVRA have consequences: "An action taken by any person who is not acting" in compliance with the FVRA "in the performance of any function or duty of a vacant office to which" the FVRA applies "shall have no force and effect," *id.* § 3348(d)(1), and any such action "may not be ratified," *id.* § 3348(d)(2).

On December 9, 2016, President Obama issued an Executive Order in which he exercised his authority under the FVRA to set a line of succession that would govern "during any period in which the [DHS] Secretary has died, resigned, or otherwise become unable to perform the functions and duties of the office of Secretary."  Exec. Order No. 13753, 81 Fed. Reg. 90,667, 90,667 (Dec. 9, 2016) ("E.O. 13753").  The order set out which DHS officials would "in the order listed . . . act as, and perform the functions and duties of the office of, the Secretary of Homeland Security . . . if they are eligible to act as Secretary under the provisions of the Federal

Vacancies Reform Act." *Id.* Several days later, on December 15, 2016, then-Secretary Jeh Johnson implemented the Executive Order by issuing Revision 8 to the "DHS Orders of Succession and Delegations of Authorities for Named Positions." Dkt. 69-3 at 7. Within the limits of the FVRA, that document created a bifurcated structure for which Department officials would act as Secretary in different situations. *Id.* In Section II.A., Johnson dealt with succession generally by providing that, "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753." *Id.* In Section II.B., Johnson delegated to a separate list of officials, attached as "Annex A," his authority "to exercise the powers and perform the functions and duties of [the Secretary's] office, to the extent not otherwise prohibited by law, in the event [the Secretary is] unavailable to act during a disaster or catastrophic emergency." *Id.*

Just a few days later, Congress amended the HSA to exempt DHS from the FVRA in certain respects and to give the Secretary greater authority to designate the order of succession for Acting Secretaries. *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, 130 Stat. 2000 (Dec. 23, 2016). The statute designates the Deputy Secretary of Homeland Security as "the Secretary's first assistant for purposes of [the FVRA]." 6 U.S.C. § 113(a)(1)(A). As noted above, the FVRA sets a default rule that if an officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office," then "the first assistant to the office of" that officer is vested with authority to "perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations" set forth elsewhere in the FVRA. 5 U.S.C. § 3345(a)(1).

The amendment further provides that, notwithstanding the FVRA, "if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available

to exercise the duties of the Office of the Secretary," then in that case "the Under Secretary for Management shall serve as the Acting Secretary."  6 U.S.C. § 113(g)(1).  The default line of succession thus passes from the Secretary to the Deputy Secretary to the Under Secretary for Management.  Beyond those three officers, the amended statute also empowers the Secretary to designate a "further order of succession."  *Id.* § 113(g)(2).  That subsection provides: "Notwithstanding [the FVRA], the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."  *Id.*  It is this final open-ended succession provision on which the dispute in this case turns.

The last presidentially appointed and Senate-confirmed Secretary of Homeland Security was Kirstjen Nielsen.  She resigned on April 10, 2019, creating a vacancy in the Office of the Secretary that persists to this day.  Dkt. 50 at 26.  Just before resigning, Secretary Nielsen "approved" a document that, according to Defendants, amended the order of succession established by Secretary Johnson.  Dkt, 50-4 at 127–28.  As relevant here, Nielsen purported to move the position of Commissioner of U.S. Customs and Border Protection ("CBP") from fourteenth to third on the list of officials who could assume the position of Acting Secretary.  *Id*; E.O. 13753, 81 Fed. Reg. at 90,667.

Because McAleenan was serving as the CBP commissioner at the time—and because the offices of Deputy Secretary and Under Secretary for Management were both vacant— McAleenan purportedly became Acting Secretary upon Secretary Nielsen's resignation, pursuant to her amendment to the order of succession.  Dkt. 69 at 18.  After only a few months on the job, McAleenan announced his resignation.  On November 8, 2019, on his way out of office, McAleenan again amended the order of succession to move the Under Secretary for Strategy, Policy, and Plans up to fourth on the list, behind only the Deputy Secretary, Under Secretary for

Management, and the Commissioner of CBP.  Dkt. 50-4 at 129.  Three days later, on November

13, 2019, the Senate confirmed Wolf as the Under Secretary for Strategy, Policy, and Plans, and

because all of the positions ahead of his in McAleenan's succession order were vacant, Wolf

immediately assumed the role of Acting Secretary.  Dkt. 50 at 28.

 Plaintiffs challenge the appointments of the two Acting Secretaries on several grounds.

*Id.* at 25–33.  For the purposes of assessing Plaintiffs' likelihood of success on the merits, the

Court focuses on their two strongest arguments: First, Plaintiffs contend that Secretary Nielsen's

effort to amend the order of succession failed because she amended only Annex A to the Johnson

order, which dealt exclusively with temporary vacancies occurring when the Secretary is

"unavailable to act during a disaster or catastrophic emergency." *Id.*  According to Plaintiffs,

that left McAleenan without authority to issue the proposed Rule and, more importantly, without

authority to re-amend the order of succession to place Wolf in line to serve as Acting Secretary.

*Id.*  Second, Plaintiffs argue that under 6 U.S.C. § 113, only a presidentially appointed, Senate-

confirmed Secretary—and not an Acting Secretary—can designate an order of succession. *Id.* at

29–31.  Thus, even if McAleenan's appointment as Acting Secretary was proper, neither he nor

any other Acting Secretary had the authority under the statute to handpick his successor, and

Wolf's appointment was therefore unlawful. *Id.*

 In recent weeks, two other district courts have accepted versions of the first argument,

holding that Wolf's appointment was invalid and that actions he has taken as Acting Secretary

are void. *See Immigrant Legal Res. Ctr.*, 2020 WL 5798269; *Casa de Maryland v. Wolf*, No.

8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020).  This Court reaches a different

conclusion with respect to Plaintiffs' first argument but, nonetheless, arrives at the same bottom

line because it is persuaded that Plaintiffs are likely to prevail on their second argument.

a.       Error in McAleenan's Appointment

Plaintiffs first claim that Secretary Nielsen's attempt to amend the Department's order of

succession was ineffective, following the reasoning that the Government Accountability Office

("GAO") applied in reaching a similar conclusion.  *See* GAO, Homeland Security, File B-

331650 (Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf.

As explained above, the Johnson order created a bifurcated order of succession by

ordering that Executive Order 13753 governs "[i]n case of the Secretary's death, resignation, or

inability to perform the functions of the Office," but that Annex A, listing sixteen DHS officials,

governs if the Secretary is "unavailable to act during a disaster or catastrophic emergency."  Dkt.

50-4 at 61, 65.  Secretary Nielsen, in turn, approved a memorandum to "designate [her] desired

order of succession for the Secretary of Homeland Security in accordance with [her] authority

pursuant to Section 113(g)(2) of title 6, United States Code."  *Id.* at 127.  The attached document,

however, amended only Annex A, not the broader agency policy governing succession.  *Id*. at

128.

Plaintiffs argue that by amending Annex A, Secretary Nielsen changed the order of

delegation to serve as Acting Secretary only "in event of disaster or catastrophic emergency."

Dkt. 50 at 28; Dkt. 50-4 at 61.  But, on Plaintiffs' reading of the administrative record, she did

not amend § II.A of the Johnson order, which incorporated the order of succession specified by

the President in Executive Order 13753 in all circumstances other than the unavailability of the

Secretary during a disaster or catastrophic emergency.  Dkt. 50 at 27.  And because the

Executive Order puts the CBP Commissioner fourteenth in line—behind the Director of the

Department's Cybersecurity and Infrastructure Security Agency and the Administrator of the

Federal Emergency Management Agency ("FEMA"), among others, *see* E.O. 13753, 81 Fed.

28

Reg. at 90,668—Commissioner McAleenan was never properly designated to serve as Acting Secretary.  Dkt. 50 at 27–28.  Thus, so the argument goes, because Secretary Nielsen amended only Annex A, her resignation left the Director of the Department's Cybersecurity and Infrastructure Security Agency, which was the highest position on the Executive Order's list that was filled at the time, in line to serve as Acting Secretary.  *Id*.

Following Plaintiffs' reasoning, the flaw in Secretary Nielsen's effort to designate McAleenan to serve as Acting Secretary carried over to infect Wolf's appointment to serve as Acting Secretary as well.  As noted above, before his resignation, McAleenan amended the order of succession again.  Dkt. 50-4 at 129.  This time, McAleenan explicitly changed not only the order of succession for emergencies but also adopted a new order of succession applicable in cases "of the Secretary's death, resignation, or inability to perform the functions of the Office." *Id.*  He accomplished this by amending § II.A. of the Johnson order, which covers vacancies because of death, resignation, or inability to perform, so that it cross-referenced the list of officials in Annex A, rather than cross-referencing the Executive Order.  *Id.*  This eliminated any bifurcation in the order of succession at the Department because, after McAleenan's amendment, §§ II.A. and II.B. both cross-referenced Annex A.  McAleenan's order further amended Annex A to move up the Under Secretary for Strategy, Policy, and Plans in the line of succession and effectively selected Wolf (who was days away from confirmation to serve as the Under Secretary) as McAleenan's successor as Acting Secretary.  That effort, however, once again failed, according the Plaintiffs.  This time, DHS got the language right, but because McAleenan was not properly serving as Acting Secretary, his effort to amend the order of succession was a nullity—and, in Plaintiffs' view, Wolf's appointment was unlawful as well.  Dkt. 50 at 29.

As mentioned above, two other district courts have found this reasoning compelling.  *See Immigrant Legal Res. Ctr.*, 2020 WL 5798269; *Casa de Maryland*, 2020 WL 5500165.  The Court may assume, without deciding, that Plaintiffs' reasoning is correct to this point, because a little further down the tortuous road of DHS succession, the Court parts ways with these other courts and holds that Plaintiffs' claims related to Nielsen's efforts to amend the Johnson order have finally hit a dead end.

On September 10, 2020, a week after Plaintiffs filed their motion for preliminary injunction, President Trump nominated Wolf to serve as the Secretary of Homeland Security. Dkt. 69 at 30.  That same day, in response to both the ongoing litigation and the GAO opinion, FEMA Administrator Peter Gaynor, who would have been Acting Secretary according to the order of succession designated by Executive Order 13753, issued a new order of succession that listed the Under Secretary for Strategy, Policy, and Plans—that is, Wolf—as the Acting Secretary, in line of succession behind the vacant offices of Secretary, Deputy Secretary, Under Secretary for Management, and CBP Commissioner.  Dkt. 69-3 at 47; Dkt. 69 at 30.  A week later, Wolf issued an order "ratifying each of [his] delegable prior actions as Acting Secretary," including his prior approval of the Final Rule at issue in this litigation.  Dkt. 69-3 at 50–52.

Gaynor's order was (at least arguably) enough to make Wolf the legitimate Acting Secretary, based on the following chain of inferences.  If Nielsen's order technically failed to change the order of succession in the event of a resignation, then McAleenan did not lawfully become Acting Secretary.  And if McAleenan did not lawfully become Acting Secretary, then his own attempts to alter the order of succession in the event of a resignation also failed.  That would mean that as of September 10, 2020, the operative document dictating the order of succession in the event of a resignation was still the Executive Order, as specified in Johnson's original order,

which both Nielsen and McAleenan had failed effectively to amend.[1]  Under the Executive

Order, moreover, the FEMA Director is fourth in line to serve as Acting Secretary.  Thus, when

Gaynor was confirmed by the Senate to serve as FEMA Director—with all the offices above his

in the Executive Order's line of succession remaining vacant—he became Acting Secretary on

January 14, 2020.  As such, so Defendant's theory goes, Gaynor had the power as Acting

Secretary to name a further order of succession under 6 U.S.C. § 113(g)(2) and properly

designated Wolf to replace him.

One potential snag for this theory is that the Executive Order designated its order of

succession pursuant to the FVRA, which includes a 210-day time limit for acting officials

"beginning on the date the vacancy occurs."  5 U.S.C. § 3346(a)(1).  Here, Nielsen resigned on

April 10, 2019, and far more than 210 days passed before Gaynor purported to amend the order

of succession, potentially rendering that action void.  But a separate provision of the FVRA

permits an acting official to serve "from the date of" a first nomination for the vacant office and

"for the period that the nomination is pending in the Senate."  *Id.* § 3346(a)(2).  Because

---

[1]  Nor does the DHS Secretary (much less the Acting Secretary) have authority to amend or to supersede an executive order.  The existence of two, conflicting orders of succession—one established pursuant to the FVRA and the other pursuant to § 113—does, however, raise a series of questions about the interaction of the two regimes and about how conflicts between the two are best resolved.  Under one of those regimes, the President has directed that the Administrator of FEMA, when the positions ahead of his in the order of succession are vacant, "*shall* act as, and perform the functions and duties of the office of, the Secretary of Homeland Security."  E.O. 13753, 81 Fed. Reg. at 90,667.  But under the other, the Acting Secretary—serving pursuant to a designation under the Executive Order—has directed that the Under Secretary for Strategy, Policy, and Plans serve as Acting Secretary.  Dkt. 69-3 at 47.  Because Plaintiffs have not challenged Wolf's designation on this ground, and because neither party has briefed the issue, the Court simply notes the oddity of an order from an Acting Secretary purporting to supplant a presidential designation.  Of course, Gaynor as Acting Secretary made his purported designation under a different (and non-exclusive) legal regime, one that vests the Secretary with discretion to designate a line of succession "[n]otwithstanding" the FVRA.  But, even with that statutory discretion, the approach advocated here would seem to turn the normal executive branch hierarchy on its head.

President Trump nominated Wolf the same day that Gaynor purported to amend the order of

succession, Gaynor was lawfully serving as Acting Secretary under the Executive Order and the

FVRA at the time he amended the order of succession.[2]

This leaves the question whether Wolf successfully ratified McAleenan's prior approval

of the Proposed Rule and his own prior approval of the Final Rule, purging those actions of any

illegitimacy.  The answer to that question is complicated and turns on the interplay between the

FVRA, the HSA, and the APA, as well as the byzantine path leading to Wolf's re-designation to

serve as Acting Secretary.  Assuming, as the Court does, that McAleenan and Wolf were not

properly serving as Acting Secretary when they initially issued the Proposed Rule and the Final

Rule because of the flaws in Nielsen's and McAleenan's attempted amendments to the order of

succession, the line of lawful authority starts with Gaynor, who was serving as Acting Secretary

pursuant to Executive Order 13753 and the FVRA.  Gaynor then purported to amend the order of

succession to name Wolf as Acting Secretary pursuant to the HSA, *see* 6 U.S.C. § 113(g).

Below, in Section II.B.1.b, the Court considers whether the HSA gives one Acting Secretary the

power to designate another Acting Secretary.  But for the purpose of assessing Plaintiffs' claims

based on harms flowing from Nielsen's unlawful appointment of McAleenan, the Court will

assume that Gaynor, as Acting Secretary, had the statutory authority under the HSA to alter the

order of succession, effectively designating Wolf to serve as Acting Secretary.  When Gaynor

did so, Wolf became the Acting Secretary, not pursuant to the FVRA, but pursuant to the HSA.

---

[2]  The President could not have directly designated Wolf to serve as the Acting Secretary
pursuant to the FVRA because the FVRA bars a nominee to a vacant office from filling that
vacancy in an acting capacity unless he or she served as the first assistant to that office before the
vacancy arose for at least 90 days, *see* 5 U.S.C. § 3345(b)(1); *NLRB v. SW General, Inc*., 137 S.
Ct. 929 (2017), *aff'd*, 137 S. Ct. 929 (2017), and Wolf never served as the Deputy Secretary.

The question, then, is whether an official serving as Acting Secretary pursuant to the HSA may ratify a proposed and final rule issued by an official who was acting without authority.

The answer depends on the antecedent question of whether the errors in McAleenan's and Wolf's appointments rendered the Proposed and Final Rules void in the first place. Plaintiffs argue that the issuance of the Proposed and Final Rules was unlawful under both the FVRA and the APA. Dkt. 50 at 32–33. The FVRA provides that "[a]n action taken by any person who is not acting" in compliance with the FVRA, "in the performance of any function or duty of a vacant office to which" the FVRA applies, "shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d). Even though McAleenan at the time of the Proposed Rule and Wolf at the time of the Final Rule were purportedly serving under the HSA, the Court is not persuaded that this renders § 3348(d) of the FVRA inapplicable, at least based on the limited briefing to date. That provision does not by its terms apply only to acting officials designated to serve pursuant to the FVRA, but, rather, applies to "a vacant office to which" the FVRA applies. *Id*. There is no doubt that the FVRA applies to the Office of the Secretary, and thus its provision giving "no force or effect" to the actions of acting officials serving unlawfully applies to McAleenan and Wolf. Of course, had McAleenan and Wolf been properly designated under the HSA, Defendants would have avoided this problem, because the FVRA provides the "exclusive means for temporarily authorizing acting officials to perform the functions and duties of any office of an Executive Branch agency, . . . unless . . . a statutory provision expressly . . . authorize[d] . . . the head of an Executive department[] to designate" the official to serve "in an acting capacity." 5 U.S.C. § 3347(a)(1)(A). But, if McAleenan and Wolf (in the first instance) were not designated in conformity with the HSA, then they failed to qualify for the exception, and their unauthorized acting service was subject to the strictures of the FVRA.

Despite this difficulty, Defendants have a persuasive response: the vacant office provision of the FVRA does not void all actions taken by those serving without authority—it nullifies only actions taken "in the performance of any function or duty of a vacant office" that is subject to the FVRA, *id.* § 3348(d). Significantly, the term "function or duty" is narrowly defined to include only those functions or duties that are (1) "established by statute" and "required by statute to be performed by the applicable officer (and only that officer)" or (2) "established by regulation" during the "180-day period preceding the date on which the vacancy occurred" and "required by such regulation to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2). It is here that Plaintiffs' first line of argument hits a dead end. Defendants point to a 2003 delegation from the Secretary that authorizes the Deputy Secretary to act for the Secretary "to sign, approve, or disapprove any proposed or final rule, regulation or related document." Dkt. 69-3 at 54–55; Dkt. 69 at 32–33. The Court has previously interpreted the FVRA's definition of "function or duty" to encompass delegable duties that were not delegated during the 180-day window proceeding the vacancy. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 34 (D.D.C. 2020). But here, because the Secretary delegated the authority to issue Department rules in 2003, that power is not vested exclusively in the Secretary and is therefore not the type of action that is voided under the FVRA. 5 U.S.C. § 3348.

Plaintiffs offer three responses. First, they assert that "DHS does not state that the 2003 document is still operative," and "[i]ts text suggests that it is not, since it addresses what happens when the Secretary resigns or is absent, a topic now addressed by the Johnson order and 6 U.S.C. § 113." Dkt. 74 at 16. It is Plaintiffs, however, who carry the burden of demonstrating that they are likely to succeed on the merits, and the Court has no reason to question Defendants' good faith in proffering the 2003 document as a preexisting (and, the Court can only assume, still

existing) delegation.[3]  Second, Plaintiffs argue that the 2003 document makes the Deputy Secretary the agent of the Secretary only for "a portion of the rulemaking process" such that "the rulemaking function . . . remains exclusive to the Secretary."  *Id.*  That argument, however, ignores that the 2003 document introduces all of the listed responsibilities as "a delegation to the Deputy Secretary to fulfill responsibilities . . . on behalf of the Secretary."  Dkt. 69-3 at 54.  This language indicates that all of the listed delegations are similar in kind, and the language Plaintiffs highlight to distinguish the delegated power to sign regulations is not so clear as to overcome the stated purpose of the document.  Finally, Plaintiffs contend that the Secretary's authority to issue final rules is established by statute and required by statute to be performed by the Secretary and only the Secretary.  Dkt. 74 at 16–17.  But, in making that argument, Plaintiffs cite to 6 U.S.C. § 112, and that provision authorizes the Secretary to delegate any of her statutorily assigned functions, "except as otherwise provided by this chapter."  Plaintiffs fail to cite to any provision that precludes delegation of authority to approve a final rule.  The Court, accordingly, concludes that the power to sign, approve, or disapprove proposed or final rules is not a "function or duty" of the Secretary within the meaning of the vacant office provision of the FVRA, and therefore the FVRA does not mandate that the Proposed Rule and Final Rule have "no force or effect."  5 U.S.C. § 3348.

Plaintiffs also argue that the Court should vacate the Final Rule because McAleenan and Wolf acted without statutory authority, and their actions, therefore, were not in accordance with law for purposes of the APA, *see* 5 U.S.C. § 706(2).  *NLRB v. SW General, Inc.*, 796 F.3d 67, provides a helpful starting point for considering this argument.  In that case, the D.C. Circuit held

---

[3]  If that assumption is mistaken, the Court expects (and directs) that Defendants promptly correct the record.

that the Acting General Counsel of the National Labor Relations Board ("NLRB") violated the

FVRA provision that prohibits an official from continuing to serve in an acting capacity after the

President has nominated the official to fill the office in which they are acting.  *Id.* at 78; *see also*

5 U.S.C. § 3345(b)(1).  But because the FVRA exempts the General Counsel of the NLRB from

the vacant office provision, 5 U.S.C. § 3348(e)(1), the court was required to decide whether the

APA provides a remedy apart from the remedy found in the FVRA, *SW Gen.,* 796 F.3d at 79.

Because the NLRB merely argued that the APA's harmless error rule and the *de facto* officer

doctrine prevented vacatur of the NLRB order at issue in that case, the court assumed, without

deciding, that § 3348 did not affirmatively "insulate" the actions of the Acting General Counsel

from attack.  *Id.*  The Court then held that neither the "rule of prejudicial error" under 5

U.S.C. § 706 nor the *de facto* officer doctrine saved the challenged NLRB order from vacatur.

*Id.* at 79–83.  Applying that same framework here, the Court concludes that Plaintiffs have yet to

demonstrate that they are likely to prevail on the merits of this claim.

      Under the APA's "rule of prejudicial error," 5 U.S.C. § 706, reviewing courts must

consider whether the agency's error affected the outcome.  *See Jicarilla Apache Nation v. U.S.

Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010).  "The burden to demonstrate prejudicial

error is on the party challenging agency action," but it "is 'not . . . a particularly onerous

requirement.'"  *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009)).  Ratification,

however, can render harmless an error in an official's appointment.  As the D.C. Circuit has

recognized, "any statutory defect in [an] acting director's authority [is] cured [if] a subsequent,

properly appointed director ratified [the] action[]."  *SW Gen.*, 796 F.3d at 79 (citing *Doolin*, 139

F.3d at 213 (D.C. Cir. 1998)); *see also Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 371

(D.C. Cir. 2017); *Intercollegiate Broad. Sys. Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 119

n.3 (D.C. Cir. 2015).  Many of those cases arose in the context of administrative adjudication, and their reasoning is difficult to adapt to the rulemaking context.  But in one recent case, the D.C. Circuit held that plaintiffs did not have a likelihood of success on the merits of an appointments-based challenge to a rulemaking because of "a properly appointed official's ratification of an allegedly improper official's prior action."  *Guedes*, 920 F.3d at 13.  *Guedes* relied in part on the plaintiffs' concession that the ratification was valid, *id.* at 12, so that portion of the D.C. Circuit's analysis does not establish a binding rule.  It is nonetheless notable that the *Guedes* court applied the ratification doctrine to the rulemaking context without pause.  *Id.* at 13.

Here, the Court concludes that, assuming Gaynor properly appointed Wolf to serve as Acting Secretary—a question that the Court takes up below—it is likely that Wolf's ratification rendered the errors in the initial promulgation of the Proposed Rule and the Final Rule harmless.  Because Wolf was ratifying his own action in adopting the Final Rule, and because McAleenan was not acting as a "statutorily independent" official with a distinct perspective when he issued the Proposed Rule, *SW Gen.*, 797 F.3d at 80, there is no reason to doubt that the Rule would have come out the same way if he had been serving properly in the first instance.  Nor is there any indication in the record that either the Proposed Rule or the Final Rule would have come out any differently had they been approved instead by the Director of the Department's Cybersecurity and Infrastructure Security Agency, whom Plaintiffs argue should have rightfully become Acting Secretary pursuant to the Executive Order, following Nielsen's resignation.  Dkt. 50 at 27–28.  In light of the precedent from the court of appeals holding that ratifications can cure appointments-related issues, and because Plaintiffs have failed to make any substantial argument to the contrary, the Court concludes that Wolf's ratification was likely effective, at least to the extent

that he was serving lawfully after Gaynor purported to amend the order of succession, which is

the question to which the Court turns next.

The Court therefore concludes that Plaintiffs are not likely to succeed on the merits of

their claim that Nielsen's flawed appointment of McAleenan rendered the Final Rule invalid.

        b.    <u>Acting Secretary's Power to Name an Order of Succession Under the HSA</u>

Underlying the foregoing analysis was the assumption that Gaynor, as Acting Secretary,

had the power under 6 U.S.C. § 113(g) to amend the Department's order of succession.  But

Plaintiffs raise a separate argument that calls that premise into question.  They contend that "the

HSA's succession-order provision [6 U.S.C. § 113(g)] does not give an *acting* secretary authority

to change the order of succession."  Dkt. 50 at 29 (emphasis in original).  This argument relies on

a literal reading of the statute, which provides that, "[n]otwithstanding [the FVRA], the Secretary

may designate such other officers of the Department in further order of succession to serve as

Acting Secretary."  6 U.S.C. § 113(g)(2).  Because the provision "distinguishes the role of

'Secretary' from that of 'Acting Secretary,'" Plaintiffs maintain that "[t]he Court should 'respect

Congress'[s] decision to use different terms to describe different categories of people' in this

context."  Dkt. 50 at 29–30 (quoting *Mohamad v. Palestinian Auth*., 566 U.S. 449, 456 (2012)).

Plaintiffs find support for their reading of the statute in the FVRA, which by its terms

constitutes the "exclusive means" for appointing acting officials unless another statute "expressly

authorizes . . . the President, a court, or the head of an Executive department, to designate an

officer or employee to perform the functions and duties of a specified office temporarily in an

acting capacity."  5 U.S.C. §3347(a)(1).  Plaintiffs argue that the HSA, by stating that the

"Secretary" may designate an order of succession, does not "expressly" vest that power in an

"Acting Secretary."  Dkt. 50 at 30.  And Plaintiffs further contend that even if the HSA might be

read to vest the Acting Secretary with authority to designate other acting secretaries, the FVRA does not permit such a result, because it "does not indicate that an *acting* 'head of an Executive department' can designate acting officials." *Id.* (emphasis added). Defendants counter that acting officials are generally understood to possess all the powers of the vacant office they are occupying, and it would be inconsistent to read the word "Secretary" as including an Acting Secretary when delineating the Secretary's powers in other parts of the HSA but not in 6 U.S.C. § 113(g)(2). Dkt. 69 at 25–26.

The Court agrees with Plaintiffs that the FVRA provides support for their reading of § 113(g)(2), for the reasons given and others. As always when interpreting a statute, the Court begins with the text. *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). Here, it is important to place the text of the HSA in context, including its textual relationship and interplay with the FVRA. The relevant provision of the HSA, 6 U.S.C. § 113, starts by providing that the Deputy Secretary "shall be the Secretary's first assistant for purposes of" the FVRA, which expressly ties 6 U.S.C. § 113(a)(1)(A) to the FVRA's default rule, 5 U.S.C. § 3345(a). In circumstances in which neither the Secretary nor Deputy Secretary is available to exercise the duties of the Secretary, "by reason of absence, disability, or vacancy in office," § 113 first provides that "[n]otwithstanding [the FVRA], the Under Secretary for Management shall serve as the Acting Secretary." 6 U.S.C. § 113(g)(1). This fits into the FVRA provision recognizing exceptions in which another statute "expressly . . . designates" a specific "officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." 5 U.S.C. § 3347(a)(1)(B). Finally, § 113(g) provides, again "[n]otwithstanding" the FVRA, that "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2). As Plaintiffs point out, this language

corresponds to the FVRA provision allowing for exceptions that "expressly . . . authorize[] the President, a court, or the head of an Executive department[] to designate" acting officials. 5 U.S.C. § 3347(a)(1)(A).

It is thus clear that Congress wrote the HSA to operate alongside the FVRA, but the "notwithstanding" clauses make equally clear that the HSA establishes an exception to the FVRA framework. In interpreting the meaning of the word "Secretary" in § 113(g)(2), the Court must decide how big an exception to the FVRA Congress created. The FVRA vests the power to set an order of succession beyond a vacant office's first assistant in "the President (and only the President)." *Id.* §§ 3345(a)(2); 3345(a)(3). The HSA creates an exception to this rule that allows the Secretary (and not "only the President") to establish an order of succession as well. If the provision refers only to a PAS Secretary, then it is a narrow exception. If, however, the word "Secretary" in § 113(g)(2) is read to include an Acting Secretary, that would make the exception much more capacious. Under the broad reading of the exception that Defendants endorse, the Secretary could designate the lowest-ranking "officer" in any office or agency within the Department to serve as Acting Secretary, and once in office, that Acting Secretary could amend the Department's order of succession to name other low-ranking "officers" to succeed him. Nothing in the text of the HSA would limit Defendants' reading of § 113(g)(2) to PAS or even presidentially appointed officers. As a result, an exception to the FVRA's requirement that the "President (and only the President)" designate acting officers would permit *any* "officer" in the Department, who is designated by the Secretary to serve in her absence, to fill the role ordinarily reserved to the "President (and only the President)" to designate such an acting official.

As the Supreme Court has explained, a canon of statutory interpretation instructs that "[a]n exception to a 'general statement of policy' is 'usually read . . . narrowly in order to

preserve the primary operation of the provision.'"  *Maracich v. Spears*, 570 U.S. 48, 60 (2013)

(quoting *Commissioner v. Clark*, 489 U.S. 726, 739 (1989)).  "[E]xceptions ought not operate to

the farthest reach of their linguistic possibilities if that result would contravene the statutory

design."  *Id.*  As the Court explained in *L.M.-M.*, "Congress enacted the FVRA, in large part, to

'recla[im]' its 'Appointments Clause power.'"  *L.M.-M.*, 442 F. Supp. 3d at 29 (citing *SW Gen.*,

796 F.3d at 70).  "Congress was concerned, most notably, that the Attorney General and other

department heads had made frequent use of organic vesting and delegation statutes to assign the

duties of PAS offices to officers and employees, with little or no check from Congress."  *Id.*  To

be sure, the FVRA left open the possibility that other statutes could carve out agency-specific

exceptions, and, by amending the HSA in 2016, Congress created such an exception.  But in the

face of statutory ambiguity, the Court may not read the exception in a way that "decimate[s the

FVRA's] carefully crafted framework."  *Id.* at 28.  Under Defendants' broad reading of

"Secretary" in § 113(g)(2), "[t]he President would be relieved of responsibility and

accountability for selecting acting officials," *id.*, and that power could pass not only to a PAS

Secretary but to lower-level "officers" whom the President did not appoint and, perhaps, whom

the President has never even heard of.  The exception to the FVRA's "exclusive means"

provision, 5 U.S.C. § 3347(a), and the provision vesting "the President (and only the President)"

with authority to designate acting officials beyond the first assistant, *id.* § 3345(a), would thereby

open the door to the Secretary and *any officer the Secretary might designate to serve in her stead*

to determine who will lead the Department.  The Court agrees with Plaintiffs that such a reading

would undermine the structure and purpose of the FVRA and that such a reading should

therefore be avoided.

Defendants' broad reading of § 113(g) is also at odds with the plain meaning of the word "expressly."  The exception to the exclusive-means provision of the FVRA applies only if "a statutory provision *expressly* . . . [1] authorizes the President, a court, or the head of an Executive department to designate an officer or employee to perform the functions and duties of a specified officer temporarily in an acting capacity" or "[2] designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity."  5 U.S.C. § 3347(a)(1) (emphasis added).  This language distinguishes between the vacant office and the officer designated temporarily to perform the duties of that office.  The acting official does not fill the vacant office but, rather, is authorized to "perform the functions and duties" of that office; that is, an Acting Secretary does not become the Secretary but, instead, is merely authorized to perform the functions and duties of the vacant office.  That understanding of what it means to serve in an acting capacity, moreover, is far from novel.  *See Boyle v. United States,* 1857 WL 4155, at *3 (Ct. Cl. Jan. 19, 1857) ("We do not consider that the mere fact that the duties of both offices are the same makes the offices themselves identical. . . . [T]he [Acting Secretary] can perform all the duties of Secretary, and yet is not Secretary.").

The word "expressly," in turn, means "explicitly," "particularly," or "specifically." Expressly, Merriam-Webster, https://www.merriam-webster.com/dictionary/expressly?src=search-dict-hed (last accessed Oct. 8, 2020).  Against this backdrop, Defendants fail to explain how a provision that vests the "Secretary" with authority to designate an order of succession can be understood to expressly—or explicitly—authorize an "Acting Secretary" to perform that same function.  To be sure, acting officials are typically "vested with the same authority that could be exercised by the officer for whom he acts," *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019), but an acting official must take

on that authority either by implication or by virtue of statutory language that expressly vests the acting official with that authority, *cf.* 28 U.S.C. § 508 (vesting Deputy Attorney General with authority to "exercise all the duties of" the office of Attorney General is case of a vacancy). Only the latter is sufficient to create an exception to the FVRA, and no such express statutory language is present here.  Because the FVRA demands an "express" statutory authorization, the Court reads "Secretary" in § 113(g)(2) to mean the Secretary, and not an Acting Secretary.

The Constitution's Appointments Clause provides substantial support for this reading. The Appointments Clause has two prongs.  Under the first, the President is empowered to "nominate, and by and with the Advice and Consent of the Senate, [to] appoint Ambassadors, other public Ministers and Counsels, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided."  U.S. Const. art. II, § 2, cl. 2.  Under the second prong, known as the "Excepting Clause," "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  *Id.*  Reading 6 U.S.C. § 113(g) to permit any Department official who is serving as Acting Secretary to appoint successors to the office of Acting Secretary would raise the question whether such an official is the "Head of Department" for purposes of the Appointments Clause.  In addressing that point, the Court begins with Defendants' well-taken concession that anyone other than the Deputy Secretary (or perhaps the Under Secretary for Management who is serving as the Acting Secretary) is an inferior officer for purposes of the Appointments Clause. Dkt. 69 at 26.  That concession follows from settled precedent. *See Edmond v. United States*, 520 U.S. 651, 661–63 (1997); *Morrison v. Olson*, 487 U.S. 654, 675 (1988); *United States v. Eaton*, 169 U.S. 331, 343 (1898).  Logic also necessitates that result: Any Acting Secretary who was not appointed to that position (or to a germane

43

position) by the President with the advice and consent of the Senate is by definition not a

principal officer, *see* U.S. Const. art. II, § 2, cl. 2, and the Acting Secretary of the Department

undoubtedly exercises significant governmental authority, meaning he or she is not simply an

employee of the Department, *see Buckley v. Valeo*, 424 U.S. 1, 125–26 (1976).

The difficult constitutional question can thus be rephrased as whether the Heads of

Departments for purposes of the Excepting Clause can include inferior officers of the United

States.  If an inferior officer lacks the constitutional authority to appoint another inferior officer,

then it seems improbable—or at least discordant—that an inferior officer may alter the order of

succession in a manner that, in effect, chooses which of the many officers serving at the

Department will become the Acting Secretary.  No existing precedent, however, answers this

question.  "As Justice Souter . . . noted" in his concurring opinion in *Weiss v. United States*, 510

U.S. 163, 192–93 (1994), "it remains unresolved whether 'the Appointments Clause envisions

appointment of some inferior officers by other inferior officers.'"  The Constitutional Separation

of Powers Between the President and Congress, 20 Op. O.L.C. 124, 1996 WL 876050, at *17

n.82 (May 7, 1996).  Various authorities point in different directions.

Non-textual evidence of what the Framers intended is scarce.  As the Supreme Court has

observed, the Excepting Clause was added to the Constitution on the final day of debate, with

little discussion.  *Edmond*, 520 U.S. at 660.  What evidence that does exist, however, suggests

that the Framers intended to limit "Heads of Department" for purposes of the Appointments

Clause to principal officers—or at least never conceived that an inferior officer might serve as a

"Head of Department."  After Gouverneur Morris proposed the Excepting Clause, James

Madison objected on the ground that the exemption "does not go far enough if it be necessary at

all."  2 Max Farrand, *The Records of the Federal Convention of 1787*, at 627 (1911).  Madison

further explained that, in his opinion, "Superior Officers below Heads of Departments ought in some cases to have the appointment of the lesser offices." *Id.* The matter was then put to a vote, and Morris's motion to add the Excepting Clause failed by an evenly divided vote. It was then urged that the motion be put to a second vote, and this time it carried unanimously. *Id.* at 627–28. This episode shows that Madison and others present considered allowing *principal* officers below the rank of Head of Department to appoint some inferior officers, but the convention unanimously decided not to accept that *loosening* of the appointments authority under the Excepting Clause. The Framers never even considered authorizing *inferior* officers to appoint other inferior officers. And it is evident that they took for granted that Heads of Department would be principal officers—in Madison's words, there were other "Superior" or principal officers "below" the rank of Head of Department.

A handful of judicial statements support an understanding of the Excepting Clause that would preclude inferior officers from appointing other inferior officers. Numerous decisions stress that the Framers sought to prevent "the diffusion of the appointment power." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878 (1991). In *Freytag*, the Supreme Court further observed that the Framers confined the term "Heads of Department" to ensure that those with the appointment power "are subject to the exercise of political oversight and share the President's accountability to the people." *Id.* at 886. Justice Scalia's concurring opinion is to the same effect. He wrote: "Like the President," heads of departments "possess a reputational stake in the quality of the individuals they appoint; and though they are not themselves able to resist congressional encroachment, they are directly answerable to the President, who is responsible to his constituency for their appointments and has the motive and means to assure faithful actions by his direct lieutenants." *Id.* at 907 (Scalia, J., concurring). Although acting department heads

remain direct lieutenants of the President, and are within the President's removal power (at least from the acting post), accountability is nevertheless diminished as the power to determine who will run a department is passed on to inferior officers, including those who were not themselves appointed by the President.

Similarly, the Supreme Court observed in *Printz v. United States* that "[t]he Constitution does not leave to speculation who is to administer the laws enacted by Congress; the President, it says 'shall take Care that the Laws be faithfully executed,' Art. II, § 3, personally and through officers whom he appoints (save for such inferior officers as Congress may authorize to be appointed by the 'Courts of Law' or by 'Heads of Departments' who are themselves Presidential appointees." 521 U.S. 898, 922 (1997). Yet, under the broad reading of 6 U.S.C. § 113(g)(2) that Defendants press, any DHS officer who became Acting Secretary under that provision would then be able to determine who would run one of the most important Departments in the government.

Defendants counter that their broader reading of § 113(g)(2) raises no constitutional concerns at all. Dkt. 69 at 26. For support, they rely almost exclusively on the D.C. Circuit's recent decision in *In re Grand Jury Investigation*, 916 F.3d at 1055–56. That case concerned whether the Deputy Attorney General had authority to appoint a Special Counsel when acting in place of the Attorney General, who was recused from the matter at hand. *Id.* at 1051. In holding that the Deputy Attorney General possessed that power, the D.C. Circuit explained that the Attorney General is the Head of the Department for purposes of the Appointments Clause, but when the Deputy Attorney General acts as the Attorney General, he "becomes the head of the Department . . . because an acting officer is vested with the same authority that could be exercised by the officer for whom he acts." *Id.* at 1055. The appellant countered by arguing that

46

28 U.S.C. § 508, which governs vacancies in the Office of Attorney General, "does not make the Deputy Attorney General an 'acting' officer but only authorizes the Deputy Attorney General to perform the duties of the Attorney General's office and the Attorney General remains the 'Head of Department' for Appointments Clause purposes." *Id*. at 1056. But the D.C. Circuit was unconvinced, holding that "Congress has authorized the Deputy Attorney General to perform 'all the duties of th[e] office' in case of vacancy, . . . such that the Deputy becomes the 'Acting' Attorney General." *Id.* (quoting 28 U.S.C. § 508(a)). "[T]he Acting Attorney General," in turn, "has authority to appoint inferior officers because that is part of the authority that could be exercised by the Attorney General." *Id*.

*In re Grand Jury Investigation* does not answer the question whether inferior officers can appoint other inferior officers because, when the Deputy Attorney General serves as the Acting Attorney General or exercises the authorities of that office, he almost certainly serves as a principal officer. This is because the Deputy Attorney General is appointed by the President with the advice and consent of the Senate and, more importantly, the same statute that establishes the office of Deputy Attorney General entrusts the Deputy Attorney General to perform the duties of the office of the Attorney General in case of a vacancy—even a "vacancy" arising by reason of a "disability." 28 U.S.C. § 508(a). In other words, heading the Department of Justice in the Attorney General's absence is part of the duties of the office of the Deputy Attorney General, and when an individual is nominated and confirmed to serve as Deputy Attorney General, he has been selected for an office that, at least at times, constitutes the senior position in the Department of Justice for which the individual holding that office is answerable to the President alone. *Edmond*, 520 U.S. at 662–63. When serving in that capacity, the Deputy

Attorney General is a principal officer and is, at least arguably, the "Head of the Department" in the constitutional sense.

An analogous inquiry applies when Congress assigns new duties to an existing office, which in some instances threatens to circumvent the Appointments Clause. As the Supreme Court held in *Shoemaker v. United States*, 147 U.S. 282, 300–01 (1893), two requirements must be satisfied for Congress to assign additional duties to an existing office. First, the duties must be assigned to the office and not the officer. *See Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183, 1192 (D.D.C. 1990). Second, the new duties must be "germane to the offices already held" by the officer at issue. *Shoemaker*, 147 U.S. at 301; *see generally Weiss*, 510 U.S. 163 (unanimously holding that PAS military officers may be assigned to serve as military judges). Justice Scalia's concurring opinion in *Weiss* is particularly helpful in considering the question raised here. Justice Scalia wrote:

> Germaneness analysis must be conducted, it seems to me, whenever that is necessary to assure that the conferring of new duties does not violate the Appointments Clause. Violation of the Appointments Clause occurs not only when (as in *Shoemaker*) Congress may be aggrandizing itself (by effectively appropriating the appointment power over the officer exercising the new duties), but also when Congress, without aggrandizing itself, effectively lodges appointment power in any person other than those whom the Constitution specifies. Thus, "germaneness" is relevant whenever Congress gives power to confer new duties to anyone other than the few potential recipients of the appointment power specified in the Appointments Clause—*i.e.*, the President, the Courts of Law, and Heads of Departments.

*Id.* at 196 (Scalia, J., concurring in part and concurring in the judgment). That reasoning extends to the present context.[4]

---

[4]  Rejecting Justice Scalia's view, the *Weiss* majority concluded that military judges were constitutionally authorized to serve by virtue of their appointment as commissioned officers of the Armed Forces. 510 U.S. at 172–76. That conclusion is inapposite here, however, because the Supreme Court relied on the unique nature of the military, including the court's conclusion that the military "remains a 'specialized society separate from civilian society,'" in which "all

To start, the Department is an exceptionally large and diverse federal agency that comprises USCIS, the U.S. Coast Guard, U.S. Customs and Border Protection, the Cybersecurity and Infrastructure Security Agency, FEMA, the Federal Law Enforcement Training Center, U.S. Immigration and Customs Enforcement, the U.S. Secret Service, the Transportation Security Administration, and multiple directorates and offices, which combined employ more than 240,000 people.  *See* About DHS (last updated July 5, 2019), https://www.dhs.gov/about-dhs; U.S. Department of Homeland Security, https://www.dhs.gov/sites/default/files/publications/19_1205_dhs-organizational-chart.pdf. These varied agencies have different missions, subject areas, and jurisdictions; it is likely that many "officers" serving in the Department were not presidentially appointed and Senate confirmed; and it borders on the inconceivable that Congress envisioned that the duties of each of these diverse offices would include serving as the "Head of Department," even on a temporary basis.  Most importantly, if each "officer" serving in any of those offices and agencies were subject to designation as the Acting Secretary—and, if each of those individuals could then, in turn, set a new order of succession, effectively designating the next Acting Secretary—the "few potential recipients of the appointment power specified in the Appointments Clause" would arguably expand beyond constitutional limits.  *Weiss*, 510 U.S. at 196 (Scalia, J., concurring). The reason Congress can vest authority to make appointments of inferior officers in the Deputy Attorney General or, by the same reasoning, the Deputy Secretary, is that the authority to assume the role as "Head of Department" is inherent in the job for which they were constitutionally

---

military officers, consistent with a long tradition, play a role in the operation of the military justice system."  520 U.S. at 174–75 (quoting *Parker v. Levy*, 417 U.S. 733, 743 (1974)).  Nor did the Supreme Court face the question in that case of whether the Appointments Clause permits inferior officers to act as "Heads of Department" in filling the most senior positions in government, even on a temporary basis.

appointed.  That theory, however, would (at least arguably) stretch to the breaking point if

extended, as Defendants urge, to any of the dozens of individuals serving as "officers" at DHS.

The D.C. Circuit's reasoning in *In re Grand Jury Investigation* thus does not dictate the

result here; the Deputy Attorney General is differently situated than the many inferior officers

Defendants would permit to appoint not just inferior officers but the individual charged with

heading the Department.  Nor do the other cases cited by the Court in *In re Grand Jury

Investigation* and by Defendants in their briefs stand for the proposition that inferior officers may

appoint other inferior officers.  To be sure, in the two Supreme Court cases cited in *In re Grand

Jury Investigation*, both from 1890—*Ryan v. United States*, 136 U.S. 68, 81 (1890), and *Keyser

v. Hitz*, 133 U.S. 138, 145–46 (1890)—the Court observed that acting officials may exercise all

the powers of the office in which they are serving.  But both cases dealt with statutes that

permitted only an officer's first assistant to act in his place, and the governing statutes in both

cases expressly empowered the acting official to "perform the duties" of the office.  Thus, in *In

re Grand Jury*, *Ryan*, and *Keyser*, Congress *expressly* vested the first assistants at issue with the

authority to exercise the duties and functions of the vacant office, just as Congress has done for

those acting officers, including the DHS Deputy Secretary, who are serving pursuant to the

FVRA.  That is a much different statutory context than a provision that allows the DHS

"Secretary" to "designate such other officers of the Department" as she deems appropriate "to

serve as Acting Secretary"—without any elaboration about what duties come with that

designation or whether any statutory distinction exists between the "Secretary" and the "Acting

Secretary."

The fact that McAleenan, Wolf, and Gaynor all ascended to the post of Acting Secretary

from their own PAS positions is irrelevant.  In interpreting the statute, the Court must consider

whether any application of the provision as interpreted by Defendants would raise constitutional concern, not whether a different statute whose scope was limited to only the facts of this case would raise the same concerns. *See Clark v. Martinez*, 543 U.S. 371, 380–81 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court."). The fact that McAleenan, Wolf, and Gaynor were all appointed by the President and confirmed by the Senate (to posts below that of Secretary or Deputy Secretary), is happenstance for purposes of Defendants' reading of § 113(g)(2).

That said, a simple textual argument supports Defendants' position that inferior officers who are serving as the head of their department may appoint other inferior officers. In the most literal of terms, one can argue that such an official is, for all intents and purposes, the "Head of Department." *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd*., 561 U.S. 477, 513 (2010) (quoting the Classification Act of 1923, which provides that "the head of the department" means "the officer or group of officers . . . who are not subordinate or responsible to any other officer of the department"). But it seems implausible that the Framers understood the term "Heads of Department" to include inferior officers, as Madison's failed argument in opposition to the Excepting Clause suggests.

For present purposes, however, the Court need not resolve this difficult constitutional question. As explained above, based on the text, structure, and purpose of the statute, the Court reads § 113(g)(2) as vesting in only the PAS Secretary the authority to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2). And that reading has the additional benefit of avoiding any constitutional

concerns.  *See Nielsen v. Preap,* 139 S. Ct. 954, 971 (2019); *Jennings v. Rodriguez,* 138 S. Ct.
830, 842 (2018); *Bond v. United States*, 572 U.S. 844, 857–58 (2014); *Nw. Austin Mun. Util.
Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009).  The Court does not employ the
constitutional avoidance canon lightly.  A court may not manufacture an ambiguity merely for
the purposes of invoking the canon, nor may it avoid what is, upon thorough scrutiny, anything
less than a serious and previously unanswered constitutional quandary.  But here, where avoiding
a serious, unaddressed constitutional problem merely confirms the Court's reading of the
statutory text, the canon fits.  The Court therefore concludes that "Secretary" in § 113(g)(2) does
not include an Acting Secretary, but instead means the PAS Secretary and only the PAS
Secretary.  *Id*.

   This conclusion has an important implication for Plaintiffs' likelihood of success in their
challenge to the validity of the Proposed and Final Rules.  In Section II.B.1.a above, the Court
concluded that Wolf's ratification of those rules was likely effective.  But Wolf (or, more
precisely, the office that he held) was initially designated to serve as Acting Secretary by
McAleenan and was later redesignated as Acting Secretary by Gaynor.  Both McAleenan and
Gaynor were serving in an acting capacity when they made those designations.  Because the
Court holds that an Acting Secretary may not amend the Department's order of succession
under § 113(g)(2), neither appointment of Wolf was effective.  Moreover, because Gaynor could
not amend the order of succession to put Wolf next in line, Wolf acted without authority when he
approved the Final Rule and when he attempted to ratify the Proposed Rule and the Final Rule.
As such, in the absence of valid ratification, both actions were "not in accordance with law" and
"in excess of . . . authority" under the APA.  5 U.S.C. § 706(2).  Plaintiffs are therefore likely to
succeed on the merits of their claim that the Rule was adopted without lawful authority.

2.      *APA Claims*

Plaintiffs also raise a host of claims under the APA.  Some of these claims assert that the Rule is arbitrary and capricious, Dkt. 50 at 38–49, while others assert that DHS failed to provide adequate notice and comment, *id.* at 33–37.  Because the Court concludes that Plaintiffs are likely to prevail on the first set of these APA claims, the Court will address only those claims and will leave Plaintiffs' remaining APA claims for another day.

Plaintiffs argue that the Final Rule is arbitrary and capricious for a multitude of reasons, most of which turn, at least in part, on DHS's alleged failure to consider adequately and to explain how, if at all, the fee increases and reduced fee waivers will affect demand for important immigration benefits.  That failure, in Plaintiffs' view, prevented DHS from making meaningful estimates about how much revenue the new fees would likely raise (*i.e.*, the Department considered price but not demand) and prevented it from grappling with the significant consequences that the Rule will have on the provision of immigration benefits (*i.e.*, the Department failed to consider the human consequences of raising the price for important benefits, like asylum, naturalization, suspension of removal, and work authorization).  To make matters worse, Plaintiffs continue, DHS failed to address its prior conclusions regarding the likely effect that large fee increases would have on the ability of the Department to serve low-income populations, failed to consider studies submitted by commenters, and made a series of conflicting pronouncements about the elasticity of demand for immigration benefits.  Overall, Plaintiffs contend that the Rule offered nothing more than conclusory and conflicting assertions in response to comments challenging the core assumptions and consequences of the Rule.

Defendants disagree with each of these contentions.  They argue that DHS reasonably concluded that the fee increases were necessary to cover the costs incurred by USCIS in

providing immigration benefits; reasonably concluded that a "beneficiary-pays" model is more equitable than an "ability-to-pay" model; and reasonably determined that even low-income beneficiaries who do not qualify for a fee waiver will find a way to pay for the uniquely attractive benefits accorded to qualified immigrants. For the reasons explained below, the Court concludes that Plaintiffs have the better of the arguments.

The APA "requires agencies to engage in reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quotation omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). An agency must also "reasonably reflect upon the information contained in the record and grapple with contrary evidence," *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017), and, if the rule departs from the agency's previous position, the agency must explain why it does so, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). The agency need not demonstrate that the new rule is "better," but it must offer "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* To be sure, the "scope of review under the 'arbitrary and capricious' standard is narrow[,] and a court is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983), but the agency must reach its judgment—whatever it may be—by considering the relevant material and making a reasoned decision.

"[R]easonable regulation," according to the Supreme Court, "ordinarily requires paying attention to the advantages and the disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015). This consideration goes beyond analyzing costs of compliance or revenue

directly generated by a regulation and extends to "any disadvantage" associated with an agency

rule.  *Id.* at 752.  Plaintiffs and Defendants seem to agree that one such "cost" or "disadvantage"

of the Final Rule that DHS was required to consider was whether—and, if so, to what extent—

the Rule would interfere with the ability of low-income applicants to obtain the covered benefits.

And, relatedly, all seem to agree that DHS could only rationally assess the fee generating

capacity of the Rule by making informed judgments about the likely effect of the rule on demand

for the covered benefits.  The parties disagree, however, about whether DHS adequately

considered whether and how the Rule would affect the accessibility and demand for immigration

benefits among low-income individuals.

Although Plaintiffs contend that their criticisms of the Rule "cut across the entire rule,"

Dkt. 77 at 18, they focus on the most substantial fee increases for some of the most important

immigration benefits.  To start, Plaintiffs note that the Rule "nearly doubles the naturalization fee

(to $1,170 for a paper filing) and eliminates the reduced fee option."  Dkt. 50 at 20.  The Rule

also "imposes non-waivable charges on asylum seekers for applications that never previously

had a fee: a $50 application fee, plus a $550 application and a $30 biometrics fee for a first

employment authorization application."  *Id.*

The following table reflects the changes for each of these services over the past several fee revisions:

| Application description | Oct. 2005 | July 2007 | Nov. 2010 | Dec. 2016 | Aug. 2020 |
|---|---|---|---|---|---|
| N-400 Application for Naturalization Paper Filing | $330 | $595 | $595 | $640; reduced fee of $320 available | $1,170 |
| I-589 Application for asylum and for withholding of removal | 0 | 0 | 0 | 0 | $50 |
| I-765 Application for Employment Authorization | $180 | $340 | $380 | $410; 0 for asylum seekers | $550 |
| Biometric Services (Non-DACA) | $70 | $80 | $85 | $85; 0 for asylum seekers | $30 |

Final Rule, 85 Fed. Reg. at 46,791–92; Dkt. 74-1 at 53–55.  For present purposes, the Court focuses on the first four of these fees.

a.    Naturalization Fees

As the table reflects, the Final Rule almost doubles the fee to apply for naturalization for those who previously paid full price and almost triples the cost for applicants who previously qualified for a reduced fee.  "In crafting prior fee rules, DHS reasoned that setting the Form N-400 fee at an amount less than its estimated costs and shifting those costs to other fee payers was appropriate in order to promote naturalization and immigrant integration."  Proposed Rule, 84 Fed. Reg. at 62,316.  Finding that this cost shifting was "not equitable," DHS adjusted naturalization fees to "recover the full cost" of naturalization adjudication "as well as a proportion of costs not recovered by other forms for which fees are limited or must be offered a waiver by statute."  *Id.*

DHS received numerous comments on this issue. *See, e.g.*, Dkt. 78-1. Commenters pointed to data showing that naturalization fees discourage immigrants from applying and posited that the substantial increase in the Form N-400 fee would "act as a barrier to immigrants with middle or lower class income," causing hardships to immigrants and potentially frustrating the Rule's stated goal of improving USCIS's finances. Final Rule, 85 Fed. Reg. at 46,857. Because lawful residents can opt to renew their green cards at a lower cost than applying for naturalization, commenters explained, immigrants are especially price sensitive to naturalization fees. Dkt. 78-1 at 57. Those immigrants who choose to renew their green cards retain some benefits, like "the right to work legally, but forego the full privileges associated with becoming citizens." *Id.* Several commenters, moreover, backed up their concerns with empirics.

The comments offered by Project Citizenship reflect the type of detailed evidence presented to DHS regarding the elasticity of demand among low-income applicants for naturalization. Project Citizenship first explained that the Proposed Rule would "increase the application fee for the N-400 naturalization form by about 83% from $640 to $1,170" and that, "[t]o add insult to injury, the Proposed Rule [would] completely eliminate fee waivers and reduced fees for citizenship applications." Dkt. 78-1 at 55. This "fee hike" and the "elimination of fee waiver and reduced fee programs" would, in Project Citizenship's view, "price many individuals out of citizenship and [would] create a *de facto* wealth requirement." *Id.* To back this up, Project Citizenship pointed to the following evidence:

> [I]n one survey, about 18% of Latino lawful permanent residents cited financial and administrative barriers as one of the main reasons they had not naturalized. *See* Ana Gonzalez-Barrera *et al.*, *The Path Not Taken: Two-Thirds of Legal Mexican Immigrants Are Not U.S. Citizens*, Pew Research Center, 6 (Feb. 4, 2013), http://www.pewhispanic.org/2013/02/04/the-path-not-taken/. The survey further showed that "Hispanic immigrants who have not yet naturalized say they 'would' naturalize if they could." *Id.* Research has also shown that increases in application fees for naturalization have significantly impacted the

composition of the population that naturalizes.  For instance, an analysis of naturalization data demonstrated that "the price increases for naturalization in 2004 and 2007 are a significant barrier to citizenship for less educated and lower income immigrants" and that "the decision by an immigrant to naturalize is price sensitive, especially in relation to the less risky and less expensive alternative— renewing one's Green Card."  Pastor *et al.*, *Nurturing Naturalization: Could Lowering the Fee Help?*[,] The National Partnership for New Americans, 17 (February                                                                          2013), http://dornsife.usc.edu/assets/sites/731/docs/Nuturing_Naturalization_final_we b.pdf ("Pastor").

. . . .

A recent Stanford study found that higher application fees prevent a substantial portion of low-income immigrants who wish to naturalize from applying for citizenship.  See Hainmueller *et al*, *A Randomized Controlled Design Reveals Barriers to Citizenship for Low-Income Immigrants*, 115(5) PNAS USA 939 (2018).  The study tested two programmatic interventions among low-income immigrants eligible for citizenship: (i) vouchers that cover the cost of the application fee; and (ii) a set of behavior nudges, similar to existing interventions used by immigrant service providers.  The results showed that "offering the fee voucher increased naturalization application rates by about 41%, suggesting that application fees act as a barrier for low-income immigrants who want to become US citizens" and that "the financial barrier is a real and binding constraint."  *Id.* at 939, 941.

Another recent study assessing policy interventions to increase naturalization rates found that the introduction and standardization of a fee waiver form by USCIS (Form I-912) had the highest positive effect on naturalization by lawful permanent residents ("LPRs") with lower incomes, lower English-language skills, and lower education levels.  See Yasenov *et al*, *Standardizing the Fee-Waiver Application Increased Naturalization Rates of Low-Income Immigrants*, 116(534) PNAS USA 16768 (2019) ("Yasenov").  The results thus demonstrated that "difficulties accessing the fee waiver are barriers to citizenship for low-income LPRs."  *Id*. at 16772.

. . . .

Studies have shown that changes in naturalization rates correlate with changes in naturalization application fees.  For example, in 1970, 64% of legal foreign-born residents had become citizens while in 2011, only 56% had become citizens.  The application fee has increased from $35 (or $80.25 in 2017 dollars) in 1985 to $725 in 2017. . . .  Another report showed that although the across-the-board 1999 fee increases did not cause significant change in other USCIS applications, there was a significant drop in N-400 applications.  *See* Pastor at 6-7.  Furthermore in 2007, when the N-400 fee increased from $330 to $595, a

> surge to about 1.4 million naturalization applications preceded the fee hike,
> followed by a sharp decline to about 500,000 applications in 2008. *Id*. at 7.

Dkt. 78-1 at 56–58.

DHS's response to this and similar comments, *see, e.g.*, *id.* at 70–71, 133–37, 159, is both inconsistent and inadequate. The Department asserts, for example, that it "does not know the price elasticity of demand for immigration benefits, nor does [it] know the level at which the fee increases become too high for applicants/petitioners to apply." Final Rule, 85 Fed. Reg. at 46,797. But, notwithstanding the Department's admitted dearth of knowledge, it goes on to assert that it "disagrees that the fees will result in the negative effects the commenters suggested" because it "believes that immigration to the United States remains attractive to millions of individuals around the world and that its benefits continue to outweigh the costs noted by the commenters." *Id.* And, again, with no analysis or response to the cited studies, the Department asserts that it "believes" that "the price elasticity for immigration services is inelastic and increases in price will have *no impact* on the demand for these services" and that "[t]his is true for *all* immigration services impacted by this rule." *Id.* (emphasis added). In addition, despite studies referenced in the administrative record showing that "fee increases have a disparate racial impact," Dkt. 78-1 at 70, and without any meaningful analysis, DHS rejected the contention that the Proposed Rule would have "any . . . discriminatory . . . effect." Final Rule, 85 Fed. Reg. at 46,797. Finally, without acknowledging its prior assertion that the price increases (and reduced waivers) will have "no impact on the demand" for any of the "immigration services" at issue, *id.*, DHS acknowledges in a later passage of the Final Rule that "the increase[d price] for the naturalization application may affect those applying," only to then return to the premise that "most individuals will continue to value American citizenship, even if it is more expensive to naturalize," *id*. at 46,857–58.

The only empirical response DHS offers pales in comparison to the studies cited in the public comments. It asserts: "DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 (e.g., N-400 filings volumes grew from less than 600,000 in FY 2009 to approximately 750,000 in FY 2011; similarly, N-400 filing volumes grew from less than 800,000 in FY 2015 to nearly 1 million FY 2017)." *Id.* at 46,799–800. It is difficult to know what to make of this assertion, however, because the Department offers data only with respect to N-400 filings, and that data fails to address any period of time when a significant across-the-board increase in the cost of applying for naturalization occurred—much less an increase approaching the magnitude of the increase at issue here. Commenters referenced a study finding that naturalization applications decreased after the substantial N-400 fee hike in 2007, Dkt. 78-1 at 58, but the Department does not compare pre-2007 and post-2007 N-400 filing rates. Instead, it points to the increase in applications from FY 2009 to FY 2011, but, as shown in the table above, it appears that the fee remained stable during this time period; it was $595 in July 2007 and remained at that rate when prices were adjusted in November 2010. And, although the fee for applying for naturalization increased between 2015 and 2017, the price increase was only $45 and, more importantly, USCIS simultaneously introduced the reduced fee of $320 for certain low-income applicants. But, even beyond these unexplained shortcomings, the Department's single sentence comparing application rates fails to control for any other variables and, in the face of the studies offered by the commenters, falls far short of DHS's obligation to "grapple with contrary evidence." *Fred Meyer Stores*, 865 F.3d at 638.

Beyond the Department's anemic reliance on historical application rates, it offers nothing of substance to rebut or to "grapple with" the evidence that an 83% price hike, accompanied with the abandonment of fee waivers and reduced fees for low-income applicants, will dissuade a

significant number of low-income applicants from applying to naturalize.  The Department

repeatedly acknowledges the concern but remains unconvinced that it is likely to materialize.

Courts, however, "do not defer to [an] agency's conclusory or unsupported suppositions."

*NetCoalition v. SEC*, 615 F.3d 525, 539 (D.C. Cir. 2010) (quoting *McDonnell Douglas Corp. v.

Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)), *superseded by statute*, Dodd-

Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376

(2010); *United Techs. Corp. v. DOD*, 601 F.3d 557, 562 (D.C. Cir. 2010) (same).  To be sure,

agencies need not accept uncritically any evidence submitted in comments during rulemaking,

but they must provide reasons for disregarding the evidence, especially when the contrary

evidence is substantial. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018)

("Conclusory explanations for matters involving a central factual dispute where there is

considerable evidence in conflict do not suffice to meet the deferential standards of our review."

(citation omitted)); *Int'l Union, United Mine Workers of Am. v. Mine Safety and Health Admin.*,

626 F.3d 84, 87, 93–94 (D.C. Cir. 2010) (An agency's unexplained reliance on its own

"knowledge and expertise" is "inadequate when expert evidence in the rulemaking record" runs

contrary to the agency's decision).

     The Final Rule also fails to address the Department's prior, conflicting conclusions

regarding the potential impact of large fees on low-income applicants.  In 2010, for example,

DHS declined to raise the fee for naturalization based on "the importance of immigrant

integration" and the interest in "promot[ing] citizenship."  2010 Rule, 75 Fed. Reg. at 58,975.

Similarly, in 2016, DHS limited the increase in the Form N-400 fee to 8% and provided a

reduced fee of $320 for applicants with family incomes greater than 150% of the FPG (those

with incomes below that level were entitled to a fee waiver) but no more than 200% of the FPG

"to help ensure that those who have worked hard to become eligible for naturalization are not limited by their economic means."  2016 Rule, 81 Fed. Reg. at 73,296–97.  On both occasions, DHS acted based on the premise that large fee increases would pose an obstacle to naturalization for low-income families.  Yet, in the 2020 Final Rule, DHS adopted the opposite premise and posited that "increases in price will have no impact on the demand for these services."  Final Rule, 85 Fed. Reg. at 46,797.  Agencies are, of course, allowed to change their views over time. But when doing so they must offer a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by prior policy."  *Fox*, 556 U.S. at 515–16. Here, however, DHS shifted from its prior "aware[ness] of the potential impact of fee increases on low-income individuals," 2016 Rule, 81 Fed. Reg. at 73,297, to a belief that "increases in price will have no impact on the demand for . . . services," Final Rule, 85 Fed. Reg. at 46,797, without explanation.  Such an unexplained change is unlikely to withstand APA scrutiny.

Finally, even if DHS had recognized that an 83% fee increase, along with unavailability of fee waivers or reduced fees, might prevent certain low-income immigrants from applying for naturalization, the Rule would still fail APA requirements because DHS never considered the hardship that the Rule might impose on those individuals.  *See Michigan*, 576 U.S. at 753. Although DHS did recite several of the hardships outlined by commenters, *see*, *e.g.*, Final Rule, 85 Fed. Reg. at 46,859–60, it dismissed these concerns by merely repeating the unsupported "belie[f]" that the price increase would not deter applicants.  A mere recitation of significant comments followed by a conclusory statement "is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020).  Confronted with calls to "account for the harm posed by increased naturalization fees such as reduced wages, broken families, and increased vulnerability to domestic violence," Final Rule, 85 Fed. Reg. at 46,881, DHS did

"acknowledge that some individuals will need to save, borrow, or use a credit card in order to pay fees," *id.* at 46,797, but it failed to consider that burden in weighing the costs and benefits of the Rule and failed to consider the impact the Rule would have on those unable to borrow the necessary funds.  Instead, without analysis or support, it merely "disagree[d] that the fees will result in the negative effects" suggested by comments.  *Id.* at 46,881.

  b. <u>Asylum Fees</u>

  The Final Rule also makes significant changes with respect to those seeking asylum.  For the first time, asylum seekers must pay to apply.  When filing an application for asylum and withholding of removal, asylum seekers must now pay a non-waivable $50 fee, an amount that does not recover costs but will "generate some revenue to offset costs."  *Id.* at 46,844.  In addition, the Final Rule requires asylum seekers to pay a $550 employment authorization fee and a $30 biometrics fee.  *Id.* at 46,833, 46,852.

  In proposing the $50 fee, DHS explained that it chose the amount because it would "not be so high as to be unaffordable to even an indigent alien."  Proposed Rule, 84 Fed. Reg. at 62,320.  Commenters, however, offered reasons to doubt that assumption.  Among other things, the comments noted that "[a]sylum seekers in detention . . . earn at most $1 a day;" some asylum seekers "need to quickly flee situations of peril" and might not have the opportunity to save; and "[a]sylum seekers are often minors with no means to support themselves and therefore cannot afford an asylum fee."  Final Rule, 85 Fed. Reg. at 46,845.  In response, the Department observed that the Rule exempts "unaccompanied alien children in removal proceedings" from the $50 fee, but otherwise simply stated that "DHS considered the effect of the fees on asylum seekers and believe[d] the fees would not impose an unreasonable burden on applicants or prevent asylum seekers from seeking protection."  *Id.*; *see also id.* at 46,850 ("DHS believes the

minimal fee of $50 is not unreasonably burdensome and does not prevent legitimate asylum seekers from submitting asylum applications.").  In response to a comment that the Department did not consider the cost to families and communities that must help cover asylum seekers' fees, DHS acknowledged that it "did not consider [these] costs" and "recognize[d] that these families and communities will have to find a way to pay, whether through their communities, friends, loans, or credit cards," but moved on without further discussion.  *Id.* at 46,881–82.  The agency then stated that it could not "accurately or reliably predict how many applicants would no longer apply for asylum as [a] result of the $50 fee," seemingly contradicting its assertions elsewhere in the Final Rule that the fee would have no deterring effect.  *Id.* at 46,882.  None of these responses deal in a meaningful way with the comments regarding the very limited means of certain asylum seekers and possible effect of even a $50 fee on the availability of an important immigration benefit.  To be sure, DHS also stresses the role the $50 fee will play in "generating some revenue to offset [the] costs" of the Department's "growing affirmative asylum workload" and the strain that those costs are placing "on the administration of other immigration benefit requests."  *Id.* at 46,850.  But that rationale stands apart from the Department's assurances that the increased fee will be "affordable" for even indigent asylum seekers and that it will not "prevent legitimate asylum seekers from submitting asylum applications."  *Id.*  To the extent DHS premised its decision on that empirical judgment, as the Final Rule asserts, the Department was required to explain why the conflicting comments were wrong.

Commenters also criticized "the change to charge asylum applicants [a $550 fee] for their first Form I-765, Application for Employment Authorization."  *Id.* at 46,851.  As those commenters explained, "[a]sylum seekers have historically not been charged for their initial EAD [employment authorization document] because their flight from their country of origin

leaves them in dire financial situations, and they often lack family support in the United States to assist them." *Id.* According to commenters, this creates a conflict for asylum seekers, who "cannot work to pay their asylum fees," leading some "people to work illegally." *Id.* at 46,852. In response, DHS noted that asylum applicants are not permitted to receive work "authorization before 180 days have passed since the filing of his or her asylum application" and that, as a result, they are "unlikely to come to the United States expecting to be authorized to work immediately" and must, instead, "rely on their own means, as well as family or community support to economically sustain themselves in the United States during the period of time that they are not employment authorized." *Id.* Presumably based on this assessment, the Department further concluded that it "does not believe the . . . fee is unduly burdensome." *Id.*; *see also id.* at 46,853. Again, the Department's consideration of the issue is based on speculation regarding applicants' ability to pay.

Commenters also raised concerns that the $550 fee would put asylum seekers (and particularly women) at risk of "hunger, abuse, homelessness, trafficking, and other coercive employment practices." *Id.* The Court does not doubt that DHS had the discretion to adopt the $550 fee despite these risks. But that is not what the Department claimed to do; rather, it said that "DHS does not believe that this final rule hinders or prevents asylum seekers from applying for employment authorization." *Id.* And that assertion is, once again, unsupported by any data or meaningful analysis.

DHS also added a $30 biometric services fee for asylum seekers applying for employment authorization. *Id.* at 46,833; Dkt. 50 at 37; Dkt. 69 at 37. Although the parties spar over whether Plaintiffs had adequate notice with respect to this particular fee, which was not treated as a standalone fee until the Final Rule was promulgated, the Court need not decide this

issue because, in any event, the comments provided with respect to the $50 and $550 fees for asylum seekers alerted DHS to the risk that an additional $30 fee for employment authorization could further burden applicants or drive them to work illegally.  For the reasons discussed above, DHS failed to grapple with the burden this and the other fees will impose on asylum seekers, relying instead on the unsupported assumption that the fees would not "hinder[] or prevent[] asylum seekers from applying for employment authorization."  Final Rule, 85 Fed. Reg.. at 46,853.

*   *   *

Defendants make several cross-cutting arguments, none of which undercuts Plaintiffs' showing that DHS failed to grapple with the effect these fee increases would have on demand for the covered services, how decreased demand would affect the Department's fiscal analysis, or the extent to which the fee increases would impose barriers to obtaining the benefits at issue or would impose other hardships on the applicants and their families.

First, Defendants maintain that DHS's thoroughly explained philosophical shift from an "ability-to-pay" to a "beneficiary-pays" model was a rough proxy for the policy considerations that Plaintiffs contend the Department ignored.  They reiterate that DHS found "requiring fee-paying applicants to subsidize other immigrants' fees" to be inequitable, that this finding constituted "consider[ation of] the equities of its fee system," and that therefore DHS adequately considered harms to applicants unable to pay for fees.  Dkt. 69 at 49.  Had DHS said as much in the rulemaking, that might have sufficed.  But although the Department trumpeted the fairness of the "beneficiary-pays" model, Final Rule, 85 Fed. Reg. at 46,795, it never wrestled with the downsides of that model and, indeed, acted on the unsupported assumption that the "increases in price will have *no* impact on the demand for the[] services" at issue, *id.* at 46,797 (emphasis

added).  To be sure, DHS does, at times, "acknowledge[] that the changes in the fee waiver

provisions may impose a burden on applicants," *id.* at 46,807, but, when it does so, the

Department fails to go beyond that bare acknowledgement, offers a conclusory response with

little or no analysis, *see*, *e.g.*, *id.* (noting that USCIS "accepts credit cards" while recognizing

"that the use of a credit card may add interest expenses to the fee payment"), or maintains that

the price increases, although burdensome, will not affect availability of the services at issue, *id.*

at 46,799.  Most notably, Defendants do not point to any instance in the record in which the

Department meaningfully addressed the hardships that applicants would face from the significant

price increases.  In each instance, DHS "[n]od[s] to concerns raised . . . only to dismiss them in a

conclusory manner."[5]  *Gresham*, 950 F.3d at 103.

     Nor is the Court persuaded that DHS adequately addressed the issues Plaintiffs raise by

noting that it reviews its fees biennially and, accordingly, "can readjust the fees in its next fee

---

[5]  Defendants identify a handful of places in the Final Rule where DHS ostensibly considered
whether increased fees would deter applicants.  Dkt. 69 at 40.  None changes this result.  One
reference, for example, merely reflects the Department's conclusion that certain vulnerable
groups would still apply for benefits because they would fall into the narrow fee waiver
exception preserved in the Final Rule.  *See* Final Rule, 85 Fed. Reg. at 46,815 (stating that "DHS
believes that . . . the final rule will not unduly burden" certain vulnerable populations because
they can still apply for a narrower set of fee waivers).  Several other references speak to DHS's
*intent*—specifically, that DHS does not intend the Final Rule to decrease application volume—
but says nothing about the potential burdens placed on applicants by new fees.  *See id.* at 46,795
(stating that the agency is increasing fees to meet costs and has no "intent to deter requests from
low-income immigrants"); 46,803 ("In adjusting the fees, DHS is not imposing a 'wealth test.'");
46,860 ("DHS wants every person eligible to apply for naturalization to submit an application.");
46,884  ("This rule in no way is intended to reduce, limit, or preclude any specific immigration
benefit request . . .. While studies indicate that some lawful immigrants who have not naturalized
cite administrative and financial barriers as a reason for not naturalizing, this alone does not
establish that previous fee levels were prohibitive."); 46,886 (disclaiming deterrence of low-
income immigrants as the Rule's purpose, but acknowledging that immigrants will consider
earnings and cost when deciding whether to apply for benefits).  The fact that the Department
does not intend to affect application volume, however, if anything, casts a further cloud over its
failure to consider whether the Rule will, in fact, do so.

rulemaking . . . if necessary." Final Rule, 85 Fed. Reg. at 46,885. Although biennial review might justify some judicial leeway when an agency acts in the midst of uncertainty, it does not permit the Court to turn a blind eye to flaws in a rule not promulgated in response to an emergency or unforeseen circumstances, nor does it permit the Court to accept an agency's unsupported assertions regarding the impact the rule will have on interested parties. That is particularly true, moreover, where, as here, the Department is not merely increasing fees to ensure that it can continue to provide necessary services but is, instead, fundamentally altering the model used for over a decade to allocate costs, charging fees to apply for asylum for the first time, and dramatically curtailing the availability of fee waivers and fee reductions for those applicants the Department has previously deemed too poor to pay full freight.

Finally, even if DHS lacked data to make the judgments that the commenters asked of it, this does not inoculate the Rule against challenge. *See id.* at 46,807 (citing a lack of data as support for assuming individuals will be able to pay heightened fees, despite an admitted burden posed by fees); 46,870 (emphasizing the agency's lack of data by stressing that DHS "simply cannot predict all filing changes that will affect actual receipt volumes"). A lack of data makes DHS's conclusions regarding price insensitivity—including the Department's belief that "price elasticity for immigration services is inelastic and [that] increases in price will have no impact on the demand for these services," *id.* at 46,797—more baffling, not less. "[T]he mere fact that the magnitude of [an effect] is *uncertain* is no justification for *disregarding* the effect entirely," *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004) (emphasis in original), and the Department's uncertainty provided good reason for it to consider carefully the studies proffered by the commenters, not to ignore or to reject them.

The Court, accordingly, concludes that Plaintiffs have carried their burden of showing that they are likely to succeed on the merits of their APA challenge.

## C.     Irreparable Injury

Having (twice) cleared the first hurdle for issuance of a preliminary injunction, Plaintiffs must show that they will suffer an irreparable injury if the Rule is allowed to take effect.  To meet this burden, "the harm must be certain and great . . . and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm."  *League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (citation omitted).  Plaintiffs argue that the Final Rule will interfere with their ability to provide essential services to their clients and/or members—in some cases irretrievably so.  Dkt. 50 at 51–52.  Plaintiffs have offered evidence that, if the Rule takes effect, CASA, for example, will "be able to help [only] about 900 members complete the naturalization application process," as "compared to the 1,500 individuals" the organization "helped seek naturalization last year, " and, as a result, many of its members will be unable to vote in time for elections occurring in 2021 and 2022.  Dkt. 50-3 at 12 (Escobar Decl. ¶¶ 38–39).  The Rule will have a similar, immediate effect on NWIRP and Ayuda's ability to serve their clients, Dkt. 50-1 at 4–11 (Barón 2d Decl. ¶¶ 14–27); Dkt. 50-2 at 7–14 (Cooper Decl. ¶¶ 21– 33), including clients who are facing, or will soon face, firm deadlines under the immigration laws, Dkt. 50-1 at 9 (Barón 2d Decl. ¶ 23); Dkt. 50-2 at 12–14 (Cooper Decl. ¶¶ 28, 33)

Defendants do not dispute Plaintiffs' factual showing of irreparable injury and, indeed, do not even address the irreparable injury requirement.  *See* Dkt. 69 at 53 (moving from arguments against Plaintiffs' likelihood of success directly to the balance of equities).  When asked about this at oral argument, counsel observed that, "in the remedies section of [their] brief, [Defendants] note that Plaintiffs have not purported to demonstrate irreparable harm as to certain

aspects of the Rule, and that must be taken into consideration." Dkt. 77 at 81–82. To the extent

that Defendants urge the Court to tailor a preliminary injunction as narrowly as reasonably

possible, their proposition is well taken. But, for purposes of the irreparable injury prong of the

preliminary injunction standard, Defendants have forfeited any objection they might have. *See*

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371,

374 n.1, 379 n.6 (D.C. Cir. 2017) (noting that when parties fail to include an argument in

briefing and only raise it in oral argument, the argument is forfeit). And, in any event, the Court

must accept Plaintiffs' unanswered averments as true. *See Elrod v. Burns*, 427 U.S. 347, 350 n.1

(plurality op.) ("[A]ll . . . uncontroverted affidavits filed in support of [a] motion for a

preliminary injunction are taken as true").

      After briefing and oral argument, Defendants filed a notice highlighting the intervening

order from the United States District Court for the Northern District of California preliminarily

enjoining the Rule, arguing that Plaintiffs will not suffer any irreparable injury "unless and until

a stay of" that order "is entered or the agency prevails on any potential appeal." Dkt. 81 at 2.

Plaintiffs respond that "[o]verlapping injunctions are 'a common outcome of parallel litigation,'"

and the "'existence of another injunction—particularly one in a different circuit that could be

overturned or limited at any time—does not negate' plaintiffs' irreparable harm." Dkt. 82 at 1

(quoting *California v. HHS*, 390 F. Supp. 3d 1061, 1065 (N.D. Cal. 2019)).

      To support their argument, Defendants cite *Washington v. Trump*, No. CI7-0141JLR,

2017 WL 4857088, at *7 (W.D. Wash. Oct. 27, 2017), in which the United States District Court

for the Western District of Washington postponed its consideration of a temporary restraining

order after the United States District Court for the District of Hawaii—a court in the same

circuit—preliminarily enjoined implementation of the regulation at issue, *see Hawaii v. Trump*,

265 F. Supp. 3d 1140 (D. Haw. 2017).  Because "the Hawaii federal district court's injunction

already provide[d] Plaintiff[s] . . . with virtually all the relief they" sought, *Washington*, 2017

WL 4857088, at *6, the Western District of Washington determined that "hardship or inequity

may result to both parties if the court does not pause to consider issues that will be on appeal in

the Ninth Circuit because of the potential for inconsistent rulings and resulting confusion."  *Id.* at

*7 (cleaned up).  In other words, the court exercised its discretion to wait for the input of its own

governing circuit.  By contrast, in *California v. HHS*, the United States District Court for the

Northern District of California considered whether to stay preliminary injunction proceedings in

light of a nationwide injunction from the United States District Court for the Eastern District of

Pennsylvania.  390 F. Supp. 3d at 1064.  The Northern District of California distinguished

*Washington v. Trump* on the ground that, unlike in that case, it was dealing with a preexisting

preliminary injunction that was from "a different circuit that could be overturned or limited at

any time" and thus did "not negate [the Plaintiff's] claim to irreparable harm."  *Id.* at 1066.  The

court added: "[O]verlapping injunctions appear to be a common outcome of parallel litigation,

rather than a reason for the Court to pass on exercising its duty to determine whether litigants are

entitled to relief."  *Id.* at 1065.

The Court is persuaded that the parallel injunction entered in the present dispute does not

remove the risk that Plaintiffs will suffer irreparable injury absent action by this Court.  At least

to date, Defendants have not committed to stand down in the parallel litigation, leaving the

prospect that the injunction in that case could be stayed or set aside by the Ninth Circuit (or the

Supreme Court).  And, because this Court's reasoning does not track that of the Northern District

of California in all respects, and because this Court is governed by the law of a different circuit,

the Court cannot conclude that a stay or decision on the merits from the Ninth Circuit (or the

71

Supreme Court) would resolve this case.  This conclusion, moreover, has a side benefit relating

to nationwide injunctions.  If courts were to conclude, as Defendants suggest, that an order

granting a nationwide, preliminary injunction in one district was sufficient to shut down all other,

similar litigation, the resolution of important questions would be left to a single district court and

to a single circuit, losing the benefit of the "airing of competing views" on difficult issues of

national importance.  *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in

the grant of stay).

      The Court, accordingly, concludes that Plaintiffs have carried their burden of

demonstrating that they will suffer an irreparable injury in the absence of preliminary injunction.

## D.    Balance of Equities

      Plaintiffs present a compelling list of ways that the Final Rule could cause irreparable

harm to low-income immigrants.  "When immigrants are unable to afford immigration fees . . .

[a]n immigrant may have his or her legal status terminated and may become subject to

removal[;] . . . asylum [seekers] may be forced back to countries where they risk persecution;" an

immigrant may be unable to work legally; and an immigrant may lose access to critical benefits

only available to citizens, like Supplemental Security Income, to name a few of the impacts.

Dkt. 50 at 55.  Defendants respond that "[p]reserving the status quo would require USCIS to

continue to forgo millions of dollars of revenue each day, forcing funding cuts, operational

cutbacks, personnel furloughs, and further delays adjudicating the very applications Plaintiffs

claim the Final Rule will deter."  Dkt. 69 at 53–54.

      The Court must consider the balance of harms against the backdrop of its conclusion that

Plaintiffs are likely to prevail on the merits.  Here, having concluded that Plaintiffs are likely to

prevail on their claims that the Rule was issued by officials acting without lawful authority and

was issued in violation of the APA, the Court is persuaded that the public interest weighs in favor of preliminary relief. As the D.C. Circuit has opined, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reo*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

The fact that some immigrants might forego important benefits, some irretrievably, while others might postpone naturalization and citizenship, also weighs strongly in favor of granting a preliminary injunction. At the same time, is it far from clear that Defendants would benefit from a decision that would permit the Rule to take effect, only to be set aside months from now. That type of on-and-off administration of the immigration laws would do little to address the fiscal concerns and need for fiscal planning that Defendants invoke, while it would engender uncertainty, confusion, and unfairness for those subject to the Rule.

The Court, accordingly, concludes that the balance of equities tips in favor of interim relief.

\* \* \*

For the foregoing reasons, the Court concludes that Plaintiffs have demonstrated a substantial likelihood that they will succeed on the merits; that they will suffer irreparable harm if the Final Rule is allowed to take effect; and that the balance of equities weighs in favor of an injunction. The Court will, accordingly, grant Plaintiffs' motion for a preliminary injunction. That, however, leaves the question of the proper scope of the injunction.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it

presents." *Trump v. Internat'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).  "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, . . . but to balance the equities as the litigation moves forward" along with "'the overall public interest.'"  *Id.* (quoting *Winter*, 555 U.S. at 26).

Applied in this unique context, the Court concludes that it should stay the effective date of the Rule in its entirety, as authorized by the APA, *see* 5 U.S.C. § 705 (authorizing courts "to postpone the effective date of an agency action" to prevent "irreparable injury"), with the exception of those fees set by statute.  As the Rule acknowledges, even with the shift from the "ability-to-pay" to the "beneficiary-pays" model, the Rule continues to reflect a comprehensive balance, with some fees set at less than full cost balanced against others set at above full costs. *See*, *e.g*., Final Rule, 85 Fed. Reg. at 46,833, 46,856, 46,858.  The Court thus agrees with Plaintiffs that the Rule's provisions are "'intertwined'" and that enjoining some but not all of the Rule's provisions would "'severely distort' DHS's fiscal program."  Dkt. 74 at 32 (quoting *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019); *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 23 (D.C. Cir. 2001)).  Similarly, even if the Court could discern a way to apply the stay to some but not all applicants—and neither Plaintiffs nor Defendants suggest a way to do so—staying the effective date for only some applicants would frustrate the Department's goal of more equitably allocating costs.  That premise—that all similarly situated applicants should be treated alike—moreover, is consistent with the interest in uniformity in immigration laws.  *Arizona v. United States*, 567 U.S. 387, 394–95 (2012) (quoting U.S. Const. art. I, § 8, cl. 4); *see also* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115, 100 Stat 3359, 3384 (1986) ("[T]he immigration laws of the United States should be enforced vigorously and uniformly.").  Finally, because the Court concludes that Wolf acted

without authority when he approved the Final Rule and later attempted to ratify that action and McAleenan's issuance of the Proposed Rule, the legal infirmity at issue reaches all portions of the Rule.

**CONCLUSION**

The Court, accordingly, will **GRANT** Plaintiffs' motion for a preliminary injunction and will stay the effective date of the Final Rule (except for those fees set by statute) pending resolution of this matter or further order of the Court.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  October 9, 2020